**HONOR LAW GROUP, PLLC**
Benjamin L. Rundall, State Bar No. 031661
James M. Cool, State Bar No. 028023
4450 S. Rural Rd., Suite C-220
Tempe, AZ 85282
(602) 282-0223
Attorney E-mail: rundall@aztrialattorneys.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Frances Salazar, individually, | Case No. CV-19-01188-PHX-SRB (ESW) |
| Plaintiff, | |
| vs. | **SECOND AMENDED COMPLAINT** |
| City of Phoenix, a political subdivision of the state of Arizona; Jeri Williams, Acting Chief of Police for the City of Phoenix Police Department; Joe Yahner, former Chief of Police for the City of Phoenix Police Department; Anthony Armour, a married man; Maricopa County, a political subdivision of the state of Arizona; Bill Montgomery, <u>Former</u> Elected head of the Maricopa County Attorney's Office; <u>Allister Adel, Appointed head of the Maricopa County Attorney's Office</u>; Elizabeth Lake, Prosecutor with the Maricopa County Attorney's Office; Black and White Companies or Entities I-X, and Jane and John Does 1-10, | **CIVIL RIGHTS ACTION (42 U.S.C. § 1983)** **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff, Frances Salazar, through counsel undersigned, for her Complaint against Defendants, alleges as follows:

**JURISDICTION & VENUE**

1. Plaintiff brings this action for violation of her constitutional rights under 42 U.S.C. § 1983 because Defendants violated their well-established duty under *Brady v. Maryland*, to disclose potentially exculpatory information material to her guilt and/or punishment.

2. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, which gives district courts original jurisdiction over civil actions arising under the Constitution, laws, or treaties of the United States, and under 28 U.S.C. § 1343(a), which give district courts jurisdiction over actions to secure civil rights extended by the United States government.

3. The events that gave rise to the Complaint occurred in Maricopa County, Arizona in the District of Arizona. Venue is appropriate in this judicial district under 28 U.S.C. § 1391(b).

**PARTIES**

4. Plaintiff Frances Salazar ("Ms. Salazar") is a resident of Maricopa County, Arizona.

5. Ms. Salazar is 56 years old, a mother of three adult children, and a grandmother.

6. Defendant City of Phoenix ("City"), is a political subdivision of the state of Arizona which acts through its employees, agents, and independent contractors.

7. Defendant Jeri Williams ("Williams") resides or works in Maricopa County, Arizona.

8. At times material hereto, Defendant Williams was the acting Chief of Police for the City of Phoenix Police Department ("PPD") with ultimate authority to control and supervise, and responsibility for, the actions of its officers and agents. Defendant Williams also has the authority and responsibility to establish policies, practices, customs, procedures,

protocols, and training for the PPD. Defendant Williams is named herein in both her official and individual capacities.

9. Defendant Joe Yahner ("Yahner") resided or worked in Maricopa County, Arizona.

10. At times material hereto, Defendant Yahner was the acting Chief of Police for the PPD with ultimate authority to control and supervise, and responsibility for, the actions of its officers and agents. Defendant Yahner also had the authority and responsibility to establish policies, practices, customs, procedures, protocols, and training for the PPD. Defendant Yahner is named herein in both his official and individual capacities.

11. Defendant, Anthony Armour ("Defendant Armour"), resides and works in Maricopa County, Arizona as a police officer with the Phoenix Police Department.

12. At all times alleged herein, Defendant Armour was employed as an officer by the PPD and was acting under the supervision and control of acting police chiefs Yahner and Williams. Defendant Armour is named herein in both his official and individual capacities.

13. Maricopa County is a political subdivision of the state of Arizona that acts through its employees, agents, and independent contractors.

14. Defendant Bill Montgomery ~~is~~ was the elected head of the Maricopa County Attorney's Office ("MCAO") and has the authority and responsibility to establish policies, practices, customs, procedures, protocols, and training for the MCAO. Defendant Montgomery is named herein in both his official and individual capacities.

15. <u>Defendant Allister Adel is the appointed head of the Maricopa County Attorney's Office and has the authority and responsibility to establish policies, practices, customs, procedures, protocols, and training for the MCAO. Defendant Adel is named in her official capacity.</u>

16. Defendant, Elizabeth Lake ("Prosecutor Lake") resides and works in Maricopa County, Arizona as a prosecutor for the Maricopa County Attorney's Office. Ms. Lake is named herein in both her official and individual capacities for actions that gave rise to Plaintiff's harms.

17. Defendants "Black and White Companies or Entities I-X" and "Jane and John Does," are fictitious entities who are properly included as parties to this lawsuit to assert or defend the claims asserted herein, but whose true identities are unknown. Plaintiff will seek to amend this complaint when and if the true identities of such people or entities become known.

## GENERAL FACTUAL ALLEGATIONS

### Background

18. After spending just shy of two years (22 months) in prison for a crime she did not commit, Plaintiff Francis Salazar ("Ms. Salazar") was exonerated and released when *Brady* material untimely disclosed by Defendants cast doubt on statements made by arresting officer Defendant Armour, whose credibility was critical to Ms. Salazar's conviction.

19. The *Brady* material, a Professional Standards Bureau Report (the "Report") initiated by the City of Phoenix Police Department (the "PPD") regarding unprofessional conduct of Officer Amour, sustained findings that Defendant Armour provided false testimony and false information during another unrelated arrest.

20. Although the Report was *Brady* evidence, Defendants did not disclose the Report until 190 days after Ms. Salazar's conviction.

21. Defendants had a non-discretionary duty under *Brady* to turn over the Report to Ms. Salazar.

4

22. Defendants' failure to disclose the report constitutes a *per se* breach of Ms. Salazar's constitutional rights to due process and a fair trial and was the result of Defendants' deliberate indifference and/or reckless disregard.

23. Besides the harm of spending time in prison as an innocent person, the deprivation of Ms. Salazar's rights as a result of Defendants' failure to disclose *Brady* material has caused Ms. Salazar mental anguish, pain and suffering, and the loss of her liberty.

### The Suspicious Arrest of Ms. Salazar

24. On December 31, 2013, around 4:00 AM, Defendant Armour was travelling with another officer in a marked patrol car as a two-man unit in Phoenix, Arizona.

25. While driving, Defendant Armour claimed he observed a gold, four-door car make a right hand turn onto a local street and travel westbound in the opposite direction of their eastbound police cruiser.

26. As the gold vehicle passed by their police cruiser, Defendant Armour, while driving, stuck his head out the driver's window and claims he observed that the gold vehicle did not have a permanent license plate.

27. Even though the patrol cruiser was heading in the opposite direction of the gold vehicle, Defendant Armour later stated he was able to maintain visual contact with the gold vehicle, and observed it turn right even though – at this moment – the gold vehicle would have been four blocks away from Defendant's police cruiser.

28. At this point, Defendant Armour caught up to and began following the gold vehicle.

29. While following the gold vehicle, Defendant Armour alleged to observe the expiration date on the registration of the vehicle had been altered with black marker and that the temporary plate was expired.

5

30. Defendant Armour effectuated a traffic stop of the gold vehicle in the parking lot of an Arizona Federal Credit Union located at 5151 N. 19th Ave., Phoenix, AZ 85015.

31. During the stop, Defendant Armour found the gold vehicle driven by Rodney McCullough and Ms. Salazar as a passenger in the front passenger seat of the gold vehicle.

32. Defendant Armour told Mr. McCullough he stopped the car for a broken tail light.

33. At some point, Defendant Armour conducted a records check on Mr. McCullough and discovered Mr. McCullough's driver license had been suspended.

34. Defendant Armour arrested Mr. McCullough and placed him in the back of his patrol car.

35. Importantly, when Defendant Armour spoke with Mr. McCullough, Mr. McCullough advised Defendant Armour he did not own the gold vehicle, but rather that the vehicle was owned by Antonio Harris.

36. Next, Defendant Armour spoke with Ms. Salazar and asked her if there was anything illegal inside the vehicle.

37. Ms. Salazar told Defendant Armour "there shouldn't be" anything illegal inside the vehicle and identified a brown purse and black wallet in the front passenger seat as belonging to her.

38. After providing this statement to Defendant Armour, Ms. Salazar was placed under arrest.

39. Up to this point in the stop, there was no indication of any drug activity.

40. Defendant Armour conducted a warrantless search of the vehicle and found a glass pipe with a rock of crack cocaine inside it.

41. Defendant Armour confronted Mr. McCullough about the pipe and crack.

42.  Importantly, in Defendant Armour's later written report, the pipe and crack is said to have been found between the front passenger seat and the center console; however, in comments to Mr. McCullough he stated it was located under the front passenger seat.

43.  Defendant Armour told Mr. McCullough "I'm not after you, I'm really after her" referring to Ms. Salazar.

44.  Mr. McCullough denied knowing anything about the pipe or crack when asked by Officer Armour.

45.  Defendant Armour asked Ms. Salazar about the pipe and crack.

46.  In a police report memorializing the stop, Defendant Armour stated "Frances admitted the substance inside the pipe being [sic] crack."

47.  Defendant Armour also wrote: "Frances then tried to recant her statement and claim that someone else must have left the pipe and drugs there, but that she would 'take responsibility for it.'"

48.  Ms. Salazar disputes she gave either of those statements to Defendant Armour and denied (and still denies) the paraphernalia and crack cocaine belonged to her.

49.  Neither of the statements by Ms. Salazar is an admission amounting to possession of paraphernalia or narcotics.

50.  Irrespective, Ms. Salazar was ultimately charged by the Maricopa County Attorney's Office and criminally prosecuted for possession of drug paraphernalia and possession of a narcotic drug, both felonies.

**The Wrongful Prosecution**

51.  On April 9, 2014, Defendant MCAO and Prosecutor Lake filed their initial disclosure statement in Ms. Salazar's criminal case.

52.  This disclosure statement did not include any *Brady* material such as internal investigation or other disciplinary reports concerning or involving Officer Armour.

7

53. On May 21, 2014, defense counsel for Ms. Salazar specifically requested, among other information, all statements of the defendant and any *Brady* material.

54. No *Brady* material was disclosed to Ms. Salazar's criminal defense counsel at this time by Defendants.

55. On April 10, 2015, Ms. Salazar retained new, private defense counsel, Chris Doran ("Attorney Doran") with the law firm DuMond & Doran, PLLC.

56. Despite requests by her previous lawyers, on October 13, 2015, Attorney Doran made his own request to Defendants for any *Brady* material.

57. Defendants did not provide *Brady* material in response to Attorney Doran's request.

58. Nevertheless, on January 29, 2016, Attorney Doran filed a Motion to Suppress evidence in which he discussed inconsistencies with Defendant Armour's statements, disputed Defendant Armour's credibility, and outlined Defendant Armour's propensity for dishonesty.

59. Some of the inconsistencies mentioned included: the reason for the traffic stop (expired tags on a temporary paper license plate or a broken taillight) and the location of the pipe found during the traffic stop (between the center console and the front passenger seat or under the front passenger seat).

60. In part because of these inconsistencies, and Ms. Salazar's steadfast proclamation of innocence, Ms. Salazar's case ultimately went to trial.

**The Trial**

61. On August 10, 2016, Attorney Doran took Ms. Salazar's case to trial.

62. At trial, Defendant Armour testified for the first time Ms. Salazar had admitted to the crack and crack pipe being hers.

8

63. Attorney Doran impeached Defendant Armour's testimony by using previous statements in his police report and prior testimony from a preliminary hearing and suppression hearing during which Defendant Armour had not claimed Ms. Salazar admitted to the crack and crack pipe being hers.

64. Defendant Armour's conflicting testimony at trial became the cornerstone of Attorney Doran's argument to the jury that his testimony was not credible, and that he had a propensity for dishonesty.

65. Attorney Doran also presented the jury with testimony from the owner of the gold vehicle, Antonio Harris, who admitted the crack pipe and crack were his.

66. Despite the testimony of Mr. Harris and the conflicting testimony of Defendant Armour, the jury ultimately found Ms. Salazar guilty on August 17, 2016.

67. On December 5, 2016, Ms. Salazar was sentenced to six years imprisonment.

**The *Brady* Material and Proof of Defendant Armour's Propensity for Dishonesty**

68. On April 27, 2016, allegations against Defendant Armour by the City of Phoenix Police Department (the "PPD"), including that he disobeyed the commands of a superior officer, lied in a police report, and provided false information, were sustained in a report (the "Report") made after an official investigation.

69. The arrest giving rise to those allegations proves Defendant Armour's propensity for dishonesty.

70. On November 4, 2015, Defendant Armour responded to a residential apartment to follow up on a domestic violence call which had occurred five (5) days earlier.

71. When Defendant Armour arrived to the apartment, he was not invited in or given consent to enter the apartment by a female resident.

72. Despite the female resident's objections to Officer Armour's entrance, Defendant Armour entered the apartment anyway and began searching the apartment.

9

73. When Defendant Armour reached the back bedroom of the residential apartment, the female resident put herself between the door of the back bedroom and Defendant Armour and told him to leave.

74. Defendant Armour again ignored her requests for him to leave, pushed her aside by physically grabbing her left arm and pulling her away from the door, and entered the back bedroom of the residential apartment.

75. In the back bedroom of the apartment Defendant Armour arrested a male resident.

76. After arresting the male resident, Defendant Armour next arrested the female resident for hindering prosecution.

77. Defendant Armour next reviewed the details of the incident and arrests with his commanding officer, Sergeant Garcia.

78. When asked by Sergeant Garcia what happened, Defendant Armour falsely told Sergeant Garcia another officer, Officer Naegali, had seen the male resident through the apartment's window, which prompted him to search the residence.

79. Officer Naegali never told Defendant Armour he had seen the male resident through the apartment's window, and in fact had explicitly told Defendant Armour that he did not know what the male resident looked like and had not seen a male resident through the window.

80. Officer Armour's statement to Sergeant Garcia about another officer seeing a male resident through the window was a lie.

81. Defendant Armour knew or should have known a Phoenix Police Officer may not enter a private residence in pursuit of a misdemeanor suspect without a warrant to search the premises.

82. Defendant Armour lied to Sergeant Garcia in order to bolster his claim of probable cause to enter the apartment and conceal his wrongdoing and violations of PPD's policies.

83. Upon review of the incident, Sergeant Garcia instructed Defendant Armour to release the female resident from custody and return her to her residence.

84. Defendant Armour told Sergeant Garcia he would not book the female resident.

85. Defendant Armour next stood by Central Booking and watched as the female resident was loaded into the transport van, headed for the 4th Avenue Jail.

86. Defendant Armour had an opportunity to prevent the female resident from being processed.

87. Defendant Armour did not intervene or attempt to stop the female resident from being processed.

88. Defendant Armour lied to Sergeant Garcia when he told Sergeant Garcia he would not book the female resident or prevent her from being booked.

89. Defendant Armour violated a direct order from Sergeant Garcia when he allowed the female resident to be processed through Central Booking.

90. In a subsequent police report written by Defendant Armour following the incident, Defendant Armour again falsely claimed Officer Naegali had told him he saw the male resident through the apartment's window.

91. The detail regarding what Officer Naegali had told Defendant Armour in Defendant Armour's written police report was a lie.

92. Defendant Armour lied in the written police report in an effort to conceal his wrongdoing and violations of PPD's policies.

93. Following the incident on November 4, 2015, the PPD initiated a Complaint against Defendant Armour.

94. The PPD raised five allegations against Defendant Armour.

95. Those allegations, summarized, included: (1) unlawful entrance of a private residence; (2) false arrest of a citizen; (3) providing false testimony in a verbal report to a supervising officer; (4) providing false information in an incident report; and, (5) disobeying a lawful order given by a supervising officer.

96. The investigation was headed by PPD's Professional Standards Bureau ("the "PSB").

97. The PSB review board consisted of three investigators who were all members of the police department.

98. On April 27, 2016, the PSB released a fifteen (15) page report sustaining every allegation against Defendant Armour.

99. In their conclusion, the PSB investigators determined Defendant Armour's actions constituted "intentional abuse of police powers, authority, and privileges."

100. PSB investigators also determined Defendant Armour "knowingly submitted a criminal investigation…report with false information."

101. Combined, Defendant Armour was cited for seven violations of PPD's polices.

102. Upon information and belief, Defendants and the City of Phoenix did not send a copy of the Report to the Arizona Peace Officer Standards and Training Board.

103. Upon information and belief, Defendants and the City of Phoenix did not release the Report to the Maricopa County Attorney's Office.

104. Upon information and belief, Defendants and the Maricopa County Attorney's Office did not release the Report to Ms. Salazar or Ms. Salazar's counsel before Ms. Salazar's trial.

105. Upon information and belief, to date, Defendant Armour has never been placed on the Brady list.

106. Defendant Armour's breach of PPD's polices demonstrates his propensity for creating false narratives to bolster his wrongful arrests, searches and seizures.

107. The Report contains information that would have been used by Attorney Doran and Ms. Salazar to impeach and undermine the credibility of Defendant Armour at trial and prove his penchant for dishonesty.

**The Blue Shield to Protect Defendant Armour and Prevent Ms. Salazar's Exoneration**

108. The Report was initially disclosed to the Superior Court by Defendants on February 22, 2017, one-hundred and ninety (190) days after Ms. Salazar's conviction by the jury on August 17, 2016.

109. The Report was not directly sent to Attorney Doran or Ms. Salazar by fax, email, or mail, but was rather filed under the old criminal court case number.

110. Defendants did not send Attorney Doran, Ms. Salazar, or any other party any kind of notification about the disclosure to the Court containing the Report.

111. Defendants did not provide notification to Attorney Doran or Ms. Salazar in hopes they could avoid responsibility for knowingly or recklessly failing to divulge *Brady* material prior to Ms. Salazar's criminal trial and conviction.

112. Attorney Doran did not receive a copy of the Report until December 14, 2017.

113. Ms. Salazar was not made aware of the Report until December 15, 2017, and did not receive a copy of the Report until January 9, 2018.

114. Even before receiving the Report, a Motion for New Trial and Post-Conviction Relief had already been filed on Ms. Salazar's behalf based on discrepancies and inconsistencies in Defendant Armour's testimony at trial.

115. On March 30, 2018, after Attorney Doran reviewed the Report, he filed a new Motion for Post-Conviction Relief on Ms. Salazar's behalf, citing Defendants' failure to disclose *Brady* material, i.e., the Report.

13

116. On June 7, 2018, Defendant MCAO filed a Response to Ms. Salazar's motion and conceded a failure to disclose *Brady* material.

117. On July 10, 2018, the Superior Court reviewed and granted Ms. Salazar's Petition for Post-Conviction Relief.

118. In its Minute Entry, the Superior Court detailed Defendants' failure to disclose the *Brady* material "with respect [to] Defendant Armour whose credibility was critical to the conviction."

119. The Superior Court also detailed the timing of Ms. Salazar's trial and appeal, noting the substantial amount of time Defendants had the material before disclosing it.

120. Defendants did not disclose the material in the one-hundred and five (105) days between creation of the Report and Ms. Salazar's trial.

121. Three-hundred and one (301) days passed between creation of the Report containing *Brady* material and Defendants' disclosure of the Report to the Superior Court.

122. Defendants' primary evidence against Ms. Salazar at trial was Officer Armour's testimony.

123. Defendant Armour unequivocally (and for the first time) testified at trial Ms. Salazar had admitted to the crack and crack pipe being hers.

124. Information contained in the Report could have been used by Ms. Salazar to impeach and undermine Defendant Armour's testimony.

125. Ms. Salazar's due process rights were violated when she was not provided with the Report.

126. Defendants had a non-discretionary duty to turn over the Report.

127. Upon information and belief, Defendants failed to disclose the Report because it contained *Brady* material.

128. Upon information and belief, Defendants chose not to disclose the Report in an effort to shield Defendant Armour's credibility to the jury and protect his testimony against Ms. Salazar from further impeachment.

**CLAIMS FOR RELIEF**

**Count One**

**(Violation of 42 U.S.C. § 1983 – Due Process)**

**(All Defendants)**

**(Defendants Elizabeth Lake and Anthony Armour in their Individual Capacities)**

129. Plaintiff re-alleges the foregoing paragraphs as if fully set forth herein.

130. As a citizen of the United States, Ms. Salazar is entitled to the protection and benefit of the laws and Constitution of the United States of America.

131. The 14th Amendment of the United States Constitution declares "nor shall any State deprive any person of life, liberty, or property, without due process of law." *See* U.S. Const. Amend. 14.

132. Defendants are all state actors whose conduct is subject to 42 U.S.C. § 1983 and the 14th Amendment of the United States Constitution.

133. Defendants' deliberate indifference and/or reckless disregard in failing to produce evidence (the Report) material to Ms. Salazar's guilt or innocence prior to trial constitutes a violation of Ms. Salazar's due process rights. *Brady v. Maryland,* 373 U.S. 83, 87 (1963); *see also Tennison v. City & County of San Francisco*, 570 F. 3d 1078, 1088 (9th Cir. 2009).

134. As a direct and proximate result of Defendants' acts and/or omissions under color of law, Ms. Salazar suffered (without limitation) a deprivation of constitutional rights

to a fair trial and to due process of law, and was wrongfully imprisoned for a period of 22 months.

135. As a direct and proximate result of Defendants' acts and/or omissions under color of law, Ms. Salazar has suffered emotional and economic damages.

## ~~Count Two~~
### ~~(Municipal Liabilty under *Monell*)~~
### ~~(Defendant City of Phoenix)~~

~~136. Plaintiff re-alleges the foregoing paragraphs as if fully set forth herein.~~

~~137. Defendants Jeri Williams, Joe Yahner, and Defendant Armour were at all times relevant, agents of the City of Phoenix.~~

~~138. Defendants acted, upon information and belief, in execution of the government policy or custom that may fairly be said to represent official policy. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978).~~

~~139. Upon information and belief, Defendant City of Phoenix failed to implement a policy to ensure compliance with law mandating the disclosure of *Brady* material or implemented a policy that was recklessly indifferent to the rights of individuals like Ms. Salazar.~~

~~140. As a direct and proximate result of Defendant Jerri Williams, Joe Yahner, and Officer Armours' acts and/or omissions pursuant to official government policy, Ms. Salazar suffered (without limitation) a deprivation of constitutional rights to a fair trial and due process of law, and was wrongfully imprisoned for a period of 22 months.~~

~~141. As a direct and proximate result of Defendants' acts and/or omissions under color of law, Ms. Salazar has suffered emotional and economic damages~~

## Count Three

**(Violation of 42 U.S.C. § 1983 – Failure to Adequately Train & Supervise under *Monell*)**

**(~~All Defendants~~)**

**(Defendants City of Phoenix and Maricopa County and Chief Jeri Williams, Chief Joe Yahner, and Maricopa County Attorney Allister Adel[1] in their Official Capacities)**

142. Plaintiff re-alleges the foregoing paragraphs as if fully set forth herein.

143. Defendants MCAO and PPD have or should have policies, procedures, practices, and/or customs which govern the disclosure of *Brady* material when discovered or requested by a party opponent in a criminal case that reasonably safeguard the fair trial and due process rights of criminal defendants.

144. Upon information and belief, Defendants MCAO and PPD's policies, procedures, practices, and/or customs require *Brady* material to be disclosed when it is discovered.

145. Upon information and belief, Defendants failed to train or supervise their employees and staff when handling requests or dealing with the production of *Brady* material which resulted in the Report being disclosed to Ms. Salazar post-conviction.

146. Upon information and belief, Defendant Lake and other Prosecutors working for Defendant MCAO have engaged in withholding or untimely disclosing *Brady* material in other cases besides Plaintiff's.

147. Specifically, Defendant MCAO has a documented history of disclosure violations by Prosecutors employed in its office, including *Brady* violations, which drive Plaintiff's suspicions that her case is not unique. *See Milke v. Ryan*, 711 F.3d 998, 1003 (9th Cir. 2013) (setting aside Defendant's conviction and sentence 22 years later because Phoenix Police Department and Maricopa County Attorney's Office failed to disclose *Brady*

---

[1] Defendant Montgomery has been substituted pursuant to Rule 25(d), Fed. R. Civ. P.

evidence); *Canion v. Cole ex rel. County of Maricopa*, 208 Ariz. 133, 140, ¶ 26, 91 P.3d 355, 362 (App. 2004), *vacated sub nom. Canion v. Cole*, 210 Ariz. 598, ¶ 26, 115 P.3d 1261 (2005) (although vacated for procedural failings by Arizona Supreme Court, criminal defendant alleged potential *Brady/*disclosure violations by MCAO resulting in his conviction); *Foor v. Smith*, 243 Ariz. 594, 597, ¶ 11, 416 P.3d 858, 861 (App. 2018) (even though Plaintiff was denied relief on other grounds, Court found that MCAO failed to disclose *Brady* material about Phoenix Police Officer in civil forfeiture action); Min. Entry at 4, *State of Ariz. V. Ronnie Camacho*, CR2018-005994 (Maricopa Cnty. Super Ct. July 31, 2019) (ordering "no other remedy" other than dismissal in criminal action appropriate for State's "willful violation of disclosure" in failing to disclose potential *Brady* information to criminal defendant's lawyer).

148. Upon information and belief, Defendant Phoenix Police Department has a policy or practice of not supplying all *Brady* material to the County Attorney's office until a case is designated for trial and the County Attorney Defendants have a policy or practice of not formally requesting all *Brady* material prior to designating a matter for trial.

149. As recently as 2019, Defendant MCAO was challenged by the American Civil Liberties Union for delaying/refusing to submit information about MCAO's policies and procedures in response to the ACLU's request for such information under Arizona's Public Records Laws. *See* Press Release, ACLU of Arizona and ACLU Criminal Law Reform Project, We're Suing Maricopa County Attorney Bill Montgomery to Release the Records He's Hiding From Arizonans (May 22, 2019)(https://www.aclu.org/blog/smart-justice/prosecutorial-reform/were-suing-maricopa-county-attorney-bill-montgomery-release).

150. Upon information and belief, Defendant MCAO's refusal/delay in complying with Arizona's public records law is because it knows such requests will reveal inculpatory information about the office and its *Brady*/disclosure practices.

151. As of October 17, 2019, Defendant MCAO has confirmed through recently appointed County Attorney Allister Adel a recommitment to "transparency" when dealing with public disclosures. *See* MCAOTV, *Press Conference 10 17 19*, YouTube (Oct. 17, 2019), https://www.youtube.com/watch?v=rBqzsc-ItM8.

152. Upon information and belief, the County Attorney's newly-announced policy of increased transparency will result in the release of previously withheld evidence confirming a pattern or practice of failing to make *Brady* disclosures as required by law.

153. Upon information and belief, the MCAO's recommitment to "transparency" is in response to Plaintiff's lawsuit, and other *Brady*/disclosure violations within Defendant MCAO's office.

154. Defendants MCAO and Montgomery (now Adel) either knew or should have known of the office's other *Brady*/disclosure failings.

155. Defendants MCAO and Montgomery (now Adel) failed to act to prevent the type of constitutional harm that befell Plaintiff.

156. As a direct and proximate result of Defendants' acts/and or omissions pursuant to official government policy, Ms. Salazar suffered (without limitation) a deprivation of constitutional rights to a fair trial and due process of law, and was wrongfully imprisoned for 22 months

157. As a direct and proximate result of Defendants' acts and/or omissions under color of law, Ms. Salazar has suffered emotional and economic damages.

////

////

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

A.    For a trial by jury on each of Plaintiff's claims;

B.    For general and compensatory damages including but not limited to pain and suffering, loss of enjoyment of life, and economic loss, in amount to be determined at trial;

C.    For taxable costs and expenses to the extent permitted by law;

D.    For pre- and post-judgment interest to the extent permitted by law;

E.    For an award of attorney fees pursuant to U.S.C. § 1988(b); and,

F.    Such other relief as may appear just and appropriate <u>including punitive damages</u>.

RESPECTFULLY SUBMITTED this 27th day of December, 2019.

**HONOR LAW GROUP, PLLC**

By    */s/ Benjamin L. Rundall*
    Benjamin L. Rundall, Esq.
    Honor Law Group, PLLC
    4450 S. Rural Rd., Suite C-220
    Tempe, AZ 85282
    *Attorneys for Plaintiff*