**SALAZAR V. CITY OF PHOENIX, ET AL.**
**NO. CV-19-01188-PHX-SRB (ESW)**
**CITY DEFENDANTS' STATEMENT OF FACTS IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**
**INDEX OF EXHIBITS**

Exhibit A -    Deposition Transcript of Frances Salazar, dated October 25, 2021

Exhibit B -    Deposition Transcript of Rodney McCullough, dated October 14, 2021

Exhibit C -    Transcript of Jury Trial Day 2 in Maricopa County Superior Court Cause No.
CR-2013-462384, dated August 10, 2016,

Exhibit D -    Transcript of Evidentiary Hearing in Maricopa County Superior Court Cause
No. CR-2013-462384, dated April 1, 2016

Exhibit E -    Declaration of Anthony Armour, dated February 4, 2022

Exhibit F -    Direct Complaint in Maricopa County Superior Court Cause No. CR-2013-
462384, filed January 3, 2014.

Exhibit G -    Minute Entry in Maricopa County Superior Court Cause No. CR-2013-
462384, filed August 17, 2016

Exhibit H -    Minute Entry in Maricopa County Superior Court Cause No. CR-2013-
462384, filed December 13, 2016

Exhibit I -    Motion for Retrial and/or Motion to Reinstate Previous Plea Offer in
Maricopa County Superior Court Cause No. CR-2013-462384, filed October
21, 2016

Exhibit J -    Motion to Remove Deputy County Attorney Elizabeth Lake for Conflict of
Interest and Request to Interview Her as a Material Witness in Maricopa
County Superior Court Cause No. CR-2013-462384, filed November 23,
2016

Exhibit K -    Motion to Appoint Officer Anthony Armour (#8605) a Criminal Defense
Attorney in Maricopa County Superior Court Cause No. CR-2013-462384,
filed November 23, 2016

Exhibit L -    Minute Entry in Maricopa County Superior Court Cause No. CR-2013-
462384, filed December 6, 2016

1

Exhibit M - State's Response to Motion for Retrial and/or Motion to Reinstate Previous Plea Offer in Maricopa County Superior Court Cause No. CR-2013-462384, filed November 10, 2016

Exhibit N - Deposition Transcript of Anthony Armour, dated June 22, 2021

Exhibit O - Declaration of Steve Martos, dated February 4, 2022

Exhibit P - Deposition Transcript of John Collins, dated June 24, 2021

Exhibit Q - Deposition Transcript of Jeri Williams, dated October 27, 2021

Exhibit R - Declaration of Joseph Yahner, dated February 4, 2022

Exhibit S - Declaration of Jeri Williams, dated February 3, 2022

Exhibit T - Deposition Transcript of Erlinda Parrish, dated October 15, 2021

Exhibit U - Declaration of Krista Campagna, dated February 3, 2022

Exhibit V - Deposition Transcript of Elizabeth Lake, dated October 2, 2020

Exhibit W - Declaration of Elizabeth Lake, dated January 20, 2022

Exhibit X - State's Motion for Protective Order Pursuant to Rule 15 in Maricopa County Superior Court Cause No. CR-2013-462384, filed February 22, 2017

Exhibit Y - State's Supplemental Motion to Disclose New Evidence Pursuant to Rule 15 and/or E.R. 3.8 in Maricopa County Superior Court Cause No. CR-2013-462384, filed February 22, 2017

Exhibit Z - Deposition Transcript of Jennifer Myers, dated October 15, 2021

Exhibit AA - Deposition Transcript of Christopher Doran, dated March 23, 2021

Exhibit BB - Deposition Transcript of Samantha DuMond, dated November 3, 2021

Exhibit CC - Motion for Post-Conviction Relief in Maricopa County Superior Court Cause No. CR-2013-462384, filed March 30, 2018

Exhibit DD - State's Response to Motion for Post-Conviction Relief in Maricopa County Superior Court Cause No. CR-2013-462384, filed June 7, 2018

<u>Exhibit EE</u> - Minute Entry in Maricopa County Superior Court Cause No. CR-2013-462384, filed July 12, 2018

<u>Exhibit FF</u> - Deposition Transcript of Margaret DiFrank, dated October 4, 2021

<u>Exhibit GG</u> - Transcript of Jury Trial Day 3 in Maricopa County Superior Court Cause No. CR-2013-462384, dated August 11, 2016

<u>Exhibit HH</u> - Transcript of Jury Trial Day 4 in Maricopa County Superior Court Cause No. CR-2013-462384, dated August 15, 2016

<u>Exhibit II</u> - Transcript of Evidentiary Hearing in Maricopa County Superior Court Cause No. CR-2013-462384, dated April 15, 2016

<u>Exhibit JJ</u> - Declaration of Kenneth R. Wallentine, dated February 3, 2022

<u>Exhibit KK</u> - Report of Daniel Brown, dated December 30, 2020

<u>Exhibit LL</u> - Plaintiff's Second, Third, Fifth, Seventh, and Eighth Supplemental MIDP Responses

<u>Exhibit MM</u>-Minute Entry in Maricopa County Superior Court Cause No. CR-2018-005994, dated July 31, 2019

# EXHIBIT A

Deposition of Frances Salazar
10/25/2021

Page: 1
Salazar vs. City of Phoenix, et al.

1  IN THE UNITED STATES DISTRICT COURT

2  DISTRICT OF ARIZONA

3

Frances Salazar, individually,  ) Case No.
4                                ) 2:19-cv-01188-PHX-
        Plaintiff,               ) SRB(ESW)
5                                )
vs.                              )
6                                )
City of Phoenix, et al.,         )
7                                )
        Defendants.              )
8  _____   )

9

10

11

12  VIDEO-RECORDED VIRTUAL REMOTE DEPOSITION OF

    FRANCES SALAZAR

13

14

15                  Phoenix, Arizona
                   October 25, 2021
16                   11:03 a.m.

17

18

19

20

21

22

23

24  REPORTED BY:
    Janice Gonzales, RPR, CRR
    AZ Certified Court
25  Reporter No. 50844

Deposition of Frances Salazar
10/25/2021

Page: 55
Salazar vs. City of Phoenix, et al.

1    Q.   You never had a conversation with him

2  about that?

3    A.   No.  I had a lengthy sentence anyway by

4  taking it to trial.

5    Q.   Mr. Harris testified at his deposition

6  that once you paid him money for the Jaguar, you kept

7  the vehicle.  Is that accurate?

8    A.   In the beginning, yes, and then I gave it

9  back to him.

10    Q.   When did you give it back to him?

11    A.   I don't know the exact date.  It was

12  prior to the arrest.  Prior to the -- the date of --

13  whatever you call this.  The supposed, alleged crime.

14    Q.   How long before December 31st of 2013 did

15  you give the vehicle back to him?

16    A.   Hadn't been that long, but it had been --

17  I can't remember.  I would have to say maybe a few

18  weeks, a month.  Maybe a little bit more.  I'm not

19  real sure.

20    Q.   So how did you end up with the car again

21  on December 31st of 2013?

22    A.   He loaned the car to Rodney.

23    Q.   Had he met Rodney?

24    A.   Yes, he knew Rodney.

25    Q.   Had he met him?

Deposition of Frances Salazar
10/25/2021

Page: 57
Salazar vs. City of Phoenix, et al.

| | |
|---|---|
| 1 | MR. RUNDALL:  Let me squeak in an |
| 2 | objection here generally to this line of questioning |
| 3 | as being not relevant to the issues in this case. |
| 4 | THE WITNESS:  I can't remember, and I |
| 5 | wasn't in Rodney's presence very much because I |
| 6 | didn't know him very well anyways. |
| 7 | BY MS. BERKE: |
| 8 | Q.   How did you meet Rodney McCullough? |
| 9 | A.   I can't remember. |
| 10 | Q.   You don't remember how you met him? |
| 11 | A.   I don't. |
| 12 | Q.   When did you meet him? |
| 13 | A.   I don't remember exactly, either, but |
| 14 | I've known him for less than a year maybe.  Maybe six |
| 15 | months.  I'm not sure.  I can't give you an exact |
| 16 | answer.  I don't remember. |
| 17 | Q.   When you met him, did he live in Arizona? |
| 18 | A.   Yes. |
| 19 | Q.   When was your driver's license suspended? |
| 20 | A.   I don't remember the date of that, |
| 21 | either.  I'm sorry, but I know it was suspended. |
| 22 | Q.   Well, it was as of October -- I'm sorry, |
| 23 | as of December 31, 2013, it was suspended, correct? |
| 24 | A.   Correct.  That's why I wasn't driving |
| 25 | anything.  I had a vehicle at that time, but I wasn't |

Deposition of Frances Salazar
10/25/2021

Page: 58
Salazar vs. City of Phoenix, et al.

1    even driving that.

2         Q.   How long -- or strike that.

3              Was your driver's license suspended a

4    month earlier, two months earlier, a year earlier?

5         A.   I don't remember.  I did have some

6    driver's license issues, and it was troublesome to

7    say the least, but I did remedy the situation and

8    have my driver's license, but I did have an I.D. card

9    at the time.

10        Q.   Is it your testimony that you never drove

11   once your driver's license was suspended?

12             MR. RUNDALL:  Objection.  Argumentative.

13             THE WITNESS:  I can't remember.

14   BY MS. BERKE:

15        Q.   Did you ever drive the Jaguar that you

16   paid money to Antonio Harris to purchase?

17        A.   Yes, I drove the Jaguar.

18        Q.   And was your driver's license suspended

19   at the time?

20        A.   I can't remember.

21        Q.   Well, if -- you just testified a moment

22   ago that Mr. McCullough was driving on December 31st

23   of 2013 because your driver's license was suspended,

24   and I thought you said you didn't drive when your

25   driver's license was suspended.  Did I understand you

Deposition of Frances Salazar
10/25/2021

Page: 59
Salazar vs. City of Phoenix, et al.

1    incorrectly?

2         A.    I don't know exactly what you understood,

3    but if I can rephrase what I said or --

4         Q.    Sure.

5         A.    On the time of my arrest on

6    December 31st, I was not driving.  I had a suspended

7    driver's license.  Now, whether I have ever driven

8    being on a suspended driver's license, I don't know.

9    I may have broken the law and done that.  I can't

10   tell you.  I don't remember.

11        Q.    You went to a third-party Motor Vehicle

12   department entity to get temporary registrations for

13   the Jaguar, correct?

14        A.    I don't know if it was the actual MVD or

15   a third party.  I don't remember, but yes, I did go.

16        Q.    Several times?

17        A.    Yes.  And you can also do those things

18   online.  So I don't remember in which form I did it.

19        Q.    You don't remember going there in person

20   to get temporary registrations?

21        A.    We're talking so many years ago.  I can't

22   remember.  I mean, but yes, I did do that.  I did get

23   the temporary tags.  I got more than one tag.  I

24   don't remember whether it was through MVD or whether

25   it was through a third party.  Now, whether I went in

Deposition of Frances Salazar
10/25/2021

Page: 60
Salazar vs. City of Phoenix, et al.

1  person or online, I probably have done both.

2       Q.   Well, if it was through a third party,

3  you would have had to have done it in person,

4  correct?

5       A.   I'm -- I'm sure I probably would have.

6       Q.   I mean, you can't -- you can't get a

7  temporary registration from a third party online,

8  correct?

9            MR. RUNDALL:   Objection.   Form.

10           THE WITNESS:   Okay.   So I know I did go

11 to a third party.   And you're not allowed to get them

12 online through a third party, then obviously I did

13 arrive at the third-party MVD to purchase that.

14 BY MS. BERKE:

15      Q.   And you drove there yourself, correct?

16      A.   I don't remember.   Somebody could have

17 drove me.

18           MR. RUNDALL:   Objection.   Argumentative,

19 form.

20 BY MS. BERKE:

21      Q.   You don't remember if you drove there

22 yourself?

23      A.   You know, I may have, but I don't

24 remember, and I may not have.   I don't remember.

25      Q.   And you knew when you were driving the

Deposition of Frances Salazar
10/25/2021

Page: 61
Salazar vs. City of Phoenix, et al.

1   Jaguar that the registration was expired, correct?

2          A.    When I drove the Jaguar --

3                MR. RUNDALL:   Objection.   Asked and

4   answered, argumentative, form, foundation.

5   BY MS. BERKE:

6          Q.    Go ahead and answer.

7          A.    When I was in possession of the Jaguar, I

8   made sure that it had the tags necessary for it to be

9   legal because I was purchasing it for my mother.   So

10  me having a driver's license was really irrelevant to

11  what I was doing with the car or what I wanted to do

12  with the car.   Unfortunately, I was never able to

13  transfer title because of other circumstances.

14         Q.    So if Mr. Harris testified that you kept

15  possession of the Jaguar from the time you paid him

16  for it, then it's your testimony that he testified

17  falsely?

18         A.    That -- I'm really not completely clear

19  on your question, but I did take possession of the

20  vehicle when I paid for it.

21         Q.    Right.   And he said that you kept

22  possession of it through the time of your arrest?

23         A.    No.   That is not true.   I gave him the

24  vehicle back prior to my arrest.   Exactly what day,

25  exactly what time, I couldn't tell you.   The reason

Deposition of Frances Salazar
10/25/2021

Page: 62
Salazar vs. City of Phoenix, et al.

```
 1   why I gave him the car back is because I could not
 2   transfer title.  I could not legally put that vehicle
 3   in my mother's name and take possession.  Okay.  The
 4   initial transaction, yes, he took the money, I took
 5   the car.  I did the things necessary to try to make
 6   the vehicle legal and it didn't happen.
 7           Q.   And so at the time of your -- so at the
 8   time of your arrest, you knew that you were not able
 9   to legally register the vehicle, correct?
10           A.   Yes, correct.  So if I may say something,
11   at the time of my arrest, yes, I did have that
12   information that I could not put the vehicle in my
13   name, but I was no longer in possession of the
14   vehicle.
15           Q.   And at the time of your arrest, you
16   didn't have a permanent or a temporary registration
17   that was valid on December 31st of 2013, correct?
18           A.   No.  And it wouldn't matter, anyways,
19   because the car was not in my possession.  So why
20   would I want tags for it at that point?  At the time
21   that I realized that every avenue I had taken to try
22   to make the car legal was -- was futile.  I didn't
23   get it.  So at that time, I returned his vehicle.
24           Q.   Right.  So on December 31st of 2013, you
25   -- according to you, you did not have possession of
```

Deposition of Frances Salazar
10/25/2021

Page: 63
Salazar vs. City of Phoenix, et al.

1 the vehicle and the vehicle wasn't registered to you,

2 correct?

3       A.   Correct.

4       Q.   And you testified in one of your hearings

5 in your criminal case that you pulled out a temporary

6 registration that you had obtained for the vehicle

7 and handed it to the police when you were pulled over

8 on December 31, 2013, correct?

9       A.   Yes, ma'am, I did.

10       Q.   So if you weren't in possession of the

11 vehicle and you couldn't -- you knew you couldn't

12 register it in your name, why did you hand that

13 temporary registration that was expired to a police

14 officer?

15       A.   There was some issue with -- with the

16 documents that should have been in the car for

17 Antonio Harris and there was nothing in the car.  I'm

18 not exactly sure, but the police also tried to say at

19 that time that, you know, "Was it stolen?"  You know,

20 "Was it stolen?"  "No, it is not."  And so I

21 explained my situation, and this is why I pulled it

22 out of my car -- out of my purse.  It was not on the

23 car.  It would be no different than if you tried to

24 purchase a car and failed.  You're not going to leave

25 any of the information in there.  You're going to put

Deposition of Frances Salazar
10/25/2021

Page: 64
Salazar vs. City of Phoenix, et al.

```
 1   it with your stuff in your possession.

 2         Q.   How many weeks before your arrest had you

 3   given up on the idea that you were going to be able

 4   to register the vehicle?

 5              MR. RUNDALL:  Objection.  Asked and

 6   answered.

 7              THE WITNESS:  I don't know exactly, but

 8   it was a while.  A month or so.  Somewhere around

 9   there.

10   BY MS. BERKE:

11         Q.   Okay.  Then why did you have a

12   registration that you altered to extend from -- was

13   it December 21st -- yeah, December 21st of 2013 --

14   I'm sorry.  What was the date on the registration

15   before you altered it?

16              MR. RUNDALL:  Objection to form.

17              THE WITNESS:  I don't remember.

18   BY MS. BERKE:

19         Q.   You don't remember?  The printed date on

20   the registration was December 28th -- I'm sorry,

21   December 18th of 2013, and you altered it to say

22   December 28th of 2013, correct?

23              MR. RUNDALL:  Objection.  Argumentative,

24   form.

25              THE WITNESS:  Answer?  Yes.
```

Deposition of Frances Salazar
10/25/2021

Page: 65
Salazar vs. City of Phoenix, et al.

1   BY MS. BERKE:

2        Q.   Yeah.

3        A.   Yes, I did alter that.

4        Q.   Okay.  And so if you had given the

5   vehicle back to Mr. Harris approximately a month

6   earlier and given up on the idea of being able to

7   register it in your name, why would you have altered

8   the date from December 18th of 2013 to December 28th

9   of 2013?

10            MR. RUNDALL:   Same objections.

11            THE WITNESS:   I don't remember exactly.

12   BY MS. BERKE:

13        Q.   Go ahead.

14        A.   I don't remember exactly, but I think

15   there was another avenue of being able to try to pay

16   the -- the amount -- the dollar amount into his name

17   and I contemplated doing that, but the figures were

18   just out of my range considering the value of the

19   car.

20        Q.   Antonio Harris was deposed in this case.

21   Do you know that?

22        A.   Not until after the fact, I knew.  I knew

23   eventually he would be.

24        Q.   And he testified that you had been

25   driving the car prior to his driving the car on

Deposition of Frances Salazar
10/25/2021

Page: 69
Salazar vs. City of Phoenix, et al.

1   false.  I don't know what his exact memory is.  I --

2   I feel like we're going in circles.  I don't -- I'm

3   sorry.

4   BY MS. BERKE:

5        Q.   If Mr. McCullough testified that you

6   drove the Jaguar either on December 30th, 2013, or

7   December 31st, 2013, was his testimony inaccurate?

8        A.   It's inaccurate, yes.

9        Q.   How many times did you and Mr. McCullough

10  drive to the credit union on December 31st of 2013?

11       A.   That one time.

12       Q.   You didn't go twice?

13       A.   No, not that I remember, but I'm just

14  about positive it was just that one time, and it

15  wasn't successful.

16       Q.   What do you mean it wasn't successful?

17       A.   So in other words, I never completed my

18  errand because I was interrupted by the arrest, but

19  the car was returned to the rightful owner.

20       Q.   Who was the rightful owner?

21       A.   Ms. Loretta Jones.

22       Q.   What's your relationship with Loretta

23  Jones?

24       A.   I was her caregiver.

25       Q.   Did she pay you for that service?

Deposition of Frances Salazar
10/25/2021

Page: 70
Salazar vs. City of Phoenix, et al.

1     A.    Yes, she did.

2     Q.    In cash?

3     A.    Yes, ma'am.

4     Q.    Did you live with her?

5     A.    No, ma'am.

6     Q.    What were your work hours?

7     A.    I went whenever she needed me.  She was a

8  woman in a wheelchair, and it just so happened to be

9  New Year's Eve, and I had stuff to do with my own

10 family.  Went with her, and the rest is history.

11    Q.    Well, when you got arrested, it was the

12 morning of New Year's Eve?

13    A.    Yes.

14    Q.    So it was really kind of the night of

15 December 30th, morning of December 31st, correct?

16    A.    It was early in the morning, yes.

17    Q.    And why is it that you were going to an

18 ATM to get cash for her at 4:00 in the morning?

19         MR. RUNDALL:  I just want to put in an

20 objection real quick.  I just want to put an

21 objection on the record to this whole line of

22 questioning as not being relevant to the issues in

23 this case.

24         THE WITNESS:  So I was going to the bank

25 because I needed to get things for her such as

Case 2:19-cv-01188-SRB-ESW   Document 208-1   Filed 02/04/22   Page 18 of 101

Deposition of Frances Salazar
10/25/2021

Page: 71
Salazar vs. City of Phoenix, et al.

1  quarters so I could wash for her.  She was in a

2  wheelchair.  She would often use the bathroom on

3  herself.  She was having an event or going to an

4  event -- I can't remember exactly -- with her family.

5  So my day started early so I could get her clothes

6  washed.  She would often use the bathroom in her bed.

7  I would have to wash things.  So the reason for the

8  money was to put the quarters in the machines at her

9  apartment complex.

10  BY MS. BERKE:

11      Q.   So you went to the credit union with her

12  ATM card to get quarters?

13      A.   To get money so that I could get quarters

14  and laundry detergent or whatever her needs may have

15  been.

16      Q.   And where were you going to get quarters

17  and laundry detergent for her?

18      A.   There used to be a 24-hour Walmart right

19  there -- right around the corner from there.

20      Q.   Why didn't you go to Walmart and use her

21  debit card to get cash back and to buy whatever she

22  needed at Walmart instead of going to an ATM?

23      A.   Because I'm not her and I would have been

24  asked for ID.  So she gave me permission to use the

25  card at the bank to get the money necessary, the

Deposition of Frances Salazar
10/25/2021

Page: 75
Salazar vs. City of Phoenix, et al.

1        A.    I don't remember exactly what I was
2   wearing.   I didn't have a jacket on.   I think I had
3   long sleeves.   I don't remember if I had sweats or
4   jeans on.   I don't remember.
5        Q.    How do you remember you didn't have a
6   jacket on?
7        A.    Because --
8             MR. RUNDALL:   Objection.   Form, vague and
9   ambiguous.
10            THE WITNESS:   I know I didn't have a
11  jacket on.   I may have had a hoodie on or just a
12  long-sleeve shirt.
13  BY MS. BERKE:
14       Q.    How do you remember you didn't have a
15  jacket on?   What's --
16            MR. RUNDALL:   Objection.   Form.
17  BY MS. BERKE:
18       Q.    What is helping you remember that?
19       A.    Because when I was arrested and taken out
20  of the car, I was shivering, and I asked -- I told
21  the officer that I was cold, and he pulled a jacket
22  out of the back seat of that vehicle and allowed me
23  to wear it, which it was too small for me, but I wore
24  it anyways because I was cold.
25       Q.    And was something found in that jacket?

Deposition of Frances Salazar
10/25/2021

Page: 76
Salazar vs. City of Phoenix, et al.

```
1              A.    Yes, it was.
2                    MR. RUNDALL:  Objection.  Form.
3     BY MS. BERKE:
4              Q.    What was found in that jacket?
5              A.    Well, allegedly, another paraphernalia.
6              Q.    Well, you saw it, didn't you?
7                    MR. RUNDALL:  Objection.  Argumentative,
8     form.
9                    THE WITNESS:  Well, I also saw what
10    Officer Armour pulled out, but was it really there?
11    BY MS. BERKE:
12             Q.    Well, you saw the female officer pull the
13    drug paraphernalia out of the jacket you were
14    wearing, correct?
15             A.    I don't --
16                   MR. RUNDALL:  Objection.  Objection.
17    Misstates testimony, argumentative, form.
18    BY MS. BERKE:
19             Q.    You can go ahead and answer.
20             A.    Okay.  I don't remember seeing her pull
21    it out.  I'm sure that may have been the case, but I
22    don't remember.
23                   MR. RUNDALL:  Lori, can I interject real
24    quick?  Not to try to throw you off, but at some
25    point, can we just break for even, like, 15 minutes
```

Deposition of Frances Salazar
10/25/2021

Page: 101
Salazar vs. City of Phoenix, et al.

1    McCullough to go to the credit union?

2         A.    I don't remember.  I may have encountered

3    Mr. McCullough prior to that date, but I don't

4    believe I had seen Mr. Harris in a bit, but I can't

5    swear to that because I don't remember.

6         Q.    Why do you believe you might have seen

7    Mr. McCullough?

8         A.    Yes.

9         Q.    You know, why is it that you believe you

10   might have seen him?  Do you have some kind of a

11   recollection?

12        A.    No.  I just know that he was around

13   around that time.  He was always around in that area.

14   I just don't remember.

15        Q.    But you live 25 minutes away from that

16   area, correct?

17        A.    Right.

18        Q.    And so -- strike that.

19              Were you displaying a temporary tag on --

20   or strike that.

21              Was there a temporary tag displayed on

22   the vehicle at the time the car was pulled over?

23              MR. RUNDALL:  Objection.  Asked and

24   answered.

25   BY MS. BERKE:

Deposition of Frances Salazar
10/25/2021

Page: 102
Salazar vs. City of Phoenix, et al.

1    Q.   Go ahead.

2    A.   No.

3    Q.   If you look at the paragraph right here

4  that starts on page 3, second paragraph, that starts

5  at "Both Rodney and Frances."  Do you see that?

6    A.   I do.

7    Q.   The second sentence reads, "Frances

8  advised me the vehicle belonged to her, but that she

9  was unable to get it registered in her name because

10 the person she was buying the vehicle from, Antonio

11 Harris, had a lien against it."  Did you tell Officer

12 Armour that?

13   A.   I told Officer Armour what the truth was.

14 The reason why I had the temporary tags and other

15 documents in my purse in my possession was because at

16 one time I did try to purchase the vehicle.

17   Q.   Okay.  But that wasn't my question.  He

18 wrote, "Frances advised me the vehicle belonged to

19 her but that she was unable to get it registered in

20 her name because the person she was buying the

21 vehicle from, Antonio Harris, had a lien against it."

22 Is that accurate?

23   A.   That is not accurate because the car did

24 not belong to me.

25   Q.   You did not say that to Officer Armour?

Deposition of Frances Salazar
10/25/2021

Page: 107
Salazar vs. City of Phoenix, et al.

1    that he relayed them.

2         Q.   Okay.  And then he says, quote, "I asked

3    Frances if there was anything illegal inside the

4    vehicle and she stated there was not."  Is that

5    accurate?

6         A.   I don't remember if he asked me that, but

7    I wouldn't have had that knowledge anyways.

8         Q.   And so, again, he made that up?  That

9    conversation didn't take place?

10        A.   I didn't conversate with him.  So there's

11   a lot of conversation in the police report that did

12   not take place.  So you're referring me to things

13   that never were in any given conversation with him.

14        Q.   Did he ask you if there was anything

15   illegal inside the vehicle?

16        A.   I don't remember.  He may have.

17        Q.   But you deny telling him that there was

18   not anything illegal inside the vehicle?

19        A.   I don't remember if he asked me that, but

20   if that's what it says in the transcripts, he may

21   have asked me that.

22        Q.   But you didn't tell him that there was

23   not?

24        A.   Well, how would I know what's in there?

25   I'm sure my assumption would have been maybe no, but

Deposition of Frances Salazar
10/25/2021

Page: 108
Salazar vs. City of Phoenix, et al.

```
 1    it's -- I can't -- I can't answer to something I
 2    don't know.
 3          Q.    Right.  So it's your testimony that you
 4    wouldn't have told him that there was not anything
 5    illegal in the vehicle because you wouldn't have
 6    known; is that what you're -- is that what you're
 7    saying?
 8              MR. RUNDALL:  Objection.  Asked and
 9    answered.  Objection.  Asked and answered,
10    argumentative, misstates testimony.
11    BY MS. BERKE:
12          Q.    Is that what you're saying?
13          A.    No, that's not what I'm saying.  Would
14    you like me to --
15          Q.    So if he had asked you if there was
16    anything illegal inside the vehicle, what would you
17    have responded with?
18          A.    I probably would have said there
19    shouldn't be or I hope not.  I don't know.  I
20    don't --
21              MR. RUNDALL:  Just get in my -- just get
22    in my --
23              MS. BERKE:  Okay.
24              MR. RUNDALL:  -- objection to form on
25    that.
```

Deposition of Frances Salazar
10/25/2021

Page: 109
Salazar vs. City of Phoenix, et al.

```
 1   BY MS. BERKE:
 2        Q.   And then it says, "I asked Frances
 3   specifically if there were any drugs inside the
 4   vehicle, and she replied, 'There shouldn't be,' but
 5   said that there had been several people inside the
 6   vehicle besides her and Rodney."  Was that question
 7   asked and was that your response?
 8        A.   I don't remember if he asked me that
 9   question or not.  We're talking nearly eight years
10   ago.  I don't remember what was said, but I do know
11   it was very little.
12        Q.   Okay.  And do you -- do you dispute that
13   you responded as he's indicated here?
14        A.   I don't remember what I responded to, so
15   I can't dispute it.
16        Q.   Do you remember telling Officer Armour
17   that you did not smoke methamphetamine?
18        A.   I don't remember exactly what I said, but
19   I know that originally he accused me of being on
20   heroin and checked my arms.  That I remember very
21   clearly.
22        Q.   And then he says on his report, "I then
23   advised Frances that I had located her crack pipe.
24   Frances stated that she had been clean since 2007 but
25   had recently relapsed."  Is that accurate?
```

Deposition of Frances Salazar
10/25/2021

Page: 110
Salazar vs. City of Phoenix, et al.

1    A.   That's not accurate, but I have been

2    clean since 2007.

3    Q.   Have you relapsed?

4    A.   No.

5    Q.   So you had not used illegal drugs since

6    2007?

7    A.   Correct.

8    Q.   So it had been six years?

9    A.   Whatever that adds up to, yes.

10    MR. RUNDALL:   I'm going to put another

11   standing objection in here as to relevance.

12   BY MS. BERKE:

13    Q.   And then it says, "Frances kept randomly

14   stating that she did not smoke methamphetamine."   Is

15   that accurate?  Did you do that?  Did you make that

16   statement?

17    A.   I don't remember what I said to Officer

18   Armour, but I know I said very little, and if he was

19   accusing me of any type of drugs, that much I'm sure

20   would have been denied.   I believe that the whole

21   thing here with the police report is that there is a

22   bunch of lies and discrepancies and stuff like that.

23   So it's just a little difficult to, like, answer the

24   questions on something that's -- the entirety of it

25   is based on a lie and his own agenda.

Deposition of Frances Salazar
10/25/2021

Page: 111
Salazar vs. City of Phoenix, et al.

1      Q.   So you've been completely clean and off

2   drugs since 2007?

3      A.   Yes.

4      Q.   And then it states that you admitted to

5   the substance inside the pipe being crack.  Is that

6   accurate?

7      A.   I believe -- I can't even remember

8   exactly how it happened.  I may have said it looks

9   like crack, but how would I know what it is?

10     Q.   Well, you know what crack looks like,

11   right?

12     A.   I know what it looks like, and he's

13   telling me the -- this is crack and I'm -- looks like

14   crack.  Okay.  So it does, but I can't say that it is

15   or not.

16     Q.   And you know what a crack pipe looks

17   like, correct?

18     A.   Yes, I do.

19     Q.   Was the drug or one of the drugs that you

20   would regularly use up until 2007 crack cocaine?

21     A.   Repeat the question, please.

22     Q.   Was crack the drug or one of the drugs

23   that you would use up until 2007?

24          MR. RUNDALL:   Objection to form and

25   relevance.

Deposition of Frances Salazar
10/25/2021

Page: 112
Salazar vs. City of Phoenix, et al.

1   BY MS. BERKE:

2        Q.   Was it?

3        A.   Yes.

4        Q.   And you would smoke it in a crack pipe?

5        A.   Yes.

6        Q.   And then he says that you refused to tell

7   him where you buy it from.  Did you have a

8   conversation about where you buy crack?

9        A.   No.

10       Q.   And then it says, "Frances then tried to

11  recant her statement and claim that someone else must

12  have left the pipe and drugs there, but that she

13  would take responsibility for it."  Did you tell him

14  at some point during your conversation that someone

15  else must have left the pipe and drugs in the car?

16       A.   I don't think I said that.  I don't

17  remember, but I know for a fact I never took

18  responsibility for it.  I'm not going to take

19  responsibility for something that is not mine.

20       Q.   So you never made the statement that you

21  would take responsibility for it?

22       A.   No, I did not.

23       Q.   And then it states that you would go back

24  and forth between lying about the drugs and admitting

25  to them due to your recent relapse.  Is that

Deposition of Frances Salazar
10/25/2021

Page: 167
Salazar vs. City of Phoenix, et al.

1          MR. RUNDALL:  Sure, no problem, Lori.

2          MS. BERKE:  Okay.  So...

3          THE VIDEOGRAPHER:  Okay.  We're going off

4     the record at 3:32 p.m.

5          (Recessed from 3:32 p.m. to 3:45 p.m.)

6          THE VIDEOGRAPHER:  We're going back on

7     the record at 3:45 p.m.

8       (Exhibit 5 was marked for identification.)

9     BY MS. BERKE:

10         Q.   All right.  Ms. Salazar, I'm going to

11    show you what's been marked as Exhibit 5 and thank

12    you everyone, by the way, for letting me take a break

13    to review that.  Okay.  I'm showing you what's been

14    marked as Exhibit No. 5.  You've seen this document

15    before, correct?

16         A.   I'm sure that I have, yes.  I haven't

17    seen it lately.

18         Q.   It's called "State's Allegation of Prior

19    Felony Conviction Pursuant to A.R.S. Section 13-703

20    or A.R.S. Section 13-704," correct?

21         A.   Yes, I see that written on there.

22         Q.   It was filed by the county attorney's

23    office on April 9th of 2014, correct?  If you look

24    right up here.  I'll make it bigger so you can see it

25    better.  Can you see that, April 9th, 2014?

Deposition of Frances Salazar
10/25/2021

Page: 168
Salazar vs. City of Phoenix, et al.

1      A.    Yes.

2      Q.    All right.   And so what this is saying is

3   that the state in your criminal case stemming from

4   your December 31st, 2013, arrest intended to allege

5   that you had been convicted of some prior felony

6   convictions which would -- if proven would have the

7   result of lengthening your sentence, correct, if you

8   were convicted in this case?

9           MR. RUNDALL:   Objection to the extent

10   that it calls for a legal conclusion.

11           THE WITNESS:   So I -- I know that my

12   prior convictions were brought up.   I believe that

13   they could have been enhanced but I'm not really that

14   positive about the outcome of this particular

15   document.

16   BY MS. BERKE:

17      Q.    Okay.   Well, but you understood in your

18   criminal case that if it was determined that you had

19   prior felony convictions, you would not be eligible

20   for probation.   You'd have to serve --

21      A.    Oh, yes.

22      Q.    -- time in prison, correct?

23      A.    I did understand that I probably wouldn't

24   be eligible for probation, yes.

25      Q.    Okay.   And according to Exhibit 5, on

Deposition of Frances Salazar
10/25/2021

Page: 169
Salazar vs. City of Phoenix, et al.

```
 1   April 5, 1991, you were convicted for the crime of --
 2   I'm sorry, on April 22, 1992, you were convicted of
 3   the crime of theft, a Class 3 felony, correct?  Is
 4   that correct?
 5        A.   Well, it doesn't say what I was charged
 6   for and I don't remember, but it's saying that it was
 7   theft.
 8        Q.   Well, it says on April 5, 1991, you
 9   committed the crime of theft, a Class 3 felony and
10   that you were convicted for that crime on April 22,
11   1992.
12        A.   Okay.  So that's correct.
13        Q.   Okay.  And then -- I'm just going to buzz
14   through these.  And then it says that on November 9th
15   of 1991 you committed the crime of possession of drug
16   paraphernalia, a Class 6 felony, and you were
17   convicted of that crime on April 22, 1992; is that
18   correct?
19        A.   Correct.
20        (Exhibit 6 was marked for identification.)
21   BY MS. BERKE:
22        Q.   Okay.  And then let's share another
23   document.  And this one is a similar document called
24   "State's Allegation of Historical Priors."  This is
25   going to be marked as Exhibit 6.  Do you see that?
```

Deposition of Frances Salazar
10/25/2021

Page: 170
Salazar vs. City of Phoenix, et al.

```
 1              A.    Yes.

 2              Q.    And that was filed the same day, April 9

 3     of 2014, correct?

 4              A.    Yes.

 5              Q.    And it says that on November 25, 20- --

 6     I'm sorry.   On November 25, 2007, you committed the

 7     crime of possession of narcotic drugs, a Class 4

 8     felony, and were convicted of that crime on December

 9     5th of 2008; is that accurate?

10              A.    Yes.

11              Q.    And it says on December 6, 2007, you

12     committed the crime of possession of narcotic drugs,

13     a Class 4 felony, and that you were convicted for

14     that crime on that same date of December 5, 2008; is

15     that accurate?

16              A.    Yes.

17              Q.    And then it states that on October 15th

18     of 2001 you committed the crime of unlawful flight, a

19     Class 5 felony, and that you were convicted for that

20     crime on December 17th of 2001; is that accurate?

21              A.    Yes.

22              Q.    And then it states that on June 25, 1999,

23     you committed the crime of possession of narcotic

24     drugs, a Class 4 felony, and were convicted of that

25     crime on February 16th of 2001; is that accurate?
```

Deposition of Frances Salazar
10/25/2021

Page: 171
Salazar vs. City of Phoenix, et al.

1    A.    Yes.

2    Q.    And then it states that on February 18,

3  1998, you committed the crime of possession of

4  narcotic drugs, a Class 4 felony, and were convicted

5  for that crime on January 5th of 2000, correct?

6    A.    Yes.

7    Q.    And that's accurate?

8    A.    Yes.

9    Q.    And then it states that on April 5, 1991

10 -- I think we already dealt with that one.  Yeah.

11 I'm not sure if that's -- it's probably the same one,

12 but I'm just going to mention it because I'm not

13 positive.  On April 5, 1991, you committed the crime

14 of theft, a Class 3 felony, and were convicted of

15 that crime on April 22, 1992, correct?

16   A.    Yes.

17   Q.    And then -- and is that accurate?

18   A.    I believe it to be accurate.

19   Q.    And then it says on October 17, 1991, you

20 committed the crime of vehicle theft, a felony

21 offense, and that you were convicted of that crime on

22 April 22, 1992, correct?

23   A.    Yes.

24   Q.    And then -- and is that accurate?

25   A.    Yes.

Deposition of Frances Salazar
10/25/2021

Page: 172
Salazar vs. City of Phoenix, et al.

1    Q.   And then it says on November 9, 1991, you

2    committed the crime of possession of drug

3    paraphernalia, a Class 6 felony, and you were

4    convicted of that crime on October -- I'm sorry -- on

5    April 22, 1992; is that accurate?

6    A.   Yes.

7    Q.   Okay.  Your trial took place in August of

8    2016, correct?

9    A.   Yes.

10   Q.   And then you weren't sentenced until

11   December of 2016, correct?

12   A.   Yes.

13   Q.   I'm going to show you what's been marked

14   as Exhibit 7, and this is the sentence of

15   imprisonment from your conviction in connection with

16   your December 31, 2013, arrest, correct?

17   A.   Yes.

18   Q.   And according -- did I already say this

19   was marked as Exhibit 6?  Sorry, it's named as

20   Exhibit 6.  And according to this -- so this document

21   is dated December 5th of 2016.  That was your

22   sentencing date, correct?

23   A.   Yes.

24   Q.   And you were there with your attorney

25   Christopher Doran, correct?

# EXHIBIT B

Deposition of Rodney McCullough
10/14/2021

Page: 1
Salazar vs. City of Phoenix, et al.

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                      DISTRICT OF ARIZONA

 3

 4    Frances Salazar,          )
      individually,             )
 5                              )
                 Plaintiff,     )
 6                              )
          vs.                   )   No. 2:19-cv-01188-PHX-SRB(ESW)
 7                              )
      City of Phoenix, et a.,   )
 8                              )
                 Defendants.    )
 9                              )
      _____ )

10

11

12

13         ZOOM VIDEOCONFERENCE VIDEOTAPED DEPOSITION OF

14                 RODNEY SCOTT McCULLOUGH

15                    V O L U M E   I

16                 (Pages 1 through 35)

17                 October 14, 2021
                     9:02 a.m.
18

19

20

21

22                         Reported by:
                           SHANNON STEVENSON, RPR, CCR
23                         Certificate No. 50461
                           BARTELT NIX
24    Prepared for:        3101 North Central Avenue, Suite 290
                           Phoenix, Arizona 85003
25    (Certified Copy)     (602) 254-4111
```

Deposition of Rodney McCullough
10/14/2021

Page: 17
Salazar vs. City of Phoenix, et al.

1   instructed you in the beginning --

2               MR. RUNDALL:  I object to that.  I would advise

3   him that, actually, probably would constitute perjury.

4        Q    BY MS. BERKE:  But as I told you in the

5   beginning of the deposition, if you don't remember

6   something, you should say you don't remember just like

7   you've been doing.

8        A    Okay.

9        Q    So what is your first memory after arriving at

10  the Camelback and 15th Avenue apartment?

11       A    I just went over there to see people, I know

12  that.

13       Q    Did you have any drugs with you?

14       A    Me?  No.

15       Q    Did you have a gun with you?

16       A    No.

17       Q    "No"?

18       A    No.

19       Q    At some point did you get into a vehicle with

20  Ms. Salazar?

21       A    Did I get in the vehicle with her?

22       Q    Yes.

23       A    Yes, when I took her to the bank.

24       Q    Had you been in a vehicle with her before going

25  to the bank?

Deposition of Rodney McCullough
10/14/2021

Page: 18
Salazar vs. City of Phoenix, et al.

1    A    I'm not sure.  I can't say.  I might have, but

2  I'm not sure.

3    Q    What bank did you go to with her?

4    A    It was a federal credit union.  I think Arizona

5  Federal Credit Union.

6    Q    And do you remember why you were going with her

7  to the federal credit union or why you were going there

8  together?

9    A    So she can withdraw some money.

10   Q    Did she ask you to go with her?

11   A    I think so, I'm not sure.  Sometimes.

12   Q    It was around 4:00 a.m. when you went to the

13  credit union; correct?

14   A    I know it was night.  I don't know the exact

15  time.

16   Q    Do you know -- if you got to that apartment

17  at -- during the daylight hours at Camelback and 15th

18  Avenue and assuming it was around 4:00 a.m. the following

19  morning when you went to the credit union, do you have

20  any recollection of what you were doing during those

21  hours between arriving at Camelback and 15th Avenue and

22  going to the credit union?

23            MR. RUNDALL:  Objection.  Asked and answered.

24            THE WITNESS:  I didn't hear him.

25   Q    BY MS. BERKE:  Do you have any memory of

Deposition of Rodney McCullough
10/14/2021

Page: 20
Salazar vs. City of Phoenix, et al.

1  this all set up.  Okay.  Are you able to see a transcript

2  on your screen?

3      A    Yes.

4      Q    Okay.  So the first page -- we're going to make

5  this Exhibit 1 to your deposition, and you'll see this is

6  a partial transcript from April 1st of 2016.  It's an

7  evidentiary hearing.  Do you see in the middle of the

8  page where it says, "Reporter's Transcript of Proceedings

9  Evidentiary Hearing"?

10          (Deposition Exhibit No. 1 was introduced for

11  identification and attached hereto.)

12          THE WITNESS:  Yes.

13      Q    BY MS. BERKE:  And it says, "State of Arizona

14  versus Frances Marie Salazar."  Do you see that?

15      A    Yes.

16      Q    So she says -- she's talking about the traffic

17  stop, and this is at Page 19 of the transcript at the

18  top.  And she says, "Rodney was driving."

19          Is that accurate that you were driving when you

20  got -- when the officers made the traffic stop?

21      A    Yes.

22      Q    And she says, "They spoke to him first."  Is

23  that accurate?

24      A    Yes.

25      Q    And she testified that, "They took him out of

# EXHIBIT C

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,            )
                             )
        Plaintiff,           )
                             )
vs.                          ) CR2013-462384-001
                             ) 1 CA-CR 16-0914
FRANCES MARIE SALAZAR,       )
                             )
        Defendant.           )
_____)

**BEFORE THE HONORABLE MICHAEL D. GORDON**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**
**(Trial Day 2)**

Phoenix, Arizona
August 10, 2016

**REPORTED BY:**
JENNIFER PANCRATZ, RMR, CRR
Certified Reporter
Certificate No. 50857

**PREPARED FOR:**
Attorney at Law
**(Copy)**

1                              INDEX
                                                    PAGE
2
       Preliminary Jury Instructions              11
3      Opening Statement by Ms. Lake              33
       Opening Statement by Mr. Doran             34
4

5      ANTHONY ARMOUR
       Direct Examination by Ms. Lake             41
6      Cross-Examination by Mr. Doran             85
       Redirect Examination by Ms. Lake          124
7

8      KEITH BACKHAUS
       Direct Examination by Ms. Lake            132
9      Cross-Examination by Mr. Doran            138
       Redirect Examination by Ms. Lake          147
10

11     ERICA BELL
       Direct Examination by Ms. Lake            156
12     Cross-Examination by Mr. Doran            173
       Redirect Examination by Ms. Lake          175
13

14

15

16

17

18

19

20

21

22

23

24

25

**COP-SALAZAR6000**

1            THE COURT:  Go right ahead.

2            JURY MEMBER:  Yes.

3            MS. LAKE:  Do you need him to repeat that

4    last answer?

5            THE COURT:  Why don't you just repeat the

6    whole question and answer.

7    BY MS. LAKE:

8        Q.   On December 31st, 2013, were you on duty as a

9    Phoenix police officer?

10       A.   I was.

11       Q.   At about 4:00 o'clock in the morning, were you in

12   the area of 17th Avenue and Highland?

13       A.   Yes.

14       Q.   Is that location in Maricopa County?

15       A.   It is.

16       Q.   On that date and at that time and in that

17   location, did you come into contact with someone who later

18   became known to you as Frances Salazar?

19       A.   I did.

20       Q.   Do you see that person in the courtroom today?

21       A.   I do.  I see her to my left, female in the middle

22   with the gray and black blazer and glasses, short blonde

23   hair.

24           MS. LAKE:  Your Honor, may the record

25   reflect the witness has identified the defendant?

1          MR. DORAN:  No objection, Your Honor.

2          THE COURT:  The record will so reflect.

3  BY MS. LAKE:

4      Q.   On that -- on that date and at that time, were

5  you on duty alone or were you with someone?

6      A.   I was riding with a partner -- excuse me.

7  Officer Backhaus, Number 8523.  We were riding as a

8  two-man unit.

9      Q.   So that means you were both in the same patrol

10  car?

11     A.   Yes.  I was driving, and Officer Backhaus was a

12  passenger.

13     Q.   Okay.  Take me back to about ten seconds before

14  you saw the defendant.  What were you doing?

15     A.   We were driving eastbound on West Highland Avenue

16  from 17th Avenue towards 15th Avenue.  As we reached 15th

17  Drive, which is -- there's a loop between 15th Drive and

18  16th Drive.  It's kind of big U that goes around a park.

19  Basically just up and down through an, I guess, apartment

20  complex area.

21          Coming off of 15th Drive southbound, we

22  observed the gold Jaguar the defense attorney mentioned

23  earlier coming southbound off of 15th Drive and make a

24  westbound turn onto West Highland past us as we were

25  passing 15th Drive.

```
 1      Q.    Okay.  What attracted your attention to that gold
 2   Jaguar?  Was it --
 3      A.    It was --
 4      Q.    -- just the fact that it was a Jaguar?
 5                 MR. DORAN:  Objection, Your Honor.  403.
 6                 May we approach?
 7                 THE COURT:  Sure.
 8                 (A bench conference was held between the
 9   Court and counsel, as follows:)
10                 MR. DORAN:  Your Honor, I have a good faith
11   belief that the State is going to go into an issue
12   involving whether or not there were fake tags on this.
13   That issue has been addressed at the suppression hearing.
14   It bears no relevance in this case.  I'd ask for it to be
15   sanitized and this just be a lawful stop, was pulled over.
16                 MS. LAKE:  Your Honor, that's not how I read
17   the Court's ruling in the suppression hearing.  When we
18   discussed this in chambers yesterday, we did not talk
19   about this.  There's no motion in limine to keep it out,
20   and it is the reason the officer pulled her over.
21                 THE COURT:  Why did he pull her over?
22                 MR. DORAN:  What's that?
23                 THE COURT:  Give me --
24                 MR. DORAN:  The officer is saying that there
25   was a temporary plate that was up in the rear window of
```

 1                    THE COURT:  He's going to be here at 1:30,

 2  your witness?

 3                    MR. DORAN:  I told him to be here to testify

 4  Thursday.  I assumed that my case in chief was starting

 5  Thursday morning, but whenever we find out.

 6                    THE COURT:  Oh, Thursday morning.  So you're

 7  saying it may be as early as tomorrow morning?

 8                    MR. DORAN:  Yes.  It doesn't matter the

 9  order.  I can call Mr. McCullough first if he's here or

10  Mr. Harris.  Whatever works best.

11                    (Jury present.)

12                    THE COURT:  Very well.  Everybody may be

13  seated as we find our places in the courtroom.

14                    The record will reflect the ongoing presence

15  of the parties and the presence of our jury, with our

16  continuing thank you for your commitment.

17                    We may call that witness back up, and we

18  will continue with his direct examination.

19                    Sir?

20                    THE WITNESS:  Swear back in or --

21                    THE COURT:  Right here.  You remain under

22  oath.

23                    THE WITNESS:  Okay.

24  BY MS. LAKE:

25     Q.   I'm going to ask you to go back just a little bit

1  in your story and tell us how -- how the car first got

2  your attention.

3       A.    I believe we left off that the vehicle coming

4  southbound on 15th Drive making a westbound, which would

5  have been their right-hand turn, toward 17th Avenue.  As

6  the vehicle passed us going parallel, I let down my

7  window, stuck my head out, turned around, looked to see

8  what the vehicle's license plate was, see if I could have

9  Officer Backhaus run it.

10                  There was no license plate on the vehicle.

11  I was able to see that there was what appeared to be a

12  temporary tag in the upper right rear windshield of the

13  vehicle, but due to the windows being tinted, I couldn't

14  read the number and lettering.  I could just see that it

15  was there.

16       Q.    So at this point, you and the Jaguar are going

17  opposite directions?

18       A.    Correct.

19       Q.    And so by sticking your head out the window, what

20  are you able to see?

21       A.    That there was no license plate on the Jaguar and

22  that there appeared to be possibly a temp tag in the upper

23  right rear windshield.

24       Q.    So you were able to see the back -- the back of

25  the car?

1      A.   Back of the vehicle, yes.

2      Q.   Okay.  Tell me a little bit about how those

3   temporary tags work.  Is there a number on them that you

4   can run in your system?

5      A.   There is.  It's more or less like a regular

6   license plate, a vehicle registration, except that there's

7   periods of getting -- you can print out a three-day temp

8   tag.  You can print out a 30-day temp tag.  I think there

9   might even be dealer temp tags which go longer.  There's

10  different --

11     Q.   Okay.

12     A.   -- iterations of it.  But pretty much you check

13  it the same way you check the regular license plate as far

14  as MVD and records checks.

15     Q.   So there is a number on the tag that's supposed

16  to be displayed for police officers?

17     A.   Yes.

18     Q.   Is that number bigger or smaller than the number

19  that would be on a regular license plate?

20     A.   It depends on what type it is.  I believe this

21  one may have been five numbers.  It might have been six,

22  but most now are either -- regular vehicle registrations

23  are either six or seven.

24     Q.   Digits?

25     A.   Yes.

1    Q.    Okay.  The number itself, is it a larger font, a
2  larger size text than a regular license plate or a smaller
3  size text?
4    A.    Smaller, usually.
5    Q.    Is that why it was difficult for you to read the
6  number from where you were?
7    A.    It was due to the vehicle's dark tinted windows.
8  I could see that there was a paper tag there that was
9  either white or yellow.  That's usually what they are.
10  But I wasn't able to read the dark writing, because those
11  are usually printed in black ink.
12    Q.    Okay.  How well lit was the street?
13    A.    Streetlights, vehicle lights, lights from the
14  park, and the ambient lighting from the apartments there.
15    Q.    No sunlight; right?
16    A.    No sunlight.
17    Q.    What time was it?
18    A.    It was -- I believe I put 4:03 in my report,
19  4:03 a.m.
20    Q.    So when you couldn't read the tag, what did you
21  do?
22    A.    I decided to see where the vehicle went and see
23  if I could get ourselves into a position possibly where we
24  could see that temp tag or make a stop on the vehicle if
25  need be.  I went to 15th Avenue, continued eastbound there

 1 │ watching the vehicle out of my driver's side window to see
 2 │ if it went north or south.
 3 │              The vehicle turned northbound at 19th
 4 │ Avenue, at which point I went northbound on 15th and
 5 │ westbound on Camelback, which is the next main street
 6 │ north of Highland, to see if I could kind of intersect the
 7 │ vehicle coming through that interaction, 19th and
 8 │ Camelback.
 9 │              When I got to 19th Avenue and Camelback, the
10 │ same vehicle, the gold Jaguar, did pass us going
11 │ northbound on 19th Avenue.  And I was able to verify that
12 │ it was the same vehicle, just -- I recognized it as the
13 │ same vehicle.
14 │    Q.   Okay.  And from that vantage point, were you able
15 │ to read what was on the tag?
16 │    A.   Still no.
17 │    Q.   So what did you do next?
18 │    A.   I turned northbound behind the vehicle.  Tried to
19 │ follow it, see if we could get that information through
20 │ just being able to see it better.  19th Avenue was more
21 │ well lit or better lit than 15th Drive and the side
22 │ street.
23 │              Eventually, probably within a block and a
24 │ half, the vehicle began to turn into a parking lot of an
25 │ Arizona credit union, which is on the east side of the

64

1    street.  I believe I put the address as 5131, maybe.  Like

2    I said, between a block or two north of Camelback.

3              As the vehicle pulled in, we pulled in

4    behind it and were able to illuminate the rear of it with

5    our vehicle spotlights, at which point we were able to

6    read the lettering from the temp tag.

7        Q.    So Arizona Federal, what kind of business is

8    that?

9        A.    It's a credit union.

10       Q.    Like a bank?

11       A.    Something like that.

12       Q.    Was the business open or closed?

13       A.    The main business is closed, but it has a

14   drive-through ATM.

15       Q.    Okay.  Was the car in the area of the ATM?

16       A.    No.  The vehicle actually pulled -- when I said

17   it turned into the parking lot, it made an eastbound turn,

18   and it just kind of pulled straight over into the parking

19   lot area, whereas the ATMs are north of that by

20   approximately maybe a hundred feet or so.  It's quite a

21   distance.  So it pretty much went the opposite direction

22   of the ATMs.

23       Q.    Okay.  At that point did you have lights on yet,

24   or were you just pulling in behind them?

25       A.    Once we were able to get the lettering on the

1   license plate, at that point, when an MVD records check

2   was performed, we found that the vehicle's registration,

3   the temporary registration, had expired on December 18th

4   of 2013.  It was currently, as you said, the 31st of

5   December.  The vehicle was -- vehicle's registration was

6   expired.

7                   And at that point, I activated red and blue

8   overhead emergency lights.  Like I said, our spotlights

9   were still on.  And at that point, with all that lighting,

10  we were able to see the temporary tag actually read that

11  it expired on December 28th as opposed to our MVD system

12  saying that it expired on the 18th.

13      Q.   Okay.  But either -- it was after both of those

14  dates; correct?

15      A.   It was expired either way, yes.

16      Q.   Okay.  So when you stop a car or find a car that

17  is driving on an expired registration, generally what do

18  you do?

19      A.   I conduct a traffic stop on it.

20      Q.   Is that -- do you write them a ticket?  Do you

21  give them a stern warning?

22      A.   It depends.  I guess it would depend on how

23  expired, what their reasoning for not being able to get

24  the registration up to date in a timely manner is.

25  There's a lot of factors that could go into it.

1       Q.   Okay.  What did you do in this case?

2       A.   In this case, after contacting the driver of the

3  vehicle, who was defendant's friend, Mr. McCullough, and

4  Ms. Salazar, we ended up having to take their information

5  from them, just writing it down.  Neither one of them had

6  identification with them.  So I obtained their information

7  verbally; name, date of birth, possibly Social.  Went back

8  to the vehicle to conduct MVD and records checks on the

9  both of them.

10            Officer Backhaus took care of that duty

11  while I watched the vehicle.  It's -- usually the

12  passenger works computer and the radio while the driver is

13  focusing, or it could be the opposite.  But usually with

14  Officer Backhaus and I, driver watches the vehicle and the

15  people in it, passenger operates the computer and the

16  radio.

17            While Officer Backhaus was conducting the

18  MVD and records checks, I kind of remarked to him that

19  Ms. Salazar was moving around quite a bit inside the

20  vehicle in a way that drew my attention.

21       Q.   Okay.  So where does Officer Backhaus conduct

22  that check?

23       A.   Right next to me, inside the vehicle.

24       Q.   Inside your patrol car?

25       A.   Yes.

1    Q.   There's a computer terminal in there?

2    A.   Yes.  A mobile data computer.

3    Q.   And while he's doing that, where are you?

4    A.   In the driver's seat.

5    Q.   So you're inside your car, and the defendant's

6    inside the other car?

7    A.   Correct.

8    Q.   And I know you touched on this, but where was the

9    defendant seated?

10    A.   In the front passenger seat.

11    Q.   Okay.  And then what was the result of the

12    records check?

13    A.   Mr. McCullough was found to have a suspended

14    driving privilege.  I believe at that time, Ms. Salazar

15    did as well.

16    Q.   But only Mr. McCullough was driving; right?

17    A.   Correct.

18    Q.   So when someone is driving on a suspended

19    license, what is your practice?

20    A.   To issue them the appropriate citations and also,

21    anyone found driving on suspended or revoked driving

22    privilege, per Arizona Revised Statute 28-3511, the

23    vehicle is to be impounded.

24    Q.   Okay.  So to impound the car, what do you have to

25    do?

1    A.   Due to driving on a suspended, revoked privilege

2  being a criminal offense, that's -- whether I give the

3  person a citation and release them or whether they end up

4  going to jail is kind of -- it's a Class 1 Misdemeanor.

5  It is a crime to drive on a suspended or revoked

6  privilege.

7          So at that point, Officer Backhaus and I

8  removed both people from the vehicle, and Mr. McCullough

9  was placed under arrest for driving on a suspended

10  privilege.

11    Q.   Okay.  And what does it mean to impound a car?

12  What happens to the car?

13    A.   The vehicle is -- we conduct an inventory search

14  of the vehicle, which is basically going from front to

15  back of the vehicle just so that the owner and/or driver

16  of the vehicle don't later make any claims, "I had a

17  Picasso in the trunk and now it's missing," that type of

18  thing.  Just to say if there's anything of import or

19  monetary value inside the vehicle.

20    Q.   So if there were $10,000 in cash in the trunk,

21  you would just document that?

22    A.   Find out what the person wanted us to do with it.

23  If they wanted it to go with them, it would go with them.

24  If they wanted us to impound it, we would impound it.  But

25  we would have to document that and witness it, include it

1    in our documentation.

2        Q.   Okay.  So in this case, did you ask the driver

3    and the defendant both to get out of the car?

4        A.   Yes.

5        Q.   And what did you do with the defendant?  Where

6    was she?

7        A.   She was standing up near the rear of her vehicle

8    with Officer Backhaus.  After I placed Mr. McCullough

9    under arrest, I walked him back to our vehicle, conducted

10   a search of him incident to arrest, and placed him into

11   the rear seat of our vehicle.

12       Q.   Okay.  Did you then search the car?

13       A.   Yes.

14       Q.   Walk me through what you did first.

15       A.   The first thing I did -- Officer Backhaus kind of

16   moved Ms. Salazar over to the right of her vehicle, I

17   guess, towards the south of the vehicles.  The first thing

18   I did was check the front passenger seat where she had

19   been sitting, due to, as I said, my having observed her

20   moving around furtively inside the vehicle while we were

21   conducting records checks of them.  I believe that she had

22   been hiding something during that time.

23            Do you want me to explain furtive movements

24   or --

25            MR. DORAN:  Objection.  Lack of foundation.

```
 1                    MS. LAKE:  I'll circle --
 2                    THE COURT:  Lay some foundation.
 3                    MS. LAKE:  I will.  Thank you, Your Honor.
 4   BY MS. LAKE:
 5        Q.    While Officer Backhaus was conducting the records
 6   check, you were charged with watching the car; right?
 7        A.    Yes.
 8        Q.    What is it that you observed the two people in
 9   the car doing while you were doing that?
10        A.    I observed Mr. McCullough turn towards his right
11   slightly, speaking with Ms. Salazar.  I could see his -- I
12   could see that he was speaking.  I observed that
13   Mrs. Salazar was turning at the waist towards the center
14   console area.  I could see her arms coming over.  It was
15   obvious that she was moving or removing something, placing
16   or displacing something, in my experience.  And this was
17   for approximately five to ten seconds.
18                    I called Officer Backhaus's attention to it.
19   And we just kind of, you know, "What's she doing?  That's
20   suspicious."  That was what I meant by --
21        Q.    Okay.
22        A.    -- suspicious movements.
23        Q.    Okay.  So could you see the defendant's hands?
24        A.    No.
25        Q.    Were you look -- were you watching her from
```

1  behind or from the front?

2      A.   From behind.

3      Q.   So could you see her face?

4      A.   When she turned, I could see her.  I could see

5  her profile.  I couldn't see it super clearly, but yes.

6      Q.   Okay.  Could you see that the two people in the

7  car were having a conversation?

8      A.   Yes.

9      Q.   And could you see Ms. Salazar's shoulders

10 rotating from left to right?

11     A.   Yes.

12     Q.   Okay.  So what conclusion did you draw at the

13 time about what that behavior might have indicated?

14              MR. DORAN:  Objection.  Relevance.

15              THE COURT:  Overruled.

16              THE WITNESS:  As I said earlier, it appeared

17 to me that she was hiding something.

18 BY MS. LAKE:

19     Q.   So when you went to inventory the car, what's the

20 first place you looked?

21     A.   Her seat and the surrounding area.

22     Q.   Okay.  So tell me how -- tell me how that went.

23     A.   Vehicle's door was already sitting open.  When we

24 had them exit, the doors remained open.  I walked over to

25 the front passenger side door.  I leaned in slightly, at

1  which point -- do I say what I saw or just that I leaned

2  in?

3      Q.   Okay.  You --

4      A.   I kind of just stuck my head in the front

5  passenger side compartment area and took a quick look

6  around.

7      Q.   When you just leaned in, did you touch anything?

8      A.   Not at first.

9      Q.   Did you move anything out of the way?

10     A.   No.

11     Q.   What did you see?

12     A.    In between the front passenger seat where

13  Ms. Salazar was sitting and the center console, sticking

14  up vertically -- well, it was at an angle facing towards

15  the front of the vehicle, I saw a small clear glass pipe,

16  ended up being approximately 4 inches in length.

17          The body of the pipe was filled with white

18  and brown burned residue.  There was steel wool, burned,

19  stuffed in one end, above which sat on a small, waxy,

20  rocklike substance.  And I recognized through my training

21  and experience as a police officer that to be crack

22  cocaine.

23          MS. LAKE:  Your Honor, may I approach the

24  witness?

25          THE COURT:  Pardon me?

COP-SALAZAR6069

```
 1                MS. LAKE:  Are you finished with that?
 2    BY MS. LAKE:
 3        Q.   When you pulled this pipe out of the car, was
 4    there a substance in the pipe besides the steel wool?
 5        A.   Yes.  As I said, a small, waxy, rocklike
 6    substance, usually ivory colored, I'd say.  That was stuck
 7    down in the end of the pipe where the steel wool was.
 8        Q.   When you impound pipes and substances together,
 9    do you generally separate them before impounding them?
10        A.   Yes.
11        Q.   So this pipe that's in evidence does not contain
12    anything that might be drug material?
13        A.   Not unless there's remnants.  Or the actual crack
14    itself, what was later determined through a field test to
15    be crack, was separated from the pipe.
16        Q.   Okay.  And when -- but when you pulled it out of
17    the car, there was something in there?
18        A.   Yes.
19        Q.   Based on your training and experience, what did
20    you believe that substance to be?
21        A.   Crack cocaine.
22        Q.   When you found the pipe, did you ask the
23    defendant about it?
24        A.   Not immediately.  I placed the pipe on top of the
25    vehicle, out of sight of the defendant, while I finished
```

1  my inventory search.

2      Q.   And when you had finished the search, did you

3  talk to the defendant?

4      A.   I did.

5      Q.   What did you ask her?

6      A.   I asked her -- I read her her Miranda rights.

7      Q.   I'm going to stop you right there.

8      A.   Sure.

9      Q.   Just tell me what you asked her.

10      A.   The first thing I asked her?

11      Q.   The first question that you asked her about --

12      A.   After Miranda?

13      Q.   Yes.

14      A.   Okay.  I confronted her with the fact that I

15  located the pipe.  First I told her -- while we were

16  impounding the vehicle, I told her why she was under

17  arrest.  And then I said, "Hey, I found your crack pipe."

18  Asked, you know, "Is this yours, and do you know what's in

19  that pipe?"

20              And she admitted it was hers and that she

21  knew that there was crack inside the pipe.  Then we kind

22  of went off on a small tangent.  The defendant began

23  telling me that she doesn't use methamphetamine, which I

24  just -- I had to kind of steer the conversation back to

25  we're talking about crack, we're not talking about meth,

COP-SALAZAR6078

1   kind of getting off subject here.

2           She admitted that she had been a frequent

3   user of crack cocaine until approximately 2007.  She said

4   she had been clean since then, but she'd recently relapsed

5   back into using the crack.

6           Kind of asked her a few more basic drug

7   questions.  I asked her -- I wanted to find out where she

8   bought it from.  She wouldn't tell me that.

9           And then after a couple minutes, she kind of

10  said, "Well, maybe that's not mine.  There might have been

11  somebody else in the car that had it."  Kind of went back

12  and forth.  She would say, "I admit that it's mine," and

13  she would say "Maybe it's not."  And then -- sorry.  That

14  was just kind of strange.

15          Then she said, "Well, maybe it's not mine,

16  but even if it isn't, I'll take responsibility for it."

17  And then kind of round and round again.  "It's mine; no,

18  it's not," that type thing.

19  Q.   When you say -- when you say she said, "I'll take

20  responsibility for it," is that a direct quote?

21  A.   Yes.

22  Q.   Did she admit that she does smoke crack?

23  A.   She did.  She said that -- she admitted that she

24  was currently a crack user again after her relapse, but

25  she said that she doesn't carry her crack around with her.

1   She leaves it at home.

2       Q.   Based on your training and experience, do people

3   who use crack generally leave their paraphernalia at home?

4       A.   No.   They carry it with them for ease,

5   availability, and immediacy of use.

6                   MS. LAKE:   No further questions.

7                   JURY MEMBER:   Excuse me.   I apologize, but

8   it's too soon after lunch.   May I take a biological break

9   here?   I'm suffering.

10                  MS. LAKE:   Now would be a great time to take

11  a break.   I'm finished with this witness.

12                  THE COURT:   All right.   We'll take about a

13  10- to 15-minute recess.

14                  JURY MEMBER:   I'm sorry.

15                  THE COURT:   Absolutely no need to apologize.

16  And thank you for telling us.

17                  Please remember the admonition.

18                  (Jury not present.)

19                  THE COURT:   Very well.   We'll take a recess.

20  We'll be off the record.   Thank you.

21                  I did get ahold of Mr. Peterson, who said

22  he'd be here tomorrow.

23                  MR. DORAN:   Thank you, Your Honor.

24                  (Recess taken.)

25                  THE COURT:   All right.   Thank you.   Let's

1  legal issues in this case; right?

2    A.   Yes.

3    Q.   And the prosecutor at the time that was sitting

4  next to you, Julia VanHelder?  Do you recall that?

5    A.   Yes.

6    Q.   And at that hearing, you testified about this

7  case under oath; right?

8    A.   Yes.

9    Q.   In a court of law?

10    A.   Yes.

11    Q.   At either of those hearings, you never testified

12  that Frances Salazar admitted to the pipe being hers, did

13  you?

14    A.   I believe I did.  That's in my report.

15    Q.   You believe that you did testify that at both

16  hearings?

17    A.   I don't remember exactly what I said two and a

18  half years ago or later last year.  It's -- whatever's in

19  my report.

20    Q.   So you don't know if you testified to her

21  admitting to the pipe being hers at either of the two

22  hearings before?

23    A.   I believe what my report said was that Frances

24  admitted to knowing that the substance inside the pipe was

25  crack.  And then --

1     Q.   You told her you weren't asking her about that;
2  right?
3     A.   Yes.
4     Q.   She repeated to tell you that she doesn't smoke
5  meth?
6     A.   Yes.
7     Q.   And you showed her the crack that was inside the
8  pipe?
9     A.   Yes.
10    Q.   And she identified that as being crack cocaine;
11 right?
12    A.   Yes, she did.
13    Q.   Now, at some point while you were speaking with
14 Frances, she told you, and you put this part in quotes,
15 that she would take responsibility for it?
16    A.   Yes.
17    Q.   She didn't say, "That's my crack pipe," did she?
18    A.   The pipe specifically, no.
19    Q.   She didn't say, "That's mine," did she?
20    A.   She admitted to possession of the drugs.
21    Q.   Officer, that's not my question.  I asked you if
22 she said, "That's mine."  She didn't say that, did she?
23    A.   You asked me specifically -- sorry --
24 specifically about the pipe itself?
25    Q.   Yes.

1  Mr. McCullough lean over and say something to Frances.

2      A.   I saw him turn towards her, not lean over.

3      Q.   You testified that he was saying something to

4  Frances; right?

5      A.   Yes.

6      Q.   That's not in your police report, is it?

7      A.   No.

8      Q.   You haven't testified to that before today, have

9  you?

10     A.   I'm not certain.

11     Q.   Frances's movements, you said that she made a

12  movement of turning her -- the upper half of her body,

13  like a hip rotation, I think you described it as; is that

14  right?

15     A.   No.  Turning towards the center console, leaning

16  over.  Could see her arms coming over.  As I said, it

17  looked as if she was placing something towards the center

18  console or removing something from there.

19     Q.   Without your opinion, I just want to talk to you

20  about your observation.

21     A.   That was my observation, sir.

22     Q.   Your observation is that she turned the upper

23  half of her body to the left and moved her hands over?

24     A.   Yes, as she was reaching towards the center

25  console.

1    to some type of violent attack where you can react safely.

2        Q.   And so as a result, you couldn't really see --

3    could you really see the passenger?

4        A.   No.

5        Q.   Did you see where -- if the passenger had a

6    purse?

7        A.   She did have a purse.

8        Q.   Do you recall where it was?

9        A.   At that time, it was on her lap.

10       Q.   And "that time" is the time you approached the

11   driver?

12       A.   Yes, initially.

13       Q.   Have you ever been asked before today about the

14   defendant's movements inside the car while you were

15   running her record?

16       A.   I'm not certain.  I know -- I believe I've spoken

17   about it.  I'm not certain if I've been asked.

18       Q.   Let's talk a little bit about the interview that

19   you did with the defendant.

20            The first -- you testified that the first

21   question you asked the defendant was, "Hey, I found your

22   crack pipe."

23       A.   Yes.

24       Q.   Right?

25            What was the defendant's reaction?

1    A.    That's when she said, "Yes.  That's crack."  And
2  then she told me about her recent relapse back in the
3  usage of crack cocaine after a period of being clean.
4    Q.    Did she seem surprised to see a crack pipe in
5  your hand?
6    A.    No.
7    Q.    Did she tell you that it -- did she tell you she
8  had no idea it was there?
9    A.    No.
10   Q.    What did she say?
11   A.    As I said, she started admitting that the
12  substance was crack cocaine, said she had been clean since
13  2007 but had recently relapsed.  And that's when she
14  started saying that she didn't use methamphetamine.
15  Steered her back towards the crack cocaine.  And then
16  after that, after several minutes is when she started
17  saying, "Well, maybe somebody else left that there."  That
18  type thing.
19   Q.    When did she tell you she would take
20  responsibility for it?
21   A.    After going back several times of saying that the
22  crack was hers and then maybe someone else left it there,
23  maybe two or three times with that, then finally she said,
24  "I'll take responsibility for it."
25              MS. LAKE:  May I approach the witness?

```
 1              THE COURT:  You may.
 2  BY MS. LAKE:
 3      Q.    I'm showing you what's been marked as Exhibit 4.
 4              Is this the same document defense was
 5  reading from earlier today?
 6      A.    Yes.
 7      Q.    I'm going to direct you to that same place where
 8  defense had you read.  It begins:  Frances admitted to the
 9  substance inside the pipe being crack.
10              Do you see where I am?
11      A.    Yes.
12      Q.    In that area of your report, do you go on to
13  document some other things the defendant said?
14      A.    I do.
15      Q.    Will you read to us from where I left off.
16      A.    Frances admitted to the substance inside the pipe
17  being crack, but refused to tell me where she buys it
18  from.  Frances then tried to recant her statement and
19  claim that someone else must have left the pipe and drugs
20  there but that she would, quote, "take responsibility for
21  it," end quote.
22              Frances would go back and forth between
23  lying about the drugs and admitting to them due to her
24  recent relapse.  Frances stated that she does smoke crack
25  but, quote, "I don't carry my stuff around.  I leave it at
```

EXHIBIT D

Michael K Jeanes, Clerk of Court
*** Electronically Filed ***
M. Martin, Deputy
3/15/2017 8:17:25 AM
Filing ID 8170959

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,              )

        Plaintiff,            )

     v.                       )   1 CA-CR 16-0914

FRANCES MARIE SALAZAR,         )   CR2013-462384-001 DT

        Defendant.            )

_____)

Phoenix, Arizona

April 1, 2016

10:09 a.m.


BEFORE:  THE HONORABLE DANIEL J. KILEY


REPORTER'S TRANSCRIPT OF PROCEEDINGS

EVIDENTIARY HEARING




(Original)




Scott A. Kindle, RPR
Certified Reporter No. 50711


SUPERIOR COURT
Phoenix, Arizona

1    conversation proceed with the officer?  Did you end up

2    getting arrested?  Did he pull you out of the car?  What

3    happened?

4        A.   Yes, I did end up getting arrested.  I was the

5    passenger in the vehicle.  When he asked me for my

6    identification, I pulled my wallet out of my purse, and I

7    gave him my ID, and then he asked me to step out of the

8    car.  And I stepped out of the car, had my wallet.  He told

9    me to leave everything in the car, so I tossed my wallet on

10   the seat.  And so I get out of the car.  And I had no

11   warrants or no probation or no -- any kind of issues that I

12   should have been arrested to begin with.

13       Q.   The officer, did he tell you that he is arresting

14   you for falsifying a registration on a vehicle?

15       A.   No.  He arrested me for possession of narcotic

16   drugs and drug paraphernalia.  I don't recall him saying

17   anything about arrest on this.

18       Q.   Okay.  So --

19       A.   However, I did admit to that.

20       Q.   So it's your understanding that he placed you

21   under arrest after he found drugs and paraphernalia in the

22   vehicle?

23       A.   Right.

24       Q.   Where was Rodney when this conversation was going

25   on with you and the officer?

SUPERIOR COURT
Phoenix, Arizona

1       A.   My bank cards, my -- just different miscellaneous

2   cards that us women and men that are important to them for

3   different reasons.   Everything that -- all my information,

4   all kinds of documents pertaining to the doctors'

5   appointments, courts, tickets, the things that I had in

6   there, you know, and I had my make-up.   I can't tell you

7   exactly what was in my purse because -- but I know there

8   was a lot of things that were valuable to me.   I mean

9   just -- and jewelry.   I had a watch that I still have, a

10  watch face, and it's valued at about $900.   I had a broken

11  ring in there.   I had some other miscellaneous stuff in

12  there that was valuable to me.   And --

13      Q.   Was there anything else outside of the purse that

14  was in the car that --

15      A.   The wallet that I took my ID out of that the

16  officer told me to leave in the car, once I gave him my ID.

17  So I gave him my ID, and he told me to step out.   He didn't

18  allow me to put my wallet -- bless you -- back in my purse,

19  so I tossed it on the seat.

20      Q.   Anything else inside the car that you know of?

21      A.   Nothing else in the car belonged to me.   At the

22  time that I returned -- that I quit trying to purchase the

23  car because of the lien, anything that belonged to me that

24  pertained to me in name or anything else was gone.

25              MR. DORAN:   Your Honor, I have no further

# EXHIBIT E

## DECLARATION OF ANTHONY ARMOUR

STATE OF ARIZONA     )
                               ) ss.
County of Maricopa       )

I, Anthony Armour, say and attest the following:

1.     I was employed as a police officer with the City of Phoenix Police Department from July 2006 through May 2019.  I retired from the Phoenix Police Department on May 31, 2019.  For the entire duration of my career with the City of Phoenix Police Department, my assignment was patrol officer.

2.     On December 31, 2013, I arrested Frances Salazar after conducting a traffic stop of the vehicle (a gold Jaguar sedan) in which she was a passenger.

3.     A true and correct copy of the Departmental Report that I prepared regarding her arrest, Phoenix Police Departmental Report No. 2013 02308942, is attached hereto as Exhibit 1.

4.     After we stopped the vehicle, my partner Officer Keith Backhaus and I approached the vehicle.

5.     We asked the occupants, Frances Salazar and Rodney McCullough, for the vehicle's registration and Ms. Salazar told them that there was not a current title or registration for the vehicle.

6.     When we questioned Ms. Salazar about the temporary tag I had observed in the window of the Jaguar, Ms. Salazar admitted that she had altered the expiration date on the temporary registration tag she had obtained for the vehicle by changing it from December 18, 2013 to December 28, 2013.

7.      I also asked Ms. Salazar if there was anything illegal in the vehicle and she said there was not.

8.      I then specifically asked Ms. Salazar if there were any drugs in the vehicle and she responded, "There shouldn't be," but she stated there had been several people in the vehicle.

9.      Based on the fact that Ms. Salazar admitted to having altered the temporary registration which she possessed, I had probable cause to arrest her for knowingly displaying or possessing a fictitious plate/temporary tag.

10.     I summoned a female officer to search Ms. Salazar incident to arrest.

11.     When the female officer searched Ms. Salazar, she found a broken glass pipe that appeared to have been used for smoking crack in the pocket of the jacket Ms. Salazar was wearing.

12.     Upon searching the Jaguar, I found a clear glass pipe containing what appeared to be a rock of crack cocaine stashed between the passenger seat where Ms. Salazar had been sitting and the center console.

13.     I arrested Ms. Salazar and booked her into jail for possession of narcotic drugs, possession of drug paraphernalia, and knowingly displaying fictious plates.

14.     On November 4, 2015, I was following up on a domestic violence call and I contacted a female at an apartment and arrested her and a male occupant.

15.     A true and correct copy of the Incident Report that I prepared regarding that incident, Phoenix Police Incident Report No. 201500002127039, is attached hereto as Exhibit 2.

2

16.     At the time of the incident, I believed the female was committing the crime of hindering prosecution because she was harboring or concealing the male suspect from being apprehended.

17.     During that incident, I believed a warrantless entry into the apartment was lawful because I understood another police officer and a third-party witness to have stated that they had seen the male suspect inside the apartment and the female occupant initially gave her consent for me to enter.

18.     Once it was later explained to me why it was not lawful for me to remain in the apartment after the female who answered the door revoked the consent she initially gave me to enter—because the act of domestic violence for which we had probable cause to arrest the male suspect was a misdemeanor—I understood and agreed that remaining in the apartment after consent was revoked not lawful.

19.     Following the November 4, 2015 incident, the Professional Standards Bureau ("PSB") of the Phoenix Police Department conducted an investigation of that incident.

20.     On January 28, 2016, I signed a Notice of Investigation regarding the PSB investigation (assigned PSB#15-0126), acknowledging that I had been advised of the investigation.

21.     The draft PSB report for PSB#15-0126 was provided to me on May 5, 2016.

22.     I did not agree with the findings contained in the draft PSB Report, but I did not know that I could dispute the findings prior to the investigation becoming final because my union representative did not communicate the process to me as he was supposed to do and the union representative simply signed the Investigative Review Control form

acknowledging receipt of the draft PSB Investigation on my behalf and returned the form to PSB without my knowledge or consent.

23.     The Notice of Findings for PSB#15-0126 was provided to me on June 27, 2016.

24.     I still did not agree with the findings, and I thought I could appeal during the review by the Phoenix Police Departments' Disciplinary Review Board ("DRB"), which is what I intended to do.

25.     However, again, my union representative did not provide me with the proper information regarding what I needed to do to appeal.

26.     I did not believe the PSB Investigation would be complete until after the DRB Hearing and after I was notified of my discipline by the Phoenix Police Department.

27.     On August 10 and 11, 2016, I testified at Frances Salazar's criminal trial.

28.     Before I testified at Ms. Salazar's criminal trial, I was never asked by the prosecutor or by Ms. Salazar's criminal attorney in a defense interview whether I was the subject of any PSB investigations or had any sustained findings of police misconduct.

29.     If I had been questioned at trial about my actions that were the subject of PSB Investigation PSB#15-0126, I would have testified that I disputed PSB's findings of untruthfulness and that I reasonably believed I had probable cause to enter the apartment and arrest the two occupants.

30.     I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on this  4th  day of February, 2022.

_____
Anthony Armour

4

# EXHIBIT 1

```
                    PHOENIX POLICE DEPARTMENT REPORT

      ORIGINAL          PAGE NUMBER:   1    DR NUMBER: 2013 02308942


REPORT DATE: 20131231   TIME: 0633

TYPE OF REPORT:  POSSESSION OF NARCOTIC DRUGS          OFFENSE: 237N

PROSECUTION DESIRED: YES                      SUSPECT[S]:  BOOKED

LOCATION: 005151 N 19TH AVENUE              BEAT: 0732  GRID: BJ25

DATE/TIME OF OCCURRENCE:   TUE   123113   0405

REPORTING OFFICER[S]: ANTHONY ARMOUR           8605    UNIT: 72K
                      KEITH BACKHAUS           8523

PREMISES: PARKING LOT                            OCCUPIED: YES

OFFENSE INVOLVED:  BIAS - NONE(NO BIAS)

PARTY-CREW: NO

PHOTOGRAPHS TAKEN: NO   BY:

SCENE PROCESSED FOR LATENTS: NO     BY:

REPORT DISPOSITION: FIELD CLEARED BY ARREST          OVER AGE 18: YES

                  ****  SUSPECT INFORMATION  ****

  ARRESTED PERSON-01:
                  NAME: SALAZAR, FRANCES MARIE
                  AKA:

    SPEAKING: ENGLISH

    SUSPECTED OF USING: DRUGS/NARCOTICS

    RACE: H  SEX: F  AGE: 51    DOB: 100462  HT: 509     WT: 160
    HAIR: BRO      EYES: BRO   SSN: 527658152
    OLN: B12823952          AZ       R&I:
    HOME: 017771 W  SOUTHERN AVENUE        APT/SUITE:
        GOODYEAR        AZ                 ZIP CODE: 85338
    MORE PHONE:CELLULAR: (602)367-5195
    LEVEL OF FORCE : RESTRAINT,JOINT LOCKS,PRESSURE PTS,OR CUFFS
    CITIZENSHIP: US                PLACE OF BIRTH: AZ

    ARREST:
        DATE: 123113   TIME: 0440       DAY: TUE   GRID: BJ24
        LOC: 005151 N 19TH AV                   PHOENIX      AZ
        PHX.P.D. BOOKING NO: 201312310330

    RIGHTS ADVISED: YES   TIME:   0515   OFFICER: 8605


2013 02308942                                   Continued.
```

COP-SALAZAR0001

PHOENIX POLICE DEPARTMENT REPORT

ORIGINAL            PAGE NUMBER:   2    DR NUMBER: 2013 02308942


**** VICTIM INFORMATION ****

VICTIM -01:
                NAME: STATE OF ARIZONA

    INSTITUTION TYPE: SOCIETY/PUBLIC

    VICTIM OF:
        DRUG/NARCOTIC VIOLATIONS - COMPLETED
            POSSESSING/CONCEALING


    VICTIM DECLINES NOTIFICATION

        ****  SUSPECT VEHICLE ****

VEHICLE NO.: 01   INVOLVED PERSON: AP-01  SALAZAR FRANCES MARIE

LAST KNOWN DIRECTION OF TRAVEL: NORTHBOUND

VEHICLE    YEAR: 01   MAKE: JAGU    MODEL: X-TYPE        STYLE: PC
    VIN:  SAJDA24C91LF22824        OAN:
    COLOR: TOP/SOLID-GLD

    LICENSE PLATE: D157D6      STATE: AZ    TYPE: TM   YEAR: 13

OWNER NAME: SALAZAR, FRANCES MARIE            REGISTERED TO OWNER: YES

        ***   PROPERTY/EVIDENCE   ***

RECOVERY LOCATION: 005151 N 19TH AV
            DATE: 123113                SEARCH WARRANT INVOLVED:

0001  PKG 001 CODE:EI   AP01
                ITEM: YDRUGPA BRAND:      MODEL:            COLOR:
    SIZE:           QUANTITY: 0001    SERIAL NO.:
    DESCRIPTION: MULTI-COLORED GLASS PIPE, APPROXIMATELY 3 INCHES I
    N LENGTH, WITH BOWL END BROKEN OFF, AND FILLED WITH BURNED STEEL WOOL. COM
    MONLY USED TOOL FOR SMOKING CRACK COCAINE, FOUND IN POSSESSION OF AP1 DURI
    NG SEARCH INCIDENT TO ARREST

        **** NARRATIVE ****
    SERIAL NUMBER: 8605

ON 12/31/13 AT APPROXIMATELY 0405 HOURS, AP1 FRANCES WAS FOUND TO BE IN
POSSESSION OF NARCOTIC DRUGS (CRACK COCAINE) AND DRUG PARAPHERNALIA DURING
A TRAFFIC STOP AT 5151 N. 19TH AV. FRANCES WAS TRANSPORTED AND BOOKED INTO
JAIL.

ON 12/31/13 AT APPROXIMATELY 0403 HOURS, WHILE RIDING AS A TWO-MAN UNIT
WITH OFC. BACKHAUS #8523, WE WERE TRAVELING EASTBOUND ON W. HIGHLAND AV.

2013 02308942                                           Continued.

COP-SALAZAR0002

PHOENIX POLICE DEPARTMENT REPORT

ORIGINAL          PAGE NUMBER:   3     DR NUMBER: 2013 02308942

FROM N. 17TH AV., WHEN WE OBSERVED A GOLD 4-DOOR PASSENGER VEHICLE TURN
WESTBOUND FROM N. 15TH DR. ONTO W. HIGHLAND AV. AS THE VEHICLE PASSED US,
I LOOKED OUT OF THE DRIVERS SIDE WINDOW, AND OBSERVED THE VEHICLE DID NOT
HAVE ANY LICENSE PLATE, BUT DID HAVE A TEMPORARY TAG IN THE UPPER RIGHT-
HAND CORNER OF THE REAR WINDOW. I CONTINUED TO N. 15TH AV., WHERE I SAT
AND CONTINUED TO WATCH THE VEHICLE TO DETERMINE WHICH DIRECTION IT WOULD
GO. I OBSERVED THE VEHICLE MAKE A NORTHBOUND TURN ONTO WHAT I BELIEVED WAS
N. 19TH AV. I MADE A WESTBOUND TURN ONTO W. CAMELBACK RD. AND CAME TO THE
RED LIGHT, AND AS I DID, THE SAME VEHICLE TRAVELED NORTHBOUND THROUGH THE
INTERSECTION. I TURNED BEHIND THE VEHICLE, WHICH WAS TRAVELING IN THE CURB
LANE. THE VEHICLE BORE AZ TEMPORARY TAG D157D6. THE VEHICLE SLOWED, AND
BEGAN TO TURN INTO THE PARKING LOT OF THE ARIZONA FEDERAL CREDIT UNION, AT
WHICH TIME THE VEHICLE CAME TO A STOP IN THE MIDDLE OF THE PARKING LOT,
NOT IN A SPACE. AN MVD/RECORDS CHECK OF THE TEMPORARY TAG REVEALED IT TO
BE EXPIRED AS OF 12/18/13; HOWEVER, THE TAG READ 12/28/13, AND APPEARED TO
HAVE BEEN ALTERED BY HAND WITH A BLACK MARKER. I ACTIVATED THE OVERHEAD
RED AND BLUE EMERGENCY LIGHTS ON OUR FULLY-MARKED PATROL VEHICLE, AT WHICH
TIME OFC. BACKHAUS AND I CONTACTED THE OCCUPANTS. THE DRIVER WAS A BLACK
MALE LATER IDENTIFIED TO US AS RODNEY MCCULLOUGH 1/22/80. THE FRONT SEAT
PASSENGER WAS A HISPANIC FEMALE LATER IDENTIFIED TO US AS AP1 FRANCES. THE
VEHICLE WAS REGISTERED TO FRANCES.

BOTH RODNEY AND FRANCES TOLD US THAT THEY DID NOT HAVE ANY FORM OF
IDENTIFICATION WITH THEM, SO I COLLECTED THEIR INFORMATION FROM THEM
VERBALLY. FRANCES ADVISED ME THE VEHICLE BELONGED TO HER, BUT THAT SHE WAS
UNABLE TO GET IT REGISTERED IN HER NAME BECAUSE THE PERSON SHE WAS BUYING
THE VEHICLE FROM, ANTONIO HARRIS, HAD A LIEN AGAINST IT. FRANCES STATED
SHE DID NOT HAVE THE CURRENT TITLE OR REGISTRATION FOR THE VEHICLE, AND
THAT THERE WAS NO INSURANCE ON IT. RODNEY AND FRANCES WERE BOTH VERY
NERVOUS, AND THEIR BEHAVIOR WAS SUSPICIOUS. AN MVD/RECORDS CHECK OF RODNEY
REVEALED HIM TO HAVE A SUSPENDED DRIVING PRIVILEGE. AS WE WERE CONDUCTING
MVD/RECORDS CHECKS OF RODNEY AND FRANCES, WE OBSERVED FRANCES TO BE
BENDING OVER TO HER LEFT, TOWARDS THE CENTER CONSOLE A LOT. WE RETURNED TO
THE VEHICLE, AND I ASKED IF FRANCES COULD LOCATE THE TEMPORARY
REGISTRATION WHICH WAS IN HER NAME, WHICH SHE DID, ALTHOUGH SHE HAD SAID
EARLIER SHE DID NOT HAVE IT. THE EXPIRATION DATE ON THE TEMPORARY TAG
FRANCES AND RODNEY HANDED ME WAS 12/18/13. ONCE I HAD THE REGISTRATION IN
HAND, I INSTRUCTED THEM BOTH TO EXIT THE VEHICLE AND STEP TO THE REAR OF
IT. AT APPROXIMATELY 0425 HOURS, I PLACED RODNEY UNDER ARREST FOR DRIVING
ON SUSPENDED PRIVILEGE, AS WELL AS OPERATOR FAIL TO PROVIDE ID.

I SAT RODNEY INTO THE REAR SEAT OF OUR PATROL VEHICLE, AND THEN RETURNED
TO FRANCES'S VEHICLE. I THEN PICKED THE TEMPORARY REGISTRATION BACK UP,
AND ASKED FRANCES WHY THE ONE IN THE WINDOW SAID 12/28/13 AND THE ACTUAL
MVD COPY SAID 12/18/13. FRANCES IMMEDIATELY SAID, "YEAH, I DID THAT,"
ADMITTING THAT SHE ALTERED THE EXPIRATION DATE BECAUSE OF THE ISSUES SHE
WAS HAVING REGISTERING THE VEHICLE. I ASKED FRANCES IF THERE WAS ANYTHING
ILLEGAL INSIDE THE VEHICLE, AND SHE STATED THERE WAS NOT. I ASKED FRANCES
SPECIFICALLY IF THERE WERE ANY DRUGS INSIDE THE VEHICLE, AND SHE REPLIED,
"THERE SHOULDN'T BE," BUT SAID THAT THERE HAD BEEN SEVERAL PEOPLE INSIDE
THE VEHICLE BESIDES HER AND RODNEY. I ASKED FRANCES WHAT BAGS IN THE

2013 02308942                                              Continued.

COP-SALAZAR0003

PHOENIX POLICE DEPARTMENT REPORT

ORIGINAL          PAGE NUMBER:  4     DR NUMBER: 2013 02308942

VEHICLE BELONGED TO HER, AND SHE STATED THAT THE BROWN PURSE AND BLACK
WALLET IN THE FRONT PASSENGER SEAT BELONGED TO HER. I ASKED FRANCES IF SHE
HAD ANY NEEDLES OR PIPES ON HER PERSON, AND SHE STATED SHE DID NOT. AT
0440 HOURS, FRANCES WAS PLACED UNDER ARREST FOR KNOWINGLY DISPLAYING A
FICTITIOUS PLATE/TEMPORARY TAG.

I BEGAN CONDUCTING A SEARCH OF THE VEHICLE, BOTH INCIDENT TO ARREST, AS
WELL AS INVENTORY. THE BROWN PURSE FRANCES SPOKE OF WAS ON THE FRONT
PASSENGER SEAT FLOORBOARD, AND THE WALLET WAS SITTING ON THE SEAT. AS I
LEANED INTO THE VEHICLE, STUFFED BETWEEN FRANCES'S SEAT AND THE CENTER
CONSOLE, I OBSERVED A CLEAR GLASS PIPE, APPROXIMATELY 4 INCHES IN LENGTH.
I RETRIEVED THE PIPE, AT WHICH TIME I OBSERVED THAT THE PIPE WAS FULLY OF
BURNED WHITE AND BROWN RESIDUE. IN ONE END OF THE PIPE WAS STUFFED STEEL
WOOL, AS WELL AS ONE ROCK OF AN OFF-WHITE SUBSTANCE. THROUGH MY TRAINING
AND EXPERIENCE, INCLUDING AS A PHOENIX POLICE OFFICER, I RECOGNIZED THE
SUBSTANCE TO BE A ROCK OF CRACK COCAINE. I SET THE PIPE AND ROCK ON TOP OF
THE VEHICLE, AND DID NOT LET FRANCES KNOW I HAD LOCATED IT.

SEARCH INCIDENT TO ARREST OF FRANCES, OFC. STRNAD #9059 LOCATED A MULTI-
COLORED GLASS PIPE, APPROXIMATELY 3 INCHES IN LENGTH, OF WHICH THE BOWL
END HAD BEEN BROKEN OFF. INSIDE THE BROKEN END OF THE PIPE WAS MORE BURNED
STEEL WOOL, SIMILAR TO HOW THE STEEL WOOL WAS PACKED INTO THE GLASS PIPE
LOCATED INSIDE THE VEHICLE.

AT 0515 HOURS, I READ FRANCES HER MIRANDA RIGHTS FROM MY STANDARDIZED
DEPARTMENT-ISSUED CARD. I ASKED FRANCES IF SHE UNDERSTOOD HER MIRANDA
RIGHTS, TO WHICH SHE REPLIED, "YES." I FIRST ADVISED FRANCES THAT IT IS
ILLEGAL TO ALTER A LICENSE PLATE, TEMPORARY TAG, OR REGISTRATION TAB
STICKER. I ALSO ADVISED FRANCES THAT RODNEY HAD A SUSPENDED DRIVING
PRIVILEGE, WHICH IS WHY THE VEHICLE WAS TO BE IMPOUNDED (PER ARS 28-
3511A1). I THEN ADVISED FRANCES THAT I HAD LOCATED HER CRACK PIPE. FRANCES
STATED THAT SHE HAD BEEN CLEAN SINCE 2007, BUT HAD RECENTLY RELAPSED.
FRANCES KEPT RANDOMLY STATING THAT SHE DID NOT SMOKE METHAMPHETAMINE, AND
I KEPT TELLING HER I WAS NOT ASKING HER ABOUT THAT. FRANCES ADMITTED TO
THE SUBSTANCE INSIDE THE PIPE BEING CRACK, BUT REFUSED TO TELL ME WHERE
SHE BUYS IT FROM. FRANCES THEN TRIED TO RECANT HER STATEMENT AND CLAIM
THAT SOMEONE ELSE MUST HAVE LEFT THE PIPE AND DRUGS THERE, BUT THAT SHE
WOULD "TAKE RESPONSIBILITY FOR IT." FRANCES WOULD GO BACK AND FORTH
BETWEEN LYING ABOUT THE DRUGS, AND ADMITTING TO THEM DUE TO HER RECENT
RELAPSE. FRANCES STATED THAT SHE DOES SMOKE CRACK, BUT, " I DON'T CARRY MY
STUFF AROUND. I LEAVE IT AT HOME." I TOLD FRANCES THAT DRUG USERS USUALLY
CARRY THEIR PIPES WITH THEM, AND REMINDED FRANCES THAT SHE HAD A SECONDARY
CRACK PIPE IN HER POSSESSION, WHICH OFC. STRNAD LOCATED. FRANCES THEN
BEGAN TELLING ME THAT SHE IS NOT LIKE EVERY OTHER DRUG USER I DEAL WITH,
AND THAT I SHOULD NOT TREAT HER AS SUCH.

AT 0528 HOURS, SGT. MARTIN #5613, WHO IS A DEPARTMENT-CERTIFIED CONTROLLED
SUBSTANCE OFFICER, ARRIVED ON-SCENE, AND TOOK POSSESSION OF THE PIPE AND
ROCK OF OFF-WHITE SUBSTANCE. AT 0530 HOURS, SGT. MARTIN ADVISED ME THE
SUBSTANCE HAD TESTED POSITIVE FOR COCAINE BASE (CRACK). PLEASE REFERENCE
SGT. MARTIN'S SUPPLEMENTAL DEPARTMENTAL REPORT FOR FURTHER DETAILS OF HIS

2013 02308942                                              Continued.

COP-SALAZAR0004

PHOENIX POLICE DEPARTMENT REPORT

ORIGINAL           PAGE NUMBER:   5      DR NUMBER: 2013 02308942

INVOLVEMENT WITH THIS INVESTIGATION.

I MAINTAINED POSSESSION OF THE PIPE LOCATED ON FRANCES'S PERSON UNTIL THE
TIME I IMPOUNDED IT AT SQUAW PEAK PRECINCT. FRANCES WAS TRANSPORTED TO AND
BOOKED INTO JAIL FOR ARS 13-3408A1, POSSESSION OF NARCOTIC DRUGS, A CLASS
4 FELONY, ARS 13-3415A, POSSESSION OF DRUG PARAPHERNALIA, A CLASS 6
FELONY, AS WELL AS ARS 28-2531B1, KNOWINGLY DISPLAYING FICTITIOUS PLATES,
A CLASS 2 MISDEMEANOR.

I HAVE NO FURTHER INFORMATION REGARDING THIS INCIDENT. END OF REPORT.

VICTIM RECEIVED RIGHTS INFORMATION:  NO          MAIL-IN SUPPLEMENT: NO

INVOICES:     4300069

DR ENTERED BY : 8605    DR FINALIZED BY : 8605

                        END OF REPORT          DR NO: 2013 02308942

**COP-SALAZAR0005**

# EXHIBIT 2

## PHOENIX POLICE DEPARTMENT (0723)
## Incident Report

| Incident Number | CFS Incident # |
|---|---|
| 201500002127039 | 201502127039 |

| Report Type | |
|---|---|
| Incident Report | Page 1 of 6 |

| Date / Time Occurred | Date / Time Reported |
|---|---|
| 11/04/2015 22:13    to | 11/04/2015 22:13 |

| ...ted Suspects | Additional Suspects | Unknown Suspects | Victims | Other Persons | Vehicles | Items | Evidence Count | Leoka Count | Related Report # |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 1 | | 1 | 1 | | | | | |

| Arson Related | Arson Code | | Damage Value | | Bias Crime | Gang Involved | Domestic Violence |
|---|---|---|---|---|---|---|---|
| ☐ | | | | | ☐ | ☐ | ☐ |

### Incident Details

| Squad | Clearance Disposition | Cleared by Exception | Exceptional Clearance Date |
|---|---|---|---|
| 61J | | | |

| Situation Found | | Status |
|---|---|---|
| | | |

| Location Given By Dispatcher | Cargo Theft |
|---|---|
| | NO |

### Incident Address

| Street Address | | | | |
|---|---|---|---|---|
| ...T N???E ST UNIT? | | | | |

| City | State | Zip | Country Code |
|---|---|---|---|
| PHOENIX | ARIZONA | 85014 | UNITED STATES OF AMERICA (USA) |

### Administrative Info

| Reporting Officer | Serial # |
|---|---|
| ARMOUR JR. ANTHONY | 08605 |

## OFFENSE

| ☑ Primary Offense | Offense Description |
|---|---|
| | HINDERING PROSECUTION-2ND DEGREE |

| Offense/Statute Code | Severity | Attempted/Completed | Premise Type |
|---|---|---|---|
| 13-2511A  010 | MISDEMEANOR | COMPLETED | APARTMENT |

| Circumstances | Bias | Bias 2 |
|---|---|---|
| | NONE | |

| Bias 3 | Bias 4 | Bias 5 |
|---|---|---|
| | | |

| Criminal Activity 1 | Criminal Activity 2 | Criminal Activity 3 |
|---|---|---|
| | | |

| ...der Using 1 | Offender Using 2 | Offender Using 3 |
|---|---|---|
| | | |

| # Premise Entered | Home Invasion | Domestic Violence | Gang Activity |
|---|---|---|---|
| | NO | NO | NO |

| Primary Gang Type | Primary Gang Name |
|---|---|
| | |

| Secondary Gang Type | Secondary Gang Name |
|---|---|
| | |

| Drug Related | Drug Type | Drug Origin | Drug Precursors |
|---|---|---|---|
| | | | |

### MO Panel

| Entry Type | Entry Area | Entry Method |
|---|---|---|
| | | |

| Entry Point 1 | Entry Point 2 | Exit Point 1 |
|---|---|---|
| | | |

| Exit Point 2 | Target Area | Property Target 1 |
|---|---|---|
| | | |

| Property Target 2 | Property Target 3 | Victim Target |
|---|---|---|
| | | |

| Time of Day | Victim Activity | Action 1 to Premises |
|---|---|---|
| | | |

| Action 2 to Premises | Action 3 to Premises | Action 1 on Victim |
|---|---|---|
| | | |

| Action 2 on Victim | Action 3 on Victim | Other Action 1 |
|---|---|---|
| | | |

| Other Action 2 | Other Action 3 | Solicited Offered 1 |
|---|---|---|
| | | |

| Solicited Offered 2 | Solicited Offered 3 | Weapon 1 |
|---|---|---|
| | | |

| Weapon 1 Auto | Weapon 2 | Weapon 2 Auto |
|---|---|---|
| | | |

| Weapon 3 | Weapon 3 Auto | Arson |
|---|---|---|
| | | |

| Precipitating Circumstance | Instrument Used |
|---|---|
| | |

| ...mments |
|---|
| |



**PHOENIX POLICE DEPARTMENT (0723)**
## Incident Report

| Incident Number | CFS Incident # |
|---|---|
| 201500002127039 | 201502127039 |

| Report Type | |
|---|---|
| Incident Report | Page 2 of 6 |

| Date / Time Occurred | Date / Time Reported |
|---|---|
| 11/04/2015 22:13   to | 11/04/2015 22:13 |

---

**SUSPECT** ☑ Known  ☐ Unknown  ☐ Arrested

| Name (Last, First Middle) | | | | | Suffix |
|---|---|---|---|---|---|
| FRANKLIN, SHANNON NICOLE | | | | | |

| Nickname | Race | Sex | SSN | Date of Birth | Age | Age Range | Age At Time Of Incident |
|---|---|---|---|---|---|---|---|
| | BLACK | FEMALE | ▇▇ | ▇▇ | 38 | to | 38 |

| Height | Weight | Driver's License # | DL State | DL Class | DL Restrictions |
|---|---|---|---|---|---|
| 5'07" | 175 | ▇▇ | WISCONSIN | OPERATOR | |

| Primary Language | Place of Birth | Citizenship | Ethnicity | Marital Status |
|---|---|---|---|---|
| ENGLISH | WISCONSIN | UNITED STATES OF AMERICA | NON-HISPANIC | SINGLE |

| SIB Check Result | ICE Contact Date | ICE Phone # | ICE Response |
|---|---|---|---|
| | | | |

| Preferred | Home Phone | Cell Phone | Email Address |
|---|---|---|---|
| CELL PHONE | | ▇▇ | |

| Additional Email or Social Media Handle | Social Media Types |
|---|---|
| | |

### Suspect Home Address

| Street Address | | | | |
|---|---|---|---|---|
| ▇▇ N 21ST ST 1069 | | | | |

| City | State | Zip | Country Code |
|---|---|---|---|
| PHOENIX | ARIZONA | 85014 | |

| Place Name |
|---|
| |

### Mailing Address

| Street Address | | | | |
|---|---|---|---|---|
| ▇▇ N 21ST ST 1069 | | | | |

| City | State | Zip | Country Code |
|---|---|---|---|
| PHOENIX | ARIZONA | 85014 | |

### Suspect Employment Information

☐ Student  ☐ Homeless   Employer / School            Occupation                      Work Phone

| Address | | | |
|---|---|---|---|
| | | | |

| City | State | Zip | Country Code |
|---|---|---|---|
| | | | |

| Hours of Employment | Days Off |
|---|---|
| | |

### Details

| Hair Color | Hair Length | Glasses | Eye Color | Build | Facial Hair |
|---|---|---|---|---|---|
| BLACK | | ☐ | BROWN | | |

| Facial Hair Color | Voice | Complexion | Teeth |
|---|---|---|---|
| | | | |

| Clothing Description |
|---|
| |

| Misc 1 |
|---|
| |

| Misc 2 |
|---|
| |

| Trademarks of Suspect |
|---|
| |

| Injury 1 | Injury 2 | Injury 3 | Injury 4 | Injury 5 |
|---|---|---|---|---|
| | | | | |

| ☐ Hospitalized | Hospital Facility | Resident |
|---|---|---|
| | | U.S. RESIDENT |

**MO Panel**

| Entry Type | Entry Area | Entry Method |
|---|---|---|
| | | |

| Entry Point | Exit Point | Target Area |
|---|---|---|
| | | |

| Property Target 1 | Property Target 2 | Property Target 3 |
|---|---|---|
| | | |

| Victim Target | Time of Day | Victim Activity |
|---|---|---|
| | | |

| Action 1 on Victim | Action 2 on Victim | Action 3 on Victim |
|---|---|---|
| | | |

| Action 1 to Premises | Action 2 to Premises | Action 3 to Premises |
|---|---|---|
| | | |



**PHOENIX POLICE DEPARTMENT (0723)**
**Incident Report**

| Incident Number | CFS Incident # |
|---|---|
| 201500002127039 | 201502127039 |
| Report Type | |
| Incident Report | Page 3 of 6 |
| Date / Time Occurred | Date / Time Reported |
| 11/04/2015 22:13 to | 11/04/2015 22:13 |

| Action 1 | Other Action 2 | Other Action 3 |
|---|---|---|
| Solicited Offered 1 | Solicited Offered 2 | Solicited Offered 3 |
| Weapon 1 | Weapon 2 | Weapon 3 |
| Weapon 1 Type | Weapon 2 Type | Weapon 3 Type |
| Weapon 1 Caliber | Weapon 2 Caliber | Weapon 3 Caliber |
| Weapon 1 Color | Weapon 2 Color | Weapon 3 Color |
| Arson | Precipitating Circumstance | Instrument Used |

Comments

### Gang Information

☐ Primary Gang    Primary Gang Name    Primary Gang Membership Info

Primary Gang Location Info    Rival Gang Name

Colors/Logos

☐ Secondary Gang    Secondary Gang Name    Secondary Gang Membership Info

Secondary Gang Location    Rival Gang Name

Colors/Logos

☐ Clothing or Colors  ☐ Gang Tattoos  ☐ Paraphernalia or Photographs  ☐ Self Proclamation  ☐ Witness Testimony/Statement  ☐ Written/Electronic Correspondance

Other

### Guardian Information

☐ Guardian Notified    Guardian Notified By    Guardian Notified On    00:00

Guardian Of    Guardian Relationship

### Associated Offenses

| Offense | ☑ Associated With Suspect |
|---|---|
| HINDERING PROSECUTION-2ND DEGREE | |

| VICTIM | Victim Type |
|---|---|
| | SOCIETY / PUBLIC |

Name (Last, First Middle)
STATE OF ARIZONA

| Suffix | Nickname | Race | | Sex | SSN | Date of Birth | Age | Age Range to |
|---|---|---|---|---|---|---|---|---|

| Infant Type | Height | Weight | Driver's License # | DL State | | | Age At Time Of Incident |
|---|---|---|---|---|---|---|---|

| Primary Language | Will Prosecute? YES | Can Identify Suspect? YES | ☐ Victim's Notification/Victim's Right Pamphlet provided. | Consular Notified? | Place of Birth | | |
|---|---|---|---|---|---|---|---|

| Citizenship | | Ethnicity | | Marital Status | Preferred | Home Phone | Cell Phone |
|---|---|---|---|---|---|---|---|

| Email Address | | Additional Email or Social Media Handle | Social Media Types |
|---|---|---|---|

### Victim Home Address

Street Address

| City | State | Zip | Country Code |
|---|---|---|---|

### Employment Information

☐ Student  ☐ Homeless    Employer / School    Occupation

PHOENIX POLICE DEPARTMENT (0723)
**Incident Report**

| | |
|---|---|
| Incident Number | CFS Incident # |
| 201500002127039 | 201502127039 |
| Report Type | |
| Incident Report | Page 4 of 6 |
| Date / Time Occurred | Date / Time Reported |
| 11/04/2015 22:13 to | 11/04/2015 22:13 |

| ge Name | On Campus | Work Phone | Hours of Employment |
|---|---|---|---|
| | Yes No | | |

Street Address

| City | State | | Zip | Country Code |
|---|---|---|---|---|

**Details**

| Hair Color | Eye Color | Build | Resident | Teeth |
|---|---|---|---|---|

| Injury 1 | Injury Description |
|---|---|

| Injury 2 | Injury 3 | Injury 4 | Injury 5 |
|---|---|---|---|

| Victim Condition | Victim-Offender |
|---|---|

| **A. Assault/Homicide** | A. Assault/Homicide Circumstance 1 | A. Assault/Homicide Circumstance 2 |
|---|---|---|
| Yes No | | |

| **Justifiable Homicide** | Justifiable Homicide Circumstance |
|---|---|
| Yes No | |

| Hospital Facility | Hospital Description |
|---|---|
| Victim Hospitalized | |

| Under Influence Alcohol? | Under Influence Drugs? | DV Frame of Action | Domestic Violence Victim Transported |
|---|---|---|---|
| Yes No Unknown | Yes No Unknown | | Yes No |

| Violation of Protective Order | Cohabitant |
|---|---|
| Yes No | Yes No |

**Gang Information**

| Primary Gang | Primary Gang Name | Primary Gang Membership Info |
|---|---|---|

| ry Gang Location Info | Rival Gang Name |
|---|---|

Colors/Logos

| Secondary Gang | Secondary Gang Name | Secondary Gang Membership Info |
|---|---|---|

| Secondary Gang Location | Rival Gang Name |
|---|---|

Colors/Logos

| Clothing or Colors | Gang Tattoos | Paraphernalia or Photographs | Self Proclamation | Witness Testimony/Statement | Written/Electonic Correspondance |
|---|---|---|---|---|---|

Other

**Guardian Information**

| Guardian Notified | Guardian Notified By | Guardian Notified On |
|---|---|---|

| Guardian Of | Guardian Relationship |
|---|---|

**Associated Offenses**

| Offense | |
|---|---|
| HINDERING PROSECUTION-2ND DEGREE | ☑ Associated With Victim |

Narrative Information

ON 11/4/15 AT APPROXIMATELY 2213 HOURS, AP1 SHANNON COMMITTED THE CRIME OF HINDERING PROSECUTION IN THE 2ND DEGREE WHEN, IN AN EFFORT TO PREVENT OFFICERS FROM ARRESTING HER BOYFRIEND, STEPHEN HUNTER (FOR WHOM PROBABLE CAUSE FOR ARREST EXISTED FOR A CRIMINAL DAMAGE--DOMESTIC VIOLENCE HE COMMITTED AGAINST HER ON 10/28/15, DEPARTMENTAL REPORT #2015-2078605), BY FIRST LYING TO THE POLICE AND TELLING THEM HE WAS NOT INSIDE THE APARTMENT, AND THEN BY ATTEMPTING TO PHYSICALLY FORCE EM AWAY FROM THE BEDROOM, WHERE HE WAS DISCOVERED TO BE HIDING. THE INCIDENT OCCURRED AT



**PHOENIX POLICE DEPARTMENT (0723)**
**Incident Report**

| Incident Number 201500002127039 | CFS Incident # 201502127039 |
|---|---|
| Report Type Incident Report | Page 5 of 6 |
| Date / Time Occurred 11/04/2015 22:13   to | Date / Time Reported 11/04/2015 22:13 |

⬤ ████████████ SHANNON WAS TRANSPORTED TO AND BOOKED INTO JAIL, AND THEN LATER RELEASED BY DECREE OF SGT. GARCIA #5413.

ON 11/4/15 AT APPROXIMATELY 2210 HOURS, I WAS AT THE APARTMENT COMPLEX LOCATED AT ████████████, IN REFERENCE TO AN UNRELATED CALL. THE PREVIOUS WEEK, OFC. EDELSON #9011 INFORMED OUR SQUAD OF THIS INCIDENT, AND THAT PROBABLE CAUSE EXISTED FOR STEPHEN'S ARREST. SINCE I WAS ALREADY IN THE COMPLEX, I WENT TO THE APARTMENT TO SEE IF STEPHEN WAS AT THE APARTMENT. AS SOON AS I WALKED UP TO THE DOOR, SEVERAL NEIGHBORS INFORMED ME THAT STEPHEN WAS INSIDE THE APARTMENT, AS THEY WERE EITHER PRESENT DURING THE TIME OF, OR FAMILIAR WITH, THE ORIGINAL INCIDENT. I SPOKE TO THE NEIGHBORS WHO TOLD ME THAT STEPHEN HAD WALKED INTO THE APARTMENT APPROXIMATELY 10-15 MINUTES AGO, AND THE ONES THAT HAD BEEN OUTSIDE THE ENTIRE TIME VERIFIED THAT HE HAD NOT LEFT. I REQUESTED AN ADDITIONAL UNIT RESPOND TO MY LOCATION, AND OFC'S NAEGELI #8762 AND ERICKSON #8477 ARRIVED. I ADVISED THEM THAT STEPHEN WAS INSIDE THE APARTMENT, AND THAT PROBABLE CAUSE EXISTED FOR HIS ARREST DUE TO THE DOMESTIC VIOLENCE-RELATED CRIMINAL DAMAGE (THE CLAIM OF CHOKING COULD NOT BE SUBSTANTIATED, BUT STEPHEN HAD ADMITTED TO OFC. EDELSON OVER THE TELEPHONE THAT HE HAD BROKEN THE CELL PHONE DURING THE ALTERCATION). AFTER I READ OFC. EDELSON'S ORIGINAL REPORT TO VERIFY THERE WAS PROBABLE CAUSE FOR STEPHEN'S ARREST, I RETURNED TO THE APARTMENT, AT WHICH TIME OFC. ERICKSON ADVISED ME THAT OFC. NAEGELI BELIEVED HE HAD SEEN STEPHEN COME TO THE FRONT WINDOW AND LOOK OUT THROUGH THE VERTICAL BLINDS, BUT WAS NOT 100% CERTAIN WHETHER IT WAS HIM.

I KNOCKED ON THE DOOR, AND RECEIVED NO ANSWER, BUT COULD HEAR MOVEMENT FROM INSIDE THE APARTMENT. AFTER APPROXIMATELY 30 SECONDS, I KNOCKED AGAIN. A BLACK FEMALE LATER IDENTIFIED TO ME AS SHANNON OPENED THE DOOR, WEARING A TOWEL. SHANNON STATED SHE HAD NOT HEARD US KNOCKING, BECAUSE SHE HAD JUST GOTTEN OUT OF THE SHOWER. SHANNON WAS COMPLETELY DRY, AND THE FLOOR SHE HAD BEEN WALKING AND STANDING ON WAS ALSO DRY, EVEN THOUGH SHE WAS BAREFOOT. I ADVISED SHANNON THAT WE WERE THERE IN REFERENCE TO THE DOMESTIC VIOLENCE INCIDENT LAST WEEK, AND ASKED HER TO HAVE STEPHEN COME SPEAK TO US. SHANNON IMMEDIATELY LIED, SAYING THAT STEPHEN HAD "JUST LEFT." I ⬤LD SHANNON I HAD BEEN OUTSIDE THE APARTMENT FOR 20-30 MINUTES, AND THAT STEPHEN HAD NOT LEFT. SHANNON SAID THAT STEPHEN HAD LEFT "IN THAT BLUE CAR," REFERRING TO THE BLUE CHEVY IMPALA, POINTING OUT TO THE PARKING LOT WHERE I HAD PARKED MY VEHICLE. I TOLD SHANNON THAT THE VEHICLE WAS STILL PARKED THERE, AND AGAIN THAT I NEEDED TO SPEAK WITH STEPHEN. I TOLD SHANNON THAT DUE TO THE INCIDENT BEING DOMESTIC VIOLENCE, AS WELL AS KNOWING THAT STEPHEN WAS IN THE APARTMENT, HE NEEDED TO COME OUT, OR WE WOULD HAVE TO ENTER THE APARTMENT TO REMOVE HIM. SHANNON ARGUED WITH ME. SHANNON THEN STATED THAT SHE WANTED TO PUT ON SOME CLOTHES, AND ASKED IF SHE COULD CLOSE THE DOOR. I TOLD SHANNON THAT SHE COULD GO INTO THE BEDROOM TO GET DRESSED, BUT SHE CLAIMED SHE WANTED TO GET DRESSED IN THE LIVING ROOM, SO WANTED HER DOOR SHUT, AND BEGAN TRYING TO PUSH THE DOOR SHUT. I PREVENTED SHANNON FROM CLOSING THE DOOR ON ME USING MY FOOT, AT WHICH TIME SHE BECAME MORE ARGUMENTATIVE, AND DEMONSTRATIVE, SAYING SHE KNOWS HER RIGHTS, AND IT IS HER RIGHT TO CLOSE THE DOOR. SHANNON WAS NO LONGER CLAIMING THAT STEPHEN WAS NOT IN THE APARTMENT, BUT THAT SHE DID NOT WANT US TO COME IN. SHANNON THEN WALKED INTO THE KITCHEN AREA, SAYING THAT SHE WANTED ME TO CLOSE THE DOOR BECAUSE SHE WAS STILL NOT DRESSED. I STEPPED INSIDE THE APARTMENT, AND SHANNON WENT INTO THE BEDROOM AND CLOSED THE DOOR BEHIND HER, SAYING SHE WAS GOING TO GET DRESSED. WHILE SHANNON WAS IN THE BEDROOM, OFC. NAEGELI AND I CONDUCTED A PROTECTIVE SWEEP OF THE LIVING ROOM, KITCHEN, AND BATHROOM, LEAVING THE BEDROOM AS THE ONLY POSSIBLE PLACE STEPHEN COULD BE. SHANNON CAME OUT OF THE BEDROOM, CLOSED THE DOOR BEHIND HER, AND WALKED INTO THE KITCHEN, TELLING ME THAT I NEEDED A WARRANT TO SEARCH HER APARTMENT. I EXPLAINED TO SHANNON AGAIN THAT WE DID NOT NEED A WARRANT, AS WE WERE THERE ON PROBABLE CAUSE REFERENCE DOMESTIC VIOLENCE, AND THAT WE WOULD NOT NEED TO SEARCH THE APARTMENT IF STEPHEN JUST CAME OUT, BUT SHE KEPT ARGUING. SHANNON THEN SAID SHE WAS GOING TO CLOSE A DOOR BETWEEN THE KITCHEN AND THE BEDROOM, BECAUSE SHE WAS NOT GOING TO ALLOW US TO GO IN THE BEDROOM. I PREVENTED SHANNON FROM CLOSING THE DOOR AND TOLD HER SHE NEEDED TO MOVE OUT OF OUR WAY WHILE ATTEMPTING TO WALK PAST HER. INSTEAD, SHANNON, GRABBED ONTO THE DOOR, WHICH WAS ON OUR LEFT SIDE, WITH HER LEFT HAND, AND GRABBED ONTO A COUNTERTOP WITH HER RIGHT HAND, WEDGING HERSELF IN THE DOORWAY IN FRONT OF ME. SHANNON THEN BEGAN ACTIVELY PUSHING INTO ME TO PHYSICALLY PREVENT ⬤E FROM GETTING PAST HER. I GRABBED ONTO SHANNON'S LEFT HAND AND TOLD HER TO LET GO AND MOVE, BUT ⬤E DID NOT. AFTER A BRIEF STRUGGLE, OFC. NAEGELI AND I MOVED SHANNON OFF TO OUR RIGHT. I WALKED

**PHOENIX POLICE DEPARTMENT (0723)**
**Incident Report**

| Incident Number | CFS Incident # |
| --- | --- |
| 201500002127039 | 201502127039 |

| Report Type | |
| --- | --- |
| Incident Report | Page 6   of 6 |

| Date / Time Occurred | Date / Time Reported |
| --- | --- |
| 11/04/2015 22:13    to | 11/04/2015 22:13 |

INTO THE BEDROOM AND CALLED OUT TO STEPHEN TO COME OUT, AND HE THEN EMERGED FROM THE CLOSET. AT 2215 HOURS, STEPHEN WAS PLACED UNDER ARREST WITH HIS HANDS CUFFED BEHIND HIS BACK, AND THE CUFFS DOUBLE-LOCKED. SHANNON CONTINUED ARGUING AND BEING BELLIGERENT, AND I THEN PLACED HER UNDER ARREST WITH HER HANDS CUFFED BEHIND HER BACK, AND THE CUFFS DOUBLE-LOCKED.

OFC'S NAEGELI AND ERICKSON TRANSPORTED STEPHEN TO THE SQUAW PEAK PRECINCT, AND I TRANSPORTED SHANNON.

STEPHEN WAS TRANSPORTED AND BOOKED INTO JAIL FOR 1 COUNT OF CRIMINAL DAMAGE, ARS 13-1602A1, A CLASS 1 MISDEMEANOR. SHANNON WAS TRANSPORTED AND BOOKED INTO JAIL FOR 1 COUNT OF HINDERING PROSECUTION IN THE 2ND DEGREE, ARS 13-2511A, A CLASS 1 MISDEMEANOR.

SHANNON WAS LATER RELEASED FROM JAIL AND TRANSPORTED HOME PER ORDER OF SGT. GARCIA #5413, FOR SUBMITTAL OF CHARGES.

I HAVE NO FURTHER INFORMATION REGARDING THIS INCIDENT. END OF REPORT.

Public Narrative

# EXHIBIT F

MICHAEL K. JEANES, CLERK
BY
△ *Draper*
DEP
FILED

**14 JAN -3 PM 3:07**

WILLIAM G. MONTGOMERY
MARICOPA COUNTY ATTORNEY

Kathryn McCormick
Deputy County Attorney
Bar ID#: 015906
301 West Jefferson, 8th Floor
Phoenix, AZ 85003
Telephone: (602)372-7350
mcaoptd@mcao.maricopa.gov
MCAO Firm # 000320000
Attorney for Plaintiff

DR 201302308942-Phoenix Police Department
ENCANTO JUSTICE COURT

CA2014000110

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

COUNTY OF MARICOPA, EDC-Downtown

| | |
|---|---|
| THE STATE OF ARIZONA<br><br>                     Plaintiff,<br><br>vs.<br><br>FRANCES MARIE SALAZAR aka FRANCIS SALAZAR<br><br>                     Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CR 2013-4 6 2 3 8 4-0 0 1

DIRECT COMPLAINT

**COUNT 1:** POSSESSION OR USE OF NARCOTIC DRUGS, A CLASS 4 FELONY

**COUNT 2:** POSSESSION OF DRUG PARAPHERNALIA, A CLASS 6 FELONY

**In Custody - Complaint**

The complainant herein personally appears and, being duly sworn, complains on information

and belief against FRANCES MARIE SALAZAR aka FRANCIS SALAZAR, charging that in Maricopa

County, Arizona:

**DCO**                                                    1

**COUNT 1:**

FRANCES MARIE SALAZAR aka FRANCIS SALAZAR, on or about the 31st day of December,

2013, knowingly possessed or used cocaine base or hydrolyzed (crack) cocaine, a narcotic drug, in

violation of A.R.S. §§ 13-3401, 13-3408, 13-3418, 13-701, 13-702, and 13-801.

**COUNT 2:**

FRANCES MARIE SALAZAR aka FRANCIS SALAZAR, on or about the 31st day of December,

2013, unlawfully used or possessed with intent to use a pipe, drug paraphernalia, to inject, ingest,

inhale, or otherwise introduce into the human body cocaine base, a narcotic drug, in violation of A.R.

S. §§ 13-3401, 13-3408, 13-3415, 13-3418, 13-701, 13-702, and 13-801.

/s/ Kathryn McCormick
Deputy County Attorney

IN CUSTODY

_____   Agency: Phoenix Police Department
Complainant

Subscribed and sworn upon information and belief this ___ day of    January    , 2014

KM/am/AO

## COURT INFORMATION SHEET (CIS)

County Attorney Case Number: CA2014000110

Filing ID Number: CA2014000110-1-1

### STATE v. FRANCES MARIE SALAZAR aka FRANCIS SALAZAR

| | |
|---|---|
| Defendant's Last Known Address: | **In Custody - Complaint** 17771 WEST SOUTHERN AVENUE GOODYEAR, AZ 85338 |
| Defendant's Employer Address: | Unknown |
| Defendant's Attorney: | |

### DEFENDANT'S DESCRIPTION:

Race: <u>H</u>   Sex: <u>F</u>   Hair: <u>BRO</u>   Eyes: <u>BRO</u>   Hgt: <u>509</u>

Wgt: <u>160</u>   DOB: <u>10/04/1962</u>   Soc Sec #: <u>527658152</u>

CR 2013 - 4 6 2 3 8 4 - 0 0 1

SID #: <u>06575234</u>   FBI #: <u>508032CA6</u>   Booking #: <u>T040636</u>

### FILING STATUS:

Direct Complaint CR #: _____

(Court Use Only)

Date Filed: _____

Court Designations:   EDC-Downtown

Adult

Adult/Juv Transfer/Juv Statutory

Justice Court Precinct: ENCANTO JUSTICE COURT

**ATTORNEY:** <u>Kathryn McCormick</u>   **Bar ID:** <u>015906</u>

### PRELIMINARY HEARING / GRAND JURY CHARGES:

**COUNT 1:** POSSESSION OR USE OF NARCOTIC DRUGS, A CLASS 4 FELONY
**COUNT 2:** POSSESSION OF DRUG PARAPHERNALIA, A CLASS 6 FELONY

| Count | ARS | ARS Literal | Date of Crime | PCN |
|---|---|---|---|---|
| 1 | 13-3408 | 13-3408A1 | 12/31/2013 | 2634058373 |
| 2 | 13-3415 | 13-3415A | 12/31/2013 | 2634058373 |

### DEPARTMENTAL REPORTS:

201302308942-Phoenix Police Department

### EXTRADITE: AO

IN THE _____ ENCANTO JP (PHX CENTRAL) _____ COURT

## STATE OF ARIZONA, COUNTY OF MARICOPA

PAGE 1 OF 2

****FINAL****                    RELEASE QUESTIONNAIRE

*Notice: Unless a specific Form IV is sealed or ordered redacted by the Court, all Form IVs are public records of the Court or Clerk at the time they are provided to the Court and will be released in their entirety upon request.*

DEFENDANT'S NAME FRANCES MARIE SALAZAR          DOB 1962-10-04 BOOKING NO. T040636

ALIAS(ES) _____          CASE NO. PF2013462384001

### A. GENERAL INFORMATION

Charges
1 Cts. 13-3408A1 NARCOTIC DRUG-POSSESS/USE F4
1 Cts. 13-3415A DRUG PARAPHERNALIA-POSSESS/USE F6

Pursuant to A.R.S. §41-1750 ten-print fingerprints were taken of the arrested person?  ☒ Yes  ☐ No
If yes, PCN = _____

Pursuant to A.R.S. §13-610 one or more of the above charges requires the arresting agency to secure a DNA *sample from the arrested person?*  ☐ Yes  ☒ No

If yes, does the defendant have a valid DNA sample on file with AZDPS? ☐ Yes ☐ No

If no, Arresting Agency has taken required sample? ☐ Yes ☐ No

Offense Location: 5200 N 19TH AV
Offense Date: 2013-12-31
Arrest Location: 5200 N 19TH AV PHOENIX AZ 85015
Date: 2013-12-31 Time: 04:40

### B. PROBABLE CAUSE STATEMENT

1. *Please summarize and include the facts which establish probable cause for the arrest:*
DEF WAS CONTACTED DURING A TRAFFIC STOP AS THE FRONT SEAT PASSENGER OF HER OWN VEHICLE AFTER AN MVD/ REGISTRATION CHECK REVEALED THE TEMPORARY TAG DIS-PLAYED IN THE REAR WINDOW TO BE FICTITIOUS. AFTER THE DRIVER WAS PLACED UNDER ARREST FOR DRIVING ON A SUSPENDED PRIVILEGE, AS WELL AS THE PENDING FICTI-TIOUS REGISTRATION INVESTIGATION, THE DEF ADMITTED THAT SHE HAD ALTERED THE TEMPORARY TAG TO HAVE AN EXPIRATION DATE OF 12/28/13 INSTEAD OF 12/18/13. THE DEF WAS THEN PLACED UNDER ARREST AS WELL. DURING SEARCH INCIDENT TO ARREST, AS WELL AS INVENTORY SEARCH OF THE VEHICLE, IN BETWEEN THE DEF'S SEAT AND THE CENTER CONSOLE, A CLEAR GLASS PIPE APPROXIMATELY 4 INCHES IN LENGTH WAS LOCATED. THE PIPE HAD BURNED RESIDUE INSIDE OF IT, AND ONE END HAD WHAT APPEARED TO BE STEEL WOOL STUFFED INSIDE OF IT, AS WELL AS AN OFF-WHITE WAXY SUBSTANCE RECOGNIZED THROUGH TRAINING AND EXPERIENCE TO BE CRACK COCAINE. THE DEF LATER ADMITTED THAT THE SUBSTANCE WAS CRACK COCAINE. THE SUBSTANCE WAS TESTED BY A DEPARTMENT-CERTIFIED CON-TROLLED SUBSTANCE OFFICER, AND DID TEST POSITIVE FOR COCAINE BASE. Usable condition.

### C. OTHER INFORMATION (Check if applicable)

1. ☐ Defendant is presently on probation, parole or any other form of release involving other charges or convictions: Explain:

2. List any prior Arrests? POND X6, AGG ASLT, POM, WPN VIO, THFT, PODP X6, TRESP, RESIST

Convictions? POND X6, AGG ASLT, POM, WPN VIO, THFT, PODP X6, TRESP, RESIST
F.T.A.'s? ONE

3. Is there any indication the defendant is:
☐ An Alcoholic?          ☐ An Addict?
☐ Mentally disturbed?    ☐ Physically Ill?
4. ☐ Defendant is currently employed
With whom

How long:
5. Where does the defendant currently reside? 17771 WEST SOUTHERN AVENUE GOODYEAR, AZ 85338
With whom SELF
How long: _____years ___6___ months _____days
6. What facts indicate the defendant will flee if released? Explain: NO EMPLOYMENT, NO TIE TO COMMUNITY

7. What facts does the state have to oppose an unsecured release? Explain: NO EMPLOYMENT, NO TIE TO COMMUNITY

### D. CIRCUMSTANCES OF THE OFFENSE (Check if applicable)

1. ☐ Firearm or other weapon was used
Type:

☐ Someone was injured by the defendant
☐ Medical attention was necessary
Nature of injuries: N/A

2. ☐ Someone was threatened by the defendant
Nature and extent of threats:

3. If property offense, value of property taken or damaged:

☐ Property was recovered
4. Name(s) of co-defendant(s):

DEFENDANT'S NAME FRANCES MARIE SALAZAR                    DOB 1962-10-04 BOOKING NO. T040636

CASE NO. PF2013462384001                    Page 2 of 2

**E. CRIMES OF VIOLENCE**
1. Relationship of defendant to victim:

   ☐ Victim(s) and defendant reside together

2. How was the situation brought to the attention of the police?
   ☐ Victim    ☐ Third Party    ☐ Officer observed
3. ☐ There are previous incidents involving these same parties
   Explain:

4. Is defendant currently the subject of:
   ☐ An order of protection    ☐ Any other court order

   ☐ Injunction against harassment

   Explain:

**F. DOMESTIC VIOLENCE ISSUES (Check if applicable)**
   Defendant's actions

☐ Threats of homicide/suicide/bodily harm

☐ Control/ownership/jealousy issues       ☐ Crime occurs in public

☐ Prior history of DV                     ☐ Kidnapping

☐ Frequency/intensity of DV increasing    ☐ Depression

☐ Access to or use of weapons             ☐ Stalking behavior

☐ Violence against children/animals

☐ Multiple violations of court orders

**G. CIRCUMSTANCES OF THE ARREST (Check if applicable)**
1. Did the defendant attempt to:

   ☐ Avoid arrest    ☐ Resist arrest    ☐ Self Surrender

   Explain:

   N/A

2. ☐ Defendant was armed when arrested
   Type:

3. ☒ Evidence of the offense was found in the defendant's possession
   Explain: GLASS STEM PIPE WITH CRACK COCAINE IN-SIDE, FOUND BETWEEN PASSENGER SEAT AND CONSOLE

4. Was the defendant under the influence of alcohol or drugs at the time of the offense?
   ☒ Yes    ☐ No    ☐ Unk

**H. DRUG OFFENSES**
1. If the defendant is considered to be a drug dealer, please state the supporting facts:

2. What quantities and types of illegal drugs are directly involved in the offense? CRACK COCAINE

☒ Drug field test completed

☒ Defendant admission of drug type
Approximate monetary value: $
3. Was any money seized?

   ☐ Yes    ☒ No
   Amount:    $

**I. ADDITIONAL INFORMATION**
1. Military Service:

Has the defendant served in the military services of the United States? ☐ Yes    ☒ No    ☐ Unknown

If yes, currently on active duty? ☐ Yes    ☐ No

Branches Served In: ____ ____
(AF - Air Force AR - Army CG - Coast Guard MC - Marine Corp
MM - Merchant Marines NG - National Guard NV - Navy
RS - Reserves)

2. Is the defendant homeless?
   ☐ Yes    ☒ No    ☐ Unknown

JUDICIAL OFFICER REVIEW
OF PROBABLE CAUSE
STATEMENT AND COMPLAINT
ON OATH OR AFFIRMATION

Complaint Review          ☐

Witness sworn             ☐

Reviewed Form IV          ☐

Other sources:            ☐
          _____

PC determined             ☐
          _____

Judicial Officer

Pursuant to AO 2003-046, the oath has been administered pursuant to the law and required procedures. _____

---

☐ **If a fugitive arrest, a Form IVA must also be completed** ☐

---

I certify that the information presented is true to the best of my knowledge.

ARMOUR, ANTHONY/8605              AZ0072300/602-495-5007          2013-12-31
ARRESTING OFFICER/SERIAL NUMBER   ARREST AGENCY/DUTY PHONE NUMBER      DATE

201302308942/AZ0072300          /                              /
DEPARTMENTAL REPORT NO.          DEPARTMENTAL REPORT NO.        DEPARTMENTAL REPORT NO.

# EXHIBIT G

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
08/17/2016 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2013-462384-001 DT                                    08/16/2016


                                              CLERK OF THE COURT
HONORABLE MICHAEL D. GORDON                        J. Porter
                                                    Deputy



STATE OF ARIZONA                          ELIZABETH M LAKE
                                          EMILY MARIE HOVATER

v.

FRANCES MARIE SALAZAR (001)               CHRISTOPHER MICHAEL DORAN




TRIAL MINUTE ENTRY
DAY 5

Courtroom CCB 7B

State's Attorney:            Elizabeth Lake and Emily Hovater
Defendant's Attorney:        Christopher Doran
Defendant:                   Presence Waived

Court Reporter, Shayna Montgomery, is present.

A record of the proceedings is also made digitally.

11:56 a.m. Trial to Jury continues from 08/15/2016 for jury deliberations.

The jury is not present.

The Court receives written questions from the jury.  Court and counsel discuss the
questions, on the record, out of hearing of the jury.  The questions are discussed.

FILED: Jury Deliberation Question (1)

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2013-462384-001 DT                                      08/16/2016

12:00 p.m. The Court is in recess.

12:06 p.m. Court reconvenes with respective counsel. Defendant's presence is waived.

Court Reporter, Shayna Montgomery, is present.

A record of the proceedings is also made digitally.

The Court receives written questions from the jury.  Court and counsel discuss the questions, on the record, out of hearing of the jury.  The questions are discussed.

FILED: Jury Deliberation Question (2)

12:10 p.m. The Court is in recess.

1:39 p.m. Court reconvenes with respective counsel.

The Court receives written questions from the jury.  Court and counsel discuss the questions, on the record, out of hearing of the jury.  The questions are discussed.

FILED: Juror Deliberation Question (3)

1:50 p.m. The Court is in recess.

Court reconvenes with respective counsel. Defendant's presence is waived.

Court Reporter, Shayna Montgomery, is present.

A record of the proceedings is also made digitally.

3:30 p.m. The jury is now present.

The jury advises the Court that a verdict has been reached.

The jury is present in the jury box and by their foreperson return into court their verdicts, which are read and recorded by the clerk and are as follows:

We, the Jury, duly empanelled and sworn in the above-entitled action, upon our oaths, do find the Defendant, as to Count 1- Possession or Use of Narcotic Drugs:

Docket Code 012                        Form R012                                Page 2

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2013-462384-001 DT                                    08/16/2016


__x_   GUILTY


____   NOT GUILTY


We, the Jury, duly empanelled and sworn in the above-entitled action, upon our oaths, do find the Defendant, as to Count 2- Possession of Drug Paraphernalia:


__x_   GUILTY


____   NOT GUILTY


The jury is polled at the request of Defense.  Each juror replies that this is his/her true verdict


FILED:  Verdicts (2)


3:35 p.m. The jury is excused from further service in this cause.


IT IS ORDERED setting time for Sentencing/Hearing on priors on 09/21/2016 at 8:30 a.m. in this Division.


IT IS FURTHER ORDERED that the Adult Probation Office shall conduct a Presentence Investigation and submit a report to this division prior to sentencing.


Defense counsel requests to be present for Presentence Interview.


ISSUED:  Request for Presentence Report


Argument is presented regarding release conditions.


IT IS FURTHER ORDERED revoking the Defendant's release conditions and remanding the Defendant to the custody of the Sheriff pursuant to Rule 7.2 (c).


ISSUED:  Order of Confinement


FILED:  Jury List and Trial/Hearing Worksheet


3:41 p.m. Trial concludes.