# EXHIBIT T

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

```
Frances Salazar, individually,  )
                                )
                  Plaintiff,    )
                                ) Case No.:
        vs.                     ) 2:19-CV-01188-PHX-SRB
                                ) (ESW)
City of Phoenix, et al.,        )
                                )
                  Defendants,   )
_____)
```

DEPOSITION OF ERLINDA PARRISH

Remote
October 15, 2021
1:00 p.m.

Prepared by:
Vicki L. O'Ceallaigh Champion, CR
Certificate No. 50534

                            BARTELT|NIX COURT REPORTERS
                            3101 North Central Avenue
                    Suite 290
                            Phoenix, Arizona  85012
Prepared for:               Phone:  (602) 254-4111
                    Fax:    (602) 254-6567
(Certified copy)    Office@barteltnix.com

1       Q.   And then these are the pages that follow,

2   and there are, let's see, three pages that follow.

3   Did those go with that e-mail?

4       A.   Yes.

5       Q.   And what are those three pages that follow?

6       A.   They are listing -- a list of cases that

7   each of the officers -- active cases that each of

8   the officers is a witness to.

9       Q.   When you say "active cases," what do you

10  mean?

11      A.   They are currently in court.  They are

12  anywhere between a prelim pretrial or a trial.

13      Q.   And then so who are the recipients of this

14  e-mail?  What is the CA-MCAO?

15      A.   The entire list of employees for MCAO.

16      Q.   So that would be prosecuters, paralegals,

17  secretaries, every employee?

18      A.   Correct.

19      Q.   And the first sentence reads, quote, "The

20  MCAO Rule 15 Disclosure Database (R15 DD) Committee

21  meets every two weeks.  The Committee recently

22  reviewed R15 DD cases, changes to the R15 DD are

23  listed below," end quote.

24           Did I read that correctly?

25      A.   Yes.

Deposition of Linda Tarish
10/15/2021
Case 2:19-cv-01188-SRB-ESW   Document 208-4   Filed 02/04/22   Page 4 of 269   Page: 21
Salazar vs. City of Phoenix, et al.

1    Q.    Then it states that, "Anthony Armour Juror

2    Badge Number 8605 Phoenix PD is one of the officers

3    who was added to the Rule 15 Disclosure Database,"

4    correct?

5    A.    Correct.

6    Q.    Then it states, "Prosecutors have a duty to

7    doublecheck all their cases with the Intranet R15 DD

8    list," correct?

9    A.    Correct.

10    Q.    Then is that a link to it below?

11    A.    Yes.

12    Q.    Then what is the information that follows

13    that?

14    A.    It says, "PBK shows the employee/officers

15    assigned to the following cases."  So the first one

16    is -- two of the officers that did not have any

17    active cases at the time, and then the name "Armour"

18    is there, and then it would have been followed by

19    the list of cases, his list of cases.

20    Q.    Oh, I see.  Then Brewer and then Hudson?

21    A.    Correct.

22    Q.    Okay.  Then at the end you sign it with your

23    name, "Legal Management Assistant, Assistant to

24    Keith Manning, Law Enforcement Liaison," correct?

25    A.    Correct.

Deposition of Amanda Parrish                    Page: 22
10/15/2021                                       Salazar vs. City of Phoenix, et al.

Case 2:19-cv-01188-SRB-ESW   Document 208-4   Filed 02/04/22   Page 5 of 269

 1      Q.   Does the Rule 15 Disclosure Database

 2 Committee meet a particular day of the week every

 3 two weeks?

 4      A.   At that time, I don't recall.  Currently,

 5 no.  It's just every two weeks and depending on the

 6 calendars of the participants.

 7      Q.   And how large is the Rule 15 Disclosure

 8 Database Committee?

 9      A.   Currently, there are 10 members.

10      Q.   Two?

11      A.   Ten.

12      Q.   Oh, 10.  And what is the committee comprised

13 of?  Like who are those 10 people by position?

14      A.   They would be our division chiefs, bureau

15 chiefs, and then our director and public safety

16 liaison.

17      Q.   So, in this case, Keith Manning?

18      A.   Yes.

19      Q.   Do you know when the meeting took place

20 where it was decided that Anthony Armour's name

21 would be added to the Rule 15 Disclosure Database?

22      A.   What date?

23      Q.   Yes.

24      A.   I do not recall.

25      Q.   Do you know if it would have been the same

EXHIBIT U

## DECLARATION OF KRISTA CAMPAGNA

STATE OF ARIZONA    )
                    ) ss.
County of Maricopa  )

I, Krista Campagna, say and attest the following:

1.      In December 2016, I was employed as an Administrative Assistant with the City Phoenix Police Department Professional Standards Bureau ("PSB").

2.      My job duties included routing PSB Investigations to the Maricopa County Attorney's Office and City of Phoenix Prosecutor's Office for the two prosecuting agencies to determine whether the law enforcement officers who were the subjects of the investigations would be added to the agencies' Law Enforcement Rule 15 Disclosure Databases, also known as "Brady lists."

3.      On December 28, 2016, I signed in to the City of Phoenix Prosecutor's Office's Officer Integrity ("OI") Database and uploaded PSB Investigation PSB#15-0126, which contained the findings of an investigation of Phoenix Police Officer Anthony Armour.

4.      A true and correct copy of a screenshot of the sign-in page for that database is attached hereto as Exhibit 1.

5.      On that same date, after I uploaded PSB Investigation PSB#15-0126 to the database, I sent an e-mail to Erlinda Parrish at the Maricopa County Attorney's Office attaching several PSB investigation reports, including PSB#15-0126, and advising her that I had uploaded these reports to the City Prosecutor's Office OI database. See E-mail from Krista Campagna to Erlinda Parrish, dated December 28, 2016, a true and correct copy of which is attached hereto as Exhibit 2.

1

6.     I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on this 3rd day of February, 2022.

Krista Campagna

# EXHIBIT 1



COP-SALAZAR6543

# EXHIBIT 2

| | |
|---|---|
| **From:** | Krista L Campagna <Krista.Campagna@phoenix.gov> |
| **Sent:** | Wednesday, December 28, 2016 2:04 PM |
| **To:** | Erlinda Parrish |
| **Cc:** | Deedee Halter |
| **Subject:** | Brady Requests 12-28-16 |
| **Attachments:** | PSB15-0126 - Armour.pdf; PSB15-0107 - Mayo.pdf; SI16-0067 - Ferrari.pdf |

Good afternoon,

Please se attached Brady requests submitted through the OI database.


Krista Campagna, Administrative Assistant I
Professional Standards Bureau
Phoenix Police Department
krista.campagna@phoenix.gov
Main: 602.262.4580
Desk: 602.534.8576
Fax:   602.340.0324
TTY:  7-1-1



PRIDE
Protection | Respect | Integrity | Dedication | Excellence

LAKE000926

# EXHIBIT V

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF ARIZONA


Frances Salazar, individually,    )
                                  )
                 Plaintiff,       )
                                  )No. CV-19-01188-PHX-SRB
              vs.                 )   (ESW)
                                  )
City of Phoenix, a political      )
subdivision of the State of       )
Arizona; Jeri Williams, Acting    )
Chief of Police for the City      )
of Phoenix Police Department;     )     DEPOSITION OF
Joe Yahner, former Chief of       )
Police for the City of Phoenix    ) ELIZABETH M. LAKE, ESQ.
Police Department; Anthony        )
Armour, a married man;            )
Maricopa County, a political      )
subdivision of the State of       )
Arizona; Bill Montgomery,         )
Elected head of the Maricopa      )   Phoenix, Arizona
County Attorney's Office;         )   October 2, 2020
Elizabeth Lake, Prosecutor        )    10:14 a.m.
with the Maricopa County          )
Attorney's Office; Black and      )
White Companies or Entities       )
I-X, and Jane and John Does       )
1-10,                             )
                                  )
                 Defendants.      )
                                  )


REPORTED STENOGRAPHICALLY BY:
PAMELA A. GRIFFIN, RPR, CRR, CRC
Certified Reporter
Certificate No. 50010

PREPARED FOR:
CONDENSED/ASCII

(Certified Copy)

38

1   dismissal of the charges?"

2                    Ms. Mak and Ms. Berke both objected, I

3   believe, as to form.

4                    MS. BERKE:  No.  My objection was not just as

5   to form.

6                    MR. COOL:  It says:  "Objection.  Vague."  So

7   that's not actually a real objection in a deposition.  I

8   would give you the benefit of the doubt.

9                    MS. BERKE:  That is.  Under federal rules, it

10  is an appropriate objection.

11  BY MR. COOL:

12      Q.   Okay.  So Ms. Berke objected.  Vague.  Ms. Mak

13  joined in that objection.

14                   So the question to you that I'd like you to

15  answer was:  Did you believe that given the credibility

16  issues that you had discovered about Officer Armour, that

17  the interest of justice mandated dismissal of the charges?

18      A.   I believe that our choices were to conduct the new

19  trial or dismiss.  There is no third door.  And in light of

20  the fact that I did not believe that a new trial was likely

21  to affirm her conviction, I had no choice but to dismiss.

22      Q.   Why did you believe a new trial was unlikely to

23  affirm her conviction?

24      A.   Because at the first trial, the evidence rested

25  largely on Officer Armour's testimony that Ms. Salazar had

65

1    necessarily, that you did not receive this information

2    until after Ms. Salazar's trial had been completed?

3         A.   Yes.

4         Q.   If you had received this information before the

5    trial was completed, would you have dismissed the case in

6    the interest of justice?

7         A.   No.

8         Q.   Why not?

9         A.   I would have disclosed this material to the

10   defense, and then I would have made an assessment about

11   whether or not we could limit its use on cross, using a

12   motion in limine.  And if I felt that we could not, then I

13   would have dismissed the case.

14        Q.   What was different about before the first trial in

15   this hypothetical and when you actually did make the

16   decision to dismiss the case sometime later?

17        A.   Officer Armour had already testified once.

18        Q.   And why was that a meaningful difference?

19        A.   I -- I thought that the cross against

20   Officer Armour would be more damaging to his credibility in

21   view of the fact that he had testified once after this

22   report -- or after the incident that's documented in this

23   report had occurred rather than the usual way, which is

24   where we would know about it and disclose it, and then sort

25   of do damage control.

1  Q.   What about Officer Armour's testimony at trial led

2  you to this conclusion?

3  A.   Nothing.  The fact that a record of his testimony

4  existed which with he -- with which he could be impeached

5  if there were any inconsistencies.

6  Q.   So is it your position that you dismissed the case

7  in the interest of justice not because of the Brady

8  material, but because you didn't want the officer to be

9  subject to cross-examination with his original testimony?

10  A.   And the Brady material.

11  Q.   So earlier when I asked you if there was any other

12  reason, you -- you're now add -- and you said no, that was

13  not correct.  You're now adding the additional reason that

14  the officer would be subject to cross-examination based on

15  prior testimony?

16              MS. MAK:  Objection.

17              MS. BERKE:  Misstates testimony.

18              MS. MAK:  Yeah.  And what testimony are you

19  referring to?

20  BY MR. COOL:

21  Q.   Well, fair point.  Let me try to clean this up for

22  you, I suppose.

23              Was there anything that Officer Armour said

24  during the trial that you believe contradicted the Brady

25  material you received sometime after the trial?

1              for disclosure in this case.  I will need to

2              draft an additional motion as well so hold

3              off on disclosing for now."

4          Did I read that correctly?

5      A.   Yes.

6      Q.   That was on February 6th of 2017?

7      A.   Correct.

8      Q.   What was the additional motion?

9      A.   A motion for new discovery.  I'm going to read it

10 off of Diane's motion, because she quotes it here:

11 "State's Supplemental Motion to Disclose New Evidence

12 Pursuant to Rule 15."

13     Q.   And is that something you drafted?

14     A.   I did.

15     Q.   So Michael did not draft that?

16     A.   No.  I drafted that.

17     Q.   Okay.  And is there an e-mail where you instruct

18 Michael to go ahead and make the disclosures?

19     A.   There is an e-mail where I instruct my legal

20 assistance, Cheryl Mumford, to file the motions.  And then

21 when that was done, to let Michael know so he could make

22 the disclosure.

23     Q.   And do you know if Cheryl ever let Michael know so

24 he could make the disclosure?

25     A.   Yes.  I've seen an e-mail where she said, okay,

110

1   done, or something like that, to Michael and to me.

2       Q.   Okay.  And did you ever see anything from Michael

3   confirming he had done what he was instructed?

4       A.   No.

5       Q.   When you filed the motions with the court, do you

6   actually attach the Brady material itself?

7       A.   No.

8       Q.   So the only way that that would have been

9   transmitted to Mr. Doran, if it was, would have been in the

10  form of an e-mail.  Right?

11      A.   When you say "that," I'm not sure what document

12  you're talking about.

13      Q.   I agree.  Thank you.  The Brady material.

14      A.   Yes.

15      Q.   Okay.

16      A.   It would have been transmitted via e-mail from

17  Michael to Mr. Doran.

18      Q.   And unlike the motion for disclosure, it was not

19  something that was available through the court's website

20  online?

21      A.   Correct.

22      Q.   If Mr. Doran did not receive your disclosure, how

23  would you know?

24      A.   Well, he would have received the motion that

25  references those Bates numbers.  And he would have received

1     A.   Correct.

2     Q.   And it's your testimony that if you were aware of

3 the Brady material at the time of the trial, you still

4 would have gone forward because you believe there would

5 still be a reasonable likelihood of conviction.  Correct?

6     A.   Correct.

7     Q.   Did you meet with Officer Armour in advance of

8 trial, shortly before the trial?

9     A.   Yes.

10     Q.   And did you ask him whether there were any pending

11 investigations, Internal Affairs or Professional Standards

12 Bureau investigations, against him?

13     A.   No.

14     Q.   Are you aware of any untruth that Officer Armour

15 told during the criminal trial?

16     A.   No.

17     Q.   As far as you know, he was truthful in his

18 testimony?

19     A.   As far as I know.

20          MS. BERKE:  All right.  I have nothing

21 further.

22          MR. COOL:  Yeah, I guess I some follow-up on

23 that.

24          THE WITNESS:  Do you -- do you need this in

25 front of me now?

140

1

2                          FURTHER EXAMINATION

3    BY MR. COOL:

4        Q.   No, I don't.

5        A.   Put it away?

6        Q.   Yes.  If you believed Officer Armour's testimony

7    in the first trial was entirely truthful, why were you

8    concerned that a transcript of that first trial would be

9    used to impeach him in a second trial?

10       A.   I'm always concerned when there's multiple,

11   on-record tellings of the same set of facts.  A grand jury

12   testimony, a suppression hearing testimony, a first trial

13   testimony, it's human nature to, like, leave out details or

14   use different words to describe something, and I just

15   didn't want him to be subject to, like, a raking over.

16       Q.   At the time of the first trial, you thought there

17   was a reasonable likelihood of success.  Right?

18       A.   Correct.

19       Q.   At the time of the first trial, Officer Armour had

20   expressed the facts of the case in a police report?

21       A.   Correct.

22       Q.   He expressed the facts of the case in a defense

23   interview?

24       A.   I assume.  I wasn't present for the defense

25   interview.

1     Q.   One was conducted, though.  Yes?

2     A.   I -- I have never seen or heard it, but I believe

3   that one was conducted.

4     Q.   He expressed the facts of the case in an

5   exhaustive cross-examination of a suppression hearing?

6     A.   Again, I wasn't present for that

7   cross-examination.  I don't know how exhaustive that was,

8   but in reviewing the docket, it appears that it was long.

9     Q.   Well, I used that word, because I think that's how

10  you described it, that it was a -- I thought the word was

11  "exhaustive," but that it was a -- it was a vigorous cross

12  by Mr. Doran.  Is that right?

13    A.   I don't know.  I just know that the hearing was

14  long and fraught.

15    Q.   Okay.  So other -- so at the time of the first

16  trial, there were three prior statements potentially about

17  the case that could have been used to muddy up

18  Officer Armour's testimony?

19            MS. BERKE:  Objection.  Vague.

20  BY MR. COOL:

21    Q.   Is that right?

22            MS. MAK:  Join.

23            THE WITNESS:  At the time of the trial, there

24  was a police report, a defense interview, and a prior sworn

25  statement given at a suppression hearing.

1  BY MR. COOL:

2      Q.   And then in the event of a second trial, there

3  would have been not three prior instances, but four?

4      A.   Correct.

5      Q.   Other than the addition of one instance of prior

6  testimony, was there any other reason you thought you had a

7  reduced likelihood of success in the second trial?

8      A.   I'm not sure what you're referring to.

9      Q.   Why did you -- let's go back.

10          Why did you believe that the interest of

11 justice warranted a dismissal of the case without a second

12 trial?

13          MS. BERKE:  Objection.  Asked and answered.

14          MS. MAK:  Join.

15          THE WITNESS:  Because there was a Brady

16 packet that had not been disclosed prior to trial which was

17 going to create an additional issue at trial if we were to

18 proceed with testimony.

19 BY MR. COOL:

20     Q.   Correct.  But nothing in that tes- -- in that

21 Brady packet had been discussed in the first trial?

22     A.   Correct.

23     Q.   Nor in any of the prior statements in the case by

24 Officer Armour?

25     A.   Not that I'm aware of.

1                    FURTHER EXAMINATION

2    BY MS. BERKE:

3         Q.   Well, in addition -- you testified a moment ago

4    that it was also the incon- -- the possibility -- or strike

5    that.

6              You also testified a few moments ago that

7    it's because there were so many other prior statements that

8    could be used for impeachment purposes.  Correct?

9         A.   Correct.

10                  MR. COOL:  Objection to form.

11                  THE WITNESS:  Correct.  I testified to that,

12   and that is true.

13                  MS. BERKE:  All right.  Nothing further.

14                  MS. MAK:  I have a few, just, clear-up

15   questions.

16

17                       EXAMINATION

18   BY MS. MAK:

19        Q.   I'm going to hand you three documents.  The first

20   one is Bates labeled LAKE000511.

21              Do you know recog- -- or what is this

22   document?

23        A.   It's the notice of appeal that was filed in ICIS,

24   essentially on the 22nd of December, 2016.

25        Q.   And based on your review of that document, who

# EXHIBIT W

1
2
3
4
5
6

**IN THE UNITED STATES DISTRICT COURT**

7

**DISTRICT OF ARIZONA**

8
9   Frances Salazar, individually,

10                Plaintiff,

11   v.

12   City of Phoenix, a political subdivision of the
     State of Arizona; Jeri Williams, Acting Chief
13   of Police for the City of Phoenix Police
     Department; Joe Yahner, former Chief of
14   Police for the City of Phoenix Police
     Department; Anthony Armour, a married man;
15   Maricopa County, a political subdivision of the
     State of Arizona; Bill Montgomery; Elected
16   head of the Maricopa County Attorney's
     Office; Elizabeth Lake, Prosecutor with the
17   Maricopa County Attorney's Office; Black and
     White Companies or Entities I-X, and Jane and
18   John Does 1-10,

19                Defendants.

20

No. CV19-01188-PHX-SRB (ESW)

**DECLARATION OF
ELIZABETH LAKE**

21        I, Elizabeth Marie Lake, declare the following:

22        1.       I am employed as a Deputy County Attorney (DCA) with the Maricopa

23   County Attorney's Office (MCAO).

24        2.       I was assigned to *State v. Salazar*, Maricopa County Superior Court Case No.

25   CR2013-462384-001 on May 4, 2016. The case went to trial on August 12, 2016.

26        3.       Officer Anthony Armour testified on behalf of the State of Arizona at trial.

27        4.       Officer Armour was placed on the MCAO's Rule 15 Disclosure Database

28   (R15DD) sometime in January 2017.

1

5.     On January 30, 2017, MCAO notified all prosecutors that Officer Anthony Armour had been placed on the R15DD. A true copy of January 30, 2017 email notification is attached to this declaration as Attachment 1, Bates marked LAKE000928-31.

6.     While a notice of appeal had been filed, I did not believe that the appeal had been perfected or an appellate number assigned.

7.     I contacted my direct supervisor, Treena Kay, and she advised me to contact Diane Meloche, Chief of the MCAO Appeals Bureau to determine how to proceed. On January 31, 2017, I e-mailed Ms. Meloche regarding the disclosure of the information pertaining to Officer Armour.

8.     On February 2, 2017, Ms. Meloche instructed me to file a State's Supplemental Motion to Disclose New Evidence Pursuant to Rule 15 and/or ER 3.8 with the trial court.

9.     A true copy of my January 31, 2017 email with Ms. Meloche's responses is attached to this declaration as Attachment 2, Bates marked LAKE000995-96. (My email is in black and Ms. Meloche's responses are in red.)

10.    On February 6, 2017, Ms. Meloche instructed me to comply with existing MCAO practice and request a protective order. A true copy of Ms. Meloche's February 6, 2017 email is attached as Attachment 3, Bates marked LAKE000935-36.

11.    I directed my paralegal, Michael Torrez, to prepare a Motion for Protective Order and to Bates stamp the Report for disclosure. A true copy of my email directing Mr. Torrez to prepare the motion and the Report for disclosure is attached as part of Attachment 3, Bates marked LAKE000935.

12.    I drafted the State's Supplemental Motion to Disclose New Evidence Pursuant to Rule 15 and/or ER 3.8.

13.    On February 21, 2017, I directed Cheryl Mumford, my legal assistant, to file the following: 1) State's Motion for Protective Order Pursuant to Rule 15; and 2) State's Supplemental Motion to Disclose New Evidence Pursuant to Rule 15 and/or ER 3.8. As was standard practice, I asked Ms. Mumford to notify me and Mr. Torrez when this was done so that Mr. Torrez could disclose the motions and documents contemporaneous with

2

the filing. A true copy of my February 21, 2017 email is attached as Attachment 4, Bates marked LAKE000941.

14.     On February 22, 2017, Ms. Mumford sent an email to Mr. Torrez and me confirming that she had filed the motions.

15.     I believed that Mr. Torrez had disclosed the motions and documents as I directed him to.

16.     On December 13, 2017, I received an e-mail from attorney Chris Doran, who had been counsel for Ms. Salazar. He stated that he did not have copies of the motions filed on February 22, 2017, or the referenced documents. This was the first time that Mr. Doran advised me that he did not have copies of the February 22, 2017 motions, or the referenced documents.

17.     I asked Mr. Torrez to produce the original February 22, 2017 disclosure.

18.     Mr. Torrez responded that was unable to find his e-mail disclosing them.

19.     I followed standard MCAO supervisory practice in delegating this ministerial assignment to my paralegal, Mr. Torrez. I had been working with Mr. Torrez for several months before the February 22, 2017 disclosure at issue. He had always carried out my instructions, had never missed any deadlines, and was an exemplary paralegal. I had confidence in his abilities and his willingness to ask questions if he was ever unsure.

I declare under penalty of perjury that the following is true and correct.

Dated: January 20, 2022

Elizabeth Marie Lake
Deputy County Attorney
Maricopa County Attorney's Office____

3

Attachment 1

| | |
|---|---|
| **From:** | Erlinda Parrish |
| **Sent:** | Monday, January 30, 2017 2:14 PM |
| **To:** | CA-MCAO |
| **Subject:** | R15DD Update |

The MCAO Rule 15 Disclosure Database (R15DD) Committee meets every two weeks.  The Committee recently reviewed R15DD cases.  Changes to the R15DD are listed below.

**Names added:** Armour, Anthony Jr. #8605 -- Phoenix PD
                  Arnold, Michael #B2736 - MCSO
                 Brewer, Justin #7711 -- DPS
                 Hudson, Cody #S2056 -- MCSO
              Larese, Michael #A5152 -- Phoenix PD

Prosecutors have a duty to double check all their cases with the Intranet R15DD list.

http://intranet.mcao.maricopa.gov/Law%20Enforcement/R15DD.xls

PbK shows the employee/officers assigned to the following cases:

**Arnold & Larese**
None

**Armour:**

1

LAKE000928

| Name/OSN | Termination Date | PbK File# | Defendant Name | CR # | Lead Charge | Assigned DCA | Bureau | Status | |
|---|---|---|---|---|---|---|---|---|---|
| Armour, Anthony (08605) | | 013-1621612 | Balderas, Martin J. | CR2016-141879-001 | Possession Or Use Of Dangerous Drugs | Lake, Elizabeth M | CBP-Central Valley | OPEN | |
| | | 013-1629917 | Benally, Tyrone Troy | CR2016-151997-002 | Kidnapping | Thurston, Gregg | CBP-SW Valley | OPEN | |
| | | 013-1622702 | Capistrand, John Wayne | CR2016-143906-001 | Aggravated Assault | Hovater, Emily | CBP-Central Valley | OPEN | |
| | | 013-1625173 | Chapman, Jason Devin | CR2016-146597-002 | Theft of Means of Transportation | Hannan, Lindsey M | SVD-Auto Theft | OPEN | |
| | | 013-1637498 | Clegg, Chelsea Helene Marie | CR2017-100175-002 | Possession Or Use Of Dangerous Drugs | Yost, Joshua | CBP-Central Valley | OPEN | |
| | | 013-1561690 | Gibson, Aubrie Diane | | | Maxwell, Josh | MOD-ROP | REVIEW | |
| | | 013-1602753 | Gonzalez, Adrian Ignacio | CR2016-002068-001 | Aggravated Assault | Fisher, Daniel F | MOD-Gang | OPEN | |
| | | 013-1424276 | Hollins, Brandon Duane | CR2014-121522-001 | Aggravated Taking Identity Of Another | Kirka, Heather | MOD-ROP | OPEN | |
| | | 013-1630178 | Holsey, Isaiah Rashad | CR2016-151997-001 | Armed Robbery | Thurston, Gregg | CBP-SW Valley | OPEN | |
| | | 013-1637497 | Hornik, Anla Laury Maj | PF2017-100779-001 | | | PTD-Diversion | REVIEW | |
| | | 013-1590457 | Jaime, Fernando | CR2016-103410-001 | Misconduct Involving Weapons | Okano, Kevin | MOD-ROP | OPEN | |
| | | 013-1637357 | Jones, David Charles | CR2017-100722-001 | Possession Or Use Of Marijuana | County Attorney, Prelim Bureau A | PTD-Prelim A | OPEN | |
| | | 013-1635128 | Martin, Trisha May | CR2016-158115-001 | Forgery | Sawyer, Tamara L | OCD-FITE | OPEN | |
| | | 013-1395345 | McQuatters, Henry C | CR2010-166236-001 | Forgery | Noble, Kara | OCD-FITE | OPEN | |
| | | 013-1591278 | Morgan, Travis Aaron | CR2016-104099-001 | Possession Or Use Of Dangerous Drugs | Feeney, Maureen E | CBP-Central Valley | OPEN | |
| | | 013-1596332 | Perez, Ricardo Francisco | CR2016-110372-001 | Aggravated Assault | Munoz, Cecilia | CBP-Central Valley | OPEN | |
| | | 013-1622048 | Plante, Jeremy Ryan | CR2016-142838-001 | Aggravated Assault | Seeger, James | SVD-Family Violence West | OPEN | |
| | | 013-1593541 | Romero, Roger Michael | CR2016-107232-001 | Aggravated Assault | Gleason, Tracey L | SVD-Family Violence West | OPEN | |
| | | 013-1548877 | Stedmire, Audriana Victorian | CR2015-115011-002 | Possession Or Use Of Marijuana | County Attorney, SEF Pretrial | PTD-SEF Pretrial | OPEN | |
| | | 013-1566725 | Thompson, Trayvon Damarcus | CR2016-136106-002 | Aggravated Assault | Leiter, Edward | OCD-Special Crimes | OPEN | |

2

LAKE000929

| | | 013-1621287 | Tovar, Christian | CR2016-141663-001 | Arson Of A Structure Or Property | Chung, C.H. | OCD-Special Crimes | OPEN |
|---|---|---|---|---|---|---|---|---|
| | | 013-1587640 | Unger, William Patrick | CR2015-158879-001 | Sexual Assault | County Attorney, Sex Cr East | SVD-Sex Crimes East | OPEN |
| | | 013-1630838 | WILLIAMS, MARQUIS D'ANDRE | CR2016-153317-001 | Armed Robbery | Munoz, Cecilia | CBP-Central Valley | OPEN |
| Armour, Anthony (8605) | 08/22/2014 | 013-0807808 | Benally, Ivan Brent | JC2012-144477-001 | Interfering With Judicial Proceedings | County Attorney, Prelim Bureau B | PTD-Prelim B | OPEN |
| | 08/22/2014 | 013-1487859 | Chatman, Brian Lathen | CR2012-138973-001 | Possession Or Use Of Dangerous Drugs | County Attorney, Diversion | PTD-Diversion | OPEN |
| | 08/22/2014 | 013-1391452 | Jefferson, Sonny Garcia | CR2010-159360-001 | Possession Or Use Of Marijuana | County Attorney, Diversion | CBP-Records | OPEN |
| | 08/22/2014 | 013-0628077 | Lawson, Patrick Jay | CR2007-151243-001 | Aggravated Driving Or Actual Physical Control While Under The Influence Of Intoxicating Liquor Or Drugs | County Attorney, Vehicular Crime | MOD-Vehicular | OPEN |
| | 08/22/2014 | 013-0812453 | Pennetti, Thomas J | CR2012-110489-001 | Possession Or Use Of Narcotic Drugs | Ruiz, Leonard | PTD-Diversion | OPEN |
| | 08/22/2014 | 013-1490470 | Randolph, Shane Anthony | CR2014-112871-001 | Criminal Trespass In The Third Degree | County Attorney, Central Valley | CBP-Central Valley | OPEN |
| | 08/22/2014 | 013-1344821 | Rios, Ramiro | CR2012-116358-001 | Possession Or Use Of Marijuana | County Attorney, Diversion | PTD-Diversion | OPEN |
| | 08/22/2014 | 013-0816605 | Whitesinger, Brandon Marlin | CR2011-107035-002 | Unlawful Use Of Means Of Transportation | County Attorney, Auto Theft | CBP-Records | OPEN |

**Brewer:**

| Name/DSN | Termination Date | PbK File# | Defendant Name | CR # | Lead Charge | Assigned DCA | Bureau | Status |
|---|---|---|---|---|---|---|---|---|
| Brewer, Justin (7711) | 11/04/2016 | 013-1541913 | Meoak, Bryon K | CR2014-158321-003 | Possession Of Dangerous Drugs For Sale | McCarty, Thomas R | OCD-Drug Enforce | OPEN |

**Hudson:**

3

LAKE000930

| Name/DSN | Termination Date | PbK File# | Defendant Name | CR # | Lead Charge | Assigned DCA | Bureau | Status | |
|---|---|---|---|---|---|---|---|---|---|
| Hudson, Cody (2056) | | 013-1594186 | Calzada, Alisha Marie | JC2016-117386-001 | Interfering With Judicial Proceedings | | County Attorney, SEF Pretrial | PTD-SEF Pretrial | OPEN |
| | | 013-1583496 | Dennis, Ronald Keith | CR2015-154313-002 | Possession Or Use Of Dangerous Drugs | | County Attorney, SEF Pretrial | PTD-SEF Pretrial | OPEN |
| | | 013-1585353 | Guzman, Michael Ray | CR2015-156024-001 | Possession Or Use Of Dangerous Drugs | | Morales, Crystal J | PTD-SEF Pretrial | OPEN |
| | | 013-1626632 | Martinez Caudillo, Angel Manuel | CR2016-030787-001 | Resisting Arrest | | County Attorney, SEF Pretrial | PTD-SEF Pretrial | OPEN |
| | | 013-1598363 | Ramirez, Phillip | PF2016-112737-001 | | | County Attorney, SEF Pretrial | PTD-SEF Pretrial | REVIEW |
| | | 013-1586642 | Salas, Nicole Marie | CR2016-122772-001 | Possession Or Use Of Marijuana | | County Attorney, SEF Pretrial | PTD-SEF Pretrial | OPEN |
| | | 013-1601139 | Thurman, Dillon Michael | CR2016-116146-001 | Aggravated Driving Or Actual Physical Control While Under The Influence Of Intoxicating Liquor Or Drugs | | Leichter, Lauren K | MOD-Vehicular | OPEN |

*Erlinda Parrish*

Legal Management Assistant
Maricopa County Attorney's Office
Executive Division, 8th floor, 602-506-3536
Assistant to:  Keith D. Manning, Law Enforcement Liaison

LAKE000931

Attachment 2

| | |
|---|---|
| **From:** | Elizabeth Lake <lakee@mcao.maricopa.gov> |
| **Sent:** | Thursday, February 2, 2017 10:03 AM |
| **To:** | Treena Kay |
| **Subject:** | FW: PA File 013-0895931, Court Case Number CR2013-462384-001 For Defendant Salazar, Francis |

Here is what Diane said about disclosing the Brady packet post-trial.  I'm going to wait to hear back about the protective order and then disclose it.

**From:** Meloche Diane
**Sent:** Thursday, February 2, 2017 9:47 AM
**To:** Lake Elizabeth
**Subject:** RE: PA File 013-0895931, Court Case Number CR2013-462384-001 For Defendant Salazar, Francis

See below.  I will let you know about the protective order as soon as I get an answer (hopefully very soon).  Let me know if you have other questions.

**From:** Lake Elizabeth
**Sent:** Tuesday, January 31, 2017 8:05 PM
**To:** Meloche Diane
**Subject:** PA File 013-0895931, Court Case Number CR2013-462384-001 For Defendant Salazar, Francis

Case 013-0895931(https://maricopa.hostedbykarpel.com/PBKAZMaricopa//Reports/RedirectToCaseInfo.aspx?cid=0130895931), Court Case Number CR2013-462384-001 For Defendant Salazar, Francis

Hi Diane,

The case above was tried in August of 2016 and is pending appeal right now.  A notice was filed but, as far as I know, the appeal has not yet been perfected and no appellate case number has been assigned.  At trial and after trial, there was a great deal of argument and litigation about the veracity of one officer's testimony.  In his report, the officer said the defendant "took responsibility" for some drugs that were found in the seat of the car where she was riding.  On the stand, the officer first told the jury the defendant's statement, and then later characterized those statements as "an admission."  The defense took issue with the word "admission," first by impeaching the officer on the stand with prior sworn testimony, and then in post-trial motions that you can find in ICIS.  Ultimately, the court ruled that it did not have jurisdiction to rule on anything until the defendant was sentenced and then the judge sentenced her to the super-mitigated term.  Rather than re-urging the motions, the defense filed a notice of appeal.

Yesterday, I received notice that the officer in question has been added to the Brady list for an incident that occurred 11/4/15.  The investigation that sustained the allegations concluded 4/27/16.  The officer was added to the Brady list on 1/23/17.  Here are my questions:

- Do I need to disclose a copy of the Brady packet? Yes.

1

LAKE000995

- If so, does it get disclosed under the superior court CR#? Yes. File a motion in Superior Court entitled "State's Supplemental Motion to Disclose New Evidence Pursuant to Rule 15 and/or ER 3.8" and list what the material is. ~~Or should I wait for the Court of Appeals to assign a number?~~
- Do I continue bates-numbering where we left off prior to trial, or should I start a new set of bates numbers? I am concerned that continuing to number might create the impression that I held on to this material to prevent the officer from being impeached, which is not the case. I don't think this matters; but continuing w/ the same numbers will avoid confusion.


- Because the case is sitting between jurisdictions right now, if I were to disclose the Brady packet, where would I file a motion for a protective order to prevent dissemination of the material for non-legal use? There is internal Office discussion about discontinuing asking for protective orders; a defendant can get the same info by filing a PRR with the Department. I'm waiting for final confirmation either way and will you know.
- If no court has jurisdiction to grant such an order, how can we ensure that this material is not copied for the defendant? Or disseminated to other attorneys?
- Bottom line:  if the officer was not on the Brady list at the time of trial (and I had no way of knowing that this investigation existed), am I going to have to do this trial a second time? It will depend on the degree of prejudice, if any.
- Is there something I should have done to prevent this?  Not if he was not on the Brady list until after trial.  We expect you to be good, but not clairvoyant!


Thanks for your help,


*Liz Lake*
*Deputy County Attorney*
*Community Based Prosecution*
*Central Valley Bureau*
*(602) 372-0189*



LAKE000996

ATTACHMENT 3

**From:** Michael Torrez
**Sent:** Monday, February 6, 2017 4:58 PM
**To:** Elizabeth Lake
**Cc:** Treena Kay
**Subject:** RE: PA File 013-0895931, Court Case Number CR2013-462384-001 For Defendant Salazar, Francis

Hi, Liz,

The Order will be prepared and ready by tomorrow morning. The attached has been Bates stamped and is pending disclosure.

Thanks,

Michael Torrez
Paralegal
Maricopa County Attorney's Office
Central Valley Bureau
P:602-372-0152

**From:** Lake Elizabeth
**Sent:** Monday, February 06, 2017 1:07 PM
**To:** Torrez Michael
**Cc:** Kay Treena
**Subject:** FW: PA File 013-0895931, Court Case Number CR2013-462384-001 For Defendant Salazar, Francis

Michael,

Please prepare a motion for protective order and bates stamp the attached for disclosure in this case. I will need to draft an additional motion as well so hold off on disclosing for now.

Thanks,

*Liz Lake*
*Deputy County Attorney*
*Community Based Prosecution*
*Central Valley Bureau*
*(602) 372-0189*



**From:** Meloche Diane
**Sent:** Monday, February 06, 2017 1:05 PM

LAKE000935

**To:** Lake Elizabeth
**Subject:** RE: PA File 013-0895931, Court Case Number CR2013-462384-001 For Defendant Salazar, Francis

No change in current practice of asking for a protective order.

**From:** Lake Elizabeth
**Sent:** Thursday, February 02, 2017 9:51 AM
**To:** Meloche Diane
**Subject:** RE: PA File 013-0895931, Court Case Number CR2013-462384-001 For Defendant Salazar, Francis

Thank you, Diane. I will wait to hear from you about the protective order before disclosing. I will likely have more questions for you if (when) defense files a motion for new trial.

Liz

**From:** Meloche Diane
**Sent:** Thursday, February 2, 2017 9:47 AM
**To:** Lake Elizabeth
**Subject:** RE: PA File 013-0895931, Court Case Number CR2013-462384-001 For Defendant Salazar, Francis

See below. I will let you know about the protective order as soon as I get an answer (hopefully very soon). Let me know if you have other questions.

**From:** Lake Elizabeth
**Sent:** Tuesday, January 31, 2017 8:05 PM
**To:** Meloche Diane
**Subject:** PA File 013-0895931, Court Case Number CR2013-462384-001 For Defendant Salazar, Francis

Case 013-0895931(https://maricopa.hostedbykarpel.com/PBKAZMaricopa//Reports/RedirectToCaseInfo.aspx?cid=0130895931), Court Case Number CR2013-462384-001 For Defendant Salazar, Francis

Hi Diane,

The case above was tried in August of 2016 and is pending appeal right now. A notice was filed but, as far as I know, the appeal has not yet been perfected and no appellate case number has been assigned. At trial and after trial, there was a great deal of argument and litigation about the veracity of one officer's testimony. In his report, the officer said the defendant "took responsibility" for some drugs that were found in the seat of the car where she was riding. On the stand, the officer first told the jury the defendant's statement, and then later characterized those statements as "an admission." The defense took issue with the word "admission," first by impeaching the officer on the stand with prior sworn testimony, and then in post-trial motions that you can find in ICIS. Ultimately, the court ruled that it did not have jurisdiction to rule on anything until the defendant was sentenced and then the judge sentenced her to the super-mitigated term. Rather than re-urging the motions, the defense filed a notice of appeal.

Yesterday, I received notice that the officer in question has been added to the Brady list for an incident that occurred 11/4/15. The investigation that sustained the allegations concluded 4/27/16. The officer was added to the Brady list on 1/23/17. Here are my questions:

- Do I need to disclose a copy of the Brady packet? Yes.

2

ATTACHMENT 4

| From: | Mumford Cheryl <mumfordc@mcao.maricopa.gov> |
|---|---|
| Sent: | Wednesday, February 22, 2017 4:30 PM |
| To: | Lake Elizabeth; Torrez Michael |
| Subject: | RE: PA File 013-0895931, Court Case Number CR2013-462384-001 For Defendant Salazar, Francis |

Ok, done

**From:** Lake Elizabeth
**Sent:** Tuesday, February 21, 2017 7:34 PM
**To:** Mumford Cheryl; Torrez Michael
**Subject:** PA File 013-0895931, Court Case Number CR2013-462384-001 For Defendant Salazar, Francis

Case 013-0895931(https://maricopa.hostedbykarpel.com/PBKAZMaricopa//Reports/RedirectToCaseInfo.aspx?cid=0130895931), Court Case Number CR2013-462384-001 For Defendant Salazar, Francis

Hi Cheryl,

Please file the top three documents in karpel (motion to disclose newly discovered evidence; motion for protective order; order for protective order).  When it's done, let me and Michael know so Michael can disclose the R. 15 packet.

Thanks,

Liz

1

LAKE000941

# EXHIBIT X

Michael K Jeanes, Clerk of Court
*** Electronically Filed ***
R. Montoya, Deputy
2/22/2017 4:29:47 PM
Filing ID 8118015

WILLIAM G MONTGOMERY
MARICOPA COUNTY ATTORNEY

Elizabeth M Lake
Deputy County Attorney
Bar ID #: 030677
301 West Jefferson, 8th Floor
Phoenix, AZ 85003
Telephone: (602) 506-8532
mcaoctd@mcao.maricopa.gov
MCAO Firm #:  00032000
Attorney for Plaintiff

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| THE STATE OF ARIZONA, | |
| Plaintiff, | |
| vs. | |
| FRANCIS SALAZAR,<br>aka FRANCES M SALAZAR<br>aka FRANCES MARIE HIGUERA<br>aka FRANCIS HIGUERA<br>aka MARIA L LEON<br>aka FRANCIS MARIE SALAZAR<br>aka FRANCES MARIE SALAZAR<br>aka FRANCES SALAZAR | CR2013-462384-001 |
| Defendant. | STATE'S MOTION FOR PROTECTIVE ORDER PURSUANT TO RULE 15<br><br>(Assigned to the Honorable  , Div. RULE32) |

The State, by and through undersigned counsel, respectfully requests this Court grant a

protective order, under its discretion as permitted by A.R.S. Rules Criminal Procedure, Rule 15.5

and Rule 15.4(d), to prohibit the dissemination of documents Bates stamped 0115-0130, disclosed

by the Maricopa County Attorney's Office to Defendant. The State also requests that this Court

order the defense not to copy, disseminate, or retain the documents for future cases. The defense

may allow the defendant in the above captioned case to view the document, but a copy should not

be provided to the defendant or anyone else.

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.      FACTS**

On February 22, 2017, MCAO disclosed Bate stamped 0115-0130 to defense counsel. These documents contain material that may or may not be used at trial, but must be disclosed by the State pursuant to Rule 15. The documents contain personal and sensitive material relating to Officer Anthony Armour Jr., #8605.

**II.     LAW AND ARGUMENT**

Rule 15.4 (d) and Rule 15.5 permits the Court to order that counsel should not disclose information to the public. Furthermore, the comments in Ethical Rules of Professional Conduct, 3.8, state that a prosecutor may seek an appropriate protective order from the tribunal if disclosure of information to the defense could result in substantial harm to an individual or to the public interest.

**III.    CONCLUSION**

For the reasons stated above, the State respectfully requests that the Court grant a protective order, under its discretion as permitted by A.R.S. Rules Criminal Procedure, Rule 15, and prohibit the defense from copying, disseminating, or retaining the above referenced materials after this case has resolved.

Submitted February  22nd , 2017.

WILLIAM G MONTGOMERY
MARICOPA COUNTY ATTORNEY

BY: _____

/s/ Elizabeth M Lake
Deputy County Attorney

2

Copy mailed\delivered February __22nd__, 2017, to:

The Honorable
Judge of the Superior Court

Christopher Michael Doran
DUMONT LAW PLLC 1006 W ADAMS ST STE 101
Phoenix, AZ 85007
Attorney for Defendant

BY: _____
/s/ Elizabeth M Lake
Deputy County Attorney

mt

# EXHIBIT Y

Michael K Jeanes, Clerk of Court
*** Electronically Filed ***
K. Curtner, Deputy
2/22/2017 4:29:51 PM
Filing ID 8118017

WILLIAM G MONTGOMERY
MARICOPA COUNTY ATTORNEY

Elizabeth M Lake
Deputy County Attorney
Bar ID #: 030677
301 West Jefferson, 8th Floor
Phoenix, AZ 85003
Telephone: (602) 506-8532
mcaoctd@mcao.maricopa.gov
MCAO Firm #: 00032000
Attorney for Plaintiff

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

### IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| THE STATE OF ARIZONA,<br><br>    Plaintiff,<br><br>vs.<br><br>FRANCIS SALAZAR,<br>aka FRANCIS M SALAZAR<br>aka FRANCES MARIE HIGUERA<br>aka FRANCIS HIGUERA<br>aka MARIA L LEON<br>aka FRANCIS MARIE SALAZAR<br>aka FRANCES MARIE SALAZAR<br>aka FRANCES SALAZAR<br><br>      Defendant. | CR2013-462384-001<br><br><br><br><br><br>STATE'S SUPPLEMENTAL MOTION TO DISCLOSE NEW EVIDENCE PURSUANT TO RULE 15 AND/OR ER 3.8<br><br>(Assigned to the Honorable Michael Gordon) |

The State of Arizona, by and through undersigned counsel, hereby notifies the court and

opposing party that the state has disclosed newly discovered evidence, Bates stamped 0115-0130,

material pertaining to the state's witness, Officer Anthony Armour, Jr., #8605.

Submitted February  22, 2017.

WILLIAM G MONTGOMERY
MARICOPA COUNTY ATTORNEY

BY: _____
/s/ Elizabeth M Lake

Deputy County Attorney

Copy mailed\delivered February  22, 2017, to:

The Honorable Michael Gordon
Judge of the Superior Court

Christopher Michael Doran
DUMONT LAW PLLC 1006 W ADAMS ST STE 101
Phoenix, AZ 85007
Attorney for Defendant


BY:  _____

    /s/ Elizabeth M Lake
     Deputy County Attorney

EML

EXHIBIT Z

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Frances Salazar, individually,    )
                                  )
                    Plaintiff,    )
                                  )    Case No.:
        vs.                       )    2:19-CV-01188-PHX-SRB
                                  )    (ESW)
City of Phoenix, et al.,          )
                                  )
                    Defendants,   )
_____ )

DEPOSITION OF JENNIFER MYERS

30(b)(6)

Remote
October 15, 2021
4:00 p.m.

Prepared by:
Vicki L. O'Ceallaigh Champion, CR
Certificate No. 50534

                        BARTELT|NIX COURT REPORTERS
                        3101 North Central Avenue
                   Suite 290
                        Phoenix, Arizona  85012
Prepared for:           Phone:  (602) 254-4111
                   Fax:     (602) 254-6567
(Certified copy)        Office@barteltnix.com

Deposition of Jennifer Myers
10/15/2021

Page: 10
Salazar vs. City of Phoenix, et al.

1    have been e-mailed from our distribution center to

2    the addresses that we have in the attorney

3    maintenance database.

4        Q.    So when is the attorney's name input into

5    that system to associate with a particular case?  Is

6    it when a notice of appearance is filed, or how is

7    that done?

8        A.    So the Attorney Maintenance Database would

9    be the first time they ever appeared in court, they

10   would be put in at that time, so any time before

11   this case, probably, it happened.  And then when

12   they are assigned to a case, they get associated in

13   the case management system.  That can be by a notice

14   of appearance.  Sometimes it happens in the

15   courtroom when they just tell the judge that they

16   are there on behalf of the client, they can be added

17   to the case and case management system that way, as

18   well.

19       Q.    Once they are in the case management system

20   for a particular party in a case, do they remain in

21   that position until there is an order permitting

22   them to withdraw?

23       A.    Correct.

24       Q.    All right.  So this minute entry that's

25   attached to Exhibit 1, the notice of deposition,

Deposition of Jennifer Myers
10/15/2021

Page: 11
Salazar vs. City of Phoenix, et al.

1    reflects that Attorney Elizabeth Lake represents the

2    State of Arizona and Attorney Christopher Michael

3    Doran represents the Defendant Frances Marie

4    Salazar, correct?

5        A.    Correct?

6        Q.    And this minute entry, it states that it was

7    issued on March 6 of 2017 and filed on March 8 of

8    2017, correct?

9        A.    Correct.

10       Q.    And tell us the difference between those two

11   dates.

12       A.    Yes.  So the 3/6/2017 date would be the date

13   that the courtroom clerk created the minute entry in

14   our MEEDS system, and then when it's approved -- so

15   I know that she approved it on 3/7, because the file

16   date is always the next business day.  So she

17   approved it on 3/7, and it got distributed -- our

18   batch process runs like at midnight, and so

19   attorneys would receive the e-mails on the file

20   date.

21            So it was approved 3/7, distributed

22   overnight of 3/7 into 3/8, and it would have been

23   received by the endorsed parties on 3/8.

24       Q.    Okay.  Tell us who the endorsed parties are

25   on the minute entry that's attached to Exhibit 1.

Deposition of Jennifer Myers
10/15/2021

Page: 12
Salazar vs. City of Phoenix, et al.

1     A.   So the State of Arizona would be Elizabeth

2  M. Lake, and Frances Marie Salazar would be

3  Christopher Michael Doran.

4          MS. BERKE:   Okay.   I will put up another

5  document.   Let me show you what we are going to mark

6  as Exhibit Number 2.

7          (Exhibit No. 2 introduced for

8  identification.)

9  BY MS. BERKE:

10    Q.   This is a document that I received from your

11  office today.   Have you seen this before?

12    A.   Yes.

13    Q.   Is it something you created?

14    A.   I created the document for Nancy.   The

15  information was obtained from someone else in our

16  technology department.

17    Q.   Okay.   So why don't you walk us through this

18  document that is Exhibit Number 2 and tell us what

19  we know from this.

20    A.   Sure.   So the first sentence, there were

21  two endorsement e-mails sent out with the minute

22  entry attached, and then it states the case number.

23  The status of zero indicates it was successfully

24  sent to Attorney Christopher Doran at

25  chris@dumondlawaz.com, which was his e-mail address

Deposition of Jennifer Myers
10/15/2021

Page: 13
Salazar vs. City of Phoenix, et al.

1    at the time of distribution.

2           So the first screenshot, from our technology

3    department, is the creation of the minute entry in

4    our MEEDS system.

5           Do you want me to go through the fields?

6       Q.   Yes.

7       A.   Okay.  So the first field, the PID, that's

8    the personal identification number, so that's the

9    identification number of the courtroom clerk who

10   created the minute entry.

11          The minute entry ID, that's more technical,

12   and I really don't -- I couldn't tell you what that

13   means.  It means something to the technology

14   department like if they had to research something,

15   they use these codes, variables.  I don't know what

16   that number means.

17          The case number was the case number that the

18   minute entry is created in.

19          The docket code is the code of the minute

20   entry, so we have various docket codes that the

21   courtroom clerks use depending on what minute entry

22   is being issued, so the reason the minute entry is

23   being issued.  So an 023 is a ruling by the court.

24      Q.   Okay.

25      A.   The entry date, that would be the date that

Deposition of Jennifer Myers
10/15/2021

Page: 14
Salazar vs. City of Phoenix, et al.

1   the clerk created the minute entry, so 3/6/2017.

2           And then the file name, that's the -- how

3   the file is saved, how the minute entry is saved in

4   our database, so that's going to be the case number

5   again.  This case number is a little bit different,

6   because it also includes the Defendant ID, the

7   001DT.  So if there are multiple defendants, they

8   each get their own ID number in the case, so she was

9   the 001 defendant, and DT is just the downtown

10  facility.

11          The 023, again, is the docket code.

12          And then after the next hyphen, that again

13  is the date the minute entry is created, 03/06/2017.

14  Again, with the approved file number.  I'm not sure

15  what that -- that's, again, a technical number.

16      Q.   Okay.

17      A.   So then the next part, there were two

18  endorsements sent out, one to the attorney for the

19  State and one to Attorney Christopher Doran.

20  The status of zero shows an e-mail was successfully

21  sent by MEEDS distribution overnight process,

22  3/7/2017, to both attorneys to the e-mail addresses

23  shown below.

24          So the status of zero is the first column.

25  If there is an error, if we send a minute entry and

Deposition of Jennifer Myers
10/15/2021

Page: 15
Salazar vs. City of Phoenix, et al.

1   it's not successfully sent, we receive a

2   notification, unable to deliver notification, so

3   that status number would be something other than

4   zero.

5       Q.    So when we see a zero on both of these

6   lines, we know it was successfully delivered to both

7   Chris Doran and to the general mailbox at the

8   Maricopa County Attorney's Office?

9       A.    Correct.

10      Q.    Which is, apparently, Ms. Lake's receiving

11  e-mail address?

12      A.    Yeah.  Because they are a firm, they use a

13  generic e-mail address.

14      Q.    Okay.  And can you walk us through the --

15      A.    Oh, absolutely.  I'm sorry.  Yeah.  I

16  apologize.

17      Q.    That's okay.

18      A.    The minute entry -- the e-mail entry and the

19  minute entry ID, those just correspond to the MEEDS

20  creation -- again, technical numbers.

21          The endorsement ID, that would be the

22  attorney's bar numbers.

23          Case number, again, is the case number,

24  docket code, same 023, the date that it was created,

25  and 3/6/2017, and then the e-mail addresses that

Deposition of Jennifer Myers
10/15/2021

Page: 16
Salazar vs. City of Phoenix, et al.

1    they were sent to, and then the file name.  The D

2    drive is where they are saved, the PDF version of

3    the document is saved, and then again, the status is

4    zero.

5         Q.    Okay.  And you have confirmed that this is

6    information for the minute entry that's attached to

7    the notice of deposition?

8         A.    Correct.

9         Q.    All right.  And then what is the last bit

10   information on this page of Exhibit 2?

11        A.    So Attorney Christopher Doran's e-mail

12   address was updated on 9/25 and went to the

13   following.  I don't believe that's a true statement,

14   because in the Attorney Maintenance Database, that

15   is the e-mail address that I believe was updated

16   sometime in January of 2019.  So the e-mail

17   addresses are the same, so I don't believe that's

18   true, but we receive a feed from the State Bar like

19   monthly, and what that feed does is it will indicate

20   if an attorney -- their status is something other

21   than active, if they are inactive, they are

22   suspended, they are disbarred, they are deceased,

23   and so it refreshes the backend data, but it doesn't

24   necessarily change the Attorney Maintenance

25   Database, if that makes sense.  So nothing is

Deposition of Jennifer Myers
10/15/2021

Page: 18
Salazar vs. City of Phoenix, et al.

1  Distribution System.

2       Q.    Got it.

3       A.    We have been using it since about 2000.

4            MS. BERKE:  All right.  I'm going to have

5  this document marked as Exhibit 3.  I will blow it

6  up a little bit, so we can all read it.  This is

7  another document your office sent to me shortly

8  before the deposition started.

9            (Exhibit No. 3 introduced for

10  identification.)

11  BY MS. BERKE:

12       Q.    Do you recognize this document?

13       A.    I do.

14            MR. RUNDALL:  Real quick, Lori, if you were

15  sent these documents, I haven't seen any of these

16  documents prior to this deposition.  Is there any

17  way you could e-mail those to me so I can review

18  them before this depo?

19            MS. BERKE:  Sure.

20            MR. RUNDALL:  And, also, too, I'm not sure

21  why these documents weren't sent to us.

22            MS. BERKE:  As I mentioned, I was in

23  hearings and depositions, and I haven't even really

24  looked at them.

25            MR. RUNDALL:  Okay.  Well, if you don't

Deposition of Jennifer Myers
10/15/2021

Page: 20
Salazar vs. City of Phoenix, et al.

```
 1            MS. MAK:  Since you are sending e-mails, can
 2    I have one, too, please.
 3            MS. BERKE:  Yeah.  I was going to give you
 4    one, also.
 5            MR. RUNDALL:  They are only for me, Maxine.
 6            MS. BERKE:  Yeah.  Let me find that other
 7    one.  Sorry about that.  It's coming both of your
 8    ways right now.
 9            MR. RUNDALL:  Great.  Thank you.
10            MS. MAK:  Thank you.
11            MS. BERKE:  Did you get it?
12            MR. RUNDALL:  Just got it.  Perfect.
13    BY MS. BERKE:
14       Q.  Can you see this document with some
15    highlights?
16       A.  Yes.
17       Q.  So this is Exhibit 3.  And can you tell us
18    what it is or -- what this is and what it tells us?
19       A.  Yes.  So this is a document that I actually
20    created.  It's a screenshot of the Attorney
21    Maintenance Database.  So there is different tabs,
22    and it's for Christopher Michael Doran, and so this
23    is just a screenshot of the contact info tab, and
24    these are the e-mail addresses that we have in the
25    database for Mr. Doran.
```

Deposition of Jennifer Myers
10/15/2021

Page: 21
Salazar vs. City of Phoenix, et al.

1        So the portions that I highlighted were the
2   initial e-mail address that we used as the
3   distribution e-mail address, and that was active
4   from 1/26/2016 until 12/3/2019.
5        Q.   Okay.  So that was the date that he changed
6   it to that other or changed it to a different e-mail
7   address?
8        A.   Correct.  I was saying January, and I
9   apologize.  It was December.
10        Q.   Okay.  And then are you able to tell what it
11   was changed to on December 3 of 2019?
12        A.   Yes.  It was changed to
13   chris@doranjustice.com.
14        Q.   Okay.  What does "IPR e-mail address"
15   mean?
16        A.   So that's actually "JPR."
17        Q.   JPR.
18        A.   Yes.  That's the judicial practice.  It's an
19   annual thing that the court does where the attorneys
20   can rate the judicial officers.
21        Q.   Judicial performance review?
22        A.   Performance review.  Thank you.  Yes.  So
23   sometimes the attorneys, especially if they are with
24   a firm, they don't want to use the firm e-mail
25   address, so we just keep those separately even if

Deposition of Jennifer Myers
10/15/2021

Page: 36
Salazar vs. City of Phoenix, et al.

```
 1              MR. RUNDALL:  Are we done?

 2              MS. MAK:  You know what, I had one question.

 3

 4                          EXAMINATION

 5   BY MS. MAK:

 6       Q.   Looking at Exhibit 2, at the bottom, it

 7   says, "The distribution," and there is an "E," is

 8   there any way to know what Mr. Doran's preferred

 9   method of distribution was in March of 2017?

10       A.   It would be in another tab of the Attorney

11   Maintenance Database.  I mean, I could provide that

12   information to you.

13       Q.   So there is a record of it?

14       A.   Uh-huh.  Correct.

15       Q.   Okay.  Is there any way you can access that

16   right now?

17       A.   If that's appropriate, I could.

18              MS. BERKE:  Yes.

19       A.   I'm going to open it first, and then I will

20   share my screen.

21              MR. RUNDALL:  Can Ms. Myers just print

22   screen and then just e-mail that to us or e-mail it

23   to the Court Reporter, and we will attach it as an

24   exhibit.

25              MS. BERKE:  Sure.  I mean, I assume she can.
```

Deposition of Jennifer Myers
10/15/2021

Page: 37
Salazar vs. City of Phoenix, et al.

```
1              MS. MAK:  I don't have any objection to
2   it.
3              MS. BERKE:  I don't have any objection to
4   it, is what I should have said.
5              MR. RUNDALL:  Ms. Myers, if you are able to
6   do that, just print screen and then send it to the
7   court reporter in an e-mail, and she will just
8   attach it as an exhibit, because I don't know if
9   anyone has any follow-up questions on it, but...
10             THE WITNESS:  I'm copying it into a Word
11  document.
12             MS. BERKE:  Why don't you tell us what you
13  accessed in order to create this when you are done
14  doing that.
15             THE WITNESS:  Sure.
16             MS. BERKE:  Jennifer, do you know how to
17  share?  Okay.
18             THE WITNESS:  Can you see my screen?
19             MS. BERKE:  Yes.  I can see it.
20             THE WITNESS:  So this is the screen share
21  that I sent, and then here is the MEEDS
22  distribution, e-mail only.  And so that was his
23  method of distribution from November of 2015.
24             MS. MAK:  Thank you.  I have no further
25  questions.
```

Deposition of Jennifer Myers
10/15/2021

Page: 38
Salazar vs. City of Phoenix, et al.

```
 1            MS. BERKE:  We will have that marked as

 2    Exhibit Number 4.

 3            (Exhibit No. 4 introduced for

 4    identification.)

 5            MR. RUNDALL:  I don't have any further

 6    questions.

 7

 8                    FURTHER EXAMINATION

 9    BY MS. BERKE:

10      Q.    Just to be clear, so Attorney Christopher

11    Doran's preferred method of receiving minute entries

12    as of March 6, 2017, and March 8 of 2017 was by

13    e-mail?

14            MR. RUNDALL:  Objection; form.

15      A.    Sounds Correct.

16    BY MS. BERKE:

17      Q.    Let me reask the question.  Exhibit 4 had

18    what date listed that he designated that as his

19    preferred method?

20      A.    The status date is 11/10/2015.

21      Q.    And after that date, did his preferred

22    method of receipt of minute entries ever change?

23      A.    Not that I'm aware of.

24      Q.    Can you look in the system and tell us?

25      A.    No.
```

Deposition of Jennifer Myers
10/15/2021

Page: 39
Salazar vs. City of Phoenix, et al.

1    Q.   How are able to say what the date that you

2    listed for us in 2015, how are you able to say that

3    was his preferred method in March of 2017?

4    A.   That's the information that we have in the

5    system is the e-mail address, not the physical

6    address, which would be needed for the USPS mail.

7    Q.   Had he ever wanted to change -- if he had

8    ever changed his preferred method of receipt of

9    minute entries would you be able to see that in the

10   system?

11   A.   I don't think it has the historical.

12   Q.   Okay I guess I'm not quite understanding

13   then how you are able to say that e-mail was his

14   preferred method of receiving minute entries in

15   March of 2017?

16   A.   That's the delivery method information that

17   we have is the e-mail address.

18   Q.   And you don't have his physical address

19   information?

20   A.   Correct.

21   Q.   And so you couldn't mail minute entries to

22   him, then, I presume?

23   A.   Correct.

24   Q.   And regardless of whether e-mail was his

25   preferred method, he did receive this minute entry

Lori V. Berke (#015628)
Jody C. Corbett (#019718)
**BERKE LAW FIRM, PLLC**
1601 N. 7th Street, Suite 360
Phoenix, AZ 85006
Phone: (602) 254-8800
Fax: (602) 254-8808
lori@berkelawfirm.com
jody@berkelawfirm.com
Attorneys for Defendants City of Phoenix,
    Chief Jeri Williams and Anthony Armour

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Frances Salazar, individually, | Case No. 2:19-cv-01188-PHX-SRB (ESW) |
| Plaintiff, | |
| vs. | **NOTICE OF RULE 30(b)(6) DEPOSITION** |
| City of Phoenix, et al., | |
| Defendants. | |

YOU ARE HEREBY NOTIFIED that pursuant to Fed. R. Civ. P. 30(b)(6), the deposition will be taken upon oral examination of the person whose name is stated below at the time and place stated below before an officer authorized by law to administer oaths.

**PERSON TO BE EXAMINED:**  **State of Arizona representative(s) with the most knowledge regarding the subject referenced in Exhibit A**

**DATE AND TIME OF DEPOSITION:**  **October 15, 2021 at 4:00 p.m.**

**COURT REPORTER:**  **Bartelt/Nix Reporting, LLC**

**PLACE OF DEPOSITION:**  **Zoom Video Conferencing***

1

EXHIBIT

1   Myers   10/15/2021

*Every remote location will need access to a webcam or a computer/laptop with a built-in webcam. Also, each party will need to download the Zoom application, which can be accessed at https://zoom.us/signup. Prior to the deposition, the court reporter will provide each participant with an invitation to join the deposition, which can be accepted via the link sent by the court reporter.*

**JOIN ZOOM MEETING:**

https://us02web.zoom.us/j/89368418252?pwd=TkNNWWtOUzk2RFIrZTBqbko1eW16QT09

Meeting ID: 893 6841 8252
Passcode: 204979

DATED this 29th day of September, 2021.

BERKE LAW FIRM, PLLC

By__s/ Lori V. Berke_____
   Lori V. Berke
   Jody C. Corbett
   Attorneys for Defendants City of
     Phoenix, Chief Jeri Williams and
     Anthony Armour

**CERTIFICATE OF SERVICE**

I hereby certify that on September 29, 2021, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Benjamin L. Rundall
HONOR LAW GROUP, PLLC
rundall@aztrialattorneys.com

Maxine S. Mak
Angela Lane
ALLISTER ADEL, MARICOPA COUNTY ATTORNEY
CIVIL SERVICES DIVISION
makm@mcao.maricopa.gov
lanea01@mcao.mariocpa.gov

__s/ Lori V. Berke_____

## EXHIBIT A

The person most knowledgeable from the Clerk of the Maricopa County Superior Court Customer Service Center who will testify regarding:

1.     The process of how Minute Entries issued by the Court are electronically sent to attorneys;

2.     To what email addresses the attached Minute Entry dated 3/6/17 in the action entitled *State v. Salazar*, Maricopa County Superior Court Case No. CR2013-462384 were electronically sent.

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
03/08/2017 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2013-462384-001 DT                                    03/06/2017


                                              CLERK OF THE COURT
HONORABLE MICHAEL D. GORDON                        K. L. Johnson
                                                      Deputy


STATE OF ARIZONA                          ELIZABETH M LAKE

v.

FRANCES MARIE SALAZAR (001)               CHRISTOPHER MICHAEL DORAN



MINUTE ENTRY


    The Court has received the State's Motion for a Protective Order (2/22/17).  The matter is on appeal and the Court has no jurisdiction to enter further orders in this case. The Court, of course, will do so if vested with jurisdiction by the Court of Appeals.   Accordingly,

    IT IS ORDERED denying the motion.

Docket Code 023                Form R000A                        Page 1

There were two endorsement emails sent out with the minute entry attached – CR2013-462384-001.

The status of 0 indicates that it was successfully sent to Attorney Christopher Doran at CHRIS@DUMONDLAWAZ.COM which was his email address at the time of distribution.

Minute Entry Information:

| pid | minuteentryid | casenumber | docket | entrydate | filename | approvedfile |
|------|---------------|------------|--------|-----------|----------|--------------|
| KKBE | 9667987 | CR2013462384 | 023 | 2017-03-06 00:00:00.000 | CR2013-462384-001DT-023-03062017.docx | m7748235.docx |

There were two endorsements sent out, one to the attorney for the State, and one to Attorney Christopher Doran.

The status of 0 shows that an email was successfully sent by MEEDS distribution overnight process 03-07-2017 to both attorneys to the email addresses shown below:

| STATUS | emailid | minuteentryid | endorsementid | CASENUMBER | DOCKET | ENTRYDATE | EMAIL | filename | status |
|--------|---------|---------------|---------------|------------|--------|-----------|-------|----------|--------|
| 0 | 22445693 | 9667987 | 030677 | CR2013462384 | 023 | 2017-03-06 00:00:00.000 | CA-GENERAL@MCAO.MARICOPA.GOV | D:\meeds\docs\Criminal\032017\m7748235.pdf | 0 |
| 0 | 22447763 | 9667987 | 032422 | CR2013462384 | 023 | 2017-03-06 00:00:00.000 | CHRIS@DUMONDLAWAZ.COM | D:\meeds\docs\Criminal\032017\m7748235.pdf | 0 |

Attorney Christopher Doran's email address was updated on 09-25-2021 to the following:

| firmid | barcode | firstname | middlename | lastname | distribution | email | status | download |
|--------|---------|-----------|------------|----------|--------------|-------|--------|----------|
| NULL | 032422 | CHRISTOPHER | MICHAEL | DORAN | E | CHRIS@DORANJUSTICE.COM | A | 2021-09-25 |

**EXHIBIT**

2   Myers   10/15/2021



EXHIBIT

3   Myers   10/15/2021



**EXHIBIT**

4   Myers   10/15/2021

# EXHIBIT AA

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Frances Salazar,              ) NO. CV-19-01188-PHX-SRB(ESW)
individually,                 )
          Plaintiff,          )
                              )
     vs.                      )
                              )
Phoenix, City of, et al.,     )
                              )
          Defendants.         )
_____)

VIDEOCONFERENCE DEPOSITION OF CHRISTOPHER M. DORAN
                Phoenix, Arizona
                 March 23, 2021
                   10:03 a.m.

REPORTED BY:
PHYLLIS M. RISSKY, RPR
Certified Reporter
Certificate No. 50422

PREPARED FOR:
(ASCII/Certified Copy)

Videoconference

10

1   didn't have a paralegal yet.

2       Q.   So after you were licensed as a lawyer in 2015,

3   did you then appear as counsel on behalf of Ms. Salazar

4   with Ms. DuMond?

5       A.   More so just me.  Not necessarily with Samantha.

6   I remember getting my bar results on the way back from a

7   jail visit.  And she was sitting in the passenger seat.  I

8   was driving.  And she kept refreshing to find out whether

9   I had passed the bar.  As soon as we found that out, she

10  was like, "All right.  I'm going on maternity leave,

11  basically."  So I kind of took over her cases and the

12  caseload.

13          And I took over Frances' case.  It's one that we

14  expected was going to be going to trial.  And I was more

15  of the litigation person that was going to be handling

16  trials.

17      Q.   Okay.  And when you took on Frances' case as a

18  lawyer, what are some of the first things that you looked

19  into in the case?

20      A.   I remember one of the very first things that I

21  did was draft a motion to suppress and file a motion to

22  suppress.  So I believe that was in January of 2016 that

23  it got filed.  But I recall that being one of the first

24  things in the case, because from my point of view there

25  was trouble with the stop.

Videoconference

1     Q.    And is that the process with the City of Phoenix?

2     A.    I would assume.  That's the general process, yes.

3     Q.    And so had you requested Officer Armour's

4  disciplinary file at any point in time, you would have

5  gotten notification as to what it's going to cost before

6  you had to lay out any money to purchase it, correct?

7     A.    I don't know about that.  That's not always the

8  case.  Sometimes they just, you know, prepare everything

9  and send it to you with an invoice.  So I'm not sure.

10     Q.    Was your decision not to request Officer Armour's

11  disciplinary file or personnel file based on monetary

12  considerations?

13     A.    No, not necessarily.  I mean Ms. Salazar didn't

14  have a lot of money, but I don't think that that was

15  the -- the reason.

16         I think the reason is I never had any indication

17  to believe that he had any disciplinary issues.

18     Q.    Had you been aware of the investigator's

19  suggestion that you request his disciplinary file, would

20  you have done so?

21     A.    Not necessarily.  Investigators can make certain

22  suggestions into things, and sometimes those

23  recommendations are followed and sometimes they're not.

24     Q.    So if you don't have an opportunity to question a

25  police officer in an interview, how would you go about

Videoconference

1   obtaining Brady information from the police officer?

2       A.   The prosecutor will send it to me because it's

3   mandatory disclosure.

4       Q.   By the prosecutor?

5       A.   Yes, ma'am.

6       Q.   Not the police officer?

7       A.   Well, it's mandatory by both.  The police

8   department, crime lab, according to case law, are an

9   extension of the prosecutorial office.  And we all know

10  from watching Law and Order they work hand in hand with

11  each other.

12          So it's everyone's job to make sure that that

13  information is disclosed.  The system is a process.  The

14  police department has to make sure they're getting the

15  information to the prosecutor.  The prosecutor has to make

16  sure that they're getting the information from the police

17  department.  So it's kind of everyone's responsibility.

18      Q.   Right.  So your expectation in terms of the

19  police department is that the police department will

20  provide Brady information about its officers to the

21  prosecutor's office.  And then the prosecutor's office in

22  turn will turn that over to the defense lawyer, correct?

23      A.   Yes.  That's my expectation.

24      Q.   Right.  Your expectation isn't to receive Brady

25  material directly from a police department.  Other than if

Videoconference

179

1   you're questioning a police officer in a defense interview

2   and you're asking about it, you expect the police officer

3   to be honest.

4          But absent an interview, you wouldn't have an

5   expectation to receive Brady material directly from the

6   police department, correct?

7      A.   Absent an interview and absent a direct request,

8   I would agree with that statement.

9          I will say that when I made my complaints to the

10  Professional Standards Bureau in this case against Officer

11  Armour and they responded with a letter back to me

12  indicating that there wasn't misconduct, nothing existed,

13  I was surprised to learn that they turned around and

14  provided different information to the Maricopa County

15  Attorney's Office.

16         I would have expected in that scenario for the

17  Professional Standards Bureau to provide you with that

18  that information.

19     Q.   Well, the Professional Standards Bureau was

20  simply addressing your specific complaint that Officer

21  Armour had given false testimony at Ms. Salazar's trial,

22  correct?

23     A.   Right.

24     Q.   You didn't ask -- you didn't make any kind of an

25  inquiry into whether he had any discipline separate from

Videoconference

1   on the Brady list, correct?

2           MR. RUNDALL:  Objection; foundation.

3           THE WITNESS:  I don't know all the ins and outs

4   of what the police department and the prosecutor's office

5   do to make the decisions about who goes on their Brady

6   list.

7   BY MS. BERKE:

8       Q.   Okay.  But the point remains, the letter you got

9   back from the police department Professional Standards

10  Bureau simply addressed your allegation of misconduct on

11  the part of Officer Armour in the Salazar case,

12  specifically that you claimed he had given dishonest

13  testimony in that case, correct?

14      A.   That's true.

15      Q.   And in your practice you have never received

16  Brady information directly from any police department

17  about an officer, correct?

18      A.   Well, no, that's not true.  When I've questioned

19  officers or when I've made those requests, I've had the

20  police department send it to me directly rather than

21  getting it through the prosecutor's office.

22      Q.   Right.  Other than when you had specifically

23  asked a question of an officer in a defense interview or

24  where you've specifically requested personnel files or

25  disciplinary files, in your experience as a criminal

1   defense attorney you've never received Brady material

2   directly from a police department, correct?

3       A.   That's true.   Their correspondence goes to the

4   prosecutor's office in most cases.

5       Q.   And that's your expectation, correct?

6       A.   I mean I think that's the standard practice that

7   police departments had a procedure for just sending that

8   directly over to the defense attorneys and cutting out the

9   middle person, that would be a perfectly fine expectation

10  for me.   I'd have no problem with that.

11           But in terms of what standard we have then, that

12  is what standard we have then.

13      Q.   In any police department that you deal with,

14  correct?

15      A.   That's true.

16      Q.   And what other police departments have you had

17  cases involving?

18      A.   Do you want me to list them all?

19      Q.   Yes,

20      A.   Okay.   So aside from the Phoenix Police

21  Department, Tempe, Gilbert, Chandler, Scottsdale, Maricopa

22  County Sheriff's Office.   Yavapai County Sheriff's Office,

23  Pima County Sheriff's Office, Pinal County Sheriff's

24  Office, DPS, Tucson Police Department, Prescott Valley

25  Police Department, Prescott Police Department, Flagstaff

Videoconference

1   Police Department, Mesa Police Department, if I didn't say

2   them yet, Glendale, Avondale.

3       Q.    Pretty good.

4       A.    The FBI.  There's probably more.  I mean I

5   practice all over the state of Arizona misdemeanor and

6   high felonies, everything from urinating in public up to

7   murder.  So I've dealt with most police departments here.

8       Q.    Okay.  And in every instance, unless you've

9   questioned a police officer in a defense interview or

10  specifically submitted a public records request or a

11  subpoena for their disciplinary or personnel files, if you

12  received Brady material, it's been from the prosecutor

13  involved in that case, correct?

14      A.    That's true, ma'am.  I've never had a police

15  officer or department reach out to me and say, "Here you

16  go, Mr. Doran.  I know you're going to ask for this.  Here

17  is the disciplinary file.  We know you have this case

18  going on."  That's never happened.

19      Q.    And it's not your expectation that that would

20  happen, correct?

21      A.    With the standard practice that there is right

22  now, no.  Would I love for that to happen, absolutely.

23      Q.    But that's not the standard practice?

24      A.    It's not.  Not in my experience.

25      Q.    Do you normally not handle appeals?

Videoconference

1          MS. BERKE:  And I'm close to being finished, but

2     I can look through my notes while, Maxine, if you want to

3     ask questions.

4

5                         EXAMINATION

6     BY MS. MAK:

7          Q.   Okay.  Did we -- Mr. Doran, looking at the

8     docket, can you tell me when you became Ms. Salazar's

9     counsel of record or do you recall?  Either way.

10          MR. RUNDALL:  We did talk about this, just to be

11     clear.  I know it's been a long day.

12          MS. MAK:  Right.

13          THE WITNESS:  So looking back at the docket,

14     April -- oh, where did it go?

15          Okay.  April 10 of 2015, Samantha DuMond, who was

16     my then boss and then subsequent partner, filed a notice

17     of Substitution of Counsel.

18          So the firm DuMond Law became counsel of record

19     in April of 2015.  April 10, specifically.

20          Q.   All right.  So -- I'm sorry.  I'm sorry for

21     interrupting you.

22          A.   That's okay.  I was just going to say that I

23     wasn't a lawyer at that time, so I was not her attorney.

24     I passed the Bar, got my results the end of October.

25     We talked about that car ride coming back from the jail.

1  And then Ms. DuMond going on maternity leave.  And I took

2  over that case and a number of cases.  So it would have

3  been sometime at the end of October or maybe even November

4  of 2015.

5      Q.   Okay.  And was Ms. Prosecutor or Ms. Lake the

6  prosecutor on the case when you became counsel of record

7  or you took over the case?

8      A.   No, ma'am, she wasn't.

9      Q.   Okay.  Did you ever ask Ms. Lake for an interview

10 of Officer Armour?

11     A.   I don't recall the answer to that.  I don't know

12 if because we had already been turned down in that

13 interview if I didn't ask once it switched or if I would

14 have re-raised that in my discussions with Ms. Lake.

15     Q.   Did you file any motions to get a deposition or

16 an interview of Officer Armour?

17     A.   No, ma'am, I didn't.

18     Q.   We talked a little bit about minute entries

19 earlier.  I think you said that minute entries on which --

20 on the cases where you're counsel of record are sent to

21 Chris@dumondlawaz.com, correct?

22     A.   Yes, ma'am.

23     Q.   Is that the only email address minute entries on

24 your cases would be sent to?

25     A.   Yes, ma'am.

# EXHIBIT BB

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


Frances Salazar, individually,)
                      )No. 2:19-cv-01188
        Plaintiff,    )    PHX-SRB(ESW)
                      )
vs.                  )
                      )
City of Phoenix, et al.,   )
                      )
        Defendants.   )
_____)


VIDEOCONFERENCE DEPOSITION OF

SAMANTHA K. DuMOND



Zoom Meeting ID No. 812 3707 7959
November 3, 2021
2:02 p.m.



Prepared by:
SHELLEY HAVERMANN, CR     BARTELT NIX REPORTING
Certificate No. 50432      3101 North Central Avenue
Prepared for:             Suite 290
SUPERIOR COURT           Phoenix, Arizona 85012
(ORIGINAL)               Phone: (602) 254-4111
(Via videoconference)     Office@BarteltReporting.com

1  so I wasn't immediately on the case.  But, yes,

2  I did represent her at one time.

3      Q.  And when did you begin representing her?

4      A.  Can I look at my records again?

5      Q.  Yes.

6      A.  I have June 3rd, 2015.

7      Q.  I noticed -- well, strike that.

8          Her trial was in August of 2016, correct?

9      A.  No.

10     Q.  It wasn't?

11     A.  No.  Because I was on maternity leave.

12  It was earlier in '16.  It was July.

13     Q.  Well, I can show you -- I have a

14  transcript --

15     A.  Oh, correction, correction.  No, no.

16  July -- it was originally -- sorry, it was

17  originally set to be when I was going to be on

18  maternity leave in July.  It got moved to

19  August.  Correction.

20     Q.  Right.  Okay.  So I'm looking at a trial

21  transcript from day one of trial, and it says

22  August 9th of 2016.  Does that sound right?

23     A.  I have the -- we went to Master Calendar

24  on the 8th, but, yeah, we probably did jury

25  selection, I think, the rest of that day and

1    trial would have started right after.

2        Q.  And did you attend her entire trial?

3        A.  Everything but the last day.

4        Q.  Why were you not present the last day?

5        A.  Because I had just had my third son -- I

6    have four kids.  That was my third -- that

7    February.  And then I did -- and I take a

8    maternity leave, but I'm still working.  So

9    it's -- you know, I still have my laptop.  I'm

10   still doing what I'm doing, but I nurse my

11   children, so I try to be there for as long as

12   possible.

13           And then I am originally from the East

14   Coast, and so every summer, absent COVID times,

15   I go back to New York for a prescheduled trip

16   to, you know, let my brothers, sisters, aunts,

17   uncles, everybody see the kids, and my husband's

18   family is there, too.  So that was a long way to

19   say I had a preplanned trip to New York.

20       Q.  Okay.  And --

21       A.  And --

22       Q.  I'm sorry.  Go on.

23       A.  The trial went late, so, like, it was

24   scheduled to be done before I was supposed to

25   leave.

1    Q.  Okay.  Do you remember why it went long

2  or late?

3    A.  Just normal trial stuff.  It wasn't

4  anything in particular.  We just thought we

5  would finish in however many days and we didn't.

6  And so I -- the only thing I missed was the

7  verdict.

8    Q.  Did you examine any witnesses at trial or

9  did Mr. Doran do all of the witness

10  examinations?

11    A.  He did examinations.  I was second chair.

12    Q.  Was that his first trial?

13    A.  No.  Well, no, I don't think so.  It was

14  the first one that I second-chaired with him.

15  I'd have to look to be certain on that.  There's

16  another one.  I just can't remember if it came

17  before Frances's or after.  And there's

18  misdemeanor trials that were in between.  So I

19  want to say, no, that that wasn't his first

20  trial, and definitely not his first trial

21  experience.  He had been doing mock trial for

22  three years in law school.

23    Q.  Between April 29th of 2016 and the date

24  of the sentencing, which was December 5th of

25  2016, did you ever subpoena Officer Armour's

1   disciplinary records or personnel file?

2         MR. RUNDALL:  Objection; foundation.

3         Whenever an attorney objects, you can

4   answer, Samantha.

5         THE WITNESS:  Oh, okay.  I was waiting.

6   I would have to look because a lot of stuff has

7   gotten confusing as far as what I know about the

8   case when it got disclosed later on.  And so

9   whether I subpoenaed it, I want to say, no, I

10  don't think I ever subpoenaed it.  We did do

11  requests to the State specifically asking if

12  there were any disciplinary issues or if any of

13  the officers were on the Brady list.  And I have

14  responses from that indicating that they

15  weren't, that there were no issues.

16        And I don't -- but I don't recall ever

17  actually subpoenaing the personnel disciplinary

18  records, but I have seen them because they came

19  in after.

20     Q.  BY MS. BERKE:  When they were disclosed

21  by the prosecution?

22     A.  Yep.

23     Q.  And so you don't believe you ever made a

24  request directly to Officer Armour or to the

25  Phoenix Police Department for his personnel

Deposition of Samantha Durbin
11/3/2021
Case 2:19-cv-01188-SRB-ESW   Document 208-4   Filed 02/04/22   Page 89 of 269   Page: 35
Salazar vs. City of Phoenix, et al.

1        A.  Yep.

2        Q.  Okay.  What did Brady versus Maryland

3   mean to you?

4        A.  It's the case that tells me that if an

5   officer has disciplinary issues or if it has --

6   the officer has anything to deal with their

7   integrity, something that -- or their

8   credibility, something that would be important

9   for jurors to hear to determine their level of

10  truthfulness and the jury to give them

11  credibility, that it's to be disclosed from the

12  State to defense.

13       Q.  And based on your experience as a lawyer

14  and practicing criminal defense, is it your

15  understanding that Brady and its progeny require

16  an affirm -- or place an affirmative duty on

17  officers to disclose that information to the

18  defense?

19            MS. BERKE:  Objection; misstates

20  testimony.

21            MS. MAK:  Join.

22            THE WITNESS:  I wouldn't say that it's

23  the officer's duty.  My interpretation is that

24  it's the duty of the officer to present it to

25  the State and then the State to present it to

Deposition of Armando Dominguez

11/3/2021                                                                Salazar vs. City of Phoenix, et al.

1   defense.  But the officers, unless I ask, they

2   don't come up and send me an email and say, hey,

3   by the way.  You know, they would contact the

4   State and the State would tell me.

5       Q.  BY MR. RUNDALL:  Okay.  So just to make

6   sure I understood what you said clearly, you do

7   think, though, that officer has a duty to

8   disclose that information to the State, and if

9   it was a case in, let's say, Maricopa County,

10  that would be the Maricopa County Attorney's

11  Office?

12      A.  Correct.

13      Q.  Okay.  If an officer decides that they're

14  not going to turn that information over to

15  Maricopa County Attorney's Office, how would you

16  get that information?

17      A.  There is a Brady list that you can

18  actually go and search to see if they're listed

19  on there.  And then we would file a motion --

20  well, one, if I found somebody on the list that

21  I had specifically asked for and a prosecutor

22  didn't give it to me and I found them, I would

23  take up the issue first with the State for

24  them -- it's their witness.  They need to go

25  talk to their officer and figure out why that

1  happened.

2         And then if I needed the materials and

3  the State still wouldn't give it to me, I would

4  ask for the Court to order the State to do it,

5  because it's their --

6      Q.  And you keep --

7      A.  -- duty.

8      Q.  And you keep --

9         MS. BERKE:  Because it's -- she wasn't

10  done.

11         What was the last part of your answer,

12  because what?

13         THE WITNESS:  It's the State's duty.

14  It's their duty.

15      Q.  BY MR. RUNDALL:  And when you keep

16  referencing the State, Samantha, do you mean the

17  prosecutor's office?

18      A.  Yes.

19      Q.  Okay.  So let's kind of go back here.

20         I guess what I'm asking is, if there's

21  information that an officer knows about that

22  might impact their integrity or credibility as a

23  witness but they don't turn that over to the

24  prosecutor's office and they're not already on a

25  Brady list, how would you know that they were on

Deposition of Samantha Cundari
11/3/2021                                                          Salazar vs. City of Phoenix, et al.
Case 2:19-cv-01188-SRB-ESW   Document 208-4   Filed 02/04/22   Page 92 of 269   Page: 53

1      Q.   All right.   So if it's standard and not a

2  rush, it's closer to the $70, correct?

3      A.   Correct.   But that could mean my client

4  eating or not that week.

5      Q.   Not always, though, right?

6      A.   In my practice, like I said, my clients

7  are usually on modest payment plans, and I'm

8  trying to help those who really can't afford to

9  have private attorneys.   So my payment plans are

10  very modest and reasonable, and sometimes they

11  can't even make their payments to me on time.

12  So it's hard to say, you know, you've missed two

13  payments, but, by the way, I need another $70.

14      Q.   Right.   But, in some instances, in some

15  cases, your clients get assistance from the

16  Court, correct, in terms of funding for their

17  cases?

18      A.   They can, but I have never had one

19  approved for a process service cost.

20      Q.   And, in fact, Ms. Salazar had an

21  investigator working for you that was paid for

22  by the State, correct?

23      A.   Yes.   Because she couldn't afford one.

24      Q.   And did you ever request that the State

25  pay for a subpoena to obtain Officer Armour's

1   personnel files?

2        A.  Not in this case because I was informed

3   by the State there were no issues with his

4   personnel file and disciplinary records, so I

5   had no reason to.

6        Q.  You testified during Mr. Rundall's

7   questioning that if the State didn't give you

8   information about an officer's disciplinary

9   history, you would have to ask the officer.

10  Otherwise, you would have no way to know,

11  correct?  That was your testimony?

12       A.  I think there was more to it, but, yeah,

13  that's a summary of it.

14       Q.  But if you subpoenaed their disciplinary

15  history, you would have that information,

16  correct, if you subpoenaed their disciplinary

17  file, if it was in their disciplinary file?

18       A.  If it was in their disciplinary file and

19  I subpoenaed it and they turned it over, then,

20  yes, I would have it, but they could be --

21       Q.  Have you ever had -- go ahead.

22       A.  They could be doing an investigation and

23  the report may not be in there, too.  I've had

24  that happen.

25       Q.  Okay.  Have you ever had the City of

1   Phoenix refuse to respond to a subpoena?

2        A.  Not that I recall.

3           MS. BERKE:  I have nothing further.

4                         *   *   *

5                    FURTHER EXAMINATION

6   BY MR. RUNDALL:

7        Q.  One last question.  Ms. DuMond, is it the

8   duty of the defense lawyer to request Brady

9   material, or is that duty of the State, slash,

10  police to turn over Brady material?

11       A.  It is not my duty.

12          MS. BERKE:  Compound, foundation, assumes

13  facts not in evidence.

14          THE WITNESS:  From my experience as a

15  defense attorney and my knowledge of the law, it

16  is not my requirement to search for Brady

17  material.  It is the State's requirement to turn

18  it over and to consult their own witnesses to

19  get it if they're on it.

20          MR. RUNDALL:  Thank you.  I don't have

21  any further questions.

22          Maxine, I don't know if you have any

23  questions.

24          MS. MAK:  I don't have any questions.

25  Thank you.

# EXHIBIT CC

Chris DeRose, Clerk of Court
*** Electronically Filed ***
T. Alameda, Deputy
3/30/2018 9:48:19 PM
Filing ID 9217553

**STEPHEN M. JOHNSON**
State Bar #015831
Law Office of Stephen M. Johnson
2601 N. 16th Street
Phoenix, Arizona 85006
Telephone: (602) 369-5037
E-mail: Stephenmjohnsonlaw@gmail.com
Attorney for Defendant Salazar

## IN THE SUPERIOR COURT OF MARICOPA COUNTY
## OF THE STATE OF ARIZONA

| | |
|---|---|
| STATE OF ARIZONA,<br><br>                    Respondent,<br><br>          vs.<br><br>FRANCES MARIE SALAZAR,<br><br>                    Petitioner. | Case No.: CR 2013-462384-001 DT<br><br>**PETITION FOR POST CONVICTION RELIEF**<br><br>**(Hon. Douglas Gerlach)** |

The petitioner, Frances Marie Salazar, through counsel, pursuant to the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution; as well as Article 2, §§ 4 and 24 of the Arizona Constitution, and the attached Memorandum of Points and Authorities, submits her Petition for Post-Conviction Relief.

Almost two years after Officer Anthony Armour arrested the petitioner Frances Salazar, Officer Armour lied to his superior, directly disobeyed a direct order, and put false information in an incident report. (Record on Appeal (ROA, item 14) and Attachment 2). This exculpatory information was made aware to the police, and therefore the State, on November 4, 2015. (Attachment 2). The results of the internal investigation were published on April 27, 2016, and never given to Ms. Salazar prior to her trial that began August 9, 2016. (Attachment 2 and ROA, item 140). At the trial, Officer Armour lied again, changing his testimony and stating that Frances Salazar admitted to possessing a pipe and crack cocaine. This Brady violation demands an evidentiary hearing and a new trial.

## STATEMENT OF THE CASE

On February 18, 2014, Frances Salazar was charged by Information with possession or use of narcotic drugs, a class four felony, in violation of A.R.S. §13-3401 and 13-3408; and possession of drug paraphernalia, a class six felony, in violation of A.R.S. §13-3401, 13-3408, 13-3415 and 13-3418. The offenses were alleged to have occurred on or about December 31, 2013. (ROA, item 14.)

The State filed several motions on April 9, 2014, including an allegation of eight felony priors (ROA, item 21); an allegation of offenses committed while on release (ROA, item 17); and an allegation of Ms. Salazar's ineligibility for mandatory probation pursuant to A.R.S. §13-901.01 (ROA, item 22); among

others.   The State also filed its Notice of Disclosure and Request for Disclosure, that included:

> 15.    The State is unaware of any existing material or information, unknown to the defense, that would tend to mitigate the defendant's guilt or punishment.  Pursuant to *Kyles v. Whitley*, 514 U.S. 419, 437-438, 115 S.Ct.. 1555, 1567-1568 (1995), the State will review any evidence in its possession, determine if any of it is exculpatory, and, if so, turn such evidence over to the defense. However, the State has no obligation to learn of existing exculpatory evidence. *Id*.

(ROA, item 20).

The petitioner filed a notice of defenses on May 21, 2014, arguing an insufficiency of the State's evidence. (ROA, item 32).   On the same day, the petitioner also filed a Rule 15.1 (a), (b), (c), (d), and (e) request for disclosure. Included in the request was, "all material or information which tends to mitigate or negate the defendant's guilt as to the offense charged, or which would tend to reduce defendant's punishment." (ROA, item 31).

On October 13, 2015, the petitioner filed a Rule 15.2 disclosure notice that included the following language: "All material and information which tends to mitigate or negate the Defendant's guilt as to the offenses charged or which would tend to reduce Defendant's punishment therefore…" (ROA, item 70).

*Officer Armour commits five offenses in another case, including unlawful entry, false arrest, giving a false report to a supervisor, providing false information in an incident report, and disobeys a direct order of a supervisor.*

(Attachment 2, emphasis added to differentiate the Brady violation from Ms. Salazar's case).

The petitioner filed a motion to suppress on January 29, 2016, alleging the search and seizure of the pipe and crack cocaine was illegal. (ROA, item 76). The petitioner, in arguing the motion, detailed several inconsistent statements from Officer Armour, including the reason for the stop (expired tags and/or broken taillight), and the location of the pipe (in the center console or under the seat). (Id.)

On February 5, 2016, a settlement conference was held with Judge Ireland. (ROA, item 79). A *Donald* advisement was given, along with an offer to plead to one count of possession of narcotic drugs, a class four felony. Believing Officer Armour would not testify to the petitioner admitting ownership of the pipe or drugs, Ms. Salazar did not accept the State's plea offer. (Id.) During the settlement conference, Commissioner Ireland advised Ms. Salazar that with her criminal background, at trial it will be her, "against the police officer, which the jury is instructed that they can't believe a police officer more or less, but we don't know if they will abide by the law." (RT 2/5/16, p. 25, Item 79). Commissioner Ireland's warning was prophetic.

An evidentiary hearing was held on the petitioner's motion to suppress over a period of three days. (ROA, items 81, 82, and 83). Officer Armour's statements were the primary evidence regarding what Ms. Salazar stated, and where the item

was found. (ROA, item 81).  The petitioner filed a supplement on April 22, 2016, highlighting the testimony of Officer Armour.

*On April 27, 2016, the Phoenix Police Department concluded its internal investigation, finding that Officer Armour had violated the five allegations previously mentioned.* (Attachment 2, emphasis added to differentiate the Brady claim from the underlying case).

The Court entered its ruling on the motion to suppress on May 11, 2016, denying the motion. (ROA, item 86).  Of note, in a footnote on the minute entry denying the motion, the Court commented on Officer Armour's "faulty recollection." (Id.)

Trial began on August 9, 2016. (ROA, item 140).  Officer Armour testified on day two and three of trial, occurring on August 10th and 11th. (ROA, items 141, 163).  The jury found the petitioner guilty of both charges on August 16, 2016. (ROA, item 165).  A trial on the allegation of priors was conducted on October 21, 2016. (ROA, item 174).  The court determined Ms. Salazar had seven prior felony convictions.  (Id.)

Prior to sentencing, the petitioner filed a motion for new trial/motion to reinstate previous plea offer. (ROA, 177).  The motion focused on Officer Armour not declaring that the petitioner admitted to possession of the pipe and crack cocaine. (Id.)

"Undersigned counsel impeached Officer Armour with a clear impeachment by contradiction from the statements made in his police report.  Undersigned counsel also impeached Officer Armour with clear impeachment by omissions with his prior testimony at the Preliminary Hearing and the Suppression Hearing.  Undersigned counsel went on to spend at least five minutes in his closing argument inviting the jury to remember Officer Armour's lies, his dishonesty, and this material fabrication."

(Id.)

The petitioner argued that, "what occurred in this case on the part of the State, through Officer Armour's egregious actions, either leads to the conclusion of a *Brady* due process violation or a *Donald* due process violation.  Either way, both avenues call for a retrial or for the previously offered plea to be reinstated. (Id.)

On November 17, 2016, the petition filed a Rule 15.7 Motion for Contempt and Request for Officer Armour to be referred for prosecution on perjury charges. (ROA, item 178 *sealed*).  On November 23, 2016, the petitioner filed a motion to have counsel appointed for Officer Armour. (ROA, item 180).   The petition accused Officer Armour of lying to the jurors while under oath. (Id.)  The motion included the following:

On November 18, 2016, an Oral Argument was held in this Court regarding the Motion to Vacate Judgement and/or Reinstate the Plea.  At the end of this hearing, Deputy County Attorney Elizabeth Lake moved for Defense's Motion for Contempt and Request for the Court to Refer Officer Armour for Prosecution on Perjury Charges to be sealed.  She stated that when Officer Armour received Ms. Salazar's letter and the Motion regarding contempt and perjury, he called her "in a panic" asking her "what to do."  Ms. Lake indicated that Officer Armour was very concerned in their conversation about these matters.  At court, Ms. Lake then advocated on Officer

Armour's behalf for the Motion to be temporarily sealed. The Motion was sealed. Now, undersigned counsel would like to interview Officer Armour about this conversation that he had with Elizabeth Lake.

(ROA, item 180).

The petitioner also filed a motion to remove the county attorney because of a conflict of interest and request to interview her as a material witness. (ROA, item 179). After oral argument was held on the motions, they were denied by the court. (ROA, item 191).

Ms. Salazar was sentenced on December 5, 2016, as a non-dangerous, repetitive offender to mitigated concurrent terms of six years on count one, and two and a quarter years on count two. (ROA, item 191).

On appeal, Ms. Salazar argued the evidence did not support the jury's verdict. The conviction was affirmed on December 12, 2017. Ms. Salazar filed a petition for review on February 7, 2018, that is still pending.

On February 22, 2017, the State filed a supplemental motion to disclose new evidence pursuant to Rule 15 and/or E.R. 3.8 (Attachment 1). Along with the motion was a 16-page report detailing an internal investigation of Officer Armour. (Attachment 2). The investigation contained five allegations against Armour, including illegal entry, false arrest, false reporting to a patrol supervisor, providing false information in an incident report, and disobeying a lawful order given to him by a supervisor. (Attachment 2). Even more disturbing, the findings had been

completed on April 27, 2016, more than three months before petitioner's trial began. (Id.)

On October 26, 2017, Ms. Salazar filed a petition for post-conviction relief.

## STATEMENT OF FACTS

The facts are taken from petitioner's opening Appellate brief.  On December 31, 2013, Phoenix Police Officer Armour and his partner, Officer Backhaus were on patrol in the area of 17th Avenue and Highland, in Phoenix at approximately 4:00 a.m. (RT 8/10/16, pgs. 43-44).  As they drove eastbound on West Highland Avenue, they observed a gold Jaguar on 15th Drive, headed south.  The Jaguar turned west on Highland and drove past them in the opposite direction. (Id.) Surprisingly, Officer Armour testified that he was able to stick his head out of his car, turn around, and at 4:00 a.m. see that the vehicle had no license plate, but that there was a temporary tag in the window. (Id., p. 60).

Officer Armour testified he decided to follow the vehicle to get a look at the temporary tag. (Id., pgs. 62-63).  They continued to follow the vehicle as it turned right into the parking lot of an Arizona Credit Union, a block or two north of Camelback Road. (Id., pgs. 63-64). After parking behind the Jaguar, Officer Armour conducted an MVD records check on the temporary tag, and determined the tag was expired.  Officer Armour activated his emergency lights and conducted a traffic stop. (Id., p. 65)

As Officer Armour was running a records check on the driver of the Jaguar, Rodney McCullough, and the Petitioner, who was the passenger, Armour noticed Ms. Salazar moving inside the car in a manner that "drew his attention." (Id., p. 66). He observed the driver turn to his right and say something to Ms. Salazar, and then observed the Petitioner turn at the waist towards the center console area, rotating her shoulders from left to right. However, he could not see her hands because he was observing this activity from behind. (Id., p. 70-71).

As a result of Mr. McCullough's driver's license being suspended, both the driver and Ms. Salazar were taken out of the Jaguar. (Id., p. 67-69). During a search incident to the arrest of the driver, Officer Armour searched the car and found a clear glass pipe. The body of the pipe was filled with a white and brown burned residue. It also contained steel wool that was burned and stuffed in one end, and a small, waxy, rocklike substance that appeared to be crack cocaine. (Id., p. 71-73).

After reading Ms. Salazar her *Miranda* rights, Officer Armour questioned the Petitioner. (Id., p. 81). Armour testified that Ms. Salazar admitted the pipe was hers, and that she knew there was crack in the pipe. Armour also testified that Ms. Salazar would switch from admitting to ownership, as well as denying same. (Id., p. 81-81).

Officer Backhaus testified that although he observed Officer Armour question Ms. Salazar, but he was "not listening to what he was asking." (Id., p. 138).   Officer Backhaus did not see where Officer Armour discovered the crack pipe.   He also never heard Ms. Salazar admit to owning the crack pipe.

The owner of the car, Antonio Harris, testified that he let the driver borrow the Jaguar. (RT 8/11/16, p. 86).   The owner also admitted that the crack pipe belonged to him. (Id., p. 92).   Mr. Harris also testified that a passenger in the car would have no way of knowing that a pipe was hidden in the car. (Id., p. 95).   The driver of the car, Rodney McCullough, testified that he did not see a crack pipe sticking out between the right front passenger seat and the center console.   The driver never saw the Petitioner with a crack pipe or cocaine that evening. (RT 8/15/16, p. 13-15).   The driver testified that Officer Armour was going after Ms. Salazar, telling him that, "I'm not after you.   I'm after her.   Because she's not being cooperative." (Id., p. 23).

However, based solely upon Armour's testimony, the jury convicted Ms. Salazar.

**Claim For Relief**

**I.     The State denied Ms. Salazar due process of law by not disclosing material exculpatory information in violation of _Brady v. Maryland_.**

In _Brady v. Maryland_, 373 U.S. 83 (1963), the United States Supreme Court held that the prosecution's suppression of evidence favorable to an accused "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecutor." 373 U.S. at 87. And, the State's duty exists even though no requests were made for the evidence. _United States v. Agurs_, 427 U.S. 97 (1976). A _Brady_ violation may arise if the prosecutor fails "to take the most rudimentary steps to obtain access to, to preserve, or to promptly disclose [exculpatory] evidence." _U.S. v. Sherlock_, 962 F.2d 1349, 1355 (9th Cir. 9 (Ariz.), 1992) quoting, _U. S. v. Alderdyce_, 787 F.2d 1365, 1370 (9th Cir. 1986).

When dealing with _Brady_ material, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." _Canion v. Cole_, 208 Ariz. 133, 138, 91 P.3d 355, 360 (App. 2004) (quoting _Kyles v. Whitley_, 514 U.S. 419, 437 (1995); see also _Pennsylvania v. Ritchie_, 480 U.S. 39, 43-45, 57-58 (1987) (plurality opinion) (prosecutor had duty to obtain exculpatory evidence possessed by other state agency (Children and Youth Services)); _United States v. Bagley_, 473 U.S.

667, 671-73, 677-78 (1985) (prosecutor should have obtained impeachment evidence possessed by federal agency); *Giglio v. United States*, 405 U.S. 150, 152-55 (1972) (*Brady* violation when one prosecutor did not disclose deal unknown to him between key witness and another prosecutor); cf. *State v. Meza*, 203 Ariz. 50, 55, 50 P.3d 407, 412 (App. 2002) (city crime laboratory arm of prosecution for purpose of disclosure); *Carpenter v. Superior Court*, 176 Ariz. 486, 489-90, 862 P.2d 246, 249-50 (App. 1993) (law-enforcement agency performing criminal investigation within prosecution's control).

"Any evidence that would tend to call the government's case into doubt is favorable for *Brady* purposes." *Milke v. Ryan*, 711 F.3d 998, 1012 (9th Cir. 2013). Evidence qualifies as material when there is "'any reasonable likelihood'" it could have "'affected the judgment of the jury.'" *Giglio*, at 154 (quoting *Napue v. Illinois*, 360 U. S. 264, 271 (1959)).

To prevail on a *Brady* claim, a defendant need not show that he "more likely than not" would have been acquitted had the new evidence been admitted. *Wearry v. Cain*, 136 S.Ct. 1002 (2016), quoting *Smith v. Cain*, 565 U. S. 73 (2012) (slip op., at 2-3) (internal quotation marks and brackets omitted). He must show only that the new evidence is sufficient to "undermine confidence" in the verdict. *Id.*, quoting *Smith* at 6. *Brady* evidence includes impeachment material. *Milke v. Ryan,* 711 F.3d 998, 1012 (9th Cir. 2013).

In its investigation of Officer Armour's misdeeds, the City of Phoenix Police Department compiled a summary of the events. (Attachment 2).   That summary sets out Armour's misdeeds for a convenient understanding.

On November 4, 2015, Officer Armour entered an apartment in search of a domestic violence suspect.   He did not have consent to enter the apartment nor were there any exigent circumstances necessitating entry.   (Id.).   After entering the apartment and locating the suspect, Officer Armour arrested the female in the apartment for misdemeanor criminal damage and hindering prosecution.

Following the arrests, Sergeant Patrick Garcia reviewed the probable cause of both arrests and the circumstances surrounding the entry into the apartment.   He then questioned Officer Armour about the arrest of the female.   Officer Armour made false statements to Sergeant Garcia concerning the entry into the apartment and included those false statements in the incident report.

After learning the details of the female's arrest, Sergeant Garcia directed Officer Armour not to book her and advised him to take her home.   Although Officer Armour advised Sgt. Garcia that he would not book the female, he disobeyed the order given to him and processed the female through booking. Officer Armour remained at booking in the holding area as the staff loaded the female into the van to be transported to Fourth Avenue jail.   Approximately 25 minutes after the female left booking, Officer Armour sent Sgt. Garcia a Mobile

Data Computer (MDC) message stating the female had already been transported to the jail.

When Sgt. Garcia received the MDC message, he made arrangements for the female to be returned to booking and transported back to her residence. The female was in custody for over five hours. (Id.)

In sustaining the five allegations, the Phoenix Police determined Officer Armour:

1. Unlawfully entered an apartment while conducting follow up on a domestic violence call.

2. Falsely arrested a female resident inside her apartment for hindering prosecution.

3. Gave a false verbal report to a patrol supervisor regarding the circumstances surrounding a misdemeanor arrest.

4. Provided false information in an Incident Report, when he failed to accurately document the circumstances surrounding a misdemeanor arrest.

5. Disobeyed a lawful order given to him by a supervisor and booked a female subject after being directed to release her from custody.

(Attachment 2)

This evidence is clearly exculpatory and became available on April 27, 2016. The State had a duty to turn this evidence over to the petitioner. When dealing with *Brady* material, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the

case, including the police." *Canion v. Cole*, 208 Ariz. 133, 138, 91 P.3d 355, 360 (App. 2004).

At trial, Officer Armour's testimony was significant in proving the State's case against Ms. Salazar. (Appellant's opening brief, p. 18). In fact, only Officer Armour's testimony was presented as to what Ms. Salazar did or didn't do, say or didn't say regarding her knowledge of the presence of the crack cocaine/pipe located between the front passenger seat and center console of the Jaguar, in which Petitioner was a front seat passenger. There is a real danger that the jury simply accepted Officer Armour's testimony, disregarding its inconsistencies and tendency to replace his words for those that Petitioner actually uttered, because the jury was aware that Ms. Salazar had a history of using crack cocaine and had recently relapsed into using it. (Id.)

Viewing Officer Armour's testimony in its entirety, it is clear that he carefully chose his words to leave the impression with the jury that those were the words of Ms. Salazar when questioned about the pipe and its contents. His credibility was key to the conviction. The fact that he had lied in a previous investigation was exculpatory, and the prosecutor had a duty to discover that exculpatory information and give it to the petitioner. "I didn't know," will not serve as an excuse.

Officer Armour's credibility was important because he is a police officer, and the jury convicted Ms. Salazar even though another person admitted to owning the pipe and its contents.   The petitioner should have been given exculpatory evidence of Officer Armour lying, among other things, and the jury should have been made aware of the same.

## Conclusion

For the reasons stated, Ms. Salazar requests an evidentiary hearing to determine the remedy for this Brady violation, including a new trial.   Officer Armour knew he was under investigation during the time leading up to the trial, and the conclusion that he in fact lied to his superior and disobeyed a direct order was known to the police, therefore the State, over three months before the trial began.

RESPECTFULLY SUBMITTED this 30th day of March, 2018.


By      _____/s/_____
Stephen M. Johnson
2601 N. 16th Street
Phoenix, Arizona 85006
Attorney for Petitioner Salazar

Original e-filed this
March 30, 2018, to:

Maricopa County Superior Court
201 W. Jefferson Street
Phoenix, AZ 85003

Original emailed to:

Clerk of the Superior Court
Maricopa County Superior Court
201 W. Jefferson Street
Maricopa, AZ 85003

Judge Douglas Gerlach
Judge of the Superior Court
175 W. Madison Street
Maricopa, AZ 85003

Diane M. Meloche, Esq.
Assigned Appeals Attorney
Maricopa County Attorney's Office
301 W. Jefferson Street
Phoenix, AZ 85003


By: _____/s/_____
        Stephen M. Johnson

# ATTACHMENT 1

# State's Supplemental Motion to Disclose New Evidence

Michael K Jeanes, Clerk of Court
*** Electronically Filed ***
K. Curtner, Deputy
2/22/2017 4:29:51 PM
Filing ID 8118017

WILLIAM G MONTGOMERY
MARICOPA COUNTY ATTORNEY

Elizabeth M Lake
Deputy County Attorney
Bar ID #: 030677
301 West Jefferson, 8th Floor
Phoenix, AZ 85003
Telephone: (602) 506-8532
mcaoctd@mcao.maricopa.gov
MCAO Firm #: 00032000
Attorney for Plaintiff

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| THE STATE OF ARIZONA, | |
|---|---|
| Plaintiff, | |
| vs. | CR2013-462384-001 |
| FRANCIS SALAZAR,<br>aka FRANCES M SALAZAR<br>aka FRANCES MARIE HIGUERA<br>aka FRANCIS HIGUERA<br>aka MARIA L LEON<br>aka FRANCIS MARIE SALAZAR<br>aka FRANCES MARIE SALAZAR<br>aka FRANCES SALAZAR | |
| Defendant. | STATE'S SUPPLEMENTAL MOTION TO DISCLOSE NEW EVIDENCE PURSUANT TO RULE 15 AND/OR ER 3.8<br><br>(Assigned to the Honorable Michael Gordon) |

The State of Arizona, by and through undersigned counsel, hereby notifies the court and

opposing party that the state has disclosed newly discovered evidence, Bates stamped 0115-0130,

material pertaining to the state's witness, Officer Anthony Armour, Jr., #8605.

Submitted February 22, 2017.

WILLIAM G MONTGOMERY
MARICOPA COUNTY ATTORNEY

BY: _____
/s/ Elizabeth M Lake

Deputy County Attorney

Copy mailed\delivered February 22, 2017, to:

The Honorable Michael Gordon
Judge of the Superior Court

Christopher Michael Doran
DUMONT LAW PLLC 1006 W ADAMS ST STE 101
Phoenix, AZ 85007
Attorney for Defendant

BY: _____
/s/ Elizabeth M Lake
Deputy County Attorney

EML

2

# ATTACHMENT 2

# City of Phoenix Police Internal Investigation



# City of Phoenix

**To:**    Joseph G. Yahner        **Date:**  April 27, 2016
        Police Chief

**From:**  John Collins, Commander
           Professional Standards Bureau

**Subject:**  **INTERNAL INVESTIGATION – PSB15-0126**

**Internal Investigators:**      Lieutenant Steve Martos (Investigative Review)
                      Sergeant Amy Breitzman (Primary Investigator)
                      Sergeant Mark Kincannon (Secondary Investigator)

**Allegation #1:**        On November 4, 2015, Officer Anthony Armour #8605 unlawfully entered an apartment while conducting follow up on a domestic violence call.

**Findings:**        Sustained

**Allegation #2:**        On November 4, 2015, Officer Anthony Armour falsely arrested a female resident inside her apartment for hindering prosecution.

**Findings:**        Sustained

**Allegation #3:**        On November 4, 2015, Officer Anthony Armour gave a false verbal report to a patrol supervisor regarding the circumstances surrounding a misdemeanor arrest.

**Findings:**        Sustained

**Allegation #4:**        On November 4, 2015, Officer Anthony Armour provided false information in an Incident Report, when he failed to accurately document the circumstances surrounding a misdemeanor arrest.

**Findings:**        Sustained

**Police Chief Joseph G. Yahner**
**PSB15-0126**
**Page 2 of 15**

| | |
|---|---|
| **Allegation #5:** | On November 4, 2015, Officer Anthony Armour disobeyed a lawful order given to him by a supervisor and booked a female subject after being directed to release her from custody. |
| **Findings:** | Sustained |
| **Employee Involved:** | Officer Anthony Armour #8605 Desert Horizon Precinct, 61K |
| **Complainant:** | Department Initiated |
| **Attachments:** | See Attachments Section |

## SUMMARY OF INVESTIGATION:

On November 4, 2015, Officer Anthony Armour #8605, entered an apartment at
                in search of a domestic violence suspect. He did not have consent from the female
resident,                    to enter the apartment nor were there any exigent
circumstances surrounding the initial contact with                necessitating entry.

Officer Armour made contact with                at the front door of the apartment. After being
told the suspect was not inside, Officer Armour entered the apartment and located the suspect,
                in the back bedroom of the apartment. Officer Armour arrested
for misdemeanor criminal damage and                for hindering prosecution.

Following the arrests, Sergeant Patrick Garcia #5413 (62J) reviewed the probable cause for
both arrests and the circumstances surrounding the entry into the apartment. After reviewing
the reports, Sergeant Garcia questioned Officer Armour about the details of
arrest. Officer Armour made false statements to Sergeant Garcia concerning the entry into
                apartment and included those false statements in the Incident Report.

After learning the details of                arrest, Sergeant Garcia directed Officer Armour not to
book her and advised him to take her home. Officer Armour advised Sergeant Garcia he would
not book                however disobeyed the directives given to him and processed

**Police Chief Joseph G. Yahner**
**PSB 15-0126**
**Page 3 of 15**

through Central Booking. Officer Armour remained at Central Booking in the holding area, as the staff loaded             into the van to be transported to the Fourth Avenue Jail. Approximately 25 minutes after             left Central Booking, Officer Armour sent Sergeant Garcia a Mobile Data Computer (MDC) message stating             had already been transported to the jail. When Sergeant Garcia received the MDC message, he made arrangements for             to be returned to Central Booking and transported back to her residence.             was in police custody for over five hours.

---

### DETAILS OF INVESTIGATION:

On October 29, 2015, during squad briefing, Officer Joshua Edelson #9011, advised the squad he had responded to a domestic violence call, involving possible strangulation allegations, at the Camelback Cove Apartments.[1] Officer Edelson advised he had probable cause to arrest             who lived in the complex with his girlfriend,             Officer Edelson said he did not have a strong case for the impeding/strangulation charge, but felt if anyone contacted             after the fact,             could be arrested for misdemeanor criminal damage and assault.

Later the same night, after responding to an unrelated call, Officer Armour discussed the incident with Officer Edelson. Officer Armour and Officer Edelson reviewed a photograph of             on their MDC and confirmed the address where the crime occurred.[2]

On November 4, 2015, (five days later) Officer Armour responded to an unrelated call at the Camelback Cove Apartments. Upon completion of the call, Officer Armour recalled the domestic violence incident and decided to attempt to make contact and arrest             As he was walking through the complex, a neighbor, who lives across from the couple's apartment, was sitting on the balcony smoking a cigarette. The neighbor, whose name and identification was not obtained, advised Officer Armour the suspect from the call,             went into his apartment approximately 15 minutes earlier. Officer Armour asked if Officers Brooks Naegeli #8762 and Earl Erickson #8477 (612M) were available to assist him at his location in reference to an aggravated assault from the previous week.

When Officers Naegeli and Erickson arrived, Officer Armour went to his vehicle to review the Incident Report and asked radio for a phone number for an available supervisor. Officers Naegeli and Erickson had very little information about the situation and did not know what the suspect looked like, so Officer Erickson called Officer Edelson by phone, while Officer Naegeli

0117

watched the front of the apartment.  Officer Erickson confirmed with Officer Edelson probable cause existed to arrest _____ for a misdemeanor criminal damage offense.

Officer Armour returned to the front of the apartment, and met with Officers Naegeli and Erickson.  Officer Naegeli advised them he saw the blinds move inside the apartment, and while he could not tell who moved them, he saw someone inside.  Officer Erickson advised Officer Armour he confirmed they had probable cause for a misdemeanor arrest only.  Officer Naegeli was told to cover the rear window while Officer Armour and Officer Erickson approached the front door.  Officer Armour knocked on the front door, and after a short period of time, _____ answered, donning only a towel.

Officer Armour immediately placed his foot into the threshold of the doorframe thus preventing _____ from closing the door.  _____ told Officer Armour _____ had just left and she tried to shut the door.  _____ and Officer Armour began to argue and Officer Armour advised her he was going to enter the apartment.[3]  They continued to argue until she became so frustrated the door swung open and she said "whatever," and told Officer Armour to shut the door behind him.  _____ never invited the officers in and there were no exigent circumstances requiring entry into the apartment.  Officer Erickson refused to enter the apartment and cleared over the radio for Officer Naegeli to come to the front of the apartment.  When he arrived, Officer Erickson went to cover the rear of the apartment and Officer Naegeli entered the apartment to ensure Officer Armour had a back-up.

_____ went into the back bedroom to get dressed and the officers remained in the front room.  During this time, Officer Armour asked Officer Naegeli to confirm he saw _____ inside the apartment.  Officer Naegeli advised him he saw blinds move inside the apartment and while he did not know who moved them, he knew someone was inside.[4]  When _____ returned to the main room of the apartment, she told the officers they needed a warrant to be inside her house and attempted to close the door leading to the back bedroom.  Officer Armour prevented her from closing the door so _____ placed her body in the doorway and blocked the path into the bedroom.  Officer Armour grabbed _____ left hand and told her to move.  When she refused to move, he moved her out of the way and went to look for _____.  _____ emerged from the closet in the back bedroom and Officer Armour took him into custody.  Officer Armour then placed _____ under arrest for hindering prosecution.  Both subjects were transported to the Mountain View Precinct for processing.

Officer Armour completed two separate Incident Reports and sent an MDC message to both Sergeant Patrick Garcia #5413 (62J) and Sergeant Matt Verthein #5881 (63J) requesting one of

**Police Chief Joseph G. Yahner**
**PSB 15-0126**
**Page 5 of 15**

them review his reports. Sergeant Garcia responded and said he would conduct the review.[5] At 12:42 a.m. Sergeant Garcia sent Officer Armour an MDC message requesting he call him as soon as possible.[6] One minute later, Officer Armour called Sergeant Garcia and they reviewed the details of the arrests.

During this initial conversation, Sergeant Garcia told Officer Armour he was not comfortable with the details of the arrest of                    and advised Officer Armour he probably should not have arrested her. Sergeant Garcia asked Officer Armour if there were any details left out of the report and Officer Armour replied "Well, Naegeli said he saw him (Mr. Hunter) inside.[7]" This was after Officer Naegeli advised Officer Armour he had not seen Mr. Hunter through the window.

Sergeant Garcia advised Officer Armour to add any additional details to the report not already included, and he would get back to him with instructions on how to move forward.[8] Sergeant Garcia advised Officer Armour he did not have a reason to enter the apartment and asked where                    was. Officer Armour advised him she was at Central Booking and they hung up.[9] Sergeant Garcia then called Central Booking to ensure                    was still there and spoke to Ms. Sarah Howell #A3380. He gave instructions to hold                    at Central Booking and not transport her to jail until Sergeant Garcia or Officer Armour was on site.[10] Ms. Howell called the detention area and relayed the information to Ms. Jackeline Morataya #A5848, and asked Ms. Morataya to have Officer Armour call her when he arrived at Central Booking.[11]

Sergeant Garcia called Sergeant Verthein to seek the advice of another on-duty supervisor and also notified Lieutenant Dave Odell #6073.[12] He advised them both he was going to direct Officer Armour to release                    and both agreed with his decision. Sergeant Garcia also reviewed Operations Orders to verify absent lawful consent, officers are not permitted to enter a private residence in pursuit of misdemeanor suspects without a warrant to search the premises.

Sergeant Garcia sent Officer Armour an MDC message to call him and had the radio dispatcher clear Officer Armour however he never responded.[13] Sergeant Garcia queried Officer Armour's location, which showed him at Mountain View Precinct. Sergeant Garcia drove to the precinct to make contact with him. Sergeant Garcia could not find him when he arrived because while Officer Armour's status showed him at the precinct, he was actually at Central Booking and had been there for approximately 30 minutes. Officer Armour manually updated his status to reflect the booking, transport and processing of         and         . Many of the updates he entered were inaccurate, making it difficult for Sergeant Garcia to contact him.

Sergeant Garcia called Central Booking again and spoke to Ms. Howell. Following the conversation with Sergeant Garcia, she called the cage area and spoke to Officer Armour. She advised him Sergeant Garcia wanted to speak to him regarding his female prisoner and she believed she told Officer Armour Sergeant Garcia did not want _____ booked.[14]

Ms. Peggy Bassett #A4358 was also working in the detention area and was present when Ms. Howell called to relay the information from Sergeant Garcia. She spoke with Officer Armour about the incident and Officer Armour told her the sergeant covering his area did not want him to arrest or process _____ [15] Ms. Bassett offered to hold the booking until Officer Armour spoke with Sergeant Garcia and she asked Officer Armour inform her when they had made a decision.[16] Officer Armour then left the detention area. After approximately 20 minutes, Ms. Bassett went to the parking lot to find Officer Armour. He was in his vehicle and she asked him what he wanted to do with _____ Officer Armour advised her to continue the booking process. Ms. Bassett asked if he was sure, and Officer Armour stated he had already talked to Sergeant Garcia and to continue to process her.[17]

Officer Armour called Sergeant Garcia from the parking lot at Central Booking. They spoke for nine minutes and during the conversation, Sergeant Garcia directed Officer Armour to release _____ and submit his report detailing the circumstances of her arrest. Sergeant Garcia told Officer Armour an officer from his squad, Officer Virginia Wuollet #9392 (624J,) was on her way to collect _____ Officer Armour advised Sergeant Garcia he was going to delete the report and he was close to Central Booking and would take care of transporting _____ home.[18] Sergeant Garcia stated during this conversation, he gave Officer Armour a direct order not to book _____ and to complete the Incident Report.[19]

Following the last conversation with Sergeant Garcia, Officer Armour is captured on video entering Central Booking's holding room. Within the next few minutes, video captured _____ being loaded into the transport van in the parking lot at Central Booking. Officer Armour stood by while _____ was processed and taken out to the van. Ms. Bassett asked him several times if he had changed his mind or if he wanted them to hold _____ Each time, Officer Armour confirmed to go ahead and process her.[20] _____ and _____ can be seen being loaded into the transport van and leaving the parking lot.[21]

Ms. Bassett indicated Officer Armour left the booking area a short time after the transport van left with _____

Sergeant Verthein received a phone call from Officer Armour between 3:15-3:45 a.m. Officer Armour asked Sergeant Verthein if he could go home early and said he did not want to deal with

Sergeant Garcia anymore.  Sergeant Verthein advised him he could go home, and ended the conversation.[22]  Officer Armour did not leave work early as requested and did not verify

had returned home.  Sergeant Verthein did not know why Officer Armour did not leave early.

Investigators developed the following time line to delineate the entry into apartment and her subsequent arrest and transportation to the 4th Avenue Jail:

- 10:15 p.m.  Officer Armour took              and              into custody.  He transported              to Mountain View Precinct and remained there until 12:41 a.m.  when he left with both prisoners and drove to Central Booking.  He did not update his status or provide transport miles.

- 12:43 a.m.  Officer Armour called Sergeant Garcia for the first time.  They talked for 12 minutes and Sergeant Garcia advised Officer Armour to add additional details to his report to justify the arrest and asked where              was.

- 12:56 a.m.  Officer Armour arrives at Central Booking/Southern Command Station at the south gate.  His status reflected he was at Mountain View Precinct, and he never provided transport miles.

- 1:11 a.m.  Sergeant Garcia attempted to call Officer Armour but did not reach him.  He then called Central Booking and spoke to Ms. Howell.  He advised her not to process              and to hold her until he or Officer Armour arrived.

- 1:30 a.m.  Officer Armour updated his status to reflect he arrived at Central Booking and provided transport miles for his vehicle on the MDC.  He had been there for over 30 minutes.

- 1:53 a.m.  Sergeant Garcia called Officer Armour and advised him not to book              and supplement the report indicating a submittal instead of a booking.  The call lasted 9 minutes.  Prior to this, Ms. Howell advised Officer Armour Sergeant Garcia did not want              booked.

- 2:03 a.m. Officer Armour returned to the Central Booking holding area following his conversation with Sergeant Garcia.  He had been given a direct order not to process and book              At 2:07 a.m. video shows              and              being loaded into the transport van and the van left for the 4th Avenue Jail.  Officer Armour was present and observed the prisoners leave.

- 2:25 a.m.  Officer Armour sent Officer Virginia Wuollet #9392 (624J) an MDC message stating "Sorry about that, I didn't think he was going to involve anyone else in his issues."

- 2:26 a.m.  Officer Armour sent Sergeant Garcia an MDC message advising him "She is already over at the jail." This was 19 minutes after Officer Armour observed leave Central Booking.  At 2:27 a.m.  Sergeant Garcia called Central Booking and arranged for                to be transported back to Central Booking as soon as possible.

- 2:43 a.m.  Sergeant Garcia called Officer Wuollet (624J) and arranged to have picked up at Central Booking and returned home.

- 2:46 a.m.  Sergeant Garcia sent Officer Armour an MDC message advising him would be en route back to Central Booking and asked Officer Armour to change the reports to reflect the submittal.

- 2:48 a.m.  Officer Armour replied to Sergeant Garcia's MDC message advising "Someone else can transport her home, I'm going to go."

- 3:21 a.m.  Officer Wuollet transported             from Central Booking to her apartment.  Officer Wuolet went back into service at 3:40 a.m.

On January 27, 2016, Mr. Ean White, Assistant City Attorney, was asked to review the report authored by Officer Armour. Mr. White is assigned to the Phoenix Police Department's Legal Unit as a legal advisor. In an email, Mr. White stated after reviewing the report, entry into              apartment violated Operations Orders, was absent exigency and Officer Armour required a warrant prior to entering the residence. Furthermore, Officer Armour was not granted consent to enter and formed his probable cause to arrest              after he located the suspect inside the residence. Mr. White instead recommended obtaining a search warrant for the suspect or waiting for him to exit the residence.

_Interview with_

PSB investigators made several attempts to contact and meet with              She was contacted once briefly over the telephone and an appointment was made to meet with her. When investigators arrived at her apartment on the day of the scheduled appointment, no one answered the door. During the initial brief phone conversation with              she indicated the incident with Officer Armour was the worst she had ever been treated by a police officer and what he did that night was wrong.[23]

### Interview with Officer Erickson

Officer Erickson confirmed he called Officer Edelson prior to making contact with
He indicated Officer Edelson was not comfortable arresting         with the strangulation
offense but had probable cause for a misdemeanor criminal damage offense. Officer Erickson
advised the only information he relayed to Officer Armour while at the scene was the charging
information from Officer Edelson and the information regarding Officer Naegeli seeing someone
look through the window through the blinds. He said he could not tell if it was a man or a
woman but someone looked through the blinds.[24] Officer Erickson advised Officer Armour
included information in his report which was inaccurate. He said he never advised Officer
Armour Officer Naegeli saw         inside the apartment. Officer Erickson advised he did
not want to get into trouble and was not comfortable going inside the apartment so he waited
outside. When Officer Armour asked if Officer Erickson was going to make him go in by himself,
Officer Erickson replied "You do not have to go in at all." He said he was fed up with the
situation and cleared for Officer Naegeli to come to the front of the apartment while he covered
the back. Officer Erickson said he was not concerned about Officer Armour's welfare or his
safety when Officer Armour initially entered the apartment alone because he kept an eye on him
until Officer Naegeli relieved him. Officer Erickson did not notify a supervisor following the
incident because he knew a sergeant would have to review the report and would know what
happened. He also indicated by the end of his shift, word spread Sergeant Garcia was
involved.

### Interview with Officer Naegeli

Officer Naegeli told investigators he never told Officer Erickson or Officer Armour he saw
        inside the apartment. Additionally, prior to the call, he never had any contact with
        and therefore did not know what he looked like.[25] Officer Naegeli confirmed he told
Officer Erickson and Officer Armour he saw the blinds moving inside the apartment but, he
could not see who moved them. He said he knew someone was inside, but he never told
Officer Armour he thought he saw         inside the apartment. He said he did not know
what         ooked like and the information Officer Armour wrote in the report concerning
him seeing         inside, never happened. Officer Naegeli advised investigators when he
came back to the front of the apartment, he could hear Officer Armour and         arguing.
He did not know what was going on, but did not want Officer Armour inside l
apartment alone with a possible suspect, so he went in to back him up.

Officer Naegeli said after he entered the apartment, he looked to ensure no one was hiding behind the door, but he did not do a protective sweep as indicated in the report. He observed Officer Armour attempting to pass by _____ who was blocking the hallway to the back bedroom with her body and grabbing onto Officer Armour. Officer Naegeli said the next thing he knew, Officer Armour was in the back bedroom taking _____ into custody and he was trying to calm _____ down. Officer Naegeli said _____ was not compliant and was angry. He advised after the arrests, neither he nor Officer Erickson advised a supervisor about the incident. He said prior to making contact at the apartment, Officer Naegeli asked Officer Armour to contact a supervisor. When Officer Armour was at his vehicle, he heard him clear over the radio for a supervisor's phone number. While he never confirmed with Officer Armour he had spoken to a supervisor, he assumed Officer Armour had worked out a plan over the phone. Officer Naegeli also said he knew all arrests would require an arrest review by a supervisor and later learned Ms. Franklin had been released and there was possibly a Notice of Investigation (NOI) issued.

_Interview with Officer Armour:_

Officer Armour was interviewed by PSB investigators and initially stated Officer Edelson advised him he had probable cause to arrest _____ for aggravated assault.[26] Later in the interview, Officer Armour clarified Officer Edelson only felt he had probable cause for a misdemeanor offense on _____ However, Officer Armour felt he might be able to develop information to charge _____ with a felony once he made contact at the apartment. Officer Armour acknowledged he did not respond to the original call and the officer who did, felt the only probable cause was for a misdemeanor arrest.

Officer Armour said _____ attempted to close the door of the apartment following his initial contact with her and he prevented her from doing so by placing his foot in the threshold of the doorframe. Officer Armour acknowledged there were no exigent circumstances necessitating his entry into the apartment and he never asked _____ for permission to go inside. Officer Armour said when _____ became frustrated with him and relinquished the doorway, he told her he was going to come in, and felt he had a right to do so.[27] He advised it was impractical to obtain a search warrant for a misdemeanor offense on _____ and he did not feel a supervisor would approve one.[28]

Officer Armour believed, at the time _____ ied to him. He chose to enter her residence to look for _____ despite _____ telling him he needed a warrant, and refusing him entry into her bedroom. Despite this, Officer Armour believed he did not violate

**Police Chief Joseph G. Yahner**
**PSB 15-0126**
**Page 11 of 15**

Fourth Amendment rights by entering her residence, without warrant and absent consent or exigent circumstances.[29] Officer Armour stated he was 100% certain             was inside the apartment, though he had not seen him inside, the front and back of the apartment was not always covered, and he had not confirmed the information the initial neighbor had provided him.[30] Officer Armour believed he followed Departmental policy and he had the right to go inside and locate             [31] Officer Armour also advised investigators he was not aware Officer Naegeli had not seen             inside the apartment until after they had made entry.[32] However once inside and after being made aware             was not seen by officers, Officer Armour continued past             into a closed bedroom despite her refusal.

Officer Armour stated he believes he had accurately documented Officer Naegeli's statements about not seeing             inside the apartment in his report. When asked if he accurately relayed the information to Sergeant Garcia, Officer Armour stated he felt he had.

Officer Armour said he had no reason for omitting the fact Officer Naelgeli told him he had not seen             after entering the apartment in his Incident Report. Officer Armour said when he spoke to Sergeant Garcia, he did not feel this was an important fact. Officer Armour advised investigators he is used to providing only the bare bones of an investigation to his supervisor and, he had done so with Sergeant Garcia. Officer Armour indicated during his interview, when he spoke to Sergeant Garcia on the phone, he did not give him 100% of the information.[33] Officer Armour felt he encompassed the situation clearly in his Incident Report despite omitting the information provided by Officer Naegeli.[34]

In reference to his MDC status, Officer Armour said he always manually types in his vehicle miles in his computer when he transports a female prisoner. He confirmed he did so that night.[35] He felt he made a mistake when he updated his status to reflect he was at Mountain View Precinct, when in reality he was at Central Booking. He also advised his status was not correct and he had not provided miles transporting             to Central Booking almost an hour prior. When he realized his mistake that night, he went out to his vehicle and updated his status to reflect he arrived at Central Booking.[36]

Officer Armour acknowledged he violated a direct order from Sergeant Garcia when he allowed             to be processed through Central Booking.[37] He felt like he was having a discussion with Sergeant Garcia and, might be able to plead his case and change Sergeant Garcia's mind.[38]   The final time they spoke on the phone, Officer Armour said he advised Sergeant Garcia he would not boo             but said he told Sergeant Garcia he did not like the fact             would not be booked.[39] Officer Armour confirmed he waited about 20

minutes before advising Sergeant Garcia that                    had left Central Booking. Officer
Armour confirmed he did not stop              from being transported to jail; even after Ms.
Bassett asked several times if he was sure he wanted her processed.[40]  Officer Armour said he
had the time and opportunity to follow Sergeant Garcia's directives but, felt the situation was
frustrating, overwhelming, and confusing.[41]  He said he was not trying to disobey his order but
was confused and there were so many moving parts.  He stated he was not being malicious or
intentional and he felt he still had time to stop              from being booked once she arrived
at the jail.[42]

---

## CONCLUSION:

On November 4, 2015, while conducting follow up on a domestic violence call which occurred
five (5) days earlier, Officer Anthony Armour unlawfully entered an apartment without a warrant
or exigent circumstances.  He was not invited in or given consent and the female resident,
                    told him to leave.  Despite                    objections and requests to leave,
Officer Armour searched the apartment until he located and arrested                    in the
back bedroom.  Therefore, allegation #1, Officer Armour unlawfully entered an apartment while
conducting follow up on a domestic violence call is Sustained.

Following the arrest of              Officer Armour subsequently arrested              for
hindering prosecution.              asked him to leave multiple times and went so far as to use
her body to prevent him from searching the back bedroom of her apartment.  Officer Armour
took              left hand and physically moved her from the hallway and proceeded passed
her to search the back area of the apartment.[43]  Therefore, allegation #2, Officer Armour falsely
arrested              for hindering prosecution is Sustained.

Officer Armour reviewed the details of the arrest with Sergeant Garcia.  He told Sergeant Garcia
one of his backup officers saw Mr. Hunter look out the apartment window.  Following the entry
into the apartment, Officer Armour asked Officer Naegeli if he had seen              through the
window.  Officer Naegeli told Officer Armour he had not.  Even after re-confirming this
information, Officer Armour informed Sergeant Garcia Officer Naegeli saw              inside the
apartment thereby bolstering his probable cause to enter.  Therefore, Allegation #3, Officer
Armour provided false statements to a supervisor is Sustained.

In the report, Officer Armour, stated "Officer Erickson advised me that Officer Naegeli believed
he had seen              come to the front window and look out through the vertical blinds, but was

not 100% certain whether it was him." According to Officer Erickson, the only information he relayed to Officer Armour while at the scene, was Officer Naegeli told him he saw someone look through the window blinds but could not tell if it was a man or a woman who looked out.[44] Officer Naegeli said he never told Officer Armour he saw          inside the apartment and he did not even know what          looked like.[45] Officer Naegeli confirmed he did say he saw the blinds move in the apartment and while he didn't know who moved them, he knew someone was inside. Neither officer advised Officer Armour they saw          look out the window. Therefore, Allegation #4, Officer Armour documented false information in an Incident Report is Sustained.

Following the arrests, and prior to          transport to the jail, Officer Armour was given specific directives to release          from custody and return her to her residence. Officer Armour told Sergeant Garcia he would not book          and then stood by Central Booking and watched as          was loaded into the transport van, heading to the 4th Avenue Jail. He did not intervene or attempt to stop          from being processed, even though he had the opportunity to do so. Therefore, allegation #5, Officer Armour failed to follow directives given to him by a supervisor is Sustained.

This investigation concluded Officer Armour's actions are in violation of the following policies:

- Operations Order 2.2.2.E(1).a "All employees will obey any lawful order of a supervisor, including any order relayed from a supervisor by an employee of the same or lesser rank, unless an employee believes the supervisor is guilty of misconduct, negligence, or unfairness."

- Operations Order 3.13.5.B(1) "Employees will not make false reports or knowingly enter or cause to be entered into any Department book, record, or report any inaccurate or false information."

- Operations Order 3.13.6.A(2) "Employees will not lie during any Department criminal and/or administrative investigation or in matters of legitimate concern to the Department."

- Operations Order 4.10.3.F(4) "Absent lawful consent, officers will not enter a private residence in pursuit of misdemeanor suspects without a warrant to search the premises."

- Operations Order 4.10.3.F(1) "Officers may arrest without a warrant under the following circumstances: In a public place, a place open to the public, or a place an officer has a legal right to be, with the probable cause to believe a crime occurred and probable cause to believe the person to be arrested committed the crime."

The most significant policy violation for Officer Armour is designated in Operations Order 3.18, Addendum A, Sub-Section 3.C.(4) "The incident involved the intentional abuse of police powers, authority, and privileges" and Operations Order 3.18, Addendum A, Sub-Section 2.D.(1)(c)

**Police Chief Joseph G. Yahner**
**PSB 15-0126**
**Page 14 of 15**

"Knowingly submitted a criminal investigation/internal investigation report with false information. These are Class III Violations, which "will be referred to the DRB for a possible demotion and/or 40, 80, or 240 hour suspension without pay, or termination/Loudermill Hearing."

## CLOSING:

This Professional Standards Bureau investigation is complete.  The investigation was reviewed and approved by the involved employee.  Upon finalization, this investigation will be forwarded to the Disciplinary Review Board for review.  This investigation will be retained in the Professional Standards Bureau in accordance with retention policies/law.

Police Chief Joseph G. Yahner
PSB 15-0126
Page 15 of 15

### Endnotes:

1 Edelson interview 10:30-11:18.
2 Edelson interview 14:20-18:41.
3 Armour interview 05:00-06:00.
4 Naegeli interview 05:35-05:43.
5 Attachment #4 MDC messages—Page 2.
6 Attachment #4 MDC messages---Page 2.
7 Officer Armour interview #4 32:30-32:39.
8 Sergeant Garcia interview 03:05-03:25.
9 Sergeant Garcia's email Attachment #2.
10 Sergeant Garcia interview 4:10-06:33.
11 Ms. Howell interview 01:55-02:17.
12 Sergeant Garcia interview 5:20-5:50.
13 Attachment #5---Page 7.
14 Ms. Howell interview 2:25-2:50.
15 Ms. Bassett interview 3:48-4:10.
16 Ms. Bassett interview 4:28.
17 Ms. Bassett interview 5:04.
18 Sergeant Garcia interview 09:00-10:19.
19 Sergeant Garcia interview 17:11.
20 Ms. Bassett interview 6:00-6:30.
21 Attachment #9.
22 Sergeant Verthein interview 06:40-08:05.
23        interview 03:14.
24 Erickson interview 5:10-5:29.
25 Naegeli interview 13:15-13:40.
26 Armour interview #1 11:18-12:56.
27 Officer Armour interview # 1 5:05-09:57.
28 Officer Armour interview #3 16:44-24:28.
29 Officer Armour interview #3 25:34 and #6 7:37.
30 Officer Armour interview #3 8:14.
31 Officer Armour interview #3 23:00-31:46.
32 Officer Armour interview #3 35:01-35:33.
33 Officer Armour's interview #4 28:55-29:51.
34 Officer Armour's interview #4 05:14-07:14.
35 Officer Armour's interview #4 25:06-25:37
36 Officer Armour's interview #6 00:53-06:24.
37 Officer Armour's interview #5 15:03 and #6 7:27.
38 Officer Armour's interview #4 20:15-20:30.
39 Officer Armour's interview #4 15:55-16:25.
40 Officer Armour's interview #5 14:11-15:20.
41 Officer Armour's interview #6 07:27-11:30.
42 Officer Armour's interview #6 10:45-11:02.
43 Officer Armour's interview #1 09:00-09:30.
44 Erickson interview 5:10-5:29.
45 Naegeli interview 13:15-13:40.

# Professional Standards Bureau
# Investigations Unit

## PSB15-0126

# TABLE OF CONTENTS
## Attachments

|  |  | **Pages** |
| --- | --- | --- |
| 1) | Phoenix Police Incident Report 15-2078605/15-2127039 | 18 |
| 2) | PSB Notification Emails | 6 |
| 3) | Sergeant Garcia's Phone Log | 1 |
| 4) | MDC Messages | 4 |
| 5) | Unit History Worksheets | 8 |
| 6) | Recall Access Event Report | 5 |
| 7) | PPD Legal Unit Email | 2 |
| 8) | Operations Orders | 9 |
| 9) | Jail Surveillance | 1 CD |

# EXHIBIT DD

Chris DeRose, Clerk of Court
*** Electronically Filed ***
T. Alameda, Deputy
6/7/2018 11:15:58 AM
Filing ID 9412046

WILLIAM G. MONTGOMERY
MARICOPA COUNTY ATTORNEY

Andrea L. Kever
Deputy County Attorney
State Bar ID No. 013577
State Bar Firm No. 00032000
301 W. Jefferson St., Suite 210
Phoenix, AZ 85003
Telephone: (602) 506-7422
mcaoexec@mcao.maricopa.gov
Attorneys for Respondent

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA, | No. CR 2013-462384-001 |
| Respondent, | |
| vs. | RESPONSE TO PETITION FOR POST-CONVICTION RELIEF |
| FRANCES MARIE SALAZAR, | (The Hon. Douglas Gerlach Rule 32 Management Unit) |
| Petitioner. | |

After reviewing the record and the claim raised in Defendant's Memorandum, the State agrees that Defendant is entitled to a new trial in this matter.

DATED this 7th day of June, 2018.

WILLIAM G. MONTGOMERY
MARICOPA COUNTY ATTORNEY


BY  /s/ Andrea L. Kever
        ANDREA L. KEVER
        Deputy County Attorney

Copies of the foregoing mailed/
hand-delivered this 7th day of
June, 2018, to:

The Hon. Douglas Gerlach
Rule 32 Management Unit
Judge of the Superior Court

Stephen M. Johnson
Law Office of Stephen M. Johnson
2601 N. 16th Street
Phoenix, AZ  85006
Attorney for Defendant


By  /s/ Andrea L. Kever
       Andrea L. Kever
       Deputy County Attorney

# EXHIBIT EE

Chris DeRose, Clerk of Court
*** Electronically Filed ***
07/12/2018 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2013-462384-001 DT                                    07/10/2018


                                                CLERK OF THE COURT
HONORABLE MICHAEL D. GORDON                       K. Sotello-Stevenson
                                                       Deputy


STATE OF ARIZONA                        ANDREA L KEVER

v.

FRANCES MARIE SALAZAR (001)             FRANCES MARIE SALAZAR
                                        098752 ASPC PERRYVILLE SANTA C
                                        PO BOX 3200
                                        GOODYEAR AZ  85395
                                        STEPHEN M JOHNSON

                                        AZ SUPREME COURT
                                        COURT ADMIN-CRIMINAL-PCR


**MINUTE ENTRY**
**GRANTING PETITION FOR POST-CONVICTION RELIEF**


### A.  Background

     Pending before the Court is Defendant's, Ms. Frances Salazar's, Petition for Post-Conviction Relief (filed 3/30/18) and the State's Response (filed 6/07/18).  The State has conceded that Ms. Salazar is entitled to a new trial under *Brady v. Maryland,* 373 U.S. 83 (1963).   Ms. Salazar alleges and the State concedes that the State failed to disclose materially exculpatory evidence with respect Officer Armour of the Phoenix Police Department., whose credibility was critical to the conviction.

     At trial, Officer Armour testified that Ms. Salazar admitted that she possessed a crack pipe with crack cocaine----which was found hidden in the console of a vehicle--- in which she was a passenger.  Armour also claimed that, prior to the stopping the vehicle, he saw her make

Docket Code 187                    Form R000A                           Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2013-462384-001 DT                                    07/10/2018

suspicious movements in the vehicle that made it look as if she was attempting to hide something.

At trial, the vehicle's actual owner testified that he loaned the car to the driver and that the pipe & drugs belonged to him.  He further testified that he had hidden them in the car without Ms. Salazar's knowledge.

The driver also testified.  He testified that Armour stated that he was "going after" Ms. Salazar because she was not being cooperative.

On August 17, 2016 a jury convicted Ms. Salazar of possession of dangerous drugs (Count 1) and possession of drug paraphernalia (Count 2).  On December 15, 2016, the Court sentenced Ms. Salazar as a repeat offender to the minimum term of 6 years at the Department of Corrections for Count 1 to run concurrently with a minimum term of 2.25 years for Count 2.  On December 12, 2017, the Court of Appeals affirmed the conviction.  A petition for review is still pending before the Arizona Supreme Court.

On February 27, 2017, the State disclosed "newly discovered evidence" reflecting an internal investigation that that sustained allegations finding that he engaged in substantial acts of dishonesty in connection with a 2013 arrest. Those findings were made on April 27, 2016.

### B.  Analysis

Now, having reviewed the parties' filings and the docket, the Court finds good cause and will grant the Petition.  As noted above, the State concedes the alleged *Brady* violation.

Further, the Court finds that the evidence is newly discovered under Rule 32.1(e) of the *Arizona Rules of Criminal Procedure*. Rule 32.1 provides that "grounds for relief" include newly discovered "material facts and such facts probably would have changed the verdict or sentence." Ariz. R. Crim. Proc. 32.1(e) (1-3) (2017).   Clearly, this evidence falls squarely within that Rule.

### C.  Conclusion.

For the foregoing reasons, the Petition is hereby granted.

# EXHIBIT FF

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


Frances Salazar, individually,)
                              )No. 2:19-cv-01188
          Plaintiff,          )    PHX-SRB(ESW)
                              )
vs.                           )
                              )
City of Phoenix, et al.,      )
                              )
          Defendants.         )
_____)



VIDEOCONFERENCE DEPOSITION OF

MARGARET M. DIFRANK



Zoom Meeting ID No.: 858 5218 4182
October 4, 2021
11:01 a.m.



Prepared by:
SHELLEY HAVERMANN, CR        BARTELT NIX REPORTING
Certificate No. 50432        3101 North Central Avenue
Prepared for:                Suite 290
SUPERIOR COURT               Phoenix, Arizona 85012
(ORIGINAL)                   Phone: (602) 254-4111
(Via videoconference)        Office@BarteltReporting.com

Deposition of Margaret DiFolloni   Case 2:19-cv-05188-SRB-ESW   Document 208-4   Filed 02/04/22   Page 141 of 269   Page: 42

10/4/2021                                                                                      Salazar vs. City of Phoenix, et al.

1       Q.  Okay.  Because you subsequently did

2    conduct a recorded interview of Mr. McCullough,

3    correct?

4       A.  I don't remember that.  Are you saying I

5    had two interviews with Mr. McCullough?

6       Q.  Yes.  I have a recording of one of them.

7       A.  Okay.

8       Q.  And in it you reference having

9    interviewed him previously, so I'm assuming it's

10   subsequent to this one.  I can play a part of it

11   for you.

12      A.  Oh, okay.  Yeah, I'm a little bit short

13   on remembering that.  I didn't realize I had two

14   interviews with him.  Were they both at the

15   prison?

16      Q.  I think -- I'm thinking one might have

17   been telephonic and that's why you were able to

18   record it.  I'm not certain.

19      A.  Okay.  And that is likely.

20      Q.  After we talk about this email exchange,

21   I'll put the interview on so you can hear the

22   beginning of it and you can tell us what your

23   recollection is.  Maybe it will be refreshed.

24      A.  Okay.

25      Q.  So on July 3rd of 2015, you sent an email

Deposition of Margaret DuBouis          Page: 43
10/4/2021                                                    Salazar vs. City of Phoenix, et al.

Case 2:19-cv-01188-SRB-ESW   Document 208-4   Filed 02/04/22   Page 142 of 269

1    to Samantha DuMond who had by that time taken

2    over as the attorney for Ms. Salazar, correct?

3        A.  Yes.

4        Q.  He told you that he was willing to

5    testify, correct?

6        A.  Yes.

7        Q.  And so all of this information where you

8    say he was the first of the two confronted by

9    the officer, he said -- when you're attributing

10   things and saying "he said," you're saying that

11   this is information that Mr. McCullough provided

12   to you during the interview, correct?

13       A.  Yes.  Correct.

14       Q.  And, in fact, everything in this email

15   starting in the second paragraph is information

16   that Mr. McCullough provided to you, correct?

17       A.  That's correct.

18       Q.  One of the things he told you in that

19   interview is that when the officer approached

20   him and asked if he could search the car, his

21   response was that it wasn't his car, correct?

22       A.  Could you show me where you're at.  Are

23   you on Page 2 now?

24       Q.  I'm on the first page.  It's about four

25   lines from the bottom.

 1   that will just be a standing objection.

 2        Q.  BY MS. BERKE:  Okay.  So what you're

 3   stating here about the gun, the drug container

 4   and the needle is that Frances had told you that

 5   Rodney was in possession of these things and

 6   they were removed and placed on the hood of the

 7   police SUV, and Rodney denied that was true,

 8   correct?

 9        A.  That is exactly what I'm saying, yes.

10        Q.  And then, similarly, you talked about the

11   differences in the borrowing of the car.  You

12   say what Frances had told you and then what

13   Rodney had told you, correct?

14        A.  That's correct, yes.

15        Q.  And then in the last paragraph, you

16   recommended to Ms. DuMond that you request from

17   the prosecutor the disciplinary files for

18   Officer Anthony Armour and Officer Keith

19   Backhaus, correct?

20        A.  Correct.

21        Q.  And you explained your reasons for that

22   recommendation, correct?

23        A.  That's correct.

24        Q.  In your experience, how would Ms. DuMond

25   go about requesting the disciplinary files?

1    Simply sending an email to the prosecutor, a

2    letter, a subpoena?  How -- in your experience,

3    how do they go about doing that?

4            MR. RUNDALL:  Objection; foundation, lack

5    of knowledge.

6            THE WITNESS:  Okay.  So as an

7    investigator, the way that I would request the

8    disciplinary files is I would do a FOIA letter

9    to the department.  I don't know how the

10   attorneys logistically, process-wise request

11   disciplinary files.

12       Q.  BY MS. BERKE:  And when you say FOIA,

13   you're referring to the Freedom of Information

14   Act?

15       A.  Yes.

16       Q.  And so, basically, what you're saying is

17   a public records request?

18       A.  Yes.  Uh-huh.

19       Q.  And you felt it was important for

20   Ms. DuMond to make that request, correct?

21       A.  I felt it was very important for her

22   case, her -- yes, the truth in the case.

23       Q.  And a public record request is just a

24   simple letter, correct?

25       A.  It's a simple letter citing the various

 1   law that allows you to do that.

 2       Q.  Right.  It's kind of a form letter,

 3   correct?

 4       A.  Yes, exactly.

 5           MR. RUNDALL:  Hey, real quick -- sorry,

 6   Lori -- I'm having some connectivity issues, but

 7   if it wasn't clear, I did object to the form of

 8   the last question.  My apologies.  Can everybody

 9   hear me?

10           MS. BERKE:  Yeah, I couldn't hear your

11   objection, so it's noted.

12           THE WITNESS:  I heard it.

13           MR. RUNDALL:  Thank you.

14           MS. BERKE:  Oh.

15           THE WITNESS:  This is a weird sound

16   arrangement here, huh?

17           MS. BERKE:  I'm not having any difficulty

18   hearing you.  I just didn't hear his objection.

19           THE WITNESS:  Okay.

20           MR. RUNDALL:  I think it's actually my

21   Internet, so I'm having some connectivity.  I'm

22   going to mute my screen.  Hopefully that will

23   help.

24       Q.  BY MS. BERKE:  And then you sent her --

25   you sent Ms. DuMond another email 20 days later

1   on July 23rd of 2015, correct?

2        A.   That's correct.

3        Q.   Before I go to that, I want to stay on

4   the other -- on the July 3rd one.  In the second

5   to last paragraph when you talk about

6   differences in their stories, what was the

7   reason you pointed that out to Ms. DuMond?

8        A.   Let me reread it again --

9        Q.   Of course.

10       A.   -- to see if that refreshes my memory.

11            MR. RUNDALL:  And I'm just going to

12   object to that.  I feel like that calls for an

13   attorney-client communication protected by work

14   product since Ms. DiFrank is a consultant -- or

15   was a consultant of Ms. DuMond at that time.

16            THE WITNESS:  Okay.  If you want to

17   restate the question.  I don't quite remember

18   exactly what it was.

19       Q.   BY MS. BERKE:  Oh, sure.  I'll just have

20   the court reporter read it back.

21       A.   Okay.

22            (WHEREUPON, the last question was read

23   back.)

24            THE WITNESS:  Well, that is -- and to

25   give you a blanket answer on that, I don't know

Case 2:19-cv-01188-SRB-ESW   Document 208-4   Filed 02/04/22   Page 147 of 269   Page: 49
Deposition of Margaret DiFulio                                                    Salazar vs. City of Phoenix, et al.
10/4/2021

1    specifically on, you know, this date in this

2    memo, why I pointed it out.  But in terms of

3    investigation process, discrepancies, lack of

4    corroboration is always recorded, noted and

5    reported to the attorneys.

6         Q.  BY MS. BERKE:  Because it can be

7    problematic, correct?

8         A.  It could be problematic for me if I

9    overlook my responsibility to let the attorneys

10   know.

11        Q.  But inconsistencies such as those can be

12   problematic for a criminal defendant, correct?

13        A.  They can be, yes, and --

14           MR. RUNDALL:  Objection; foundation.

15           THE WITNESS:  And, you know, actually,

16   that is a legal response, and I can't answer a

17   legal opinion.

18        Q.  BY MS. BERKE:  Right.  But that's why

19   it's important for you to bring those

20   discrepancies to the attention of the attorney

21   you're working for, correct?

22        A.  It is important --

23           MR. RUNDALL:  Objection; form and

24   foundation.

25           THE WITNESS:  It's important that the

1   attorneys know everything I found out in my

2   investigation and to use it as they need to.

3        Q.   BY MS. BERKE:   Right.   And it's important

4   for you to advise the attorneys of any

5   discrepancies between the criminal defendant and

6   the defense witnesses, correct?

7        A.   I think it's important they know it, and

8   so where I know it, I record it --

9        Q.   Okay.

10       A.   -- and give it to them.

11       Q.   And, then, now let's go to the July 23rd,

12  2015 email.   You wanted to confirm that she

13  received your email regarding your interview of

14  Mr. McCullough, correct?

15       A.   Correct.

16       Q.   And then you asked, quote, Have you given

17  any thought to the officer's behavior and

18  requesting his record, end quote?

19            Do you see that?

20       A.   Yes, I do.

21       Q.   And so, again, you are encouraging her to

22  request Officer Armour's disciplinary file,

23  correct?

24       A.   That's correct.

25       Q.   Because you thought that was very

1    important for her to do, correct?

2            MR. RUNDALL:  Objection; form.

3            THE WITNESS:  I thought it was very

4    important to the case that we knew more about

5    this officer.

6        Q.  BY MS. BERKE:  I'm going to put --

7    hopefully, I can get this to work.  I'm going to

8    play -- I don't know that I've done an audio

9    share-screen -- an audio share-screen before.

10   I've done it on Court Connect, but let's see if

11   I can get it to work.

12       A.  Okay.

13       Q.  Hang on one second.

14           Okay.  So, hopefully -- do you see my

15   interviews here?

16       A.  Oh, okay.  Yes.  Yeah.  Okay.  I do.

17       Q.  And this says -- it's labeled August 21

18   of '15.  You'll recall that in your memo that's

19   Exhibit 2, your first interview was July 2nd of

20   2015, correct?

21       A.  I'm a little confused here because this

22   memo, the July 23rd, says Exhibit 12.

23       Q.  Yeah, that was at Mr. Doran's deposition.

24   We're going to make that Exhibit 2 to your

25   deposition.

 1          A.  Oh, okay.  Okay.  All right.

 2               (WHEREUPON, Exhibit Nos. 2 and 3 were

 3     marked for identification.)

 4          Q.  BY MS. BERKE:  So I'm going to --

 5          A.  Now -- go ahead.

 6          Q.  So, according to Exhibit 2, you

 7     interviewed Mr. McCullough in prison on July 2nd

 8     of 2015, correct?

 9          A.  Correct.

10          Q.  Okay.  I'm going to play the beginning of

11     this recorded interview we have.  Tell me if you

12     can hear it.  Okay?

13          A.  Okay.

14               (Audio playing)

15          Q.  BY MS. BERKE:  Do you hear that?

16          A.  No.  I hear like noise.

17          Q.  Okay.  I've got to figure out how to

18     share.  Let's see.

19               MS. BERKE:  Does anybody know how to do

20     that, share audio?

21               THE REPORTER:  Off the record?

22               MS. BERKE:  Yeah, we can go off the

23     record.

24               (WHEREUPON, there was a discussion off

25     the record.)

7/23/2015                                    DuMond Law PLLC Mail - Fwd: Salazar, Interview of Rodney McCullough

 

C. DORAN
March 23, 2021
Exhibit No. 12
Phyll sM. Rlasky                    Legal Assistant <intern@dumondlawaz.com>

## Fwd: Salazar, Interview of Rodney McCullough
1 message

**Samantha DuMond <samantha@dumondlawaz.com>**                      Thu, Jul 23, 2015 at 2:29 PM
To: Legal Assistant <intern@dumondlawaz.com>

Print out email with notes from investigator.

Sent from my iPhone

Begin forwarded message:

> **From:** Margaret DiFrank <mdifrank@gmail.com>
> **Date:** July 23, 2015 at 5:20:22 PM EDT
> **To:** Samantha DuMond <Samantha@dumondlawaz.com>
> **Subject: Fwd: Salazar, Interview of Rodney McCullough**

> Samantha, confirming that you did receive this email regarding my interview of Rodney
> McCullough. Have you given any thought to the officer's behavior and requesting his record. Last
> week my partner attempted to see Mr. Harris at LBJ and was denied access to him. Has his
> attorney responded to you? I have the postcard from Antonio asking to come see him on Frances'
> behalf and I am going to attempt to see him Monday.

> Please let me know if there is anything further you need. I see there's a hearing on Tuesday.

> Margaret M. DiFrank
> Mitigation Specialist/LPI
> INFO-TRACTS, LLC
> (Ofc) 520.299.0573
> (Cell) 602.920.7221

> ———— Forwarded message ————
> **From:** Margaret DiFrank <mdifrank@gmail.com>
> Date: Fri, Jul 3, 2015 at 4:23 PM
> Subject: Salazar, Interview of Rodney McCullough
> To: Samantha DuMond <Samantha@dumondlawaz.com>

> On July 2, 2015 I interviewed Rodney McCullough at the ASPC-Douglas facility as the witness
> who was driving the Jaguar on 12/31/13, when he and Frances Salazar were stopped for expired
> tags. This was not recorded although we spoke a little over an hour. He had a few things to say
> that may be of help to our client. He said he is willing to testify.

> First of all, he was the first of the two confronted by the officer. He said it wasn't his car but he
> had permission to drive it. The officer confirmed he had a suspended DL and Rodney was cuffed
> and placed in the back of one of the patrol vehicles. He said the officer told him he stopped them
> for a broken tail light. However, the officer said in his report, "expired tags." As Rodney was
> sitting there in the patrol car, he was able to see the same officer and Frances standing in front of
> the car; they appeared to be arguing. Later he said the officer came to him and asked if he could
> search the car. He said again that it wasn't his car. The officer then said to Rodney, *am I going to
> find anything if I search the car?* Rodney said that he didn't know—it wasn't his car. (This would
> indicate to me that there was no pipe "in plain view," which raises the issue of whether or



**EXHIBIT**

2 DiFrank 10-4-21

not it was a legal search., he officer's report says he began a s   ch incident to arrest, but it's not clear what he was arresting Frances for; if expired tags, there should not be a search of the vehicle; the title was not in her name. The officer should have called Mr. Harris who owned the car to have it towed home.

Secondly, Rodney stated that he did not see Frances smoke, drug, nor be in possession of a pipe that day; he said that was the first time the two of them had hung out together, although they knew of each other as they have mutual friends. He did not see a pipe between the car's council and the passenger seat as written in the report.

Additionally, Rodney said the officer told him he found the pipe <u>under</u> the passenger seat, therefore not in plain view. **At some point, the officer also made the comment to Rodney that *I am not after you, I'm really after her* and that was because she argued with him.** The officer told him that he found Loretta Jones debit card and that he was going to take Rodney to her residence; that if Loretta verified that she had asked the two of them to go get money for her out of the ATM, then he'd release Rodney with a suspended license charge. The officer did so and Ms. Jones verified this and Rodney was released right there at Loretta Jones' place.

Two points differ in Frances' and Rodney's story. Frances claims Rodney had a gun, a drug container and a needle removed from his person and placed on the hood of the police SUV when he was patted down. She also said that Rodney had borrowed the car from Antonio Harris. In Rodney's statement he said that he's never met Antonio and the only time he'd ever driven it was that day the second time the two of them left Loretta's place to go to the ATM. Otherwise he stated that Frances had been the driver all day as they were hanging out, going to the mall, etc.

Samantha, I would suggest that we ask the prosecutor for the disciplinary files of Ofc. Anthony Armour and Keith Backhaus. I'm concerned about the comment that the officer made about being out to get Frances, about the search, about the lack of what Frances claims she saw being taken off of Rodney's person and the fact that he misspoke at the prelim hearing and the prosecutor on the spot backed up and gave him a second chance to restate things correctly. I don't recall if either prior attorney requested a transcript of that hearing.

Margaret M. DiFrank
Mitigation Specialist/LPI
INFO-TRACTS, LLC
License 1003701

7/23/2015                                   DiMond Law PLLC Mail - Fwd: Salazar, Interview of Rodney McCullough

POB 65778, Tucson, AZ 85728
(Ofc) 520.299.0573
(Cell) 602.920.7221
(Fax) 866.840.1211

EXHIBIT GG

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,               )
                                )
        Plaintiff,              )
                                )
vs.                             )  CR2013-462384-001
                                )  1 CA-CR 16-0914
FRANCES MARIE SALAZAR,          )
                                )
        Defendant.              )
_____ )

BEFORE THE HONORABLE MICHAEL D. GORDON

REPORTER'S TRANSCRIPT OF PROCEEDINGS
(Trial Day 3)

Phoenix, Arizona
August 11, 2016

REPORTED BY:
JENNIFER PANCRATZ, RMR, CRR
Certified Reporter
Certificate No. 50857

PREPARED FOR:
Attorney at Law
(**Copy**)

COP-SALAZAR6182

<u>INDEX OF EXAMINATIONS</u>

                                                                 <u>PAGE</u>
<u>ANTHONY ARMOUR</u>
Further Cross-Examination by Mr. Doran              18
Further Redirect Examination by Ms. Lake           22
Recross-Examination by Mr. Doran                   39
Further Redirect Examination by Ms. Lake           41
Jury Questions                                     42
Follow-up Examination by Mr. Doran                 43
Jury Questions                                     43
Follow-up Examination by Mr. Doran                 44
Jury Questions                                     45
Follow-up Examination by Ms. Lake                  46
Jury Questions                                     47
Follow-up Examination by Ms. Lake                  48
Follow-up Examination by Mr. Doran                 48
Jury Questions                                     48
Follow-up Examination by Ms. Lake                  49
Follow-up Examination by Mr. Doran                 49
Jury Questions                                     53
Follow-up Examination by Mr. Doran                 54
Jury Questions                                     56
Follow-up Examination by Ms. Lake                  57
Jury Questions                                     58
Follow-up Examination by Ms. Lake                  59
Follow-up Examination by Mr. Doran                 60
Jury Questions                                     62
Follow-up Examination by Ms. Lake                  62
Follow-up Examination by Mr. Doran                 63
Jury Questions                                     65
Follow-up Examination by Ms. Lake                  66
Follow-up Examination by Mr. Doran                 66


<u>ANTONIO HARRIS</u>
Direct Examination by Mr. Doran                    84
Cross-Examination by Ms. Lake                      104
Redirect Examination by Mr. Doran                  109
Jury Questions                                     128
Follow-up Examination by Ms. Lake                  128
Follow-up Examination by Mr. Doran                 129
Jury Questions                                     130
Follow-up Examination by Mr. Doran                 130
Jury Questions                                     131
Follow-up Examination by Ms. Lake                  131
Jury Questions                                     132
Follow-up Examination by Mr. Doran                 133

**COP-SALAZAR6184**

1            <u>INDEX OF EXAMINATIONS</u> (Continued)

2      <u>ANTONIO HARRIS (Continued)</u>
       Jury Questions                              134
3      Follow-up Examination by Ms. Lake          134
       Jury Questions                              134
4      Follow-up Examination by Ms. Lake          135
       Jury Questions                              135
5      Follow-up Examination by Mr. Doran         136
       Follow-up Examination by Ms. Lake          137
6      Jury Questions                              138
       Follow-up Examination by Mr. Doran         138
7      Jury Questions                              138
       Follow-up Examination by Ms. Lake          156
8      Jury Questions                              159
       Follow-up Examination by Mr. Doran         159
9      Jury Questions                              160
       Follow-up Examination by Mr. Doran         160
10     Follow-up Examination by Ms. Lake          161
       Jury Questions                              163
11     Follow-up Examination by Mr. Doran         163
       Follow-up Examination by Ms. Lake          165
12     Jury Questions                              166
       Follow-up Examination by Mr. Doran         167
13     Jury Questions                              172
       Follow-up Examination by Mr. Doran         173
14     Follow-up Examination by Ms. Lake          174
       Jury Questions                              174
15     Follow-up Examination by Mr. Doran         175
       Jury Questions                              175
16     Follow-up Examination by Mr. Doran         177
       Follow-up Examination by Ms. Lake          178
17     Jury Questions                              178

18

19

20

21

22

23

24

25

1                         Thank you, sir.

2                         THE WITNESS:  Thank you, sir.

3                         THE COURT:  Any other witnesses for the

4  State?

5                         MS. LAKE:  State rests at this time.

6                         THE COURT:  All right.  So the State having

7  rested, we will continue with proceedings this afternoon

8  at 1:30, potentially do that, in any event.

9                         Let's all rise for the jury.  We'll see you

10  all at 1:30.  Please remember the admonition.  We'll be at

11  recess until then.

12                         I'll ask the parties to remain in our

13  courtroom.

14                         Actually, I'm going to have you come back at

15  1:45.  There are some legal matters I need to discuss with

16  the lawyers.  So you can have an extra 15 minutes at

17  lunch.  I'm sure that you'll be in the air conditioning

18  somewhere, so be careful out there.

19                         (Jury not present.)

20                         THE COURT:  All right.  We're going to take

21  up legal matters at 1:30, which will be, I'm anticipating,

22  a Rule 20.  I don't know whether you actually want to do

23  that or not.  And then we'll move on to the defense case,

24  if you choose to do that.

25                         We'll be at recess until then.  Thank you.

1          THE COURT:  We're on the record.  This is

2   CR2013-462384.  The parties are present.  We're outside

3   the presence of our jury.

4          Can you bring in Mr. Harris and

5   Mr. Peterson?

6          MR. DORAN:  Yes, Your Honor.

7          THE COURT:  Thank you.

8          MR. DORAN:  And the deputy was asking me a

9   question before we went on the record as to approximately

10  when we think we might need Mr. McCullough.

11         THE COURT:  We'll deal -- let's just deal

12  with one thing at a time.

13         MR. DORAN:  Okay.

14         THE COURT:  Multitasking is not good for me.

15         (Mr. Peterson and Mr. Harris present.)

16         THE COURT:  All right.  We're on the record.

17  The record will reflect the presence of the parties.  We

18  now have Mr. Peterson and Mr. Harris.

19         Mr. Harris and Mr. Peterson, can you come up

20  to the podium there?

21         I'm the assigned trial judge in this case.

22  And, Mr. Peterson, you've been appointed to represent this

23  witness; correct?

24         MR. PETERSON:  Yes.

25         THE COURT:  You have advised him of his

 1  to the stand.
 2              THE COURT:  All right.  Would you mind
 3  getting him?
 4              Mr. Harris, our courtroom clerk is up here
 5  and will swear you in.
 6
 7                      ANTONIO HARRIS,
 8  a witness herein, having been first duly sworn, was
 9  examined and testified as follows:
10
11              THE COURT:  Right up here, sir.  Around this
12  way and to the witness chair.
13              Sir, you may proceed when you're ready.
14              MR. DORAN:  Thank you, Your Honor.
15
16                   DIRECT EXAMINATION
17  BY MR. DORAN:
18     Q.   Sir, will you please introduce yourself to the
19  members of the jury.
20     A.   My name is Antonio Rico Harris, and I am a city
21  bus operator.  My job is to transport the public from
22  Point A to Point B safely.  My background is driving.  I
23  drove a fire truck in Los Angeles.
24              I'm a father of six.  My youngest son just
25  graduated from Deer Valley High School, full ride

```
 1  didn't know in each of her proceedings what was going on
 2  until later on in the process.
 3                  THE COURT:  Mr. Doran?
 4
 5                  FOLLOW-UP EXAMINATION
 6  BY MR. DORAN:
 7     Q.   Mr. Harris, I don't want you to tell me the
 8  specifics.  I just want you to let me know if you recall
 9  or not.
10                  But were you arrested in January of 2014?
11     A.   Yes.  I was.
12     Q.   Did you go to jail?
13     A.   Yes, I did.
14     Q.   Did that affect your communication a little bit
15  while you were in jail?
16     A.   Completely.  A hundred percent.
17                  MR. DORAN:  No further questions.
18                  THE COURT:  Ms. Lake?
19                  MS. LAKE:  No questions.
20                  THE COURT:  Did you seek out Frances after
21  your car was impounded?
22                  THE WITNESS:  Yes.  To learn what had
23  happened, why it was impounded, and what the purposes of
24  the car being impounded for, because there shouldn't -- to
25  me, my car shouldn't have been impounded.  So, yes, I did
```

# EXHIBIT HH

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,              )
                               )
     Plaintiff,         )
                               )
vs.                     ) CR2013-462384-001
                               ) 1 CA-CR 16-0914
FRANCES MARIE SALAZAR,    )
                               )
     Defendant.         )
_____)

**BEFORE THE HONORABLE MICHAEL D. GORDON**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**
**(Trial Day 4)**

Phoenix, Arizona
August 15, 2016

**REPORTED BY:**
JENNIFER PANCRATZ, RMR, CRR
Certified Reporter
Certificate No. 50857

**PREPARED FOR:**
Attorney at Law
(**Copy**)

1
<u>INDEX OF EXAMINATIONS</u>

<u>PAGE</u>

2    RODNEY MCCULLOUGH
Direct Examination by Mr. Doran                    8
3    Cross-Examination by Ms. Lake                   24
Redirect Examination by Mr. Doran                30
4    Jury Questions                                  64
Follow-up Examination by Mr. Doran               65
5    Jury Questions                                  65
Follow-up Examination by Mr. Doran               68
6    Follow-up Examination by Ms. Lake              69
Jury Questions                                   70
7    Follow-up Examination by Mr. Doran             70
Jury Questions                                   71
8    Follow-up Examination by Ms. Lake              72
Jury Questions                                   72
9    Follow-up Examination by Mr. Doran             72
Jury Questions                                   72
10   Follow-up Examination by Mr. Doran             73
Jury Questions                                   74
11   Follow-up Examination by Mr. Doran             74
Jury Questions                                   75
12
Final Jury Instructions                          84
13   Closing Argument by Ms. Lake                   99
Closing Argument by Mr. Doran                   106
14   Rebuttal Closing Argument by Ms. Lake          130
Closing Jury Instructions                       136

15

16

17

18

19

20

21

22

23

24

25

COP-SALAZAR6379

 1  ready.

 2              MR. DORAN:  Thank you, Your Honor.

 3

 4                   DIRECT EXAMINATION

 5  BY MR. DORAN:

 6      Q.   Good morning, sir.

 7      A.   Good morning.

 8      Q.   I know I've spoken with you a few times, and

 9  you're a little soft-spoken, so I'm just going to have --

10  make sure you speak up enough so all the members of the

11  jury and the judge can hear you.  Is that all right?

12      A.   Yes.

13      Q.   Okay.  Can you start by telling the members of

14  the jury your name.

15      A.   Rodney Scott McCullough.

16      Q.   And, sir, I see by your attire that it looks like

17  you are in custody right now.  Is that fair?

18      A.   Yes.

19      Q.   All right.  And have you been convicted of a

20  felony before?

21      A.   Yes.

22      Q.   Is that affecting your testimony and ability to

23  tell the truth at all in any way today?

24      A.   No.

25      Q.   Now, the purpose of you being here, I just want

1          THE COURT:  Cross-examination.

2

3                  CROSS-EXAMINATION

4  BY MS. LAKE:

5      Q.    Good morning, Mr. McCullough.

6      A.    Morning.

7      Q.    Would you like me to call you Mr. McCullough or

8  would you like me to call you Rodney?

9      A.    Whichever's easier for you.

10     Q.    Is it okay if I call you Rodney?

11     A.    Yes.

12     Q.    Rodney, we agree that you're a prior -- you have

13 prior felony convictions; right?

14     A.    Right.

15     Q.    And we agree that you're in custody right now;

16 right?

17     A.    Yes.

18     Q.    And we agree that you were in the car on

19 December 31st, 2013 --

20     A.    Yes.

21     Q.    -- with Ms. Salazar; right?

22     A.    Yes.

23     Q.    And we agree that you were in the driver's seat?

24     A.    Yes.

25     Q.    And we agree that from your vantage point, you

Michael K Jeanes, Clerk of Court
*** Electronically Filed ***
K. Curtner, Deputy
3/15/2017 8:17:49 AM
Filing ID 8170960

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | |
| Plaintiff, | ) | |
| v. | ) | 1 CA-CR 16-0914 |
| FRANCES MARIE SALAZAR, | ) | CR2013-462384-001 DT |
| Defendant. | ) | |
| _____ | ) | |

Phoenix, Arizona

April 15, 2016

11:13 a.m.


BEFORE:  THE HONORABLE DANIEL J. KILEY


<u>REPORTER'S TRANSCRIPT OF PROCEEDINGS</u>

EVIDENTIARY HEARING




(Original)




Scott A. Kindle, RPR
Certified Reporter No. 50711


SUPERIOR COURT
Phoenix, Arizona

 1                    THE WITNESS:  Sure.

 2                    THE COURT:  Right up here.

 3                       ANTONIO RICO HARRIS,

 4     called as a witness herein, having been first duly sworn,

 5     was examined and testified as follows:

 6                    THE COURT:  Thank you.  Please be seated.

 7               And, Mr. Peterson, would you like to pull up a

 8     seat next to him or how would -- whatever you'd like to do.

 9                    MR. PETERSON:  I can just sit.  I'll sit in

10     the jury box, Your Honor, close enough that he can see me.

11                    THE COURT:  Thank you.

12               Mr. Doran?

13                    MR. DORAN:  Thank you, Your Honor.

14                       DIRECT EXAMINATION

15     BY MR. DORAN:

16          Q.   Good morning, sir.

17          A.   Good morning.

18          Q.   Will you please state your name for the record.

19          A.   Sure.  Antonio Rico Harris.

20          Q.   Sir, thank you for testifying today.  Can I ask

21     you, you've been advised or you've been appointed a counsel

22     in this case, so I want to start off by asking you why are

23     you choosing to testify anyways?

24          A.   To shed light on truth for the ownership of the

25     vehicle being the owner and, of course, the contents,

                           SUPERIOR COURT
                           Phoenix, Arizona

1      Q.    Your sister in Christ?

2      A.    Yes.

3      Q.    Can you please tell me, explain to me what that

4    means?

5      A.    That means I met her in a situation, a point in my

6    life where I had needed some encouragement, and she was

7    there to provide that for me, and we remained very close

8    friends after that.  We started fellowshiping in church and

9    she invited me to her church and so on, and that's how we

10   met.  That's my relationship.

11     Q.    And when did you meet her?

12     A.    2010.

13     Q.    2010.  And, Mr. McCoullough, it is in fact true

14   that you have numerous prior felony convictions; isn't that

15   right?

16     A.    Mr. Harris.

17     Q.    I'm sorry.  Mr. Harris.  I have Rodney's name

18   written here, so I keep referring to him.  Mr. Harris, you

19   do in fact have numerous prior felony convictions; isn't

20   that right?

21     A.    I do.

22     Q.    And you have counsel here because you are

23   currently facing charges before the Superior Court;

24   correct?

25     A.    Correct.

1      Q.    And when we had spoken last month about your prior

2    felonies, you stated you remembered a few of them, but

3    maybe not all of them; correct?

4      A.    Correct.

5      Q.    Do you remember the one --

6              MR. DORAN:  Objection, Your Honor, relevance.

7    The specifics of these felonies are not relevant to his

8    testimony, and I'd ask that we have a conversation about it

9    at the bench with the judge to have you determine if you

10   need to hear what they are.

11             THE COURT:  All right.  Let's -- can you

12   approach?

13             (Whereupon the following discussion is held

14   at the bench:)

15             THE COURT:  I suppose that certain felonies

16   could be relevant if they go to truthfulness.

17             MR. DORAN:  If they -- yes, absolutely.

18             THE COURT:  So --

19             MS. VAN HELDER:  Yes, Judge.

20             THE COURT:  -- do you have any felonies that

21   go to truthfulness?

22             MS. VAN HELDER:  Judge, I have the organized

23   retail theft in 2015, which I believe goes to truthfulness.

24             MR. DORAN:  I'd argue that it doesn't, Your

25   Honor.

                         SUPERIOR COURT
                         Phoenix, Arizona

1          MS. VAN HELDER:  I also have, as it relates

2     to this defendant, a theft from -- I'm sorry.  Let's see.

3     I had tied the two, organized retail theft and the theft,

4     together.  And a flight from a law enforcement vehicle that

5     I believe occurred.

6          THE COURT:  How would the unlawful flight

7     apply?

8          MS. VAN HELDER:  In my mind, Judge, if you

9     flee from law enforcement, that is a testament to your

10    ability to take accountability and be truthful of your

11    actions.  That's my perspective.

12         MR. DORAN:  I don't know if there's any case

13    law that supports that, Your Honor.

14         THE COURT:  Unless you have any case law on

15    that, I would not -- I would have trouble with that one.

16         But why wouldn't theft relate to honesty?

17         MR. DORAN:  Your Honor, I think that certain

18    thefts can certainly relate to honesty, but we don't know

19    any specifics about this.  I haven't seen any prior

20    conviction sheets from the State.  I think, unless I'm

21    mistaken, this is all just based on an interview of what he

22    remembers about his past.  We don't even know if they're

23    felonies.

24         THE COURT:  Do you have his criminal history?

25         MS. VAN HELDER:  I do, Judge.  And I also

1   have minute entries from his priors.

2                    THE COURT:  Can you show them to Mr. Doran?

3                    MS. VAN HELDER:  Yes.  So these are his

4   priors here.  I'm looking specifically for the minute

5   entry.

6                    MR. DORAN:  And which ones are you referring

7   to?

8                    MS. VAN HELDER:  So I'm referring to the

9   organized retail theft.

10                   MR. DORAN:  Is that the current case he's on

11  trial for?

12                   MS. VAN HELDER:  My understanding is he's on

13  trial for shoplifting, but maybe Mr. Peterson would be the

14  better person to address that.

15                   MR. DORAN:  Okay.

16                   MS. VAN HELDER:  I didn't look it up because

17  I wasn't aware that was the last one.  And this is the

18  unlawful flight.  So this relates to it looks like there's

19  the theft related to him stealing a car.  It was also tied

20  to the unlawful flight.

21                   THE COURT:  I just want to make sure that

22  everything has actually been adjudicated --

23                   MS. VAN HELDER:  It has, Judge, yes.

24                   THE COURT:  -- and it's a felony.

25                   MR. DORAN:  And this is a probable cause

1    statement that we're looking at, Your Honor.  This is not

2    a --

3                MS. VAN HELDER:  Well, I have the full minute

4    entry as well.  It was from 2007, and it has been

5    adjudicated.

6                Also, Judge, when I asked Mr. Harris what were his

7    priors, I wasn't going to allege that he was untruthful

8    certainly because I think he believed me to the best of his

9    knowledge, but certainly what he told me was not consistent

10   with the truth, so --

11               THE COURT:  I think the fact that he -- he

12   can be impeached with the fact that he has prior felony

13   convictions, and I think that if those convictions relate

14   to honesty, and I think that does, that the nature of the

15   conviction be brought out.  I don't think that any -- that

16   the nature of any other felonies is relevant unless it

17   relates to honesty.  But I think that does.  I don't think

18   an unlawful flight does.

19               MS. VAN HELDER:  Judge, so if I'm

20   understanding the Court correctly, you believe that the

21   fact that felonies exists are appropriate to bring out --

22               THE COURT:  Right.

23               MS. VAN HELDER:  -- but not what they are

24   for?

25               THE COURT:  Unless they're for honesty,

SUPERIOR COURT
Phoenix, Arizona

1    unless they're for theft.

2                    MS. VAN HELDER:  Unless for theft?

3                    THE COURT:  Correct.

4                    MS. VAN HELDER:  Okay.

5                    MR. DORAN:  And may I see the two that we're

6    talking about?

7                    MS. VAN HELDER:  Yes.

8                    THE COURT:  I'll give you a chance to go back

9    to your desk and look at it, but I just want to make sure

10   Mr. Doran has a chance to look at your file to -- or look

11   at those documents you're referring to to make sure that --

12                   MS. VAN HELDER:  Sure.

13                   THE COURT:  -- they're actually adjudicated

14   priors.

15                   MS. VAN HELDER:  And my apologies.  I was not

16   aware that he did not have this information on his witness,

17   so I can certainly share what I have and he can review

18   that.  Okay.

19                   MR. DORAN:  And, Your Honor, just the last

20   thing for the record, I guess that my position would be

21   when I was mentioning that not all thefts are related to

22   honesty and truthfulness, I certainly think certain thefts

23   like theft by deception or some form of deception to obtain

24   that are, but not all thefts, like taking gum from a store

25   or something, necessarily would come in.  And I understand

1  that's not what we're dealing with, but just an example.

2                   (Proceedings in open court:)

3                   (Counsel confer.)

4                   MR. DORAN:  Judge, can we approach?

5                   (Whereupon the following discussion is held

6  at the bench:)

7                   MR. DORAN:  It appears that Ms. VanHelder was

8  looking at Rodney McCullough again and not Antonio Harris.

9                   MS. VAN HELDER:  My apologies, Judge.

10  Mr. Harris does in fact have four priors, not the eight,

11  but of the four, the unlawful flight, and there is an

12  unlawful flight and a theft.  However, the theft is older.

13                   MR. DORAN:  1992.

14                   MS. VAN HELDER:  Right.  So the unlawful

15  flight from 2008 was the one that I was referring to.

16                   THE COURT:  Then just get into the fact of

17  convictions, but not the nature of the offenses.

18                   MS. VAN HELDER:  Okay.  I understand.  Thank

19  you.

20                   (Proceedings in open court:)

21                   THE COURT:  Ms. VanHelder?

22                   MS. VAN HELDER:  Yes.  Thank you, Judge.

23      Q.   (BY MS. VAN HELDER)  My apologies, Mr. Harris.

24  Okay.  So you do in fact have prior felony convictions; is

25  that correct?

```
 1        A.   Correct, yes.

 2        Q.   And do you within the last ten years recall how

 3   many you have?

 4        A.   No, I don't.

 5        Q.   Would it be safe to say that it's more than one?

 6        A.   Oh, definitely, yes.

 7        Q.   I'm sorry?

 8        A.   Yes.

 9             MS. VAN HELDER:  Yes.  Okay.

10        Judge, no further questions for this witness.

11             THE COURT:  Thank you.

12        Mr. Doran?

13                     REDIRECT EXAMINATION

14   BY MR. DORAN:

15        Q.   Mr. Harris, does the fact that you have prior

16   felony convictions affect your ability to tell the Court

17   the truth about what happened in today's case?

18        A.   No, not at all.  Why would that be?

19        Q.   Why are you testifying today?

20        A.   Because it's the truth, and it needs to be told,

21   because the car is mine, and I need to tell that.

22        Q.   And the fact that you have a close relationship

23   with Frances Salazar, that she's your sister in Christ --

24        A.   Has nothing to do with it.

25        Q.   -- as you mentioned, is that why you're
```

# EXHIBIT II

Michael K Jeanes, Clerk of Court
*** Electronically Filed ***
K. Curtner, Deputy
3/15/2017 8:17:49 AM
Filing ID 8170960

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | |
| Plaintiff, | ) | |
| v. | ) | 1 CA-CR 16-0914 |
| FRANCES MARIE SALAZAR, | ) | CR2013-462384-001 DT |
| Defendant. | ) | |
| _____ | ) | |

Phoenix, Arizona

April 15, 2016

11:13 a.m.

BEFORE:  THE HONORABLE DANIEL J. KILEY

REPORTER'S TRANSCRIPT OF PROCEEDINGS

EVIDENTIARY HEARING

(Original)

Scott A. Kindle, RPR
Certified Reporter No. 50711

SUPERIOR COURT
Phoenix, Arizona

1               THE WITNESS:  Sure.

2               THE COURT:  Right up here.

3                    ANTONIO RICO HARRIS,

4    called as a witness herein, having been first duly sworn,

5    was examined and testified as follows:

6               THE COURT:  Thank you.  Please be seated.

7           And, Mr. Peterson, would you like to pull up a

8    seat next to him or how would -- whatever you'd like to do.

9               MR. PETERSON:  I can just sit.  I'll sit in

10   the jury box, Your Honor, close enough that he can see me.

11              THE COURT:  Thank you.

12          Mr. Doran?

13              MR. DORAN:  Thank you, Your Honor.

14                   DIRECT EXAMINATION

15   BY MR. DORAN:

16      Q.   Good morning, sir.

17      A.   Good morning.

18      Q.   Will you please state your name for the record.

19      A.   Sure.  Antonio Rico Harris.

20      Q.   Sir, thank you for testifying today.  Can I ask

21   you, you've been advised or you've been appointed a counsel

22   in this case, so I want to start off by asking you why are

23   you choosing to testify anyways?

24      A.   To shed light on truth for the ownership of the

25   vehicle being the owner and, of course, the contents,

```
 1      Q.    Your sister in Christ?

 2      A.    Yes.

 3      Q.    Can you please tell me, explain to me what that

 4   means?

 5      A.    That means I met her in a situation, a point in my

 6   life where I had needed some encouragement, and she was

 7   there to provide that for me, and we remained very close

 8   friends after that.  We started fellowshiping in church and

 9   she invited me to her church and so on, and that's how we

10   met.  That's my relationship.

11      Q.    And when did you meet her?

12      A.    2010.

13      Q.    2010.  And, Mr. McCoullough, it is in fact true

14   that you have numerous prior felony convictions; isn't that

15   right?

16      A.    Mr. Harris.

17      Q.    I'm sorry.  Mr. Harris.  I have Rodney's name

18   written here, so I keep referring to him.  Mr. Harris, you

19   do in fact have numerous prior felony convictions; isn't

20   that right?

21      A.    I do.

22      Q.    And you have counsel here because you are

23   currently facing charges before the Superior Court;

24   correct?

25      A.    Correct.
```

1      Q.   And when we had spoken last month about your prior

2   felonies, you stated you remembered a few of them, but

3   maybe not all of them; correct?

4      A.   Correct.

5      Q.   Do you remember the one --

6            MR. DORAN:  Objection, Your Honor, relevance.

7   The specifics of these felonies are not relevant to his

8   testimony, and I'd ask that we have a conversation about it

9   at the bench with the judge to have you determine if you

10  need to hear what they are.

11           THE COURT:  All right.  Let's -- can you

12  approach?

13           (Whereupon the following discussion is held

14  at the bench:)

15           THE COURT:  I suppose that certain felonies

16  could be relevant if they go to truthfulness.

17           MR. DORAN:  If they -- yes, absolutely.

18           THE COURT:  So --

19           MS. VAN HELDER:  Yes, Judge.

20           THE COURT:  -- do you have any felonies that

21  go to truthfulness?

22           MS. VAN HELDER:  Judge, I have the organized

23  retail theft in 2015, which I believe goes to truthfulness.

24           MR. DORAN:  I'd argue that it doesn't, Your

25  Honor.

SUPERIOR COURT
Phoenix, Arizona

1          MS. VAN HELDER:  I also have, as it relates

2    to this defendant, a theft from -- I'm sorry.  Let's see.

3    I had tied the two, organized retail theft and the theft,

4    together.  And a flight from a law enforcement vehicle that

5    I believe occurred.

6          THE COURT:  How would the unlawful flight

7    apply?

8          MS. VAN HELDER:  In my mind, Judge, if you

9    flee from law enforcement, that is a testament to your

10   ability to take accountability and be truthful of your

11   actions.  That's my perspective.

12         MR. DORAN:  I don't know if there's any case

13   law that supports that, Your Honor.

14         THE COURT:  Unless you have any case law on

15   that, I would not -- I would have trouble with that one.

16         But why wouldn't theft relate to honesty?

17         MR. DORAN:  Your Honor, I think that certain

18   thefts can certainly relate to honesty, but we don't know

19   any specifics about this.  I haven't seen any prior

20   conviction sheets from the State.  I think, unless I'm

21   mistaken, this is all just based on an interview of what he

22   remembers about his past.  We don't even know if they're

23   felonies.

24         THE COURT:  Do you have his criminal history?

25         MS. VAN HELDER:  I do, Judge.  And I also

SUPERIOR COURT
Phoenix, Arizona

1    have minute entries from his priors.

2                    THE COURT:  Can you show them to Mr. Doran?

3                    MS. VAN HELDER:  Yes.  So these are his

4    priors here.  I'm looking specifically for the minute

5    entry.

6                    MR. DORAN:  And which ones are you referring

7    to?

8                    MS. VAN HELDER:  So I'm referring to the

9    organized retail theft.

10                   MR. DORAN:  Is that the current case he's on

11   trial for?

12                   MS. VAN HELDER:  My understanding is he's on

13   trial for shoplifting, but maybe Mr. Peterson would be the

14   better person to address that.

15                   MR. DORAN:  Okay.

16                   MS. VAN HELDER:  I didn't look it up because

17   I wasn't aware that was the last one.  And this is the

18   unlawful flight.  So this relates to it looks like there's

19   the theft related to him stealing a car.  It was also tied

20   to the unlawful flight.

21                   THE COURT:  I just want to make sure that

22   everything has actually been adjudicated --

23                   MS. VAN HELDER:  It has, Judge, yes.

24                   THE COURT:  -- and it's a felony.

25                   MR. DORAN:  And this is a probable cause

1   statement that we're looking at, Your Honor.  This is not

2   a --

3               MS. VAN HELDER:  Well, I have the full minute

4   entry as well.  It was from 2007, and it has been

5   adjudicated.

6          Also, Judge, when I asked Mr. Harris what were his

7   priors, I wasn't going to allege that he was untruthful

8   certainly because I think he believed me to the best of his

9   knowledge, but certainly what he told me was not consistent

10  with the truth, so --

11              THE COURT:  I think the fact that he -- he

12  can be impeached with the fact that he has prior felony

13  convictions, and I think that if those convictions relate

14  to honesty, and I think that does, that the nature of the

15  conviction be brought out.  I don't think that any -- that

16  the nature of any other felonies is relevant unless it

17  relates to honesty.  But I think that does.  I don't think

18  an unlawful flight does.

19              MS. VAN HELDER:  Judge, so if I'm

20  understanding the Court correctly, you believe that the

21  fact that felonies exists are appropriate to bring out --

22              THE COURT:  Right.

23              MS. VAN HELDER:  -- but not what they are

24  for?

25              THE COURT:  Unless they're for honesty,

SUPERIOR COURT
Phoenix, Arizona

 1  unless they're for theft.

 2                MS. VAN HELDER:  Unless for theft?

 3                THE COURT:  Correct.

 4                MS. VAN HELDER:  Okay.

 5                MR. DORAN:  And may I see the two that we're

 6  talking about?

 7                MS. VAN HELDER:  Yes.

 8                THE COURT:  I'll give you a chance to go back

 9  to your desk and look at it, but I just want to make sure

10  Mr. Doran has a chance to look at your file to -- or look

11  at those documents you're referring to to make sure that --

12                MS. VAN HELDER:  Sure.

13                THE COURT:  -- they're actually adjudicated

14  priors.

15                MS. VAN HELDER:  And my apologies.  I was not

16  aware that he did not have this information on his witness,

17  so I can certainly share what I have and he can review

18  that.  Okay.

19                MR. DORAN:  And, Your Honor, just the last

20  thing for the record, I guess that my position would be

21  when I was mentioning that not all thefts are related to

22  honesty and truthfulness, I certainly think certain thefts

23  like theft by deception or some form of deception to obtain

24  that are, but not all thefts, like taking gum from a store

25  or something, necessarily would come in.  And I understand

1  that's not what we're dealing with, but just an example.

2           (Proceedings in open court:)

3           (Counsel confer.)

4           MR. DORAN:  Judge, can we approach?

5           (Whereupon the following discussion is held

6  at the bench:)

7           MR. DORAN:  It appears that Ms. VanHelder was

8  looking at Rodney McCullough again and not Antonio Harris.

9           MS. VAN HELDER:  My apologies, Judge.

10  Mr. Harris does in fact have four priors, not the eight,

11  but of the four, the unlawful flight, and there is an

12  unlawful flight and a theft.  However, the theft is older.

13           MR. DORAN:  1992.

14           MS. VAN HELDER:  Right.  So the unlawful

15  flight from 2008 was the one that I was referring to.

16           THE COURT:  Then just get into the fact of

17  convictions, but not the nature of the offenses.

18           MS. VAN HELDER:  Okay.  I understand.  Thank

19  you.

20           (Proceedings in open court:)

21           THE COURT:  Ms. VanHelder?

22           MS. VAN HELDER:  Yes.  Thank you, Judge.

23     Q.   (BY MS. VAN HELDER)  My apologies, Mr. Harris.

24  Okay.  So you do in fact have prior felony convictions; is

25  that correct?

SUPERIOR COURT
Phoenix, Arizona

1      A.   Correct, yes.

2      Q.   And do you within the last ten years recall how

3   many you have?

4      A.   No, I don't.

5      Q.   Would it be safe to say that it's more than one?

6      A.   Oh, definitely, yes.

7      Q.   I'm sorry?

8      A.   Yes.

9           MS. VAN HELDER:  Yes.  Okay.

10          Judge, no further questions for this witness.

11          THE COURT:  Thank you.

12          Mr. Doran?

13                    REDIRECT EXAMINATION

14   BY MR. DORAN:

15     Q.   Mr. Harris, does the fact that you have prior

16   felony convictions affect your ability to tell the Court

17   the truth about what happened in today's case?

18     A.   No, not at all.  Why would that be?

19     Q.   Why are you testifying today?

20     A.   Because it's the truth, and it needs to be told,

21   because the car is mine, and I need to tell that.

22     Q.   And the fact that you have a close relationship

23   with Frances Salazar, that she's your sister in Christ --

24     A.   Has nothing to do with it.

25     Q.   -- as you mentioned, is that why you're

                        SUPERIOR COURT
                        Phoenix, Arizona

# EXHIBIT JJ

## DECLARATION OF KENNETH R. WALLENTINE

STATE OF UTAH       )
                            ) ss.
County of Salt Lake     )

I, Kenneth R. Wallentine, say and attest the following:

1.  I am the Chief of Police of the West Jordan, Utah Police Department and am also an expert in the area of police practices and procedures.

2.  My qualifications are described in detail in my Curriculum Vitae, which is attached hereto as Exhibit 1.

3.  I was retained as an expert witness by Berke Law Firm PLLC in the case of Salazar v. City of Phoenix, et al., Arizona Federal District Court No. 2:19-cv-01188-PHX-SRB (ESW).

4.  I was asked to provide my expert opinions regarding, among other things, the communication by the Phoenix Police Department of potential Brady material related to Officer Anthony Armour to the Maricopa County Attorney's Office and whether that communication was reasonable and consistent with generally accepted police policies and practices in place in 2016.

5.  I was also asked to provide expert opinions regarding whether Officer Anthony Armour had an obligation to inform the Maricopa County Attorney's Office of a pending Professional Standards Bureau investigation or of the outcome of that investigation.

1

6.      After reviewing the relevant records provided to me, I prepared a report pursuant to Fed. R. Civ. P. 26(a)(2) that contains a complete statement of my expert opinions as of that date and the basis and reasons for those opinions.

7.      Attached hereto as Exhibit 2 is a true and correct copy of the report I prepared in this case, dated November 19, 2021.

8.      I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on this _3ʳᵈ_ day of February, 2022.

_____
Kenneth R. Wallentine

EXHIBIT 1

## Ken Wallentine

3330 West Signal Peak Drive, #RP318
Taylorsville, Utah 84129
krwallentine@gmail.com

*Curriculum vita summary*

- Chief of police since 2005
- Investigations Bureau Chief 2002-2005
- Law enforcement officer since 1982
- President, Utah Chiefs of Police Association
- Chair of Salt Lake County Officer-Involved Critical Incident Investigations Teams
- Member, Utah Commission on Criminal & Juvenile Justice
- Board of Advisors, Association of Force Investigations
- Licensed attorney since 1990
- Author of American Bar Association criminal procedure guidebook
- AELE Certified Litigation Professional
- Advanced Force Science Specialist®
- Certifications include: POST Firearms Instructor, TASER® Instructor, Excited Delirium and Sudden Death Investigation Instructor, LAPD Force Investigation Division Officer-Involved Shooting Investigation

Disclosure information for Fed. R. Civ. P. 26
November 1, 2021

*Employment*

I am the Chief of the West Jordan (Utah) Police Department, where I oversee all police operations and investigations.  I became certified as a law enforcement officer and as a corrections officer in the State of Utah in 1982.  I was formerly employed with the Utah Attorney General, where I served as the Chief of Law Enforcement.

After a period in private legal and consulting practice, I was a Supervisory Special Agent with the Utah Attorney General Investigation Division, where I developed a statewide use of force training initiative and coordinated officer-involved shooting investigations and other special investigations.  I also serve in a consultation role as Senior Legal Advisor for Lexipol, the nation's leading provider of law enforcement risk and policy management resources.

I formerly served as a Bureau Chief at the Utah Department of Public Safety, Peace Officer Standards and Training Division, where I supervised investigations into allegations of improper and excessive force, officer integrity, and criminal acts alleged to have been committed by law enforcement officers and supervised in-service training administration and certification for all peace officers in the State of Utah.  I also supervised the police service dog training and certification program for the State of Utah.  I had responsibility for policy drafting and review for the parent agency, the Utah Department of Public Safety.

My duties included direct supervision and command of various investigative units and agents throughout the State of Utah, supervising law enforcement officers, forensic specialists, and technicians.  I commanded the State of Utah Child Abduction Response Team.  I commanded the State of Utah Officer-Involved Fatality Investigation Team.  I was a member of the Board of Review of the Utah Technical Assistance Program, consulting in cold case homicide and complex violent person crimes investigations.  In 2010, Governor Herbert selected me for the

COP-SALAZAR6544

Governor's Leadership in Public Service award for my work in public safety leadership.

*Law enforcement teaching experience and certifications*

I was formerly responsible for providing delivery of the Basic Training Curriculum related to all legal subjects, as well as certain tactical subjects, at the Utah Law Enforcement Academy. I continue to teach at the Utah Law Enforcement Academy. I am the author of the police academy curriculum currently in use for several subjects, including, but not limited to, use of force, reasonable force, use of force and police service dog teams, search and seizure, search and seizure for police service dog teams, and use of force/firearms instructor liability.

I am a certified POST Firearms Instructor, and have served as the lead instructor for POST Firearms courses. I am certified by the Force Science Research Center as a Force Science Analyst® and an Advanced Force Science Specialist®. I am a former certified TASER® Instructor. I am a certified Excited Delirium and Sudden Death Investigation Instructor. I was certified by the Los Angeles Police Department in Officer-Involved Shooting Investigation. In 2011, I was certified by the Institute for the Prevention of Sudden In-Custody Death as an instructor in restraint systems. I am a Certified Litigation Professional, certified by the Americans for Effective Law Enforcement.

*Legal practice*

I am a licensed attorney, having continuously licensed to practice law since 1990. I am admitted to practice before the United States Supreme Court, the Courts of Appeals for the Fifth and Tenth Circuits, and the State and Federal courts in the State of Utah. I am a former Chief Deputy County Attorney and a former Utah Attorney General designated prosecutor. I am a Master of the Bench of the American Inns of Court, Inn One, where I also served as the past-President of the Inn of Court. I serve as an Administrative Law Judge for the State of Utah and for various counties and cities in Utah, providing hearing officer and appellate hearing services for hearings involving allegations of police officer misconduct for a variety of state agencies and municipalities. I was formerly on the faculty of Excelsior College, teaching Criminal Procedure, Evidence and Management Strategies for Public Safety.

I served two terms as Commission Chairman of the Salt Lake County Peace Officer Merit Service Commission, appointed by the Salt Lake County Mayor and the Mayors of the various municipalities that comprise the Unified Police Department of Greater Salt Lake County. In that capacity, I directed the commission that oversees the hiring, promotion, discipline and termination of all sworn officers of the Salt Lake County Sheriffs Office, Salt Lake County Protective Services Office and the Unified Police Department.

I was the longest serving member of the Utah Board of Mandatory Continuing Legal Education, an independent committee serving on behalf of the Utah Supreme Court. I was first appointed in 1996 and was reappointed by the Chief Justice to serve through 2016.

*Consultation practice*

In addition to my primary employment, I occasionally consult and provide expert witness opinions on police procedures, and use of force issues. I occasionally perform in-custody death investigations and officer-involved shooting death investigations for agencies which may lack the requisite expertise. I am a consultant to the Utah Risk Management Mutual Association, the state's largest insurer of public safety agencies, on matters of officer conduct and discipline, hiring and screening practices, use of force, and police pursuit policies.

I am the co-founder of a best practices advisory group that developed comprehensive model

policies and best practices under the authority of the Utah Chiefs of Police Association, the Utah Sheriffs Association and various state law enforcement agencies. These policies serve as a model for all Utah public safety agencies. I am the author of a number of model policies for law enforcement agencies, and have provided policy drafting and policy review services for several agencies, including policy drafting responsibility for large law enforcement agencies. I have served as a contract consultant to the United States Department of Justice, assigned to provide technical assistance and management consulting to various public safety entities in the United States.

*Professional activities and organizations*

I participate and serve in a number of community and professional capacities. I am the President of the Utah Chiefs of Police Association. I represent the Utah Chiefs of Police Association on the League of Cities and Towns Listen, Love, Learn Task Force, creating strategies for police reform and relations with communities of color. I am a founding member of First Steps to More Trust, an initiative to join young persons in the BIPOC community with young public safety professionals in leadership training and community engagement.

I am the Chair of the Governing Board of the Officer-Involved Critical Incident Investigations Teams in Salt Lake County, Utah, and have direct command of Officer-Involved Critical Incident Investigations Team IV. I am the Chair of the Salt Lake County Law Enforcement Administrators and Directors Association. I serve on the Salt Lake County Criminal Justice Advisory Council. I currently serve on the Use of Force Standards and the K9 Standards Committees of the Utah Peace Officer Training and Standards Division, statutorily charged with articulating the standards for use of force by police officers and deployment of police service dogs. I am a member of the Statewide Information and Analysis Center Governance Board. I also serve as a member of the Utah Communications Authority Public Safety Advisory Board.

Other professional activities include serving as a member of the Utah Commission on Criminal & Juvenile Justice and a member of the Utah Behavioral Health Master Plan Executive Committee. I serve on the Board of Directors of the Institute for the Prevention of Sudden In-Custody Death. I am also a member of the Board of Advisors, Association of Force Investigations, former member of the Board of Directors of Crisis Intervention Team Utah, Past-President of the Utah Peace Officers Association, former Board Member of the Utah SWAT Association, member of the International Association of Law Enforcement Educators and Trainers Association, member of the International Association of Chiefs of Police and the Utah Chiefs of Police Association, member of the National Tactical Officers Association, member of the International Association of Law Enforcement Firearms Instructors, member of the International Association of Directors of Law Enforcement Standards and Training, member of the International Law Enforcement Educators and Trainers Association, member of the K9 Section of the Utah Peace Officers Association, member of the United States Police Canine Association, Life Member and past member of the board of directors of the NAACP, Salt Lake City branch, and board member and co-Chairman of the Utah Law Enforcement Legislative Committee.

I served as a gubernatorial appointee to the Council on Peace Officer Standards and Training. I am a former member of the Scientific Working Group on Dog and Orthogonal Detector Guidelines, a national scientific best practices organization sponsored by the Federal Bureau of Investigation, the Department of Homeland Security, and the Transportation Security Administration, with support coordinated by the International Forensic Research Institute at Florida International University. I have been a presenter at a variety of professional conferences and seminars, including presenting on use of force training at the annual convention of the International Association of Chiefs of Police and the International Conference of the Institute for the Prevention of Sudden In-Custody Death.

*Publication history*

I have previously published a number of other professional articles, many of which have been subjected to peer review.  My most recent book, *Preparing for an Active Shooter Threat*, was published in June 2020 by Blue360 Media.  Another book, *Street Legal: A Guide to Pre-trial Criminal Procedure for Police, Prosecutors, and Defenders*, 2nd edition, was published in 2020 by the American Bar Association Publishing Division.  It is a treatise on public safety and criminal procedure.  *The K9 Officer's Legal Handbook*, 3rd ed., was published in February 2019.

My other published works include:  *Mitigating Suicide Threat Response Risks*, Police Chief, V. 86, No. 3 (2019);  *Avoiding a Peer Support Pitfall*, Police Chief, V. 85, No. 3 (2018); *Avoiding a Peer Support Pitfall*, Police Chief, V. 85, No. 3 (2018); *Should I Stay or Should I Go?*, POLICE, October 2017, *Hill v. Miracle: Adapting the Graham Standard to Non-Criminal Interventions*, Police Chief (August 2017): 18–19; *Armstrong v. Village of Pinehurst: Training and Policy Implications for Police*, Police Chief, V. 83, No. 6 (2016); *Supreme Court Decision Casts Doubt on Hotel Registry Ordinances*, Police Chief, V. 81, No. 10 (2015); *Body Worn Cameras: Plan Before Your Office Buys In*, The Sheriff (June 2015); *Legal Risks of Failing to Care for Children of Arrested Persons*, Police Chief, V. 81, No. 10 (2014); *A Rational Foundation for Use of Force Policy, Training and Assessment*, 2014 (2) AELE Mo. L. J. 101; *Post Incident Video Review*, Police Chief, V. 68, No. 12 (2011);  *Cell Site Location Evidence: A New Frontier in Cyber Investigation*, 2 A.E.L.E. Mo. L.J. 401 (2011).

*Litigation history*

I have testified and/or provided depositions in the following cases (limited to the past four years):

*Brown v. City of Phoenix*,  No. 2:20 cv 02087 DLR JZB, United States District Court for the District of Arizona, 2021.  Trial testimony given on behalf of defendants.  Subject matter: police use of force.

*Coleman v. City of Tempe*,  No. 2:17-cv-02570 PHX DLR, United States District Court for the District of Arizona, 2021.  Trial testimony given on behalf of defendants.  Subject matter: police use of force.

*Khalaj v. City of Phoenix, et al.*, CV-17-01199-PHX-GMS, United States District Court for the District of Arizona, 2021.  Deposition testimony given on behalf of defendants.  Subject matter: police use of force.

*Bueno v. Howard, et al.*, No. 2:16-cv-03450-DGC-JZB, United States District Court for the District of Arizona, 2021.  Trial testimony given on behalf of defendants.  Subject matter: police use of force.

*Lane v. City of Mesa*, No. 2:19-cv-00852-DJH, United States District Court for the District of Arizona, 2021.  Deposition testimony given on behalf of defendant.  Subject matter: wrongful death.

*Mitchell v. City of Cedar Rapids*, No. LACV087209, Iowa District Court for Linn County, 2021.  Deposition testimony given on behalf of defendant.  Subject matter: wrongful death.

*Johnson v. City of Mesa*, No. 2:19-CV-02827-JAT-JZB, United States District Court for the District of Arizona, 2020.  Deposition testimony given on behalf of defendant.  Subject matter: police use of force.

*Ortega v. United States of America*, No. CV-19-08110-PCT-JAT, United States District Court for the District of Arizona, 2020.  Deposition testimony given on behalf of defendant.  Subject matter: police custody.

*Peralta v. Arizona Department of Public Safety*, No. CV-17-01868-DJH-BSB,  United States District Court for the District of Arizona, 2020.  Trial testimony given on behalf of defendant. Subject matter: police custody.

*Krakana & Zinn v. City of Scottsdale*, No. CV-17-01813-PHX-JJT,United States District Court for the District of Arizona, 2020.  Trial testimony given on behalf of defendant.  Subject matter: police tactical operation.

*A.C. v. County of Santa Barbara*, No. 2:18-CV-3694 SK, United States District Court for the Central District of California, 2019.  Deposition testimony given on behalf of defendant.  Subject matter: police use of force.

*Smith v. City of Waterloo*, Case No. LACV133172, District Court for Black Hawk County, Iowa, 2019.  Trial testimony given on behalf of defendants.  Subject matter: emergency vehicle operation.

*Mould v. City of Tempe*, No. CV2016-018161, United States District Court for the District of Arizona, 2019.  Trial and deposition testimony given on behalf of defendant.  Subject matter: wrongful death.

*Castro v. State of Arizona*, Case No. 2:18-cv-00753-SRB, United States District Court for the District of Arizona, 2019.  Deposition testimony given on behalf of defendants.  Subject matter: police use of force.

*Lawrence v. Las Vegas Metro Police Department*, No. 2:16-cv-03039-JCM-NJK, United States District Court for the District of Nevada, 2019.  Deposition testimony given on behalf of defendants.  Subject matter: wrongful death.

*Webb v. City of Waterloo*, No. 6:17-cv-2001-CJW-MAR, United States District Court for the Northern District of Iowa.  Deposition testimony given on behalf of defendants.  Subject matter: police use of force.

*Charboneneau v. Demings*, No. 2017-CA-010862-O, Ninth Judicial District Court, Orange County, Florida, 2019.  Hearing testimony given on behalf of defendants.  Subject matter: use of force.

*Carsons v. Black Bear Reserve Homeowners Association, Inc., et al.*, No. 35-2015-CA-001910, Fifth Judicial District Court, Lake County, Florida, 2018.  Deposition testimony given on behalf of defendants.  Subject matter: investigative procedures.

*McSwain v. United States*, No. 2:15-cv-01321, United States District Court for the District of Nevada, 2018.  Deposition testimony given on behalf of defendant.  Subject matter: negligence.

*Rodriguez v. City of West Covina*, No. 2:17-CV-0138 CBM, United States District Court for the Central District of California, 2018.  Deposition testimony given on behalf of defendant.  Subject matter: police force and canines.

*Mims v. City of Charlotte*, No. 2014-CVS-23815, Superior Court of North Carolina, 2018.  Trial and deposition testimony given on behalf of the defendants.  Subject matter: wrongful death.

*Chastang v. Levy*, No. 6:17-cv-00538-Orl-37DC, United States District Court for the Middle District of Florida, 2018.  Deposition testimony given on behalf of defendant.  Subject matter: police use of force.

*Consultation and Expert Witness fees, effective November 1, 2020 through November 1, 2021*

For matters which progress beyond an initial brief consultation, I charge $275.00 per hour for examination of reports and documents, site visits, interviews, administrative tribunal, deposition or court testimony, with a minimum fee of $1,100.00 for deposition or court testimony.  I bill for actual travel expenses and a travel fee of $1,100.00 per day/part-day for travel to western states and $1,750.00 per day/part-day outside western states.  Unless airline tickets are pre-paid by the client, I travel only with tickets purchased as fully refundable fares.

COP-SALAZAR6549

# EXHIBIT 2

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF ARIZONA

| | | |
|---|---|---|
| | : | |
| Frances Salazar, | : | No. CV-19-01188-PHX-SRB (ESW) |
| Plaintiff, | : | |
| vs. | : | |
| City of Phoenix, *et al*., | : | Report of Kenneth R. Wallentine |
| Defendants. | : | |

The following report of Kenneth R. Wallentine is submitted after reviewing the following documents, pleadings, records, and reports:

Plaintiff's 2nd Amended Complaint

Protective Order

Answer of Defendant City of Phoenix, Jeri Williams, Joseph Yahner, & Anthony Armour to 2nd Amended Complaint

Defendant Lake's Answer to 2nd Amended Complaint

Defendant City of Phoenix's Supplemental Response to Plaintiff's First Set of Requests for Admission to Defendant City of Phoenix

Plaintiff's Rule 26(a) Initial Disclosure Statement including the following attachments:

- Professional Standards Bureau Report re: Officer Amour

- Police Report

- State's Notice of Disclosure and Request for Disclosure

- Defendant's Rule 15.1 (a), (b), (c), (d), (e) Request for Disclosure

- Motion to Continue Trial Date Beyond Last Day

**COP-SALAZAR6550**

- Defendant's Rule 15.2 Disclosure Notice
- State's Supplemental Motion to Disclose New Evidence Pursuant to Rule 15 and/or ER 3.8
- Notice of Post-Conviction Relief
- Petition for Post-Conviction Relief
- Response to Petition for Post-Conviction Relief
- State's Motion to Dismiss
- Minute Entry re: PCR Granted/Judgment Vacated

Plaintiff's 5th Supplemental MIDP Responses, including the following attachments:

- Phoenix Police Department Operations Order 1.1 – Purchase Statement/Guiding Values
- Phoenix Police Department Operations Order 1.2 – Limits of Authority
- Phoenix Police Department Operations Order 3.19 – Misconduct Investigations

Defendants' City of Phoenix, Jeri Williams, Joseph Yahner, and Anthony Armour Mandatory Initial Discovery Responses, including the following attachments:

- Phoenix Police DR 2013-02308942
- Letter from Keith Manning, Maricopa County Attorney's Office, to Chief Jeri Williams, dated January 26, 2017
- Letter from Keith Manning, Maricopa County Attorney's Office, to Anthony Armour, dated January 26, 2017
- *Brady* Review Process Flow Chart
- Phoenix Police Department Operations Order 2.9 (Court Appearances)
- Professional Standards Bureau Manual
- First Page of letter to former Chief Daniel Garcia from City Prosecutor Aarón J. Carreón Aínsa, dated August 18, 2014
- E-mail from Commander John Collins to PSB Lieutenants, dated August 11, 2016

- Routing entries from Professional Standards Bureau for PSB Investigation 15-0126

- Discipline Notice for Anthony Armour dated November 30, 2016

- Professional Standards Bureau File No. PSB15-0126

Defendants' City of Phoenix, Jeri Williams, Joseph Yahner, and Anthony Armour 1st Supplemental Mandatory Discovery Responses, including the Professional Standards Bureau File No. INQ16-0811, produced in the folder marked "COP-SALAZAR0193" that contains the following documents:

- E-mail to PPD Complaints/Commendations Web Site from Christopher Doran with attachments

- Administrative Inquiry IA No. INQ16-081

- Officer Anthony Armour's Trial Testimony on August 10, 2016

- Officer Anthony Armour's Trial Testimony on August 11, 2016

- Audio file of conversation between Sergeant Warren Brewer and Christopher Doran on 11-28-16

- Christopher Doran email to Complaints Commendations PPD November 23, 2016

- Letter from Jessica Garner, Paralegal for Christopher Doran, to Sgt. Warren Brewer

- Letter from Commander John Collins to Christopher Doran dated December 20, 2016

City Defendants' Answers to Plaintiff's 1st Set of Non-Uniform Interrogatories

City Defendants' Responses to Plaintiff's 2nd Set of Requests for Production with the following attachments:

- Cover letters addressed to Maricopa County Attorney's Office and City of Phoenix Prosecutor's Office regarding potential inclusion in Law Enforcement Rule 15 Disclosure Database, dated between January 2010 and the present

City Defendants' Responses to Plaintiff's 1st Request for Admission

City Defendants' Answers to Plaintiff's 2nd Set of Non-Uniform Interrogatories

Expert Report and Opinion of Melissa Kovacs, Ph.D.

Subpoena response from Melissa Kovacs, Ph.D.

Report of Daniel Brown

Subpoena response from Daniel Brown

Interview of Sandra Hunter, City of Phoenix Law Department

Transcript from the depositions of Elizabeth Lake, Christopher Doran, Anthony Armour, John Collins, Rodney McCullough, Antonio Harris, Jeri Williams, Samantha DuMond, Margaret DeFrank, Jennifer Myers, Erlinda Parrish, and Frances Salazar, together with the exhibits thereto

Documents from the action entitled *State v. Salazar*, Maricopa Cty. Superior Ct. No. CR2013-462383-004

Video recordings of Jury Trial in *State v. Salazar*, Maricopa Cty. Superior Ct. No. CR2013-462383


Kenneth R. Wallentine states as follows:

I.      In the instant matter I have relied upon the documents, pleadings, records, reports, and statements previously described.  I have formed a number of opinions based upon the aforementioned, as well as my experience, education and familiarity with professional standards, practices, and publications.  My opinions, and a summary of the circumstances known or reported to me upon which those opinions are based, are set forth herein as follows.


**Abbreviated synopsis of reported events:**

In the very early morning hours of December 31, 2013, Frances Salazar ("Plaintiff") was a passenger in a gold Jaguar E-type sedan.  Rodney McCullough was driving.  As McCullough and Plaintiff turned westbound from North 15th Drive onto West Highland Avenue, Phoenix

Police Department Officer Anthony Armour[1] saw that the Jaguar did not have any license plate, but did have a temporary tag in the upper right hand corner of the rear window.  Officer Armour was in a two-officer patrol car with Officer Keith Backhaus.

Officer Armour followed the Jaguar to a parking lot where McCullough stopped.  The officers checked motor vehicle registration records and discovered that the temporary registration had expired on December 18, 2013.  The date on the tag read December 28, 2013.  Officer Armour saw that the tag appeared to have been altered by hand with a black marker.  Even with the alteration the registration was expired.  He turned on the patrol car emergency lights and he and Officer Backhaus approached Plaintiff and McCullough.

Officer Armour arrested McCullough for driving on a suspended license, which is a crime in Arizona.[2]  During the course of the encounter Officer Armour found a clear glass pipe inside the car that he recognized as the type commonly used to smoke crack cocaine.  The pipe contained a burned white and brown residue and a ball of compressed steel wool, consistent with a pipe used to smoke crack cocaine.  Officer Armour also found a small rock of crack cocaine inside the pipe.

After speaking with Plaintiff, Officer Armour arrested her for altering the temporary registration tag.  Officer Alice Strnad searched Plaintiff incident to her arrest.  Officer Strnad found another glass pipe, on Plaintiff's person that was multicolored, approximately three inches long, with a broken bowl.  This pipe also was of the type commonly used for smoking crack cocaine.  It was also packed with burned steel wool, similar to the glass pipe located inside the

---

[1]  Officer Armour retired from the Phoenix Police Department on May 21, 2019.  For purposes of clarity, he is referred to as "Officer Armour" in this report.

[2]  *See* Ariz. Rev. Stat. § 28-3473.

COP-SALAZAR6554

Jaguar.  Officer Armour also arrested Plaintiff for illegal possession of narcotic drugs (crack cocaine)[3] and for illegal possession of drug paraphernalia.[4]

The State of Arizona charged Plaintiff with possession of drug paraphernalia and possession of narcotic drugs on January 2, 2014.  A criminal court trial began on August 9, 2016.  The jury convicted Plaintiff of both charges on August 16, 2016.  Plaintiff was sentenced to prison on December 5, 2016.

Nearly two years after Plaintiff's arrest, Officer Armour became the subject of a Professional Standards Bureau investigation in connection with an arrest that took place on November 4, 2015.  In the ordinary course of the Professional Standards Bureau investigation, Sergeant Amy Breitzman, the assigned investigator, gave Officer Armour a formal Notice of Investigation on January 28, 2016.  The notice included a direct order to Officer Armour: "You are being given a direct order not to discuss this investigation, including your interview, with any unauthorized person.  Other than the investigating supervisor/s, the only persons you may speak to concerning this investigation are enumerated in Operations Order 3.19 in the MOU (collective bargaining agreement) for your respective work unit as follows:  Privileged communications between the employee and his/her attorney, minister, unit representative, or spouse."  Essentially, Officer Armour was given an order prohibiting him from discussing the nature and substance of the Professional Standards Bureau investigation.

Sergeant Breitzman concluded her investigation and submitted a draft report on April 27, 2016.  The draft report was provided to Officer Armour on May 5, 2016.  Officer Armour received the Notice of Findings on June 30, 2016, in which the allegations against him were sustained.  A Disciplinary Review Board was convened on September 30, 2016.  Officer Armour received the Notice of Discipline on November 30, 2016.  The Notice informed him of his right to appeal within 14 days (by December 14, 2016).

---

[3]  *See* Ariz. Rev. Stat. § 13-3408.

[4]  *See* Ariz. Rev. Stat. § 13-3415.

Two weeks later, on December 28, 2016, the Phoenix Police Department notified the Maricopa County Attorney's Office that an investigation revealed potential *Brady* material related to Officer Armour.  On January 26, 2017, the Maricopa County Attorney's Office Law Enforcement Liaison notified Officer Armour that he had been added to the County Attorney's Law Enforcement Rule 15 Disclosure Database, generally known as the "*Brady* list."

On March 30, 2018, Plaintiff petitioned the Arizona Superior Court for Post-Conviction Relief seeking release from prison.  The court granted Plaintiff's petition.  Plaintiff subsequently filed a lawsuit against the City of Phoenix, the former and current Chiefs of Police and Officer Armour, and the prosecutor, Elizabeth Lake.

**Discussion and opinions:**

a.   **The Phoenix Police Department properly and timely communicated potential *Brady* material related to Officer Armour to the Maricopa County Attorney's Office.  The communication was reasonable and consistent with generally accepted police policies and practices in place in 2016.**

1.   The Phoenix Police Department investigation, review, and disciplinary system features[5] a number of defined steps that are consistent with generally accepted police policies and practices for professional standards operations and consistent with applicable collective bargaining agreements, constitutional due process, and state law.[6]  These steps include:

A.   Receipt of a complaint, whether from an aggrieved party, an officer, or another individual.  Chief Collins testified that the Phoenix Police

---

[5]  Certain aspects of the system changed over time for various reasons.  This discussion addresses the system in place at the time of the events relevant to this lawsuit.

[6]  Arizona state law includes a "peace officers bill of rights" in Arizona Revised Statutes §§ 38-1102 *et seq.*

COP-SALAZAR6556

Department has even initiated Professional Standards investigations based on "something that we see on TV or something we see on YouTube we don't like."  Providing for a broad range of possibilities to complain and to identify potential misconduct or areas for improvement of conduct, tactics, operations, etc., indicates that the Phoenix Police Department does not shy away from investigating complaints and that the Department does not cover up or hide allegations of officer misconduct.

B.   Initial review of the complaint and assignment for formal investigation by Professional Standards Bureau investigators for complaints of misconduct.

C.   Issuance of a Notice of Investigation, generally coupled with a direct order to the officer to strictly refrain from discussing the investigation with any unauthorized person.

D.   Investigation of the allegation(s) to include review of any tangible evidence, such as radio recordings and mobile data terminal logs, dispatch records, etc., and interviews of witnesses and the officer(s) who are the subject of the investigation and/or simply involved in the incident.

E.   Preparation of a draft report for review, comment, and approval of Professional Standards Bureau supervisors and command-level officers.

F.   A period for the subject officer(s) and his or her legal counsel or union representative to review the draft report and request corrections and inclusion of additional material.  This is known as the "IRP" or investigative review process.  It is a period of 21 days.

G.   Submission of the Notice of Findings listing the investigator's factual findings as approved by the Professional Standards Bureau commander. Once the Professional Standards Bureau commander signs the

investigation report, then the report is considered to no longer be a draft and to be a final report.

H.   Convening a Disciplinary Review Board to consider the report and factual findings and to make a recommendation for a disciplinary penalty where allegations of misconduct are sustained.

I.   Service of a Notice of Discipline endorsed by the chief of police and city manager on the subject officer(s).

J.   A period of 14 days[7] in which the subject officer(s) may appeal the discipline to the Civil Service Board.

K.   Once the appeal period has passed and if no appeal has been filed, the investigative findings are reviewed for transmittal of potential *Brady* material by the Professional Standards Bureau commander and the police department Legal Bureau.  This review of the investigative findings in the Professional Standards Bureau investigation considers the findings in light of the parameters provided to Phoenix Police Department by the Maricopa County Attorney's Office and the City of Phoenix Prosecutor's Office.

J.   At the conclusion of the investigation, supervisory review, and Disciplinary Review Board process and upon the determination that the conduct leading to the investigation may potentially be *Brady* material, the investigative findings are then transmitted to the City of Phoenix Prosecutor's Office and to the Maricopa County Attorney's Office for the prosecuting agencies to decide if the information needs to be produced in any criminal case and whether the officers should be placed on the *Brady* list.

---

[7]  The appeal period is extended to 21 days if the subject officer is served by mail and not in person.

*Salazar v. City of Phoenix, et al.*
*Report of Kenneth R. Wallentine*                      9

2.   After the disciplinary process was finally concluded, the Phoenix Police Department notified the Maricopa County Attorney's Office on December 28, 2016, that a Professional Standards Bureau investigation revealed potential *Brady* material related to Officer Armour.  The Phoenix Police Department was instructed by the Maricopa County Attorney's Office to make "timely" disclosure of potential *Brady* material known to the police department.  The potential *Brady* information related to Officer Armour was timely disclosed by the Phoenix Police Department at the conclusion of the process and in a fashion consistent with long-standing practice followed by the Phoenix Police Department and the Maricopa County Attorney's Office.  At the time of these events, the Maricopa County Attorney's Office had never asked or requested that the Phoenix Police Department communicate potential *Brady* material in any other way or any sooner than at the conclusion of the disciplinary process.  The time at which the Phoenix Police Department disclosed potential *Brady* material to the Maricopa County Attorney's Office was reasonable and consistent with generally accepted police policies and practices throughout the country.

3.   At the time that Plaintiff was prosecuted for the December 2013 crimes of possession of drug paraphernalia and possession of narcotic drugs, the steps described above were consistent with the expectations and the practice of the Maricopa County Attorney's Office.  The steps described above were also consistent with generally accepted police policies and practices.  A police administrator would reasonably rely on the approval of the prosecuting authority for the flow of communication of potential *Brady* material.

4.   The Phoenix Police Department does not create or maintain a *Brady* list.  That is not an obligation or function of police agencies.  Deputy Maricopa County Attorney Elizabeth Lake testified: "the decision of whether or not something constitutes *Brady* [material] is made at [the Maricopa County Attorney's Office]."

COP-SALAZAR6559

Under *Brady v. Maryland*, 373 U.S. 83 (1963), and related judicial decisions a criminal prosecutor has an affirmative duty to disclose to the criminal defendant any known exculpatory evidence.[8]  A police agency must cooperate with prosecutorial agencies to fulfill this responsibility, as stated by the Supreme Court in *Kyles v. Whitley*, 514 U.S. 419 (1995).  The obligation of disclosure to the defendant is upon the prosecutor, not the police agency.  The police agency's role is to share potential *Brady* material with the prosecutor in a manner consistent with lawful direction from the prosecutor so that the prosecutor may reach a legal conclusion as to whether the potential *Brady* information must be disclosed or not.

5.   The Maricopa County Attorney's Office is responsible for maintaining a *Brady* list or database of police officers.[9]  The Maricopa County Attorney's Office assesses potential *Brady* information that it receives and makes the decision whether officers are added to the *Brady* list.  Officers understand that the authority to reach this decision is vested with the prosecuting authority as a matter of law and practice nationwide.  Chief Collins verified that the prosecutorial offices are responsible for designating an officer for inclusion on the list: "The Maricopa County Attorney's Office and the City of Phoenix each maintain their own *Brady* list."  "It's not for me to decide."  Chief Williams testified that inclusion on the *Brady* list "is not determined by my agency . . . it's the Maricopa County Attorney's [Office] and at times, the City prosecutor's office can make those determinations also."

6.   Officer Armour was not obligated to affirmatively inform anyone of the pending investigation, the allegations contained in the Notice of Investigation, or the

---

[8]  Officers understand that the generic term "*Brady* material" includes possible impeachment evidence.  *See Giglio v. United States*, 405 U.S. 150 (1972).

[9]  The *Brady* list is more formally known as the "Law Enforcement Integrity Database" or the "Rule15 Disclosure Database," referring to the applicable Arizona Rule of Criminal Procedure.  This report uses the shorter colloquial term, "*Brady* list."

COP-SALAZAR6560

outcome of the investigation.  To the contrary, he was under an unambiguous admonishment from the police department and could have been subjected to discipline for violating the order.  Officer Armour testified that he understood the order to mean that he "was under admonishment not to speak with anyone about it."[10]  Chief Collins confirmed that Officer Armour "was actually prohibited from himself discussing the investigation with the prosecutor."  It was the policy and practice of the Phoenix Police Department for the Department, not individual employees (with limited exceptions), to communicate and transmit potential *Brady* material related to police officers to the Maricopa County Attorney's Office.  This practice is consistent with generally accepted police practices and policies.  Thus, there was no obligation for Officer Armour to inform the Maricopa County Attorney's Office about the subject investigation, including the outcome.  It would be reasonable for an officer in Officer Armour's situation to conclude that he did not have an obligation to disclose the Professional Standards Bureau investigation to anyone while the investigation process was pending.  He could not do so until he was released from the admonition in the Notice of Investigation.  That release would not come until Officer Armour was served with the Notice of Findings.

7.    At the time that Officer Armour testified at Plaintiff's criminal trial he knew that the Disciplinary Review Board process was not final.  The Disciplinary Review Board was not convened until September 30, 2016.  Officer Armour received the Notice of Discipline on November 30, 2016.[11]  Thus, at least until November 30,

---

[10]  Officer Armour was given a written "direct order not to discuss this investigation, including your interview, with any unauthorized person.  Other than the investigating supervisor/s, the only persons you may speak to concerning this investigation are enumerated in Operations Order 3.19 and the MOU for your respective work unit, as follows:  Privileged communications between the employee and his/her attorney, minister, unit representative, or spouse."

[11]  Officer Armour did not appeal as was his right.  He asserts that he wanted to appeal, but his appeal rights were foreclosed by an action of his union representative taken without

2016, Officer Armour was not the subject of sustained disciplinary action related to the Professional Standards Bureau investigation into the events of November 4, 2015.  Even if the police department's policy had required Officer Armour to communicate potential *Brady* information to the prosecuting agency, which it did not, a reasonable officer would understand that Officer Armour had no obligation to disclose the fact of the investigation prior to any prosecutions in cases in which he might be testifying.

8.     The Phoenix Police Department Operations Order 2.9, Court Appearances, instructs officers that they are required to notify the prosecutor in cases in which they will be testifying if the officer has been notified "that they have had material from the employee's file sent over for review as to whether their names should be added to the Law Enforcement Integrity Database" and/or when the officer "is aware of potential exculpatory information that the Department is not."  At the time that Officer Armour testified at Plaintiff's criminal trial, he knew that the allegations in the investigation –which he contested and continues to contest to this date– had not been finally resolved and the process was still pending.  Officer Armour knew that the Phoenix Police Department was aware of the allegatiuons of misconduct because it was the Department that initiated the investigation into the allegations.  The Phoenix Police Department initiated the investigation and notified Officer Armour of the investigation, showing conclusively that the Department had actual knowledge of the allegations being investigated.  Chief Collins testified that Officer Armour had no responsibility under Operations Order 2.9 to disclose anything related to the investigation pending at the time of Plaintiff's criminal trial.  Pursuant to Operations Order 2.9, Officer Armour never had a responsibility to provide information about the investigation related to his alleged misconduct and/or the outcome of the investigation to the prosecutor.  A

Officer Armour's knowledge or consent.

COP-SALAZAR6562

reasonable officer would have believed he personally had no obligation or responsibility to provide information about the investigation related to his alleged misconduct and/or the outcome of the investigation to the prosecutor.

9. At the time of Plaintiff's criminal trial, Officer Armour could not have informed anyone that he was on the Maricopa County Attorney's Office *Brady* list for the simple reasons that he was not on the list at that time and had not been told that he was on the list at that time. Officer Armour did not learn that his name had been submitted for inclusion on the Maricopa County Attorney's Office *Brady* list, or that the determination had been made that his name would be included on the *Brady* list, until he received written notice from Keith Manning, Law Enforcement Liaison for the Maricopa County Attorney's Office, on January 26, 2017. Officer Armour had no obligation to inform Elizabeth Lake at this time because he had not received a request for an upcoming court appearance, testimony, or interview, as provided in Operations Order 2.9. At the time that Officer Armour received this notice (January 26, 2017) his testimony in the prosecution of Plaintiff was long past and Officer Armour had not received any request for additional testimony related to the matter. Thus, he had no obligation to disclose to Elizabeth Lake that his name had been added to the Maricopa County Attorney's Office *Brady* list at the time that he received the notice of that fact.

10. It was the policy and practice of the Phoenix Police Department to be the party responsible for communicating potential *Brady* material to the respective prosecutorial agencies. Officer Armour complied with that practice and policy. It is common practice for law enforcement agencies to hold the responsibility for communication of potential *Brady* material to the appropriate prosecutorial agencies. The Phoenix Police Department policy that the department would notify the Maricopa County District Attorney's Office and the City of Phoenix Prosecutor's Office of potential *Brady* material related to Phoenix Police

COP-SALAZAR6563

Department officers and the department's assumption of that responsibility is reasonable and consistent with generally accepted police policies and practices.

11.   It is not a generally accepted police practice for police officers to seek out criminal defendants in cases in which an officer previously provided testimony to inform the defendants that the prosecutorial agency held any potential *Brady* material or had placed the officer on a *Brady* list.

12.   Officer Armour was not asked at the time of Plaintiff's criminal trial, or any time during the pre-trial and trial process, whether he knew of any potential *Brady* material connected to him or whether he was the subject of any investigations or had been found to have engaged in any misconduct.  The trial prosecutor, Elizabeth Lake, testified that she did not ask Officer Armour about any potential *Brady* issues or investigations.  She testified that it was her practice "to consult the Rule 15 Database, Disclosure Database, in the run-up to trial, about a week. So I would conduct a check once at the start of the case and then again about a week before trial to see if anyone had been added to it that was on my witness list."

13.   Plaintiff was not without resources to investigate any pending investigations regarding Officer Armour.  Plaintiff's trial counsel, Christopher Doran, acknowledged that he was aware of the law enforcement process commonly followed by "police departments and prosecutorial agencies" related to *Brady* disclosures.  Margaret DiFrank is a licensed private investigator who was hired to assist with Plaintiff's criminal defense.  Ms. DeFrank recommended to Samantha DuMond, Mr. Doran's law partner and co-counsel in Plaintiff's case, that Ms. DuMond request from the prosecutor the disciplinary files for Officers Armour and Backhaus.  Plaintiff's counsel had the ability to make a public records request of the Phoenix Police Department to obtain information about any pending allegations, investigations, or other impeachment evidence related to Officer

COP-SALAZAR6564

Armour.[12]  Ms. DeFrank testified that she was very familiar with making public records requests to the Phoenix Police Department for police officer disciplinary files and that she had frequently done so.  She testified that the defense would "always" receive the file when the simple public records request was properly made.  Plaintiff's counsel could have also simply requested such information from the assigned prosecutor or could have asked the Superior Court judge to issue a subpoena for the information.  The Police Department would have promptly responded to a prosecutor's request or a subpoena.[13]  Chief Collins testified that the police department would have produced information regarding "any Professional Standards Bureau investigations concerning Officer Armour . . . in response" to a subpoena, subject only to legal review of the documents.  The cost to the defense would have been minimal.  Consistent with common police practice, the Phoenix Police Department routinely complies with court subpoenas and public records requests for documents.  The Phoenix Police Department accepts service of subpoenas served by process servers and/or by telefacsimile and/or email.  Plaintiff's former attorney, Samantha DuMond testified that a presumed cost of "anywhere from $70 to $150" for a process server was an impediment to serving a subpoena to the Phoenix Police Department.  However, because Phoenix Police Department provides no-cost, easy methods to accept service of a subpoena there was no need for Plaintiff or Plaintiff's attorneys to expend funds for a process server.

---

[12]  Arizona's public records statutes provide for broad disclosure of public records, including police disciplinary records.  *See* Ariz. Rev. Stat. §§ 39-121-128.  Though personal identifying information must be redacted pursuant to Ariz. Rev. Stat. § 39-128, there is no requirement for a showing of need or relevancy to a criminal case in order to obtain the records.

[13]  As criminal defense attorneys regularly practicing in Arizona state courts, Plaintiff's attorneys should have been aware of the well-established process for obtaining a subpoena in a criminal proceeding articulated in *Carpenter v. Superior Court*, 176 Ariz. 486 (Ariz. Ct. App. 1993).

14.     Even if Plaintiff's counsel had diligently sought and obtained Officer Armour's disciplinary file, including the subject investigation, prior to Plaintiff's criminal trial, possessing the material does not necessarily mean that the material would be admissible in the trial proceeding.  Officer Armour contested the allegations raised in the complaint.  Under normal procedure, the trial judge would conduct an *in camera* review, much like a judge's consideration of a motion *in limine*, to determine whether the material actually contained potential *Brady* material or any other exculpatory material to the defense.  This process is commonly practiced in courts throughout the country and is prescribed by the Arizona Supreme Court.[14]

15.     Plaintiff's statistical consultant stated that she examined "the number of days from the date the PSB report was 'created' to the first communication with" the Maricopa County Attorney's Office and opined that the average number is 200.25 days.  She has also stated that over 476 days pass, on average, from the time of the officer's incident to the time the officer is added to the *Brady* list.  Her conclusions, whether accurate or not, are irrelevant to the application of generally accepted police policies and practices.  I cannot discern from Dr. Kovac's report whether she is aware that the Phoenix Police Department (or any police department) cannot control the timing of a *Brady* list decision.  As noted above, that is within the exclusive control of the prosecutorial agency.

16.     One cannot review the span of ten years of case information –understanding that the scope of the information provided was defined by the request for the information– in an abstract vacuum and reach fair conclusions to assess the reasonableness of the investigative and adjudicatory process.  Each case is unique in its variables, including the severity of the allegations, the caseload of other investigations assigned to the respective principal investigators, the ability of

---

[14]  *See State v. Lukezic*, 143 Ariz. 60 (Ariz. 1984).

COP-SALAZAR6566

finding witnesses (not all witnesses willingly cooperate with professional standards investigations), the quality and volume of evidence, access to evidence, including video and audio recordings to be examined, as well as other evidence requiring specialized technology for review and analysis. The more relevant timing question is the timeliness of communicating potential *Brady* material by the Phoenix Police Department to the Maricopa County Attorney's Office, consistent with the direction of the County Attorney's Office, and the promptness of legal determination and *Brady* listing if appropriate by the Maricopa County Attorney's Office once it receives the potential *Brady* material.

17. There is no generally accepted standard for timeliness of transmission of potential *Brady* information from a law enforcement agency to the appropriate prosecutorial agency that is based upon or determined by the number of days between the occurrence of the alleged misconduct or the first report of the alleged misconduct and either the first communication to the prosecutorial agency or the time of the officer's alleged misconduct to the time the officer is added to the *Brady* list by the prosecutorial agency. As noted above, in this case the communication from the police department to the Maricopa County Attorney's Office was timely, reasonable, and consistent with generally accepted police policies and practices.

18. Not only is each professional standards investigation unique with its own set of circumstances, most of these investigations portend very serious consequences for those involved. It is common for professional standards (also known as "internal affairs" in some jurisdictions) investigators and supervisors to engage in informal verbal communication about whether a developing investigation merits submission to the prosecutor for consideration for inclusion of the involved officer on the *Brady* list. A quality investigation takes time and may require significant resources beyond investigator time.

COP-SALAZAR6567

19.     I saw nothing in the record or in Dr. Kovacs's analysis suggesting that the Phoenix Police Department staff tried to hide evidence or delay the investigation in this or any other case.  Nor does the record contain any evidence that the Maricopa County Attorney's Office was dissatisfied with the Phoenix Police Department's investigation, review, and disciplinary process related to matters that might implicate *Brady* issues or with the timing of communication from the police department to the Maricopa County Attorney's Office of the investigatory findings in the final report or instructed the Phoenix Police Department to make changes to the timing of providing information for *Brady* analysis.  Indeed, because the Maricopa County Attorney's Office did not instruct the police department to make any changes in the timing of its transmission of potential *Brady* materials, the police department reasonably believed that the process it was following was consistent with the requirements of *Brady* and its progeny.

II.     In reaching my opinions in this matter I have relied upon my training and experience in public safety acquired throughout my career.  A summary of my qualifications, publications, litigation history and fee schedule are recited herein.

III.    **My qualifications as an expert in this subject matter include the following:**  I am a law enforcement officer in the State of Utah.  I became certified as a law enforcement officer in the State of Utah in 1982.  I am the Chief of the West Jordan (Utah) Police Department, where I oversee all police operations and investigations.  I am the Chair of the Governing Board of the Officer-Involved Critical Incident Investigations Teams in Salt Lake County, Utah.  I was formerly employed with the Utah Attorney General, where I served as the Chief of Law Enforcement.  After a period in private practice, I was employed as a Special Agent with the Utah Attorney General Investigation Division, where I coordinated a statewide use of force training initiative and coordinated officer-involved shooting investigations and other special

COP-SALAZAR6568

investigations.  I also serve in a consultation role as Senior Legal Advisor for Lexipol, the nation's leading provider of law enforcement risk management resources.

I was formerly employed as a Bureau Chief at the Utah Department of Public Safety, Peace Officer Standards and Training Division, where I supervised investigations into allegations of improper and excessive force, officer integrity, and criminal acts alleged to have been committed by law enforcement officers and supervised in-service training administration and certification for all peace officers in the State of Utah.  I also supervised the police service dog training and certification program for the State of Utah.  I had responsibility for policy drafting and review for the parent agency, the Utah Department of Public Safety.

My duties included direct supervision and command of various investigative units and agents throughout the State of Utah, supervising law enforcement officers, forensic specialists, and technicians.  I commanded the State of Utah Child Abduction Response Team.  I commanded the State of Utah Officer-Involved Fatality Investigation Team.  I am a member of the Board of Review of the Utah Technical Assistance Program, consulting in cold case homicide and complex violent person crimes investigations.  In 2010, Governor Herbert selected me for the Governor's Leadership in Public Service award for my work in public safety leadership.

IV.     I currently serve on the Use of Force Standards and the K9 Standards Committees of the Utah Peace Officer Training and Standards Division, articulating the standards for use of force by police officers and deployment of police service dogs.  I was formerly responsible for providing delivery of the Basic Training Curriculum related to all legal subjects, as well as certain tactical subjects, at the Utah Law Enforcement Academy.  I continue to teach at the Utah Law Enforcement Academy.  I am the author of the police academy curriculum currently in use for several subjects, including, but not limited to, use of force, reasonable force, use of force and police service dog teams, search and seizure, search and seizure for police service dog teams, and use of force/firearms instructor liability.  I am certified by the Force Science Research Center as a Realistic De-Escalation Instructor, a course certified by the International Association of Directors of Law Enforcement Standards and Training.  I am a certified POST Firearms Instructor, and

often served as the lead instructor for POST Firearms courses.  I am certified by the Force Science Research Center as a Force Science Analyst® and an Advanced Force Science Specialist®.  I am a former certified TASER® Instructor.  I am a certified Excited Delirium and Sudden Death Investigation Instructor.  I was certified by the Los Angeles Police Department in Officer-Involved Shooting Investigation.  In 2011, I was certified by the Institute for the Prevention of Sudden In-Custody Death as an instructor in restraint systems.

V.      I am a licensed attorney, having practiced law since 1990.  I am admitted to practice before the United States Supreme Court, the Courts of Appeals for the Fifth and Tenth Circuits, and the State and Federal courts in the State of Utah.  I am a Master of the Bench of the American Inns of Court, Inn One, where I also serve as the past-President of the Inn of Court.  I am a former Chief Deputy County Attorney and a former Utah Attorney General designated prosecutor.  I serve as an Administrative Law Judge for the State of Utah and for various counties and cities in Utah, providing hearing officer and appellate hearing services for hearings involving allegations of police officer misconduct for a variety of state agencies and municipalities.  I was formerly on the faculty of Excelsior College, teaching Criminal Procedure, Evidence and Management Strategies for Public Safety.

VI.     In addition to my primary employment, I occasionally consult and provide expert witness opinions on police procedures, and use of force issues.  I occasionally perform in-custody death investigations and officer-involved shooting death investigations for agencies which may lack the requisite expertise.  I have served on several International Association of Chiefs of Police Policy Center working groups and presently serve on the Search Warrants policy working group.  I am a consultant to the Utah Risk Management Mutual Association, the state's largest insurer of public safety agencies, on matters of officer conduct and discipline, hiring and screening practices, use of force, and police pursuit policies.  I am the co-founder of a best practices advisory group that developed comprehensive model policies and best practices under the authority of the Utah Chiefs of Police Association, the Utah Sheriffs' Association and various state law enforcement agencies.  These policies serve as a model for all Utah public safety agencies.  I am the author of

COP-SALAZAR6570

a number of model policies for law enforcement agencies, and have provided policy drafting and policy review services for several agencies, including policy drafting responsibility for large law enforcement agencies.  I have served as a contract consultant to the United States Department of Justice, assigned to provide technical assistance and management consulting to various public safety entities in the United States.

VII.     I participate and serve in a number of community and professional capacities. Professional activities pertinent to law enforcement include serving as the president of the Utah Chiefs of Police Association.  I am a member of the Board of Governance of the Statewide Information and Analysis Center, Utah's unified intelligence fusion center.  I represent the Utah Chiefs of Police Association on the League of Cities and Towns Listen, Love, Learn Task Force, creating strategies for police reform and relations with communities of color.  I am a founding member of First Steps to More Trust, an initiative to join young persons in the BIPOC community with young public safety professionals in leadership training and community engagement.  I am the Chair of the Governing Board of the Officer-Involved Critical Incident Investigations Teams in Salt Lake County, Utah, and have direct command of Officer-Involved Critical Incident Investigations Team IV.  I am Vice-Chair of the Salt Lake County Law Enforcement Administrators and Directors Association.  I am a member of the Board of Directors of the Institute for the Prevention of Sudden In-Custody Death, member of the Board of Advisors, Association of Force Investigations, member of the International Association of Chiefs of Police and the Utah Chiefs of Police Association, member of the National Tactical Officers Association, former member of the International Association of Law Enforcement Firearms Instructors, member of the United States Police Canine Association, former member of the Board of Directors of Crisis Intervention Team Utah, Past-President of the Utah Peace Officers Association, former Board Member of the Utah SWAT Association, past member of the board of directors of the NAACP, Salt Lake City branch, and board member of the Utah Law Enforcement Legislative Committee.  I formerly served as a gubernatorial appointee to the Council on Peace Officer Standards and Training.  I am a former member of the Scientific Working Group on Dog

**COP-SALAZAR6571**

and Orthogonal Detector Guidelines, a national scientific best practices organization sponsored by the Federal Bureau of Investigation, the Department of Homeland Security, and the Transportation Security Administration, with support coordinated by the International Forensic Research Institute at Florida International University.  I have been a presenter at a variety of professional conferences and seminars, including presenting on use of force training at the annual convention of the International Association of Chiefs of Police and the International Conference of the Institute for the Prevention of Sudden In-Custody Death.

VIII.    From 1994 to 2014, I was a consultant with the K9 Academy for Law Enforcement and the International Police Canine Conference.  My principal responsibilities included providing use of force training, civil liability instruction, and search and seizure instruction.  I have provided police service dog training and certification standards consultation for two police service dog organizations, including a western regional group and one of the major national groups.  I serve as a consultant for the California Narcotic and Explosive Canine Association and have been a featured lecturer at their annual training conferences over the past decade.

IX.    I am a Senior Legal Advisor for Lexipol.  In that capacity, I have assisted in the drafting and review of use of force and other policies in current use by more than 3,300 public safety agencies in the United States.

X.    **My publications (limited to ten years) include the following:**  I have previously published a number of other professional articles, many of which have been subjected to peer review.  My most recent book, *Preparing for an Active Shooter Threat*, was published in June 2020 by Blue360 Media.  Another book, *Street Legal: A Guide to Pre-trial Criminal Procedure for Police, Prosecutors, and Defenders*, 2nd edition, was published in 2020 by the American Bar Association Publishing Division.  *The K9 Officer's Legal Handbook*, 3rd ed., was published in February 2019.  My other published works include:  *Mitigating Suicide Threat Response Risks*, Police Chief, V. 86, No. 3 (2019); *Avoiding a Peer Support Pitfall*, Police Chief, V. 85, No. 3 (2018); *Should I Stay or Should I Go?*, POLICE, October 2017, *Hill v. Miracle: Adapting the Graham Standard to Non-Criminal Interventions*, Police Chief (August 2017): 18–19;

COP-SALAZAR6572

*Armstrong v. Village of Pinehurst: Training and Policy Implications for Police*, Police Chief, V. 83, No. 6 (2016); *Supreme Court Decision Casts Doubt on Hotel Registry Ordinances*, Police Chief, V. 81, No. 10 (2015); *Body Worn Cameras: Plan Before Your Office Buys In*, The Sheriff (June 2015); *Legal Risks of Failing to Care for Children of Arrested Persons*, Police Chief, V. 81, No. 10 (2014); *A Rational Foundation for Use of Force Policy, Training and Assessment*, 2014 (2) AELE Mo. L. J. 101; *Post Incident Video Review*, Police Chief, V. 68, No. 12 (2011); *Cell Site Location Evidence: A New Frontier in Cyber-Investigation*, 2011 (2) AELE Mo. L. J. 501.

XI.     **My fee schedule is established as follows:** I charge $275.00 per hour for examination of reports and documents, site visits, interviews, administrative tribunal, deposition or court testimony, with a minimum of $1,100.00 for deposition or court testimony.  I bill for actual travel expenses and a travel fee of $1,100.00 per day/part-day for travel to western states and $1,500.00 per day/part-day outside western states.

XII.    **My prior experience as an expert witness (limited to the past four years) includes the following cases:**  I have been qualified as an expert in the subject matter of police procedures, including use of TASER® devices, police use of force, shootings and wrongful death claims, search and seizure, police service dog use, both in drug detection and dog bites, and I have never had a court decline to find that I am a qualified expert witness.  I have testified and/or provided depositions and trial testimony in the following cases which may be generally related to the subject of the instant litigation in the past four years:  *Brown v. City of Phoenix*,  No. 2:20 cv 02087 DLR JZB, United States District Court for the District of Arizona, 2021.  Trial testimony given on behalf of defendants.  *Coleman v. City of Tempe*, No. 2:17-cv-02570 PHX DLR, United States District Court for the District of Arizona, 2021.  Trial testimony given on behalf of defendants.  Subject matter: police use of force.  *Khalaj & Youmarin v. City of Phoenix, et al.*, CV-17-01199-PHX-GMS, United States District Court for the District of Arizona, 2021.  Deposition testimony given on behalf of defendants.  Subject matter: wrongful detention.  *Gomez-Guerrero v. Villafuerte*, No. 20 L 70, 19th Judicial Circuit Court, Lake County, Illinois.

Deposition testimony given on behalf of defendants.  Subject matter: wrongful death.  *Bueno v. Howard, et al.*, No. 2:16-cv-03450- DGC-JZB, United States District Court for the District of Arizona, 2021.  Trial testimony given on behalf of defendants.  Subject matter: police use of force.  *Lane v. City of Mesa*, No. 2:19-cv-00852-DJH, United States District Court for the District of Arizona, 2021.  Deposition testimony given on behalf of defendant.  Subject matter: wrongful death.  *Mitchell v. City of Cedar Rapids*, No. LACV087209, Iowa District Court for Linn County, 2021.  Deposition testimony given on behalf of defendant.  Subject matter: wrongful death.  *Johnson v. City of Mesa*, No. 2:19-CV-02827-JAT-JZB, United States District Court for the District of Arizona, 2020.  Deposition testimony given on behalf of defendant.  Subject matter: police use of force.  *Ortega v. United States of America*, No. CV-19-08110-PCT-JAT, United States District Court for the District of Arizona, 2020.  Deposition testimony given on behalf of defendant.  Subject matter: police custody.  *Peralta v. Arizona Department of Public Safety*, No. CV-17-01868-DJH-BSB, United States District Court for the District of Arizona, 2020.  Trial testimony given on behalf of defendant.  Subject matter: police custody.  *Krakana & Zinn v. City of Scottsdale*, No. CV-17-01813-PHX-JJT, United States District Court for the District of Arizona, 2020.  Trial testimony given on behalf of defendant.  Subject matter: police tactical operation.  *A.C. v. County of Santa Barbara*, No. 2:18-CV-3694 SK, United States District Court for the Central District of California, 2019.  Deposition testimony given on behalf of defendant.  Subject matter: police use of force.  *Smith v. City of Waterloo*, Case No. LACV133172, District Court for Black Hawk County, Iowa, 2019.  Trial testimony given on behalf of defendants.  Subject matter: emergency vehicle operation.  *Mould v. City of Tempe*, No. CV2016-018161, United States District Court for the District of Arizona, 2019.  Trial and deposition testimony given on behalf of defendant.  Subject matter: wrongful death.  *Castro v. State of Arizona*, Case No. 2:18-cv-00753-SRB, United States District Court for the District of Arizona, 2019.  Deposition testimony given on behalf of defendants.  Subject matter: police use of force.  *Lawrence v. Las Vegas Metro Police Department*, No. 2:16-cv-03039-JCM-NJK, United States District Court for the District of Nevada, 2019,

COP-SALAZAR6574

Deposition testimony given on behalf of defendants.  Subject matter: wrongful death.  *Webb v. City of Waterloo*, No. 6:17-cv-2001-CJW-MAR, United States District Court for the Northern District of Iowa.  Deposition testimony given on behalf of defendants.  Subject matter: police use of force.  *Charboneneau v. Demings*, No. 2017-CA-010862-O, Ninth Judicial District Court, Orange County, Florida, 2019.  Hearing testimony given on behalf of defendants.  Subject matter: use of force.  *Carsons v. Black Bear Reserve Homeowners Association, Inc., et al.*, No. 35-2015-CA-001910, Fifth Judicial District Court, Lake County, Florida, 2018.  Deposition testimony given on behalf of defendants.  Subject matter: investigative procedures.  *Mould v. City of Tempe*, No. CV2016-018161, United States District Court for the District of Arizona, 2018.  Deposition testimony given on behalf of defendant.  Subject matter: wrongful death.  *McSwain v. United States*, No. 2:15-cv-01321, United States District Court for the District of Nevada, 2018.  Trial testimony given on behalf of defendant.  Subject matter: negligence.  *Rodriguez v. City of West Covina*, No. 2:17-CV-0138 CBM, United States District Court for the Central District of California, 2018.  Deposition testimony given on behalf of defendant.  Subject matter: police canines.  *Mims v. City of Charlotte*, No. 2014-CVS-23815, Superior Court of North Carolina, 2018.  Trial and deposition testimony given on behalf of the defendants.  Subject matter: wrongful death.  *Chastang v. Levy*, No. 6:17-ev-00538-0r1-37 DCI, United States District Court for the Middle District of Florida, 2018.  Deposition testimony given on behalf of defendant.  Subject matter: police defensive deadly force.

The observations and opinions stated herein are preliminary, insofar as additional information may be provided to me through the course of discovery and other incidents of the litigation process.  They are based on the best information presently known to me.  I have assumed the general accuracy of the documents, statements, and reports, excepting those expressed as opinions and those conflicting one with another and/or conflicting with physical evidence, that were provided to me.  The opinions herein may be supplemented and/or revised upon receipt of additional information, including, but not limited to, further deposition testimony, consideration of any report submitted by Plaintiff's experts, further investigation

COP-SALAZAR6575

and/or further witness interviews.  I may supplement this report upon completion of depositions of witnesses in this matter and/or upon being provided with other investigative documents, and/or diagrams, video and photographs.

My trial testimony may be supported by exhibits that include the pleadings, documents, statements, depositions, diagrams, photographs, and reports listed herein, as well as illustrative evidence such as a visual presentation of computer-generated slides and visual images projected onto a screen, charts, graphs, or illustrations created to better illustrate the aforementioned documents.

COP-SALAZAR6576

CONCLUSION

Officer Armour had no duty under Operations Order 2.9 to disclose anything related to the investigation pending at the time of Plaintiff's criminal trial.  At the time that Officer Armour received this notice that his name had been placed on the Maricopa County Attorney's Office *Brady* list on January 26, 2017, his testimony in the prosecution of Plaintiff was long past and Officer Armour had not received any request for additional testimony related to the matter.  Thus, he had no obligation to disclose to Plaintiff that his name had been placed on the list.

The potential *Brady* information was timely disclosed by the Phoenix Police Department in a fashion consistent with parameters for disclosure previously provided to the Phoenix Police Department by the Maricopa County Attorney's Office and approved by the Maricopa County Attorney's Office.  The Phoenix Police Department's communication was timely, reasonable, and consistent with generally accepted police policies and practices.  The Phoenix Police Department's practice of notifying the Maricopa County Attorney's Office and the City of Phoenix Prosecutor's Office of potential *Brady* material related to Phoenix Police Department officers and the department's assumption of that responsibility is reasonable and consistent with generally accepted police policies and practices and complies with the requirements under *Brady* and its progeny.  The timing in which the Phoenix Police Department disclosed potential *Brady* material to the Maricopa County Attorney's Office met its obligation under *Brady* was reasonable and consistent with generally accepted police policies and practices.

Kenneth R. Wallentine
November 19, 2021

# EXHIBIT KK



# Expert Witness Report
### Daniel Brown, MADM, Chief of Police (Retired)

December 30, 2020


Mr. Benjamin L. Rundall

Honor Law Group, PLCC

4450 S. Rural Road, Suite C-220

Tempe, AZ 85282


### Report and Opinion

Re: *Frances Salazar v. City of Phoenix et al.*


## EXPERT WITNESS REPORT

This report incorporates information received as of this date obtained through evidence provided by the Attorney for the Plaintiff, Mr. Benjamin L. Rundall, regarding the following:

- Frances Salazar v. City of Phoenix, a political subdivision of the state of Arizona; Jeri Williams, Acting Chief of Police for the City of Phoenix Police Department; Joe Yahner, former Chief of Police for the City of Phoenix Police Department; Anthony Armour, a married man; Maricopa County, a political subdivision of the state of Arizona; Bill Montgomery, Former Elected head of the Maricopa County Attorney's Office; Allister Adel, Appointed head of the Maricopa County Attorney's Office; Elizabeth Lake, Prosecutor with the Maricopa County Attorney's Office; Black and White Companies or Entities I-X, and Jane and John Does 1-10
- United States District Court, District of Arizona, Case No. CV-19-01188-PHX-SRB (ESW)
- Evidence in this case, specifically, Exhibits A – L, 148 total pages
- **Evidence Solutions, Inc. (ESI) case number DJB20-003**

The opinions and conclusions that I hereby render below are based upon relevant documents reviewed, current and relevant law enforcement standards, and my professional experience, training, and education in law enforcement. My opinions are made with a reasonable degree of professional certainty. My education, qualifications, and expertise are further set out in my CV, which is included.

1



# Expert Witness Report
### Daniel Brown, MADM, Chief of Police (Retired)

## PROFESSIONAL BACKGROUND

- Currently a Law Enforcement Standards of Care Expert Witness for Evidence Solutions, Inc., a company which, among other services, provides law enforcement standards of care consulting.
- Currently, a full-time student enrolled in Liberty University, Helms School of Government, pursuing a Doctor of Philosophy (Ph.D.) in Criminal Justice, Leadership, having completed 39 credit hours with a current GPA of 3.87 to date.
- Possess a Master of Administration with an emphasis in Public Management from Northern Arizona University.
- Experienced law enforcement professional with nearly twenty-two years of experience, with over seven years as a Chief of Police, having recently retired in July 2020.
- Years of experience in writing, reviewing, approving, and implementing police department policies and procedures based on current and relevant case law and court rulings.
- Experience with being directly responsible for hiring, firing, and disciplining certified peace officers.
- Well respected in the law enforcement community, having been a frequent presenter, member, and policy review board member for the International Association of Chiefs of Police and also served as the President of the Northeastern Arizona Police (Chiefs) Association, as well as the First Vice President of the Arizona Association of Chiefs of Police.
- Served as a founding member and former Vice-Chairman of the Arizona Law Enforcement Accreditation Program, dealing with best practices in law enforcement.
- Experience in building and re-building police organizations as well as following recommendations from the Police Executive Research Forum.

## RELEVANT DOCUMENTS REVIEWED

- ABC 15 News interview: https://www.abc15.com/news/local-news/investigations/phoenix-police-chief-has-no-idea-about-brady-list-system
- ABC 15 News interview: https://www.abc15.com/news/local-news/investigations/a-grandmother-convicted-as-a-phoenix-officers-lies-are-kept-secret
- YouTube video: https://www.youtube.com/watch?v=Ix2VGLgD3w8&ab_channel=ABC15Arizona
- Second Amended Complaint in United States District Court, District of Arizona, Frances Salazar v. City of Phoenix et al. filed December 27, 2019
- City of Phoenix Defendants' Answers to Plaintiff's First Set of Non-Uniform Interrogatories dated May 26, 2020

2

SAL00285



# Expert Witness Report
### Daniel Brown, MADM, Chief of Police (Retired)

- City of Phoenix Defendants' Responses to Plaintiff's First Request for Admission dated October 8, 2020
- Phoenix Police Department (PPD) Professional Standards Bureau Report No. PSB15-0126 dated April 27, 2016
- Discipline Review Board Hearing Memo from DRB15-15/PSB-0126/SH-0020 regarding Officer Anthony Armour Jr. #8605
- Letter from PPD Commander John Collins to Mr. Christopher Doran dated December 20, 2016
- Email to Warren Brewer (sender redacted) dated November 28, 2016
- Letter from Jessica Garner to PPD Sergeant Warren Brewer (undated)
- Administrative Inquiry No. INQ16-0811 entered by PPD Sergeant Warren Brewer on November 29, 2016, regarding 'Personal Conduct/Elements of a crime – Felony'
- Declaration of Custodian of Records from PPD Sergeant Heather Maldonado dated February 24, 2017
- Allegation of Criminal Misconduct by a Police Officer from PPD Sergeant John Bell to PPD Detective Theron Quaas dated September 22, 2010
- Flow chart of 'Brady Process' (not dated)
- Email from John Collins regarding 'PSB Brady Review Process' dated August 11, 2016
- First page of a letter to PPD Chief Daniel Garcia from City of Phoenix City Prosecutor Aaron J. Carreon Ainsa dated August 18, 2014, regarding '*a legal and ethical obligation to disclose evidence…*' pursuant to *Brady v. Maryland*
- Letter from Maricopa County Attorney's Office (MCAO), Law Enforcement Liaison, Keith Manning to PPD Officer Anthony Armour dated January 26, 2017, regarding the Law Enforcement Rule 15 Disclosure Database Committee review findings
- Internal Routings from the Phoenix Police Department regarding PSB 15-0126, Brady Review for Officer Armour
- Letter from Maricopa County Attorney's Office (MCAO), Law Enforcement Liaison, Keith Manning to PPD Chief Jeri Williams dated January 26, 2017, regarding the Law Enforcement Rule 15 Disclosure Database Committee review findings for Officer Anthony Armour
- Phoenix Police Department Operations Order 2.9, Court Appearances (Revision date 06/13)
- Administrative Inquiry No. INQ16-0600 entered by PPD Sergeant Terri Dicino dated September 8, 2016, regarding 'Personal Conduct/Sexual Misconduct.'
- Administrative Inquiry No. INQ16-0055 entered by PPD Sergeant Amy Breitzman dated February 3, 2016, regarding 'Service Complaint/Failed to take required action'
- Administrative Inquiry No. INQ11-0686 entered by PPD Sergeant Shane Disotell dated December 14, 2011, regarding 'Service Complaint/Abuse of authority'



# Expert Witness Report
### Daniel Brown, MADM, Chief of Police (Retired)

- Administrative Inquiry No. INQ12-0624 entered by PPD Sergeant Jennifer Hanson dated December 24, 2012, regarding possible sexual abuse claim while on duty
- Administrative Inquiry No. INQ13-0597 entered by PPD Sergeant Jeff Webbe dated October 9, 2013, regarding 'Service Complaint/Unprofessional conduct'
- Administrative Inquiry No. INQ14-0369 entered by PPD Sergeant Ken Kartchner dated June 9, 2014, regarding 'Service Complaint/Rudeness'
- Administrative Inquiry No. INQ15-0043 entered by Toby Dunn dated January 23, 2015, regarding 'Use of Force/Physical Force'
- Administrative Inquiry No. INQ15-0340 entered by PPD Sergeant Tadd Cline dated June 9, 2015, regarding 'Rules and regulations/Other rule violation'
- Administrative Inquiry No. INQ15-690 entered by PPD Sergeant Chadwick Hunnicutt dated October 17, 2015, regarding Use of Force/Excessive Force'
- Emails between Ben Rundall and Jody Corbett dated August 25, 2020, and August 26, 2020, regarding the maintaining of a 'Brady List'

## RESOURCES

- Phoenix Police Department Operations Orders (as of November 14, 2017), https://media.kjzz.org/s3fs-public/11-14-17PhoenixPDoperations_orders.pdf
- International Association of Chiefs of Police, Model Policy titled 'Brady Disclosure Requirements' dated April 2009 https://www.theiacp.org/sites/default/files/all/b/BradyPolicy.pdf
- International Association of Chiefs of Police, Concepts and Issues Paper titled 'Brady Disclosure Requirements' dated August 2008 https://www.theiacp.org/sites/default/files/all/b/BradyPaper.pdf

## METHODOLOGY

In this case, the method utilized is to review available data, which at a minimum includes a review of all evidence received by the plaintiff's attorney, a review of applicable Phoenix Police Department operations orders, current best practices in law enforcement policy and procedures, and current case law. The method is then to review deposition testimony taken in the case as well as related discovery available. After such review, the method is to determine whether current best practices in law enforcement have been followed and if the plaintiff's civil rights were potentially violated due to poor practice, neglect, deceit, or negligence.

## CASE DESCRIPTION

In this case, Ms. Frances Salazar alleges a violation of her constitutional rights under 42 U.S.C. § 1983 because the defendants violated their duty to disclose potentially exculpatory information under *Brady v. Maryland* regarding defendant Anthony Armour, a City of Phoenix police officer.

4



# Expert Witness Report
### Daniel Brown, MADM, Chief of Police (Retired)

Plaintiff Salazar was convicted and sentenced to 22 months in prison due to an alleged drug-related offense following her arrest initiated by defendant Armour on December 31, 2013. Salazar claims she did not commit the drug offense, as she was unaware there were illegal drugs and drug paraphernalia inside the vehicle where she had been a front-seat passenger. Armour made several conflicting statements during and following Salazar's investigation and arrest and Salazar's criminal trial that led to her conviction. There was no body camera or voice recording evidence presented in the criminal case, nor were there any independent witnesses provided by the state during the criminal trial.

The criminal trial that led to the conviction of Salazar hinged heavily on the testimony of Armour. In essence, Armor's testimony seemingly outweighed Salazar's testimony, largely because Armour was a certified peace officer, and Salazar had a history of drug abuse. However, unbeknownst to Salazar or her criminal defense attorney, Anthony Armour had been investigated internally by the Phoenix Police Department for a separate matter. He was found to have been untruthful during the internal investigation.

Despite requests from two separate defense attorneys for any potential *Brady* material under Arizona's Rule 15.1, Armour's propensity for untruthfulness was not disclosed. Even during Salazar's criminal trial, Anthony Armour's conflicting testimony became a focal point of the criminal case. Regardless of Armour's untruthfulness during Salazar's investigation and subsequent criminal trial, Salazar was ultimately convicted and sentenced to prison.

Plaintiff Salazar and her attorneys contend that had the jury during Salazar's criminal trial been made aware of Anthony Armour's documented accounts of untruthfulness under *Brady v. Maryland*, Salazar may not have spent nearly two years in prison for a crime she claims she did not commit.

## IMPORTANT TIMELINES INVOLVING THE CASE (*IN CHRONOLOGICAL ORDER*)

- December 31, 2013 - Frances Salazar was arrested by Phoenix Police Officer Anthony Armour.
- April 9, 2014 – Maricopa County Attorney's Office filed Disclosure Statement.
- May 21, 2014 – Original defense counsel requested any Brady material.
- August 18, 2014 – The City of Phoenix Law Department, Office of the City Prosecutor, City Prosecutor Aaron J. Carreon Ainsa sent a letter to then Phoenix Chief of Police Daniel Garcia stating that their office 'is a legal and ethical obligation to disclose evidence that could lead to be used for impeachment of police officers and departmental employees pursuant to *Brady v. Maryland* and its progeny.' This letter requested that the Phoenix Police Department continue to notify the city prosecutor's office of adverse investigative findings related to the credibility of officers or witnesses and legal proceedings. This letter included findings of misconduct involving untruthfulness and officer misconduct.

5



# Expert Witness Report
### Daniel Brown, MADM, Chief of Police (Retired)

- October 13, 2015 - New defense counsel requested any Brady material.
- November 4, 2015 – Anthony Armour was accused of lying to his direct supervisor (sergeant). The sergeant initiated a complaint against Armour for dishonesty (unrelated case), and an internal investigation commenced.
- January 29, 2016 – Defense filed a motion to suppress dishonesty in Anthony Armor's case.
- April 27, 2016 – Allegations of dishonesty were sustained against Armour following an internal investigation.
- July 6, 2016 – PSB received final, completed investigation on Armour and listed it as 'low priority.'
- July 13, 2016 – Commander Collins initialed the Armor investigation findings typed on April 27, 2016 and forwarded the findings to Acting Chief Yahner (nearly three months later).
- August 2, 2016 - Phoenix Police Department Discipline Review Board (DRB) clears armors dishonesty investigation for a scheduled review.
- August 10, 2016 – During the Salazar criminal trial, Armour testified that Salazar admitted to possession of drugs. This testimony conflicted with his prior testimony in the case, as well as his written police report.
- August 17, 2016 – Salazar was found guilty at trial.
- August 19, 2016 - Anthony Armour's DRB is scheduled for September 29, 2016.
- September 30, 2016 – Armour was given a 104-hour (80 and 24 hours, respectively) suspension from duty following a discipline review board hearing for dishonesty.
- October 4, 2016 – Acting Chief Yahner acknowledges suspension for Armour.
- October 5, 2016 - Results of the DRB are received in Armour's dishonesty investigation.
- November 30, 2016 - Armour serves his suspension from the Phoenix Police Department.
- December 5, 2016 – Salazar was sentenced to prison.
- December 19, 2016 - the Phoenix Police Department decides that Armour's dishonesty investigation is ready for a "Brady review.'
- December 23, 2016 – Armour's dishonesty investigation is forwarded to the Maricopa County Attorney's office and city prosecutor's office for 'Brady review.'
- January 26, 2017 - Ofc. Anthony Armour is served a letter from the Maricopa County Attorney's office, Law Enforcement Liaison Keith Manning, notifying him that he 'shall be' included in the Law Enforcement Rule 15 Disclosure Database. The letter is carbon copied to the Phoenix Law Enforcement Association.
- January 26, 2017 – Chief Jeri Williams is sent a letter from the Maricopa County Attorney's Office, Law Enforcement Liaison Keith Manning, notifying her that Armour 'shall be' included in the Law Enforcement Rule 15 Disclosure Database.

6

SAL00289



# Expert Witness Report
### Daniel Brown, MADM, Chief of Police (Retired)

## FACTORS IN DETERMINING OPINIONS AND CONCLUSIONS

The following are all factors considered in determining opinions and conclusions in this case. These factors are common knowledge to trained, educated, and experienced law enforcement executives throughout the United States. They should be considered when creating police department policies, procedures, and directives and are essential in the decision making within any law enforcement agency regardless of the size or location. Each listed court case directly relates to the Salazar case.

1. Plaintiff Salazar was not afforded protection as a United States citizen under the 14th Amendment of the United States Constitution (U.S. Constitution Amendment 14).
   a. The defendants, in this case, violated the due process of law. They were aware of Anthony Armour's documented history of untruthfulness and failed to disclose this information when requested.
2. *Brady v. Maryland*, 373 U.S. 83, 87 (1963) is a landmark case that has been in existence for more than half a century. This 1963 capital murder case stipulated that the government has a duty to disclose material exculpatory evidence.
   a. Failing to disclose exculpatory evidence, where the evidence is material to either , innocence of the accused, or punishment for the accused, violates due process under the 14th Amendment to the United States Constitution.
   b. There is a clear requirement under due process that requires the prosecution to turn over evidence that may be favorable to the accused and material to his\her guilt or punishment. This requirement includes evidence that could potentially be used to impeach the prosecution's witnesses, including peace officers.
   c. Police officers and police departments are considered part of the prosecution team under *Brady v. Maryland*. Therefore, police officers and police departments must promptly make the prosecutor aware of any evidence favorable to the accused. Defendant Anthony Armour knew he was under investigation for untruthfulness by the Phoenix Police Department. The Phoenix Police Department was aware of Anthony Armour's propensity for untruthfulness, and yet no member of the Phoenix Police Department promptly notified the prosecution of this fact.
3. *Giglio v. United States*, 405 U.S. 170 (1972) is another landmark court case that expounds on *Brady v. Maryland* and the requirement that includes evidence that can be used to impeach a witness. When a witness's reliability may be a determining factor of guilt or innocence, non-disclosure of evidence affecting credibility must be disclosed regardless of whether it is withheld in good faith.
   a. The Phoenix Police Department was aware of Armour's dishonesty, which could have affected the jury's opinion of Armour's credibility during the trial.
4. *United States v. Bagley*, 473 U.S. 667 (1985) is a court case that clarifies there is no legal distinction between exculpatory evidence and impeachment evidence for Brady rule purposes. Favorable evidence is material if there is a reasonable probability that the court

7



# Expert Witness Report
### Daniel Brown, MADM, Chief of Police (Retired)

case's outcome would have differed if the defense has known exculpatory evidence under the Brady rule. Regardless of whether or not a failure to disclose to defense attorneys that a 'harmless error' standard occurred, it does not apply under *U.S. v. Bagley*. The issue is whether the evidence is material to the case at hand.

    a. The Phoenix Police Department was aware of Armour's dishonesty, and this information should have been disclosed at any point during the trial.

5. *Kyles v. Whitley*, 514 U.S. 419 (1995) stipulates that a prosecutor has a duty to learn of any favorable evidence known to others acting on behalf of the government, including the police.

    a. The Phoenix Police Department was aware of Armour's dishonesty.

6. *Strickler v. Greene*, 527 U.S. 263 (1999) is a US Court of Appeals case for the Fourth Circuit that was argued in 1999. There are three essential components of a Brady claim that can impact a court case. Evidence favorable to the defendant because it is exculpatory or impeaching, the state willfully or inadvertently suppressing the evidence, and when prejudice results in a case.

    a. The Phoenix Police Department was aware of Armour's dishonesty and either willfully or inadvertently suppressed the Brady material evidence.

7. Phoenix Police Department Operations Order 2.9 (Revision date 06/13), Court Appearances, Section 8, Brady Disclosure Procedures:

    a. Subsection A states: "*Potential <u>Brady</u> disclosure material may deal with issues of honesty, integrity, bias, and/or moral turpitude.*"

    b. Subsection B states: "It is the responsibility of all department employees who may be potential witnesses to notify the prosecutor immediately of their status, if: "… *The employee is aware of potential exculpatory information that the department is not.*"

8. Phoenix Police Department Operations Order 3.13 (Revision date 06/13), Rules and Regulations, Section 6, Rules of Conduct, Subsection A requires all Phoenix Police Department employees to be truthful.

9. Phoenix Police Department Operations Order 3.18 (Revision date 04/16), Discipline Policy and Review Boards. This policy is 17 pages in length and is quite comprehensive. Nowhere in the discipline policy does the Phoenix Police Department mention the Rule 15 Database, Brady List, or Integrity Database, or the potential referral to such a database as a result of discipline for exculpatory Brady material.

10. Phoenix Police Department Operations Order 3.19 (Revision date 04/16), Misconduct Investigations. This policy is 15 pages in length and is quite comprehensive. Nowhere in this policy does the Phoenix Police Department mention the Rule 15 Database, Brady List, or Integrity Database, or the potential referral to such a database resulting from a sustained misconduct investigation for exculpatory Brady material.

11. International Association of Chiefs of Police (IACP), Model Policy, Brady Disclosure Requirements, effective date April 2009.

8



# Expert Witness Report
### Daniel Brown, MADM, Chief of Police (Retired)

12. International Association of Chiefs of Police (IACP), National Law Enforcement Policy Center, concepts and issues paper dated August 2008 titled 'Brady Disclosure Requirements.'

## OPINIONS AND CONCLUSIONS

1. Based on the documents provided and reviewed, the Phoenix Police Department and Officer Anthony Armour failed to follow well-accepted standards for law enforcement agencies in the United States regarding the disclosure of exculpatory Brady review material promptly.

   a. In reviewing the Phoenix Police Department Operations Orders, there does not appear to be a clearly defined policy regarding Brady disclosure requirements and the timeline required to disclose exculpatory Brady material. Although Phoenix Police Department Operations Order 2.9 (Revision date 06/13), Court Appearances, Section 8, Brady Disclosure Procedures articulate, "It is the responsibility of all department employees who may be potential witnesses to notify the prosecutor **immediately** of their status, if: "… *The employee is aware of potential exculpatory information that the department is not*." The policy is vaguely written as it pertains to the actual timeline of when the police investigators are required to disclose Brady material, and specifically, and who in the agency is required to notify the court in a timely manner.

   b. An undated flowchart provided by the Phoenix Police Department regarding the 'Brady Process' indicates that the very first step in the process does not start until 'discipline has been served' on the affected employee. In Anthony Armor's case, his internal investigation for dishonesty was sustained on April 27, 2016. On this date, the Phoenix Police Department was aware that Anthony Armour was a documented liar. However, the Phoenix Police Department did not forward these findings to the Maricopa County Attorney's office until December 23, 2016, nearly eight months after the department was aware of exculpatory Brady material regarding Anthony Armour. Meanwhile, Frances Salazar's criminal trial hinged on Armour's credibility as a witness for the state. The delay in immediately notifying the Maricopa County Attorney's office of a potential exculpatory Brady material item was detrimental to Frances Salazar's defense.

   c. Regarding potential Brady review material, internal affairs investigations that are generally confidential and not yet subject to investigative closure does not apply under the Brady doctrine. In certain circumstances, such as Anthony Armour's dishonesty investigation, the officer's prior conduct is relevant in the criminal trial because that conduct reflects on the credibility of the police officer himself. The Phoenix Police Department and Anthony Armour himself had a duty to disclose exculpatory Brady material in the Salazar case, yet failed to do so. At a minimum, the Phoenix Police Department should have immediately made the prosecutor's

9

SAL00292



# Expert Witness Report
### Daniel Brown, MADM, Chief of Police (Retired)

office aware of Anthony Armour's information that would be favorable to the defense.

    d.   The IACP Model Policy for Brady Disclosure Requirements is an excellent example of a well-vetted policy regarding Brady disclosure used by hundreds of law enforcement agencies around the United States. While the Phoenix Police Department includes Brady disclosure procedures within the court appearances policy, the disclosure timeline is vague at best, and the policy does not clearly articulate the time frame within the internal investigation process that potential Brady issues exist and must be disclosed. In the current Phoenix Police court appearance policy, the investigators should have **immediately** notified the prosecutors office regardless of any departmental discipline process.

    e.   The Phoenix Police Department does not appear to have a clearly defined policy or directive that abides by the Brady review process's basic premise that protects the rights of those accused in criminal proceedings.

    f.   It is the opinion of this law enforcement expert that the constitutional rights of Ms. Frances Salazar were violated under 42 U.S.C. § 1983 because the defendants violated their duty to disclose potentially exculpatory information under *Brady v. Maryland* regarding defendant Anthony Armour, a City of Phoenix police officer. The inaction of the Phoenix Police Department to swiftly notify the Maricopa County Attorney's office of the potential Brady issues with their employee potentially deprived Ms. Salazar of her freedoms

2. There is insufficient information provided that indicates the Maricopa County Attorney's Office was aware that Anthony Armour was the subject of an ongoing internal investigation involving untruthfulness that could be potential exculpatory Brady material at any point during the trial of Frances Salazar.

**FINALLY**

In this report, I base my opinions/conclusions on current law enforcement standards which are derived from my extensive training, knowledge, formal education, and experience as a police administrator and veteran law enforcement officer of nearly 22 years. My investigation in this matter is ongoing. I may make additions, deletions, or amendments to this report in the future, which should be reflected in my trial testimony, based on newly discovered information, the reports, and testimony of other witnesses, or other additional information. If you need more specific information about anything in this report or anything additional in this case, please notify me.

Respectfully,


Daniel J. Brown

www.EvidenceSolutions.com | ClientServices@EvidenceSolutions.com | P.O. Box 42047, Tucson, AZ 85733 | (866) 795-7166

SAL00293

# EXHIBIT LL

1

**HONOR LAW GROUP, PLLC**
Benjamin L. Rundall, State Bar No. 031661

2
James M. Cool, State Bar No. 028023
4450 S. Rural Rd., Suite C-220

3
Tempe, AZ 85282
(602) 282-0223

4
Attorney E-mail:  rundall@aztrialattorneys.com

5
*Attorneys for Plaintiff*

6
                        **UNITED STATES DISTRICT COURT**

7

8
                            **DISTRICT OF ARIZONA**

9
Frances Salazar, individually,                    Case No. CV-19-01188-PHX-SRB (ESW)

10
                          Plaintiff,

11
                                                  **PLAINTIFF'S SECOND**
                                                  **SUPPLEMENTAL MIDP RESPONSES**

12
          vs.

13
City of Phoenix, a political subdivision of

14
the state of Arizona; Jeri Williams, Acting
Chief of Police for the City of Phoenix

15
Police Department; Joe Yahner, former
Chief of Police for the City of Phoenix

16
Police Department; Anthony Armour, a
married man; Maricopa County, a political

17
subdivision of the state of Arizona; Bill

18
Montgomery, Elected head of the Maricopa
County Attorney's Office; Elizabeth Lake,

19
Prosecutor with the Maricopa County
Attorney's Office; Black and White

20
Companies or Entities I-X, and Jane and

21
John Does 1-10,

22

23
                          Defendants.

24
          Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure and General Order

25
17-08, Plaintiff Frances Salazar ("Plaintiff" or "Ms. Salazar"), by and through undersigned

26
counsel, hereby submits the following supplemental disclosures. ***Accumulative, additions in***

27
***bold and italics.***

28

**A.    PERSONS WHO ARE LIKELY TO HAVE DISCOVERABLE INFORMATION RELEVANT TO THE PARTIES' CLAIMS OR DEFENSES.**

The witnesses Plaintiff expects to call and the subject matter upon which each witness may testify are set forth below. Plaintiff reserves the right to supplement and amend this information with additional witnesses and/or information at any time.

     **1.      Frances Salazar**
         c/o Honor Law Group, PLLC
         4450 S. Rural Rd., Ste. C-220
         Tempe, AZ 85282

Frances Salazar is the Plaintiff in this case. Ms. Salazar is expected to testify about the facts and circumstances giving rise to this action and the harms caused to her by Defendants.

     **2.      Christopher Doran, Esq.**
         Doran Justice, PLLC
         67 E. Weldon Ave., Suite 103
         Phoenix, AZ 85012

Christopher Doran was Ms. Salazar's trial attorney. Mr. Doran is expected to testify about his knowledge of the issues raised throughout Ms. Salazar's criminal case and, specifically, regarding Officer Armour's conflicting and dishonest statements and testimony.

     **3.      Samantha DuMond, Esq.**
         DuMond Law, PLLC
         1006 W. Adams St. #101
         Phoenix, AZ 85007

Samantha DuMond was one of Ms. Salazar's attorneys and co-counsel with Attorney Doran during Ms. Salazar's trial. Ms. DuMond is expected to testify about her knowledge of the issues raised throughout Ms. Salazar's criminal case and, specifically, regarding Officer Armour's conflicting and dishonest statements and testimony.

2

**4.** **Tom M. Timmer, Esq.**
c/o Public Defender's Office
620 W Jackson Street, Suite 4015
Phoenix, AZ 85003

Tom M. Timmer was Ms. Salazar's first public defender. Mr. Timmer is expected to testify about his knowledge of Ms. Salazar's case.

**5.** **Emily Wolkowicz, Esq.**
c/o Public Defender's Office
620 W Jackson Street, Suite 4015
Phoenix, AZ 85003

Emily Wolkowicz was one of Ms. Salazar's public defenders. Ms. Wolkowicz is expected to testify about her knowledge of Ms. Salazar's case and the issues raised throughout the beginning of Ms. Salazar's criminal case and, specifically, regarding Officer Armour's conflicting statements.

**6.** **Zubair Aslamy, Esq.**

Zubair Aslamy was one of Ms. Salazar's public defenders. Mr. Aslamy is expected to testify about his knowledge of Ms. Salazar's case.

**7.** **Jeff Altieri, Esq.**
Altieri Law Office
20 E. Thomas Rd., Suite 2200
Phoenix, AZ 85012

Jeff Altieri was one of Ms. Salazar's public defenders. Mr. Altieri is expected to testify about his knowledge of Ms. Salazar's case.

3

**8.     Greg Clark, Esq.**
         c/o Public Defender's Office
         620 W Jackson Street, Suite 4015
         Phoenix, AZ 85003

Greg Clark was one of Ms. Salazar's public defenders. Mr. Clark is expected to testify about his knowledge of Ms. Salazar's case.

**9.     Heather Kirka, Esq.**
         c/o Maricopa County Attorney's Office
         301 W Jefferson Street, Suite 800
         Phoenix, AZ 85003

Heather Kirka was one of the prosecutors assigned to Ms. Salazar's case. Ms. Kirka is expected to testify about her knowledge of Ms. Salazar's case.

**10.    Joseph Hinrichsen, Esq.**
         c/o Maricopa County Attorney's Office
         301 W Jefferson Street, Suite 800
         Phoenix, AZ 85003

Joseph Hinrichsen was one of the prosecutors assigned to Ms. Salazar's case. Mr. Hinrichsen is expected to testify about his knowledge of Ms. Salazar's case.

**11.    Julia C. Vanhelder, Esq.**
         c/o Maricopa County Attorney's Office
         301 W Jefferson Street, Suite 800
         Phoenix, AZ 85003

Julia Vanhelder was one of the prosecutors assigned to Ms. Salazar's case. Ms. Vanhelder is expected to testify about her knowledge of Ms. Salazar's case.

**12.    Elizabeth Lake, Esq.**
         c/o Maricopa County Attorney's Office

4

301 W Jefferson Street, Suite 800
Phoenix, AZ 85003

Elizabeth Lake was the prosecuting attorney at trial. Ms. Lake is expected to testify about her knowledge of Ms. Salazar's case, Officer Armour's sustained wrongdoing, and the MCAO's policies and procedures regarding *Brady* material.

**13.    Emily Hovater, Esq.**
c/o Maricopa County Attorney's Office
301 W Jefferson Street, Suite 800
Phoenix, AZ 85003

Emily Hovater was co-counsel with Prosecutor Lake during Ms. Salazar's trial. Ms. Hovater is expected to testify about her knowledge of Ms. Salazar's case, Officer Armour's sustained wrongdoing, and the MCAO's policies and procedures regarding *Brady* material.

**14.    Officer Anthony Armour (#8605)**
c/o Phoenix Police Department
620 W. Washington St.
Phoenix, AZ 85003

Officer Anthony Armour was the arresting officer on December 31, 2013. Officer Armour is expected to testify about his knowledge of this matter.

**15.    Officer Keith Backhaus (#8523)**
c/o Phoenix Police Department
620 W. Washington St.
Phoenix, AZ 85003

Officer Keith Backhaus was Officer Armour's partner during the December 31, 2013 traffic stop and arrest of Ms. Salazar. Officer Backhaus is expected to testify about the facts and circumstances giving rise to this action and, specifically, his observations and actions

5

preceding and during the traffic stop. He is further expected to testify consistent with his trial testimony.

**16.   Officer Alicia Strnad (#9059)**
c/o Phoenix Police Department
620 W. Washington St.
Phoenix, AZ 85003

Officer Strnad was a responding officer on December 31, 2013 after Officer Armour requested assistance. Officer Strnad is expected to testify about the facts and circumstances giving rise to this action and, specifically, about her search of Ms. Salazar.

**17.   Sergeant Bill Martin (#5613)**
c/o Phoenix Police Department
620 W. Washington St.
Phoenix, AZ 85003

Sergeant Bill Martin performed the field test of the substance found in the pipe on December 31, 2013 after Officer Armour requested assistance. Sergeant Martin is expected to testify consistent with his field test findings.

**18.   Police Chief Jeri Williams**
c/o The City Clerk
200 W. Washington St.
Phoenix, AZ 85003

Police Chief Jeri Williams is the acting Chief of Police for the Phoenix Police Department and has been since October 2016. Chief Williams is expected to testify about the Phoenix Police Department's current policies and procedures regarding *Brady* material and placing officers on the Brady list.

6

**19.    Joseph Yahner**

███████████████████████

███████████████

Joseph Yahner is the former Chief of Police for the Phoenix Police Department from December 2014 through October 2016. Mr. Yahner is expected to testify about the Phoenix Police Department's policies and procedures that were in place during his tenure regarding *Brady* material and placing officers on the Brady list.

**20.    Rodney McCullough**

████████████████

██████████

█████████████████████████████

██████████████

████████████████

Rodney McCullough was the driver of the gold Jaguar at the time of the traffic stop on December 31, 2013, and witnessed the events giving rise to this action. Mr. McCullough is expected to testify on the facts and circumstances giving rise to this action.

**21.    Antonio Harris**

█████████████████

██████████████████

Antonio Harris was the owner of the gold Jaguar at the time of the traffic stop on December 31, 2013, who testified at Ms. Salazar's trial that the crack pipe and crack were his. Mr. Harris is expected to testify on the facts and circumstances giving rise to this action.

**B.    INDIVIDUALS WHO HAVE GIVEN WRITTEN OR RECORDED STATEMENTS RELEVANT TO THE ANY PARTY'S CLAIM OR DEFENSES.**

Plaintiff is not aware of any individuals who given written or recorded statement relevant to any party's claims or defenses in this lawsuit. If Plaintiff becomes aware of any

statements, this disclosure will be supplemented accordingly.

**C.**     **DOCUMENTS, ESI, AND OTHER TANGIBLE THINGS WHICH MAY BE RELEVANT TO ANY PARTY'S CLAIMS OR DEFENSES.**

| Date | Description | Bates Number |
|---|---|---|
| 04/27/2016 | Professional Standards Bureau Report re: Officer Armour | SAL00001 – SAL00016 |
| 12/31/2013 | Police Report | SAL00017 – SAL00024 |
| 04/09/2014 | State's Notice of Disclosure and Request for Disclosure | SAL00025 – SAL00031 |
| 05/21/2014 | Defendant's Rule 15.1 (a), (b), (c), (d), (e) Request for Disclosure | SAL00032 – SAL00034 |
| 03/31/2015 | Motion to Continue Trial Date Beyond Last Day | SAL00035 – SAL00037 |
| 10/13/2015 | Defendant's Rule 15.2 Disclosure Notice | SAL00038 – SAL00044 |
| 02/22/2017 | State's Supplemental Motion to Disclose New Evidence Pursuant to Rule 15 and/or ER 3.8 | SAL00045 – SAL00046 |
| 10/26/2017 | Notice of Post-Conviction Relief | SAL00047 – SAL00050 |
| 03/30/2018 | Petition for Post-Conviction Relief | SAL00051 – SAL00068 |
| 06/07/2018 | Response to Petition for Post-Conviction Relief | SAL00069 – SAL00070 |
| 07/10/2018 | Minute Entry Granting Petition for Post-Conviction Relief | SAL00071 – SAL00072 |
| 07/23/2018 | State's Motion to Dismiss | SAL00073 – SAL00074 |
| 07/26/2018 | Minute Entry re: PCR Granted / Judgment Vacated | SAL00075 – SAL00076 |
| 08/09/2016 – 08/16/2016 | Video of Jury Trial in Maricopa County Case No. CR2013-462384 | SAL00077 |
| | *Maricopa County Attorney placard with Berger v. US quote* | *SAL00080* |
| *02/21/2018* | *Motion to Vacate Judgement and/or New Trial, due to Newly Disclosed State's Evidence* | *SAL00081 – SAL00105* |

8

| | | |
|---|---|---|
| *03/30/2018* | *Petition for Post-Conviction Relief* | *SAL00106 – SAL00142* |
| *06/07/2018* | *Response to Petition for Post-Conviction Relief* | *SAL00143 – SAL00144* |
| *07/23/2018* | *State's Motion to Dismiss* | *SAL00145 – SAL00146* |
| *03/22/2013* | *Arizona Prosecuting Attorneys' Advisory Council – Prosecutorial Ethics* | *SAL00147 – SAL00155* |
| | *Texas District & County Attorneys Association – Setting the Record Straight on Prosecutorial Misconduct (excerpt)* | *SAL00156 – SAL00165* |
| | *National District Attorneys Association Addresses Exonerations* | *SAL00166 – SAL00167* |
| | *National District Attorneys Association – National Prosecution Standards (excerpt)* | *SAL00168 – SAL00173* |
| | *Maricopa County Attorney's Office Website* | *SAL00174 – SAL00175* |
| | *Ethical Rule 3.8 – Special Responsibilities of a Prosecutor* | *SAL00176 – SAL00177* |
| *12/12/2017* | *Memorandum Decision in appellate action 1-CA-CR-16-0914* | *SAL00178 – SAL00182* |
| | *Brady/Kyles Checklist* | *SAL00183 – SAL00185* |
| | *Emails between C. Doran and E. Lake; C. Doran, J. Garner, and S. DuMond; and M. Torrez and C. Doran re: Brady evidence* | *SAL00186 – SAL00199* |
| | *Rule 15 Disclosure and Brady Obligations* | *SAL00200 – SAL00267* |
| | *Maricopa County Attorney's Office – Prosecution Policies and Procedures* | *SAL00268 – SAL00271* |
| | *Transcript of Excerpt from Legal-Ease Podcast: An Interview with Maricopa County Attorney Candidates on Criminal Justice Reform* | *SAL00272 – SAL00278* |
| | *Audio of Legal-Ease Podcast: An Interview with Maricopa County Attorney Candidates on Criminal Justice Reform* | *SAL00279* |

9

1
2

**D.    FACTUAL BACKGROUND AND LEGAL THEORIES SUPPORTING CLAIMS OR DEFENSES.**

3
4
5
6
7
8
9

After spending just shy of two years (22 months) in prison for a crime she did not commit, Ms. Salazar was exonerated and released when *Brady* material untimely disclosed by Defendants cast doubt on statements made by arresting officer Defendant Armour, whose credibility was critical to Ms. Salazar's conviction. The *Brady* material, a Professional Standards Bureau Report initiated by the City of Phoenix Police Department (the "PPD") regarding unprofessional conduct of Officer Amour, sustained findings that Defendant Armour provided false testimony and false information during another unrelated arrest.

10
11
12
13

On December 31, 2013, around 4:00 AM, Defendant Armour was on duty with another officer in a marked patrol car as a two-man unit in Phoenix, Arizona. Defendant Armour effectuated a traffic stop of the gold vehicle driven by Rodney McCullough and with Ms. Salazar in the front passenger seat, supposedly for a broken tail light.

14
15
16
17
18
19

At one point, Defendant Armour conducted a warrantless search of the vehicle and found a glass pipe with a rock of crack cocaine inside it. Defendant Armour confronted Mr. McCullough about the pipe and crack. Importantly, in Defendant Armour's later written report, the pipe and crack is said to have been found between the front passenger seat and the center console; however, in comments to Mr. McCullough he stated it was located under the front passenger seat.

20
21
22
23
24

Defendant Armour asked Ms. Salazar about the pipe and crack. In a police report memorializing the stop, Defendant Armour stated "Frances admitted the substance inside the pipe being [sic] crack." Defendant Armour also wrote: "Frances then tried to recant her statement and claim that someone else must have left the pipe and drugs there, but that she would 'take responsibility for it.'"

25
26
27

Ms. Salazar disputes she gave either of those statements to Defendant Armour and denied (and still denies) the paraphernalia and crack cocaine belonged to her. Neither of the statements by Ms. Salazar is an admission amounting to possession of paraphernalia or

28

10

narcotics. Irrespective, Ms. Salazar was ultimately charged by the Maricopa County Attorney's Office and criminally prosecuted for possession of drug paraphernalia and possession of a narcotic drug, both felonies.

### 1. The Wrongful Prosecution

On April 9, 2014, Defendant MCAO and Prosecutor Lake filed their initial disclosure statement in Ms. Salazar's criminal case that did not include any *Brady* material such as internal investigation or other disciplinary reports concerning or involving Officer Armour. On at least two (2) occasions, different defense counsel for Ms. Salazar specifically requested, among other information, all statements of the defendant and any *Brady* material. No *Brady* material was ever disclosed to Ms. Salazar's criminal defense counsel by Defendants.

Nevertheless, on January 29, 2016, Frances' then-current counsel, Attorney Christopher Doran, filed a Motion to Suppress evidence in which he discussed inconsistencies with Defendant Armour's statements, disputed Defendant Armour's credibility, and outlined Defendant Armour's propensity for dishonesty. Some of the inconsistencies mentioned included: the reason for the traffic stop (expired tags on a temporary paper license plate or a broken tail light) and the location of the pipe found during the traffic stop (between the center console and the front passenger seat or under the front passenger seat). In part because of these inconsistencies, and Ms. Salazar's steadfast proclamation of innocence, Ms. Salazar's case ultimately went to trial.

### 2. The Trial

On August 10, 2016, Attorney Doran took Ms. Salazar's case to trial. At trial, Defendant Armour testified for the first time Ms. Salazar had admitted to the crack and crack pipe being hers. Attorney Doran impeached Defendant Armour's testimony by using previous statements in his police report and prior testimony from a preliminary hearing and suppression hearing.

Defendant Armour's conflicting testimony at trial became the cornerstone of Attorney Doran's argument to the jury that his testimony was not credible, and that he had a propensity

for dishonesty. Attorney Doran also presented the jury with testimony from the owner of the gold vehicle, Antonio Harris, who admitted the crack pipe and crack were his.

Despite the testimony of Mr. Harris and the conflicting testimony of Defendant Armour, the jury ultimately found Ms. Salazar guilty on August 17, 2016. On December 5, 2016, Ms. Salazar was sentenced to six years imprisonment.

### 3. The *Brady* Material and Proof of Defendant Armour's Propensity for Dishonesty

On April 27, 2016, allegations against Defendant Armour by the City of Phoenix Police Department (the "PPD") were sustained in a report (the "Report") made after an official investigation. Those allegations, summarized, included: (1) unlawful entrance of a private residence; (2) false arrest of a citizen; (3) providing false testimony in a verbal report to a supervising officer; (4) providing false information in an incident report; and, (5) disobeying a lawful order given by a supervising officer. The arrest giving rise to those allegations proves Defendant Armour's propensity for dishonesty.

Following the problematic arrest, which occurred on November 4, 2015 and involved Defendant Armour's actions in following-up on a domestic violence call from five (5) days earlier, the PPD initiated a Complaint against him. The investigation was headed by PPD's Professional Standards Bureau ("the "PSB"). On April 27, 2016, the PSB released a fifteen (15) page report sustaining every allegation against Defendant Armour. In their conclusion, the PSB investigators determined Defendant Armour's actions constituted "intentional abuse of police powers, authority, and privileges." PSB investigators also determined Defendant Armour "knowingly submitted a criminal investigation…report with false information." Combined, Defendant Armour was cited for seven violations of PPD's polices.

### 4. The Blue Shield to Protect Defendant Armour and Prevent Ms. Salazar's Exoneration

The Report was initially disclosed to the Superior Court by Defendants on February 22, 2017, one-hundred and ninety (190) days after Ms. Salazar's conviction by the jury on

August 17, 2016. The Report was not directly sent to Attorney Doran or Ms. Salazar by fax, email, or mail, but was rather filed under the old criminal court case number by the Prosecutor even though the Superior Court does not disseminate disclosures.

Defendants did not send Attorney Doran, Ms. Salazar, or any other party any kind of notification about the disclosure to the Court containing the Report. Attorney Doran did not receive a copy of the Report until December 14, 2017. Ms. Salazar was not made aware of the Report until December 15, 2017, and did not receive a copy of the Report until January 9, 2018.

On March 30, 2018, after Attorney Doran reviewed the Report, he filed a new Motion for Post-Conviction Relief on Ms. Salazar's behalf, citing Defendants' failure to disclose *Brady* material, i.e., the Report. Then, on June 7, 2018, Defendant MCAO filed a Response to Ms. Salazar's motion and conceded a failure to disclose *Brady* material. On July 10, 2018, the Superior Court reviewed and granted Ms. Salazar's Petition for Post-Conviction Relief.

Defendants' primary evidence against Ms. Salazar at trial was Officer Armour's testimony. Defendant Armour unequivocally (and for the first time) testified at trial Ms. Salazar had admitted to the crack and crack pipe being hers. Information contained in the Report could have been used by Ms. Salazar to impeach and undermine Defendant Armour's testimony. Defendants had a non-discretionary duty to turn over the Report. Accordingly, Ms. Salazar's due process rights were violated when she was not provided with the Report.

**5.      Violation of 42 U.S.C. § 1983 – Due Process**

As a citizen of the United States, Ms. Salazar is entitled to the protection and benefit of the laws and Constitution of the United States of America. The 14th Amendment of the United States Constitution declares "nor shall any State deprive any person of life, liberty, or property, without due process of law." *See* U.S. Const. Amend. 14. Defendants are all state actors whose conduct is subject to 42 U.S.C. § 1983 and the 14th Amendment of the United States Constitution.

Defendants' deliberate indifference and/or reckless disregard in failing to produce evidence (the Report) material to Ms. Salazar's guilt or innocence prior to trial constitutes a violation of Ms. Salazar's due process rights. *Brady v. Maryland,* 373 U.S. 83, 87 (1963); *see also Tennison v. City & County of San Francisco*, 570 F. 3d 1078, 1088 (9th Cir. 2009).

**6.     Municipal Liability under *Monell***

Defendants were at all times relevant, agents of the City of Phoenix. Defendants acted, upon information and belief, in execution of the government policy or custom that may fairly be said to represent official policy. *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658, 694 (1978).

Upon information and belief, Defendants failed to implement a policy to ensure compliance with law mandating the disclosure of *Brady* material or implemented a policy that was recklessly indifferent to the rights of individuals like Ms. Salazar.

**7.     Violation of 42 U.S.C. § 1983 – Failure to Adequately Train & Supervise**

Defendants MCAO and PPD have or should have policies, procedures, practices, and/or customs which govern the disclosure of *Brady* material when discovered or requested by a party opponent in a criminal case that reasonably safeguard the fair trial and due process rights of criminal defendants.

Upon information and belief, Defendants MCAO and PPD's policies, procedures, practices, and/or customs require *Brady* material to be disclosed when it is discovered. Upon information and belief, Defendants failed to train or supervise their employees and staff when handling requests or dealing with the production of *Brady* material which resulted in the Report being disclosed to Ms. Salazar post-conviction.

**E.     <u>COMPUTATION OF DAMAGES</u>**

Plaintiff reserves the right to amend and supplement this section of her disclosure as discovery continues.

**F.     <u>INSURANCE</u>**

This portion of the mandatory disclosure is not applicable to Plaintiff.

14

DATED this 1st day of October, 2020.

**HONOR LAW GROUP, PLLC**

By _____*/s/ Benjamin L. Rundall*_____
      Benjamin L. Rundall, Esq.
      4450 S. Rural Rd., Suite C-220
      Tempe, AZ 85282
      *Attorneys for Plaintiff*

COPY of the foregoing mailed/emailed
this 1st day of October, 2020, to:

Maxine S. Mak, Esq.
Charles E. Trullinger, Esq.
Maricopa County Attorney's Office – Civil Division
222 N. Central Ave., Suite 1100
Phoenix, AZ 85004
*Attorneys for County Defendants*

Lori V. Berke, Esq.
Jody C. Corbett
Berke Law Firm, PLLC
1601 N. 7th St., Suite 360
Phoenix, AZ 85006
*Attorneys for City Defendants*

*/s/ ALG*_____

15

**HONOR LAW GROUP, PLLC**
Benjamin L. Rundall, State Bar No. 031661
James M. Cool, State Bar No. 028023
4450 S. Rural Rd., Suite C-220
Tempe, AZ 85282
(602) 282-0223
Attorney E-mail:  rundall@aztrialattorneys.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Frances Salazar, individually, | Case No. CV-19-01188-PHX-SRB (ESW) |
| Plaintiff, | |
| vs. | **PLAINTIFF'S THIRD SUPPLEMENTAL MIDP RESPONSES** |
| City of Phoenix, a political subdivision of the state of Arizona; Jeri Williams, Acting Chief of Police for the City of Phoenix Police Department; Joe Yahner, former Chief of Police for the City of Phoenix Police Department; Anthony Armour, a married man; Maricopa County, a political subdivision of the state of Arizona; Bill Montgomery, Elected head of the Maricopa County Attorney's Office; Elizabeth Lake, Prosecutor with the Maricopa County Attorney's Office; Black and White Companies or Entities I-X, and Jane and John Does 1-10, | |
| Defendants. | |

Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure and General Order 17-08, Plaintiff Frances Salazar ("Plaintiff" or "Ms. Salazar"), by and through undersigned counsel, hereby submits the following supplemental disclosures. ***Accumulative, additions in bold and italics.***

C.    **DOCUMENTS, ESI, AND OTHER TANGIBLE THINGS WHICH MAY BE RELEVANT TO ANY PARTY'S CLAIMS OR DEFENSES.**

| Date | Description | Bates Number |
|------|-------------|--------------|
|  | *DuMond & Doran file* | *SAL00280 – SAL00283* |

DATED this 18th day of November, 2020.

HONOR LAW GROUP, PLLC

By _____*/s/ Benjamin L. Rundall*_____
        Benjamin L. Rundall, Esq.
        4450 S. Rural Rd., Suite C-220
        Tempe, AZ 85282
        *Attorneys for Plaintiff*

COPY of the foregoing mailed/emailed
this 18th day of November, 2020, to:

Maxine S. Mak, Esq.
Charles E. Trullinger, Esq.
Maricopa County Attorney's Office – Civil Division
222 N. Central Ave., Suite 1100
Phoenix, AZ 85004
*Attorneys for County Defendants*

Lori V. Berke, Esq.
Jody C. Corbett
Berke Law Firm, PLLC
1601 N. 7th St., Suite 360
Phoenix, AZ 85006
*Attorneys for City Defendants*

___*/s/ ALG*___

2

1
2
3
4
5
6

**HONOR LAW GROUP, PLLC**
Benjamin L. Rundall, State Bar No. 031661
Abbie L. Godles, State Bar No. 036003
4450 S. Rural Rd., Suite C-220
Tempe, AZ 85282
(602) 282-0223
Attorney E-mail: rundall@honorlawgroup.com
                 godles@honorlawgroup.com

*Attorneys for Plaintiff*

7
8
9

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

10
11
12
13
14
15

| | |
|---|---|
| Frances Salazar, individually, | Case No. CV-19-01188-PHX-SRB (ESW) |
| Plaintiff, | |
| vs. | **PLAINTIFF'S FIFTH SUPPLEMENTAL MIDP RESPONSES** |
| Phoenix, City of, et al., | |
| Defendants. | |

16
17
18
19
20

Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure and General Order 17-08, Plaintiff Frances Salazar ("Plaintiff" or "Ms. Salazar"), by and through undersigned counsel, hereby submits the following supplemental disclosures. ***Accumulative, additions in bold and italics.***

21
22

**C.    DOCUMENTS, ESI, AND OTHER TANGIBLE THINGS WHICH MAY BE RELEVANT TO ANY PARTY'S CLAIMS OR DEFENSES.**

23
24
25
26
27
28

| Date | Description | Bates Number |
|---|---|---|
| | ***City of Phoenix Police Department Operations Order 1.1 – Purpose Statement / Guiding Values*** | *SAL00294 – SAL00295* |
| | ***City of Phoenix Police Department Operations Order 1.2 – Limits of Authority*** | *SAL00296* |
| | ***City of Phoenix Police Department Operations Order 3.19 – Misconduct Investigations*** | *SAL00297 – SAL00311* |

| | | |
|---|---|---|
| *01/2001* | *U.S. Department of Justice's Principles for Promoting Police Integrity* | *SAL00312 – SAL00356* |
| *01/2020* | *U.S. Department of Justice's Justice Manual – Title 9: Criminal* | *SAL00357 – SAL00376* |
| *10/28/20* | *Correspondence from The People's Law Firm to MCAO re: Officer Armour* | *SAL00377 – SAL00393* |
| | *AZPOST's response to Plaintiff's subpoena duces tecum* | *SAL00394 – SAL00680* |
| | *ABC15 Interview of Officer Abigail Frost* | *SAL00681 – SAL00683* |

DATED this 13th day of May, 2021.

HONOR LAW GROUP, PLLC

By _____ */s/ Benjamin L. Rundall* _____
Benjamin L. Rundall, Esq.
4450 S. Rural Rd., Suite C-220
Tempe, AZ 85282
*Attorneys for Plaintiff*

COPY of the foregoing mailed/emailed
this 13th day of May, 2021, to:

Maxine S. Mak, Esq.
Angela Lane, Esq.
Maricopa County Attorney's Office – Civil Division
222 N. Central Ave., Suite 1100
Phoenix, AZ 85004
*Attorneys for Elizabeth Lake*

Lori V. Berke, Esq.
Jody C. Corbett
Berke Law Firm, PLLC
1601 N. 7th St., Suite 360
Phoenix, AZ 85006
*Attorneys for City Defendants*

___ */s/ ALG* ___

2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**HONOR LAW GROUP, PLLC**
Benjamin L. Rundall, State Bar No. 031661
Abbie L. Godles, State Bar No. 036003
4450 S. Rural Rd., Suite C-220
Tempe, AZ 85282
(602) 282-0223
Attorney E-mail:  rundall@honorlawgroup.com
                 godles@honorlawgroup.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Frances Salazar, individually,<br><br>Plaintiff,<br><br>vs.<br><br>Phoenix, City of, et al.,<br><br>Defendants. | Case No. CV-19-01188-PHX-SRB (ESW)<br><br>**PLAINTIFF'S SEVENTH SUPPLEMENTAL MIDP RESPONSES** |

Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure and General Order 17-08, Plaintiff Frances Salazar ("Plaintiff" or "Ms. Salazar"), by and through undersigned counsel, hereby submits the following supplemental disclosures. ***Accumulative, additions in bold and italics.***

**A.** **PERSONS WHO ARE LIKELY TO HAVE DISCOVERABLE INFORMATION RELEVANT TO THE PARTIES' CLAIMS OR DEFENSES.**

*22.* *Abigail Frost Dennison*

*Abigail Dennison is a former police officer who worked with Defendant Armour. Mrs. Dennison is expected to testify about her knowledge of Defendant Armour's character for truthfulness.*

1

2        **23.**    *JeAnna Anderson*

3

4        *JeAnna Anderson was arrested and assaulted by Defendant Armour. Ms. Anderson*

5   *is expected to testify about her knowledge of Defendant Armour's character for*

6   *truthfulness.*

7

8        **24.**    *Tim Biardi*
                      *c/o Berke Law Firm, PLLC*

9                     *1601 N. 7th St., Suite 360*
                      *Phoenix, AZ 85006*

10

11       *Tim Biardi was one of Defendant Armour's police union representatives. Mr. Biardi*

12  *is expected to testify about his knowledge of Defendant Armour's decision not to appeal the*

13  *findings sustained in PSB Report No. 15-0126 and that he never signed anything on*

14  *Defendant Armour's behalf without Defendant Armour's knowledge.*

15

16       **25.**    *Michael "Britt" London*
                      *c/o Berke Law Firm, PLLC*

17                    *1601 N. 7th St., Suite 360*
                      *Phoenix, AZ 85006*

18

19

20       *Michael Britt London was one of Defendant Armour's police union representatives.*

21  *Mr. London is expected to testify about his knowledge of Defendant Armour's decision not*

22  *to appeal the findings sustained in PSB Report No. 15-0126 and that he never signed*

23  *anything on Defendant Armour's behalf without Defendant Armour's knowledge.*

24

25       **26.**    *Assistant Chief Steve Martos*
                      *c/o Berke Law Firm, PLLC*

26                    *1601 N. 7th St., Suite 360*
                      *Phoenix, AZ 85006*

27

28

*Assistant Chief Steve Martos was the PSB lieutenant who reviewed Defendant Armour's case leading to the sustained allegations in PSB Report No. 15-0126. Assistant Chief Martos is expected to testify about his knowledge of the current Brady process that the City of Phoenix Police Department uses.*

27.   *Sergeant Amy Breitzman*
      *c/o Berke Law Firm, PLLC*
      *1601 N. 7th St., Suite 360*
      *Phoenix, AZ 85006*

*Sergeant Amy Breitzman is a PSB sergeant who was the primary investigator of Defendant Armour's case leading to the sustained allegations in PSB Report No. 15-0126. Sergeant Brietzman is expected to testify about her investigation of the allegations sustained in PSB Report No. 15-0126.*

28.   *Sergeant Mark Kincannon*
      *c/o Berke Law Firm, PLLC*
      *1601 N. 7th St., Suite 360*
      *Phoenix, AZ 85006*

*Sergeant Mark Kincannon is a PSB sergeant who was the secondary investigator of Defendant Armour's case leading to the sustained allegations in PSB Report No. 15-0126. Sergeant Kincannon is expected to testify about his investigation of the allegations sustained in PSB Report No. 15-0126.*

## C.   DOCUMENTS, ESI, AND OTHER TANGIBLE THINGS WHICH MAY BE RELEVANT TO ANY PARTY'S CLAIMS OR DEFENSES.

| Description | Bates Number |
| --- | --- |
| *Salazar Data Analysis* | *SAL00700 – SAL00702* |

3

1        DATED this 2nd day of September, 2021.

2

3                          **HONOR LAW GROUP, PLLC**

4                  By _____*/s/ Benjamin L. Rundall*_____

5                      Benjamin L. Rundall, Esq.

6                      4450 S. Rural Rd., Suite C-220

7                      Tempe, AZ 85282

                    *Attorneys for Plaintiff*

8

9  COPY of the foregoing emailed this
2nd day of September, 2021, to:

10

11  Maxine S. Mak, Esq.
Angela Lane, Esq.

12  Maricopa County Attorney's Office – Civil Division
222 N. Central Ave., Suite 1100

13  Phoenix, AZ 85004

14  *Attorneys for Elizabeth Lake*

15  Lori V. Berke, Esq.

16  Jody C. Corbett
Berke Law Firm, PLLC

17  1601 N. 7th St., Suite 360

18  Phoenix, AZ 85006
*Attorneys for City Defendants*

19

20  ___*/s/ ALG*___

21

22

23

24

25

26

27

28

                                4

1  **HONOR LAW GROUP, PLLC**
   Benjamin L. Rundall, State Bar No. 031661
2  Abbie L. Godles, State Bar No. 036003
   4450 S. Rural Rd., Suite C-220
3  Tempe, AZ 85282
   (602) 282-0223
4  Attorney E-mail:  rundall@honorlawgroup.com
5                     godles@honorlawgroup.com

6  *Attorneys for Plaintiff*

7                 **UNITED STATES DISTRICT COURT**

8                     **DISTRICT OF ARIZONA**

9

10  Frances Salazar, individually,          | Case No. CV-19-01188-PHX-SRB (ESW)

11                Plaintiff,

12                                           | **PLAINTIFF'S SEVENTH**
                                             | **SUPPLEMENTAL MIDP RESPONSES**
13       vs.

14  Phoenix, City of, et al.,

15                Defendants.

16       Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure and General Order

17  17-08, Plaintiff Frances Salazar ("Plaintiff" or "Ms. Salazar"), by and through undersigned

18  counsel, hereby submits the following supplemental disclosures. ***Accumulative, additions in***

19  ***bold and italics.***

20  **A.      PERSONS WHO ARE LIKELY TO HAVE DISCOVERABLE INFORMATION**

21          **RELEVANT TO THE PARTIES' CLAIMS OR DEFENSES.**

22

23          ***29.     Ed Zuercher***

24                  ***c/o Berke Law Firm, PLLC***
                    ***1601 N. 7th St., Suite 360***
25                  ***Phoenix, AZ 85006***

26

27          ***Ed Zuercher is the former City Manager for the City of Phoenix and was responsible***

28  ***for hiring Chief Jerri Williams. Mr. Zuercher is expected to testify about his knowledge of***

***Chief Williams experience and training. Chief Zuercher is also expected to testify regarding his knowledge of the City's policies and procedures. Last, Mr. Zuercher is expected to testify regarding his knowledge of investigations into constitutional deprivations by the City of Phoenix Police Department.***

DATED this 19th day of November, 2021.

HONOR LAW GROUP, PLLC

By _____ */s/ Benjamin L. Rundall* _____
    Benjamin L. Rundall, Esq.
    4450 S. Rural Rd., Suite C-220
    Tempe, AZ 85282
    *Attorneys for Plaintiff*

COPY of the foregoing emailed this
19th day of November, 2021, to:

Maxine S. Mak, Esq.
Angela Lane, Esq.
Maricopa County Attorney's Office – Civil Division
222 N. Central Ave., Suite 1100
Phoenix, AZ 85004
*Attorneys for Elizabeth Lake*

Lori V. Berke, Esq.
Jody C. Corbett
Berke Law Firm, PLLC
1601 N. 7th St., Suite 360
Phoenix, AZ 85006
*Attorneys for City Defendants*

  */s/ BLR*

2

# EXHIBIT MM

Clerk of the Superior Court
*** Filed ***
08/02/2019 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2018-005994-001 DT                                    07/31/2019

                                        CLERK OF THE COURT
HONORABLE GEOFFREY FISH                      I. Huerta
                                               Deputy

STATE OF ARIZONA                        GREGORY CECILIA

v.

RONNIE CAMACHO (001)                    KACIE TAYLOR NICKEL

                                        DISPOSITION CLERK-CSC
                                        JUDGE FISH

MINUTE ENTRY

    An Order to Show Cause hearing in this matter was conducted on July 30, 2019.  The Court has since considered the argument presented, the Defendant's *Motion for Hearing to Show Cause* filed on July 18, 2019 and the *State's Response to Motion to Show Cause* filed on July 29, 2019 and the Defendant's exhibit[1] emailed to both the Court and State following the hearing.

    At issue is the repeated requests from the Defendant to the State for the alleged victim's confidential informant (C.I.) file with the Glendale Police Department.  This specific discovery was requested on January 28, 2019 via Defendant's *Supplemental 15.1 Request for Disclosure*. In addition, it appears an email was sent by Defendant's investigator to the State regarding the C.I. file.  Multiple other emails were sent following up on more general discovery requests as well as the C.I. file.  A specific email sent on April 17, 2019 requests, among other things, the C.I. file and related information.  This request is also relayed to the Court at the April 17, 2019 complex case management conference.  The Court ordered full disclosure by April 30, 2019 and set a May 20, 2019 status conference to follow up on any missing discovery.

---

[1] Defense counsel prepared a memorandum detailing discovery requests over a period of time to include emailed requests, in person requests, phone requests, court orders for discovery and the like.  This Court specifically focuses on the C.I. file requests as this is the issue before the Court. The Court will file the memorandum as an exhibit and incorporates the memorandum in this minute entry order.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2018-005994-001 DT                                                        07/31/2019

Between April 17, 2019 and the status conference on May 20, 2019, the parties continued discussing discovery and setting up interviews. Defendant, through counsel, continued to make specific requests of missing discovery including the C.I. file. **On May 20, 2019, counsel for the State sent an email to defense counsel indicating that the C.I. file did not exist[2].** During the May 20, 2019 status conference the Court ordered that all discovery shall be provided to the Defense no later than June 3, 3019. Several emails followed the May 20, 2019 status conference regarding additional missing discovery and on May 31, 2019, defense counsel sent counsel for the state an email restating items the State said did not exist including the C.I. file.

On June 4, 2019, the Defendant filed for a hearing to discuss discovery, preclusion of discovery and extensions of deadlines to file substantive motion. Also during this time period, interviews of many witnesses were being set or attempted to being set. Some interviews did get set, while some were cancelled. The Defense prepared Notices of Deposition for those officers whose interviews could not get set.

On June 13, 2019, the Defense interviewed Sgt. Jared Smith of the Glendale Police Department and learned that the Glendale Police Department requires officers to maintain confidential informant files pursuant to policy. After several more interviews, it was determined that the C.I. file did in fact exist. The State also confirmed at that point that the file existed. The assigned DCA contacted the State's Case Agent, Detective Bill Johnston of the Glendale Police Department to request the file. According to the assigned DCA, Detective Johnston objected to the release of the C.I. file believing that its release would put the victim in danger. Detective Johnston also told the assigned DCA that he believed it was not relevant to the case against the Defendant. The assigned DCA indicated to Det. Johnston that despite these concerns, the Court had ordered the disclosure of the file.

Det. Johnston was interviewed by the Defense on or about July 17, 2019. During that interview the Defense learned more about the C.I. file and also learned that there is a second file held by the Federal Bureau of Alcohol, Tobacco and Firearms.[3]

In their *Response*, the State posits during his interview Det. Johnston answered many questions relating to the alleged victim's conduct as a C.I. and the contents of the file. The Court notes while this may be true, it is still wholly insufficient as the Defense must take Det.

---

[2] The Court has no evidence and does not suspect the assigned Deputy County Attorney of intentionally misleading either the Court or Defense counsel. The Court does take the assigned DCA at his word when he informed Defense counsel that the C.I. file did not exist. In his Response to the OSC, the assigned DCA indicated that it was not until a few weeks before the OSC hearing that he learned about the file's existence and the Court has no reason to question that statement.

[3] Defense concedes that this Court does not have the authority to order the ATF to disclose their file.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2018-005994-001 DT                                      07/31/2019

Johnston's word for what's in the file without the ability to see the file itself and conduct their own investigation and review.

The assigned DCA also informed this Court that Det. Johnston would prefer to see this case resolved and was reminded that there is a court order for the disclosure of the file.  Det. Johnston, as recently as July 25, 2019, informed the assigned DCA that the prosecution should try to resolve the case through a plea agreement and that if the Defendant reject it, he will provide the confidential informant file for disclosure.  As of the hearing held on July 30, 2019, the C.I. file was not disclosed.   Trial in this matter is set for August 8, 2019, just a little over a week away.

The Court has never before encountered such a situation either during the time on the bench or in prior law practice where an order has been issued and a law enforcement agency has refused to comply with the order.  The Court is further befuddled by the fact that someone at the Maricopa County Attorney's Office hasn't called a supervisor at the Glendale Police Department to get the disclosure pursuant to the court order.

While Det. Johnston may rightfully believe that disclosure places the alleged victim in danger, something the Court has no reason to disbelieve, there are mechanisms that could have been put in place including protective orders prohibiting dissemination and limiting Defense counsel from showing the Defendant or others.  The Court takes great issue with Det. Johnston's apparent conclusion that the disclosure is "not relevant".  This is not Det. Johnston's decision and his opinion on what is relevant and not relevant doesn't matter.  What matters is that two separate court orders were issued mandating disclosure of the file and the State, through Det. Johnston has willfully ignored the court's order.

Arizona Rules of Criminal Procedure, Rule 15.7. addresses disclosure violations and sanctions:

> *(a) Motion. Any party may move to compel disclosure or request an appropriate sanction for a disclosure violation of Rule 15 or both. Any motion to compel disclosure or for sanctions must include a separate statement that the moving party has personally consulted with opposing counsel and has made good faith efforts to resolve the matter. Any motion filed without the separate statement will not be heard or scheduled for a hearing.*
> *(b) Order. If the court finds that a party violated a disclosure obligation under Rule 15, it must order disclosure as necessary and impose an appropriate sanction, unless the court finds that:*
> *(1) the failure to comply was harmless; or*

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2018-005994-001 DT                                    07/31/2019

*(2) the party could not have disclosed the information earlier with due diligence and the party disclosed the information immediately upon its discovery.*
*(c) Sanctions. In considering an appropriate sanction for nondisclosure or untimely disclosure, a court must determine the significance of the information not timely disclosed, the violation's impact on the overall administration of the case, the sanction's impact on the party and the victim, and the stage of the proceedings when the party ultimately made the disclosure. Available sanctions include, but are not limited to:*
*(1) precluding or limiting a witness, the use of evidence, or an argument supporting or opposing a charge or defense;*
*(2) dismissing the case with or without prejudice;*
*(3) granting a continuance or declaring a mistrial if necessary in the interests of justice;*
*(4) holding in contempt a witness, a party, or a person acting under the direction or control of a party;*
*(5) imposing costs of continuing the proceeding; or*
*(6) any other appropriate sanction.*

**THE COURT FINDS** that the State has willfully failed to comply with two court orders for disclosure, specifically the orders of April 17, 2019 and May 2019. The disclosure is material to this case.

Having found the State has willfully failed to comply with disclosure orders, the Court is now left with deciding the appropriate sanction.  Normally, the proper sanction in such situations would be preclusion of either witnesses or specific evidence the State wishes to use from the disclosure.  In this case, that remedy is clearly insufficient.  The Defense is still prejudiced as the Defense does not know what is in the file.  Preclusion simply doesn't work.  Imposing costs or a continuance of the matter are also not appropriate sanctions. Unfortunately, this Court can see no other remedy for the State's willful violation of disclosure other than dismissal of this action. The Court recognizes this is the ultimate sanction and not something this Court takes lightly.

The Court wishes to make clear that the dismissal of this action lays upon Det. Johnston's refusal to comply with a court order and the State's failure to ensure that the court orders were followed.

**THE COURT FURTHER FINDS** that the only sanction available in this situation is dismissal of this action.  Accordingly,

**IT IS ORDERED** dismissing this case against this Defendant only.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2018-005994-001 DT                                    07/31/2019


**IT IS FURTHER ORDERED** exonerating any bond posted in this matter to be issued to the posting party.

The Court having issued its ruling also puts the State on notice that Det. Johnston's actions in refusing to comply with two valid court orders may be enough to place his name on the Brady list.  However, the Court does not formally address this issue as it is not before the Court.


/s/

_____
HONORABLE GEOFFREY FISH