Lori V. Berke (#015628)
Jody C. Corbett (#019718)
**BERKE LAW FIRM, PLLC**
1601 N. 7th Street, Suite 360
Phoenix, AZ 85006
Phone: (602) 254-8800
Fax: (602) 254-8808
lori@berkelawfirm.com
jody@berkelawfirm.com
Attorneys for Defendants City of Phoenix,
    Chief Jeri Williams, retired Chief Joseph
    Yahner, and Officer Anthony Armour

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Frances Salazar, individually, | Case No. 2:19-cv-01188-PHX-SRB (ESW) |
| Plaintiff, | **LODGED PROPOSED** |
| vs. | |
| City of Phoenix, et al., | **CITY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| Defendants. | **(Oral Argument Requested)** |
| | **ATTACHED** |

Lori V. Berke (#015628)
Jody C. Corbett (#019718)
**BERKE LAW FIRM, PLLC**
1601 N. 7th Street, Suite 360
Phoenix, AZ 85006
Phone: (602) 254-8800
Fax: (602) 254-8808
lori@berkelawfirm.com
jody@berkelawfirm.com
Attorneys for Defendants City of Phoenix,
    Chief Jeri Williams, retired Chief Joseph
    Yahner, and Officer Anthony Armour

**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Frances Salazar, individually,<br><br>                    Plaintiff,<br><br>    vs.<br><br>City of Phoenix, et al.,<br><br>                    Defendants. | Case No. 2:19-cv-01188-PHX-SRB (ESW)<br><br>**CITY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>            **(Oral Argument Requested)** |

        Pursuant to Fed. R. Civ. P. 56, Defendants City of Phoenix, Chief Jeri Williams, retired Chief Joseph Yahner, and retired Officer Anthony Armour (collectively "City Defendants"), through undersigned counsel, move for summary judgment on Plaintiff Frances Salazar's ("Plaintiff") claims against them.  This Motion is supported by the following Memorandum of Points and Authorities and the City Defendants' concurrently filed Statement of Facts.

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.    FACTUAL BACKGROUND.**

    **A.    Plaintiff's Arrest**

        On December 31, 2013, Plaintiff was at the apartment of a woman named Loretta Jones for whom Plaintiff claims she was working as a caregiver.  (See City Defendants'

1

Statement of Facts in Support of Motion for Summary Judgment ("SOF") ¶ 1).   At approximately 4:00 a.m., Plaintiff left the apartment in a gold Jaguar sedan driven by Rodney McCullough.  (SOF ¶ 2).  Plaintiff was seated in the front passenger seat.  (SOF ¶ 3).  Plaintiff testified at deposition that she did not know Mr. McCullough well.   (SOF ¶ 4).  Plaintiff testified that she had purchased the Jaguar from a friend of hers named Antonio Harris, but that a few weeks earlier, she had given it back to him because she had not been able to transfer the title of the Jaguar to her mother to whom she had intended to give the vehicle.  (SOF ¶ 5). She testified that on December 31, 2013, Mr. McCullough had borrowed the Jaguar from Mr. Harris.  (SOF ¶ 6).  Plaintiff testified that Mr. McCullough was driving her to an ATM at a credit union so she could get cash to get quarters and buy laundry detergent to do laundry for Ms. Jones.  (SOF ¶ 7).  Plaintiff knew on December 31, 2013 that the registration on the Jaguar was expired.  (SOF ¶ 8).  Indeed, she knew the registration had been expired since before she purchased the vehicle from Mr. Harris.  (SOF ¶ 9).  While Mr. McCullough was driving Plaintiff to the ATM, police officers initiated a traffic stop of the Jaguar.  (SOF ¶ 10).

Phoenix Police Officer Anthony Armour (now-retired) (referred to herein as "Officer Armour") testified that he observed a temporary tag in the rear window of the Jaguar that was expired.  (SOF ¶ 11).  Plaintiff disputes that the temporary tag was in the rear window of the Jaguar and testified at deposition that the temporary tag was in her purse and that there was an expired license plate on the Jaguar.  (SOF ¶ 12).  This factual dispute is not material because either way there was reasonable suspicion for the officers to stop the vehicle.  Officer Armour and his partner, Officer Keith Backhaus, followed the Jaguar into the parking lot of the credit union which was located at 17th Avenue and Highland in Phoenix, and once it was confirmed that the Jaguar did not have current registration, they activated their overhead lights and initiated a traffic stop of the Jaguar.  (SOF ¶ 13).  The officers asked Plaintiff and Mr. McCullough for their identification, but neither provided it, and instead verbally provided their identifying information.  (SOF ¶ 14).  Plaintiff claims she provided her identification card to the officers (SOF ¶ 15).  This factual dispute is not material because she was not charged with failing to provide identification.    The officers asked Plaintiff and Mr.

2

McCullough for the vehicle's registration and Plaintiff told them that there was not a current title or registration for the vehicle. (SOF ¶ 16). The officers ran a records check and learned that Mr. McCullough's license was suspended. (SOF ¶ 17). They also learned that Plaintiff's driver's license was suspended. (SOF ¶ 18).

While the officers were running the records checks on Plaintiff and Mr. McCullough, Officer Armour observed Plaintiff repeatedly bending over to her left toward the center console of the car, which seemed suspicious to Officer Armour because it appeared as though Plaintiff might be attempting to hide something. (SOF ¶ 19). The officers then returned to the Jaguar and Officer Armour instructed both Mr. McCullough and Plaintiff to exit the vehicle, which they did. (SOF ¶ 20). The officers placed Mr. McCullough under arrest for driving with a suspended license[1] and failure to provide identification.[2] (SOF ¶ 21). The officers searched Mr. McCullough incident to his arrest and seated him in the rear of their patrol vehicle. (SOF ¶ 22). The officers then questioned Plaintiff about the temporary tag. (SOF ¶ 23).

Plaintiff admitted to the officers that she had altered the expiration date on the temporary registration tag she had obtained for the vehicle by changing it from December 18, 2013 to December 28, 2013. (SOF ¶ 24). Plaintiff testified at her deposition that the temporary registration was not being displayed on the vehicle at the time the Jaguar was pulled over, but rather that she had pulled it out of her purse to give to the officers to show the car was not stolen. (SOF ¶ 25). Officer Armour testified that the expired temporary registration was being displayed on the vehicle at the time of the traffic stop. (SOF ¶ 26). This is not a material factual dispute inasmuch as under either version, the car was displaying expired registration and therefore there was reasonable suspicion for the stop. This dispute is also not material because Plaintiff is not asserting a claim for false arrest in this case and she was not prosecuted for displaying or possessing an altered registration.

---

[1] A.R.S. § 28-3473.
[2] A.R.S. § 28-1595(B).

Officer Armour asked Plaintiff if there was anything illegal in the vehicle and she said there was not.  (SOF ¶ 27).  Officer Armour then specifically asked if there were any drugs in the vehicle and Plaintiff responded, "There shouldn't be," but stated there had been several people in the vehicle.  (SOF ¶ 28).  Plaintiff testified at her deposition that she does not recall if she had that exchange with Officer Armour, but she does not deny it.  (SOF ¶ 29).  Plaintiff identified her wallet and purse as the only bags in the vehicle belonging to her.  (SOF ¶ 30).  Based on the fact that Plaintiff admitted to having altered the temporary registration which she possessed, Officer Armour had probable cause to arrest her for knowingly displaying or possessing a fictitious plate/temporary tag.[3]  (SOF ¶ 31).  Officer Armour summoned a female officer to search Plaintiff incident to arrest.  (SOF ¶ 32).  When the female officer searched Plaintiff, she found a broken glass pipe that appeared to have been used for smoking crack in the pocket of the jacket Plaintiff was wearing.  (SOF ¶ 33).  Plaintiff claimed at deposition that the jacket was not hers, that it had been inside the vehicle and that she had asked the officers if she could put it on because she was cold.[4]  (SOF ¶ 34).  Officer Armour also searched the vehicle incident to arrest and found a clear glass pipe containing what appeared to be a rock of crack cocaine stashed between the passenger seat where Plaintiff had been sitting and the center console.  (SOF ¶ 36).  Officer Armour read Plaintiff her <u>Miranda</u> rights, told her he had found the drugs and drug paraphernalia in the vehicle and he questioned her about them.  (SOF ¶ 37).  Officer Armour testified that Plaintiff told him she had been clean since 2007, but had recently relapsed.  (SOF ¶ 38).  (Plaintiff disputes that she told Officer Armour she had relapsed and claims she has not used drugs since 2007.  (SOF ¶ 39)).  Officer Armour also maintains that Plaintiff kept randomly stating that she did not smoke methamphetamine.  (SOF ¶ 40).  Officer Armour testified that Plaintiff admitted to the

---

[3]Under A.R.S. § 28-2531(B)(1), it is a class 2 misdemeanor to "[d]isplay[] or possess[] a registration card or license plate knowing it to be fictitious or to have been stolen, canceled, revoked, suspended or altered."

[4]Whether or not the jacket and the broken glass pipe belonged to Plaintiff is not material to this motion because Plaintiff was not prosecuted for or convicted of possessing the broken pipe found in the jacket.  (SOF ¶ 35).

4

substance inside the pipe being crack, but refused to tell Officer Armour where she buys crack. (SOF ¶ 41). Plaintiff testified that she "may have said it looks like crack" but that she did not have a conversation with Officer Armour about where she buys crack. (SOF ¶ 42). According to Officer Armour, Plaintiff then tried to recant her statement and claim that someone else must have left the pipe and drugs there, but that Plaintiff would "take responsibility for it." (SOF ¶ 43). Officer Armour testified that Plaintiff would go back and forth between lying about the drugs and admitting to them due to her recent relapse. (SOF ¶ 44). Plaintiff denies that she stated she would take responsibility for the drugs. (SOF ¶ 45). There is no dispute that Officer Amour found drugs and drug paraphernalia when he searched the Jaguar. (SOF ¶¶ 36, 44).

### B. Plaintiff's Criminal Conviction

Plaintiff was booked into jail for possession of narcotic drugs, possession of drug paraphernalia, and knowingly displaying fictious plates. (SOF ¶ 46). She was charged by the Maricopa County Attorney's Office with one count of possession or use of narcotic drugs and one count of possession of drug paraphernalia. (SOF ¶ 47). Following a jury trial that took place in August 2016, at which Officer Armour testified, Plaintiff was convicted of both crimes. (SOF ¶ 48). Plaintiff was sentenced to six years in prison on December 5, 2016. (SOF ¶ 49).

During the criminal case proceedings, Plaintiff filed various motions arguing that Officer Amour's trial testimony regarding Plaintiff's admissions to him about the drugs and drug paraphernalia found in the vehicle being hers was not timely disclosed and was inconsistent with prior testimony and his police report, but all of the motions were denied. (SOF ¶ 50). Specifically, Plaintiff argued to the criminal court that during his preliminary hearing testimony, Officer Armour had testified only that Plaintiff admitted that the substance in the pipe Officer Armour found in the car was crack cocaine, and not that the drugs were hers. (SOF ¶ 51). Plaintiff then argued that at the suppression hearing that Officer Armour had only previously testified that Plaintiff would "take responsibility" for the drugs. (SOF ¶ 52). In a post-trial motion, Plaintiff argued that Officer Armour testified for the first time at

her criminal trial that Plaintiff admitted that the crack pipe and drugs were hers. (SOF ¶ 53). In response, the State argued that Officer Armour's trial testimony was consistent throughout the criminal proceedings and with his police report. (SOF ¶ 54). The criminal court judge rejected Plaintiff's arguments and denied all of Plaintiff's motions. (SOF ¶ 55).

### C.   PSB Investigation #15-0126 of Officer Armour

An incident completely unrelated to Plaintiff's arrest occurred on November 4, 2015. (SOF ¶ 56). On that date, Officer Armour went to an apartment in follow-up to a domestic violence call to look for the male domestic violence suspect. (SOF ¶ 57). Officer Armour entered an apartment looking for the male suspect. (SOF ¶ 58). He believed a warrantless entry into the apartment was lawful because he understood another police officer and a third-party witness to have stated that they had seen the male suspect inside the apartment and the female occupant initially gave her consent for him to enter. (SOF ¶ 59). However, the act of domestic violence the male suspect was suspected to have committed for which the officers had probable cause to arrest the male suspect was a misdemeanor and the female who answered the door revoked the consent she initially gave him to enter. (SOF ¶ 60). Thus, warrantless entry into the apartment was not legally permitted.[5] (SOF ¶ 61). Officer Armour located the male suspect in the back bedroom and arrested him. (SOF ¶ 63). He also arrested the female who answered the door for hindering prosecution.[6] (SOF ¶ 64). When Officer Armour provided the facts of what had taken place to his supervisor, the supervisor told Officer Armour to release the female from custody and not to book her into jail. (SOF ¶ 66). Officer Armour did not release her from custody before she was transported to the jail by other officers. (SOF ¶ 67). She was never booked into jail, however. (SOF ¶ 68). Officer Armour stated in his report that before he entered the apartment, Officer Erickson advised

---

[5]Officer Armour has never denied that he was mistaken regarding whether it was lawful for him to remain in the apartment after consent was revoked. (SOF ¶ 62).

[6]The female hindered prosecution by harboring or concealing the male from being apprehended by police. (SOF ¶ 65). See A.R.S. § 13-2510, -2511.

him that Officer Naegeli believed he had seen the male suspect through the front window, but was not 100% certain it was him.  (SOF ¶ 69).

The Professional Standards Bureau of the Phoenix Police Department ("PSB") is the department that investigates potential misconduct of department employees, conducts any other investigations requested by the police chief, conducts inspections, and updates policies. (SOF ¶ 70).  PSB initiated an investigation of the incident involving Officer Armour on November 4, 2015 (it was assigned number 15-0126) (hereafter "PSB Investigation").  (SOF ¶ 71).  On January 28, 2016, Officer Armour signed the Notice of Investigation ("NOI") for the PSB Investigation, which contained the following admonition:

> You are being given a direct order not to discuss this investigation, including your interview with any unauthorized person.  Other than the investigating supervisor/s, the only persons you may speak to concerning this investigation are enumerated in Operations Order 3.19 and the MOU for your respective work unit, as follows:  Privileged communications between the employee and his/her attorney, minister, unit representative, or spouse."

(SOF ¶ 72).  (An NOI is given to an officer when he or she is under investigation by PSB or the employee's supervisor.  It contains a synopsis of the incident under investigation and the allegations of misconduct.  (SOF ¶ 73).  "MOU" is the Memorandum of Understanding between the officer's union and the Phoenix Police Department that governs the wages, hours, and working conditions of the officers.  (SOF ¶ 74).)  Therefore, as of that date, Officer Armour was prohibited from telling anyone other than his attorney, minister, unit representative, or spouse about the PSB Investigation, including the prosecutor.

The two other officers who were at the apartment (Officer Erickson and Officer Naegeli) were interviewed by PSB investigators.  (SOF ¶ 75).  Officer Erickson told PSB investigators that he never advised Officer Armour that Officer Naegeli saw the male suspect inside the apartment.  (SOF ¶ 76).  Rather, he claimed he told Officer Armour that Officer Naegeli saw someone look out the apartment window but could not tell if it was a man or a woman.  (SOF ¶ 77).  Officer Naegeli told investigators that he never told Officer Erickson or Officer Armour that he saw the male suspect inside the apartment, but just told them he

saw the blinds moving inside the apartment.  (SOF ¶ 78).  Officer Armour stands by his claim that when he entered the apartment he believed Officer Naegeli had seen the male suspect through the window.  (SOF ¶ 79).  PSB concluded that Officer Armour unlawfully entered the apartment (and Officer Armour has never denied, once it was explained to him, that remaining in the apartment after consent was revoked was not legally permitted).  (SOF ¶ 80).  PSB also found that Officer Armour unlawfully arrested the female, gave a false verbal report to his supervisor regarding the circumstances of the arrest of the male suspect, provided false information in his report when he failed to accurately document the incident, and failed to obey a lawful order of his supervisor when he booked the female into jail after being directed to release her from custody.  (SOF ¶ 81).  Officer Armour denies he made any false statements to his supervisor or in his report and denies he failed to obey a lawful order.[7]  (SOF ¶ 82).

A draft PSB Report was completed on April 27, 2016.  (SOF ¶ 84).  The draft PSB Report was provided to Officer Armour for review on May 5, 2016.  (SOF ¶ 85).  Officer Armour did not agree with the findings contained in the draft PSB Report, but did not know that he could dispute the findings prior to the investigation becoming final because his union representative did not do his job of communicating the process to Officer Armour and the union representative simply signed the Investigative Review Control form acknowledging receipt of the draft PSB Investigation on behalf of Officer Armour and returned the form to PSB without Officer Armour's knowledge or consent.  (SOF ¶ 86).  The PSB Report was finalized on June 27, 2016 and Officer Armour signed the Notice of Findings on June 30, 2016.  (SOF ¶ 87).  When an officer signs a Notice of Findings, he acknowledges receipt of the final investigation report.  (SOF ¶ 88).  Under Phoenix Police Department Operations Order 3.19, the admonition was lifted as of June 30, 2016.  (SOF ¶ 89).  On July 13, 2016, Assistant Chief Steve Martos (who was a Lieutenant assigned to PSB at the time and was the Acting Commander on that date) initialed and approved the PSB report.  (SOF ¶ 90).  The

---

[7] Officer Armour does admit to insubordination stemming from this incident, however. (SOF ¶ 83).

Commander assigned to PSB at the time was John Collins. (SOF ¶ 91). Once the report was final, the PSB Investigation was sent to the Phoenix Police Department's Disciplinary Review Board ("DRB") for review. (SOF ¶ 92). The DRB is a panel of police department supervisors, officers and citizens that reviews investigation reports in which allegations of officer misconduct are sustained that may lead to a suspension, demotion, or termination. The DRB makes recommendations to the Chief of Police regarding the degree and severity of the disciplinary action to be taken. (SOF ¶ 93). The DRB hearing regarding the PSB Investigation of Officer Armour was held on September 28, 2016, at which the DRB recommended that Officer Armour receive an 80-hour suspension. (SOF ¶ 94). The DRB recommendation was sent to Phoenix Police Chief Joseph Yahner for review. (SOF ¶ 95). Chief Yahner approved the recommended discipline on October 4, 2016. (SOF ¶ 96).

Chief Yahner retired from the Phoenix Police Department on October 31, 2016. (SOF ¶ 97). His successor, Jeri Williams, was sworn in as the new Chief on October 28, 2016. (SOF ¶ 98). She had previously served as Chief of Police of the Oxnard Police Department in Oxnard, California. (SOF ¶ 99).

On November 14, 2016, a Discipline Notice was served on Officer Armour along with Appeal Procedures stating that he had 14 days to appeal the suspension by requesting a hearing. (SOF ¶ 100). Officer Amour disagreed with the findings of the investigation and intended to appeal, but his union representative did not provide him with the proper information regarding what he needed to do to appeal. (SOF ¶ 101). Officer Armour did not believe the investigation would be complete until after he was notified of his discipline by the Phoenix Police Department. (SOF ¶ 102).

### D. Disclosure of the PSB Investigation by the Phoenix Police Department to Prosecutors.

The Phoenix Police Department does not make the determination as to whether an officer is to be placed on a "Brady list." (SOF ¶ 103). That determination is made by the prosecuting agencies—here, the Maricopa County Attorney's Office and the City of Phoenix Prosecutor's Office. (SOF ¶ 104). Both the Maricopa County Attorney's Office ("MCAO")

1    and the City of Phoenix Prosecutor's Office maintain their own separate "Law Enforcement

2    Rule 15 Disclosure Databases" also known as "Brady lists." (SOF ¶ 105).

3          Except in limited circumstances set forth in Phoenix Police Department Operations

4    Order 2.9(8) discussed in Section I(E) *infra*, and which are not applicable here, the Phoenix

5    Police Department has delegated the responsibility for informing prosecuting agencies about

6    potential Brady material stemming from officer misconduct to PSB. (SOF ¶ 106). The

7    Phoenix Police Department relies on the prosecuting agencies to provide it guidance on what

8    information needs to be provided to them for evaluating potential Brady information. (SOF

9    ¶ 107). MCAO and the City Prosecutor's Office provided written guidance to the Phoenix

10   Police Department for determining what types of information about police officer misconduct

11   needs to be provided to the prosecuting agencies for Brady review. (SOF ¶ 108). MCAO

12   instructed the Phoenix Police Department that it wants to be notified of "adverse investigative

13   findings in personnel investigations when such findings relate to the credibility of officers as

14   witnesses in legal proceedings." (SOF ¶ 109). The following were given as examples of

15   categories of information that need to be provided: "Findings of misconduct involving

16   untruthfulness;" "Conviction of a crime;" "Patterns of improper use of force;" and "Sustained

17   findings of the violation of a defendant's constitutional rights." (SOF ¶ 110). MCAO

18   requested that the Brady material be "timely" disclosed, but did not specify what was meant

19   by "timely." (SOF ¶ 111). Once PSB provides the aforementioned information to the

20   prosecuting agencies, they conduct their own assessment as to whether the information

21   constitutes Brady material that must be disclosed to a criminal defendant and whether an

22   officer should be placed on the prosecuting agency's Brady list.[8] (SOF ¶ 112).

23         In 2015 and 2016, the Brady review process followed by PSB was as follows: Once

24   a draft of the PSB investigation report was completed, the report was provided to the officer

25

26         [8]There is a committee at MCAO called the Rule 15 Disclosure Database Committee

27   that meets every two weeks to review potential Brady material received from law
     enforcement agencies to determine whether officers should be placed on the Brady list. (SOF

28   ¶ 113).

being investigated, and he or she had three weeks to review it and meet with his supervisor, PSB investigators, the PSB Commander, and the officer's union representative and/or attorney, if he or she chooses to do so, and to dispute any findings in the report. (SOF ¶ 114). After that process was complete, the report was revised if deemed appropriate by PSB and then finalized. (SOF ¶ 115). It became final when the PSB Commander signed off on it. (SOF ¶ 116). The investigation was then forwarded to the Executive Assistant Chief to determine whether it should be sent to the DRB. (SOF ¶ 117). If the investigation was sent for a DRB hearing, after that process was complete, the investigation and discipline recommendation were forwarded to the Police Chief for review and for a final decision to be made by the Chief regarding what, if any, discipline would take place. (SOF ¶ 118). After any discipline notice was then served on the officer, the officer had fourteen days to appeal the discipline. (SOF ¶ 119). After any appeal was complete, or the appeal time ran if no appeal was filed, then either the PSB Commander reviewed the report for potential Brady issues and/or attorneys in the Legal Unit of the Phoenix Police Department reviewed the investigation report to determine whether it should be forwarded to MCAO and/or City Prosecutor's Office for a determination as to whether the Officer would be placed on the Brady list. (SOF ¶ 120). That is a decision that is made by prosecutors, not police officials. (SOF ¶ 121). This is the process the Phoenix Police Department had followed for many years with the knowledge and approval of the Maricopa County Attorney's Office and the City of Phoenix Prosecutor's Office. (SOF ¶ 122).[9] In this case, once the time for Officer Armour to appeal the 80-hour suspension imposed by Chief Yahner passed, Commander John Collins

---

[9] In early 2020, MCAO instructed the Phoenix Police Department to adjust the timing of when PSB investigations are submitted to MCAO for Brady consideration—specifically that they be submitted once the report is signed off on by the PSB Commander, instead of after the disciplinary process for the officer is complete. (SOF ¶ 123). PSB complied with this request and began forwarding reports where an officer was determined to have engaged in misconduct that could be subject to disclosure under Brady (using the parameters provided by MCAO and the City Prosecutor's Office) to MCAO and the City Prosecutor's Office for their Brady review process as soon as the Commander of PSB had signed off on the investigation. (SOF ¶ 124).

reviewed the PSB Investigation for <u>Brady</u> issues in accordance with the process proscribed by the prosecuting agencies. (SOF ¶ 125). Commander Collins determined that the report should be forwarded to MCAO and the City Prosecutor's Office for review to determine whether Officer Armour should be placed on their respective <u>Brady</u> lists. (SOF ¶ 126). On December 28, 2016, following the process outlined above, PSB uploaded the PSB Investigation to the portal used by MCAO and the City Prosecutor's Office to receive investigations from the Phoenix Police Department that PSB determined met the <u>Brady</u> review criteria outlined by prosecuting agencies. (SOF ¶ 127).

On January 26, 2017, MCAO informed Chief Williams and Officer Armour that Officer Armour was being placed in the Maricopa County Attorney's Office's Law Enforcement Rule 15 Disclosure Database or on the "<u>Brady</u> list." (SOF ¶ 128). Prior to that date, Chief Williams did not know who Officer Armour was and did not know about the PSB Investigation. (SOF ¶ 129).

### E.  <u>Prosecutor's Disclosure of the PSB Investigation to Plaintiff and Plaintiff's Petition for Post-Conviction Relief</u>

Law enforcement agencies have a responsibility to disclose <u>Brady</u> material to prosecutors, but not to criminal defense attorneys. (SOF ¶ 130). The Phoenix Police Department fulfilled its responsibility to disclose the results of the PSB Investigation to MCAO on December 28, 2016. (SOF ¶ 131). On February 22, 2017, after prosecutor Elizabeth Lake of MCAO learned that Officer Armour had been placed on the <u>Brady</u> list, she filed a "Supplemental Motion to Disclose New Evidence" and a "Motion for Protective Order" in Plaintiff's criminal case in which she disclosed the PSB Investigation, including the report. (SOF ¶ 132). Ms. Lake directed her paralegal to disclose the PSB Investigation documents by e-mail to Plaintiff's criminal counsel of record at the time, Christopher Doran. (SOF ¶ 133). Ms. Lake believed her paralegal had disclosed the PSB Investigation documents on February 22, 2017, as directed. (SOF ¶ 134). The court in the criminal case denied the State's Motion for Protective Order on March 6, 2017, and a copy of the Minute Entry denying the Motion was e-mailed to Mr. Doran. (SOF ¶ 135). (Mr. Doran and his partner,

Samantha DuMond, represented Plaintiff at her criminal trial.  (SOF ¶ 136).)  An employee of the Maricopa County Superior Clerk's Office testified at deposition that according to the records of the Maricopa County Superior Court, Mr. Doran received the Minute Entry denying the States' Motion for Protective Order electronically via email on March 7, 2017.  (SOF ¶ 137).  Thus, Plaintiff was on notice of the State's disclosure of the PSB Investigation in March 2017.

On March 30, 2018, Plaintiff filed a Motion for Post-Conviction Relief arguing that the State (meaning the prosecutor) should have disclosed the PSB Investigation to her before Officer Armour testified at her trial in August 2016.  (SOF ¶ 138).  On June 7, 2018, MCAO filed a response, stating "the State agrees that Defendant is entitled to a new trial in this matter."  (SOF ¶ 139).  On July 10, 2018, the criminal court granted Plaintiff's Petition for Post-Conviction Relief and Plaintiff was subsequently released from prison.  (SOF ¶ 140).  MCAO ultimately made the decision not to re-try Plaintiff on the two drug charges.  (SOF ¶ 141).  Prosecutor Elizabeth Lake testified at her deposition that she does not believe Anthony Armour testified untruthfully at Plaintiff's criminal trial.  (SOF ¶ 142).  Ms. Lake testified that if the Brady information had been available before Plaintiff's criminal trial, she still would have proceeded to trial.  (SOF ¶ 143).  If Anthony Armour had been questioned about the PSB Investigation at trial, he would have explained that he disputed PSB's findings of untruthfulness and that he reasonably believed he had probable cause to enter the apartment and arrest the two occupants.  (SOF ¶ 145).  Deputy County Attorney Lake also testified that the reason she decided not to re-try Plaintiff was that at a new trial there would have been even more statements that could be used to impeach Officer Armour (including his testimony from the first criminal trial).  (SOF ¶ 146).  She explained at deposition that when there are multiple on the record "tellings" of the same set of facts, the more likely it is that there will be minor inconsistencies with which a witness can be impeached.  (SOF ¶ 147).  Therefore, in those situations, Ms. Lake is always concerned that the likelihood of conviction is substantially reduced (in any case—not just this one).  (SOF ¶ 148).

Plaintiff's criminal attorneys, Christopher Doran and Samantha Dumond, both testified at deposition that police officers are required to disclose potential <u>Brady</u> material to the prosecutor and not directly to the criminal defendant or her attorney, and it is the responsibility of the prosecutor to provide <u>Brady</u> material to the criminal defendant's attorney. (SOF ¶ 149). An investigator that worked for Plaintiff's criminal attorneys, Margaret DiFrank, testified that she recommended in two separate e-mails to Plaintiff's criminal attorney Samantha Dumond that she request from the prosecutor the disciplinary files of Officer Armour and the other officer at the traffic stop, Officer Keith Backhaus. (SOF ¶ 150). Ms. Dumond testified that she did not ever subpoena or otherwise request Officer Armour's disciplinary file. (SOF ¶ 151).

Before Officer Armour testified at Plaintiff's criminal trial, he was never asked by the prosecutor or by Plaintiff's criminal attorney in a defense interview whether he was the subject of any PSB investigations or had any sustained findings of police misconduct. (SOF ¶ 152). As set forth above, the Phoenix Police Department has designated PSB to make <u>Brady</u> notifications to prosecuting agencies except in the limited circumstances set forth in Operations Order 2.9(8). (SOF ¶ 106). Since at least 2008, Operations Order 2.9(8) has stated that "[i]t is the responsibility of all Department employees who may be potential witnesses to notify the prosecutor immediately of their status, if . . . [t]he Department and/or the Maricopa County Attorney's Office have notified an employee that they have had material from the employee's file sent over for review as to whether their names should be added to the Law Enforcement Integrity Database (LEID)"[10] or "[t]he employee is aware of potential exculpatory information that the Department is not." (SOF ¶ 154). "This notification will be made upon a request for court appearance, testimony, or interview by a prosecutor's office which includes Federal, State, County and/or Municipal courts." (SOF ¶ 156). Officer Armour was not required under Phoenix Police Department policy to

---

[10] "This notification will be made unless the Maricopa County Attorney's Office has notified the employee of the results of their file review and they are not on the LEID." (SOF ¶ 155).

personally inform the prosecutor in Plaintiff's criminal case of the PSB Investigation and/or the sustained findings of misconduct because at the time he was requested to appear in court and testify, he had not been notified that the PSB Investigation had been sent for review to the Maricopa County Attorney's Office **and** the Phoenix Police Department was aware of the allegations that were made against him and ultimately sustained in the PSB Investigation. As discussed in <u>Section I(D)</u> above, the responsibility for informing MCAO of the PSB Investigation and its outcome rested with PSB, not Officer Armour.

## II.   <u>LEGAL ARGUMENT.</u>

### A.   <u>Standard for Summary Judgment.</u>

A court must grant summary judgment "if the movant shows there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  The moving party bears the burden of presenting the basis for its motion and identifying those portions of the record, together with affidavits, that it believes demonstrate the absence of a genuine issue of material fact.  <u>Celotex</u>, 477 U.S. at 323; <u>Devereaux v. Abbey</u>, 263 F.3d 1070, 1076 (9th Cir. 2001).  If the moving party meets its burden with a properly supported motion, the burden then shifts to the non-moving party to present specific facts that show there is a genuine issue for trial.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  In order to defeat the motion, the non-moving party must designate specific facts that show there is a genuine issue for trial.  <u>Anderson</u>, 477 U.S. at 249; <u>Devereaux</u>, 263 F.3d at 1076.  The non-moving party may not rest upon the pleadings' mere allegations and denials, but must present admissible evidence of specific disputed facts.  <u>Anderson</u>, 477 U.S. at 248.

### B.   <u>Officer Armour is Entitled to Qualified Immunity on Plaintiff's Claim Against Him Under 42 U.S.C. § 1983 in Count One.</u>

In Count One of her Second Amended Complaint, Plaintiff alleges that Officer Armour violated her due process rights by "failing to produce evidence [the PSB Investigation] material to [Plaintiff's] guilt or innocence prior to trial."  (SOF ¶ 166).  The qualified immunity analysis of a Section 1983 claim consists of two prongs.  <u>Pearson v.</u>

<u>Callahan</u>, 555 U.S. 223, 239-43 (2009).  Under the first prong, courts determine whether a constitutional right has been violated.  <u>Id.</u>  Under the second prong, courts determine whether the constitutional right was clearly established at the time of the alleged violation.  <u>Id.</u>  When considering qualified immunity, the court may consider whether the government official violated a constitutional right or skip that inquiry and examine whether the right was clearly established.  <u>Id.</u>  Either way, a defendant is entitled to qualified immunity if there is no evidence that the defendant violated the plaintiff's constitutional rights or if the right was not clearly established such that "every" reasonable officer in the defendant's position would not have known that he or she was violating a constitutional right.  <u>Id.; Ashcroft v. al-Kidd</u>, 563 U.S. 731, 741 (2011).

### 1.    Officer Armour Did Not Violate Plaintiff's Due Process Rights.

To prove that an individual police officer violated a plaintiff's due process rights under 42 U.S.C. § 1983 by failing to disclose material, exculpatory evidence to the prosecutor, a plaintiff must prove that the police officer acted with deliberate indifference to or in reckless disregard for an accused's rights or for the truth in withholding evidence from prosecutors. <u>Tennison v. City & Cty. of San Francisco</u>, 570 F.3d 1078, 1088 (9th Cir. 2009).  The plaintiff also must prove that there is a "reasonable probability" that had the withheld evidence been disclosed, it would have led to a different result at the plaintiff's criminal trial.  <u>United States v. Olsen</u>, 704 F.3d 1172, 1184–85 (9th Cir. 2013).  "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." <u>Barker v. Fleming</u>, 423 F.3d 1085, 1099 (9th Cir. 2005).

Officer Amour's failure to inform the prosecutor about the PSB Investigation and/or the sustained findings of misconduct before he testified at Plaintiff's criminal trial did not constitute a due process violation.  First, the prosecutor did not ask him if he had any pending investigations or any sustained allegations of misconduct.  (SOF ¶ 152).  Second, the disciplinary process for the PSB Investigation was not yet complete at the time he testified at Plaintiff's criminal trial.  (SOF ¶¶ 48, 92-96, 100).  As set forth above, in 2015 and 2016, the

practice of the Phoenix Police Department, with the knowledge and approval of MCAO, was to conduct its preliminary Brady review of sustained findings of officer misconduct once the disciplinary process was complete, and to provide information about officer misconduct believed to constitute Brady material to MCAO for Brady review at that time.  (SOF ¶¶ 114-122).  The Phoenix Police Department, through PSB, relied on the prosecuting agencies for direction regarding what needed to be disclosed to them pursuant to Brady and the timing of same.  There is no evidence that prior to December 2016, either prosecuting agency—MCAO or the City Prosecutor's Office—instructed the Phoenix Police Department to disclose information to them about officer misconduct prior to the disciplinary process being completed.  (SOF ¶¶ 122, 173-174).  Third, under City of Phoenix Police Department policy, the Department, through its Professional Standards Bureau, assumed the responsibility for informing the prosecuting agencies of Brady material related to officer misconduct, which is constitutionally permissible.  (SOF ¶ 106).  As discussed in Section I(E) above, there are some exceptions to this where a police officer is required to personally provide this information to the prosecutor, found in Operations Order 2.9(8), but none of those are applicable here.  (SOF ¶¶ 153-156).

Finally, there is no evidence demonstrating that there is a reasonable probability that had the PSB Investigation been provided to Plaintiff before her criminal trial, the outcome of the criminal trial would have been different.  Significantly, the prosecutor, Elizabeth Lake, testified that she does not believe Anthony Armour testified untruthfully at Plaintiff's trial.  (SOF ¶ 142).  Further, the only two witnesses who testified on Plaintiff's behalf at trial were both convicted felons.  (SOF ¶ 157).  Plaintiff who was also a convicted felon, did not testify at her criminal trial (SOF ¶ 158)—likely in large part because she knew she would be impeached with her prior convictions.  Ms. Lake testified that if the Brady information regarding Officer Armour had been available before Plaintiff's criminal trial, she still would have proceeded to trial.  (SOF ¶ 143).  In fact, had the PSB Investigation been provided to prosecutor Lake prior to trial, she would have moved *in limine* to prevent some or all of it from being used at trial to impeach Officer Armour.  (SOF ¶ 144)  Ms. Lake also testified

17

that the reason she dismissed the case and did not re-try Plaintiff after she was granted a new trial was that at a new trial there would have been even more statements with which to impeach Officer Armour than there had been at the original trial.  (SOF ¶ 146).   Ms. Lake testified that the more times a witness testifies regarding an event, there can be more inconsistencies in the testimony, and that is problematic for prosecuting any case.  (SOF ¶¶ 146-148). For all of these reasons, there is not a reasonable probability that had the PSB Investigation and its outcome been disclosed to Plaintiff prior to her criminal trial, the outcome of the trial would have been different.  Therefore, there is no evidence in the record to demonstrate that Officer Armour acted with deliberate indifference to or in reckless disregard for Plaintiff's due process rights by not informing the prosecutor of the PSB Investigation and/or the sustained findings of misconduct prior to testifying at Plaintiff's criminal trial.[11]  For this reason alone, Officer Amour is entitled to summary judgment on Plaintiff's claim against him in Count One.

## 2. Officer Armour Did Not Violate Plaintiff's Clearly Established Constitutional Rights.

Even if the Court finds that Officer Armour violated Plaintiff's due process rights, the law was not clearly established in 2016 that Officer Armour's failure to inform the prosecutor or Plaintiff of the PSB Investigation and/or the sustained allegations of misconduct violated Plaintiff's due process rights.  The United States Supreme Court has held that "[q]ualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  White v. Pauly, 580 U. S. ___, ___, 137 S.Ct. 548, 551 (2017) (internal quotation marks omitted).  A right is clearly established when it is "sufficiently clear that **every** reasonable official would have understood that what he is doing violates that right."  Mullenix v. Luna, 577 U.S. 7, 11 (2015) (emphasis added and internal quotation marks omitted).  Qualified immunity thus protects

---

[11]Officer Armour maintains that he did not lie to his supervisor or in his report.  That would have been his testimony at trial had Officer Armour been questioned about the sustained findings of misconduct.  (SOF ¶ ).

1   "all but the plainly incompetent or those who knowingly violate the law." <u>Rico v, Ducart,</u>

2   <u>980 F.3d 1292, 1298 (9th Cir. 2020),</u> quoting <u>Dist. of Columbia v. Wesby</u>, ___ U.S. ___, 138

3   S. Ct. 577, 589 (2018).  The plaintiff bears the burden of proof to show that a right was clearly

4   established. <u>J. K. J. v. City of San Diego</u>, 17 F.4th 1247, 1258 (9th Cir. 2021), <u>quoting</u> <u>Shooter</u>

5   <u>v. Arizona</u>, 4 F.4th 955, 961 (9th Cir. 2021).  Thus, unless Plaintiff can show that in 2016, it

6   was clearly established that Officer Armour had a constitutional obligation to personally

7   inform the prosecutor and/or Plaintiff of the PSB investigation and/or the sustained findings

8   of misconduct before he testified at Plaintiff's criminal trial, qualified immunity applies.

9          Although "this Court's case law does not require a case directly on point for a right to

10   be clearly established, existing precedent must have placed the statutory or constitutional

11   question **beyond debate**." <u>White</u>, 580 U. S. at ___, 137 S.Ct., at 551 (emphasis added and

12   internal quotation marks omitted).  This inquiry "must be undertaken in light of the specific

13   context of the case, not as a broad general proposition." <u>Brosseau v. Haugen</u>, 543 U.S. 194,

14   198 (2004) (internal quotation marks omitted).   In analyzing whether rights are clearly

15   established, the Court must look to then-existing "cases of controlling authority" or, absent

16   such cases, to a "robust consensus" of persuasive authorities. <u>City & Cnty. of San Francisco</u>

17   <u>v. Sheehan</u>, 575 U.S. 600, 617 (2015); <u>Evans v. Skolnik</u>, 997 F.3d 1060, 1066 (9th Cir. 2021).

18   The court must consider whether "the violative nature of [the defendant's] <u>particular</u> conduct

19   is clearly established . . . in light of the <u>specific context</u> of the case.'" <u>Rico v. Ducart</u>, 980

20   F.3d 1292, 1298 (9th Cir. 2020), <u>quoting</u> <u>Hamby v. Hammond</u>, 821 F.3d 1085, 1091 (9th Cir.

21   2016)).  The United States Supreme Court has insinuated that constitutional rights can only

22   be clearly established with on-point Supreme Court precedent and that controlling Circuit

23   precedent is not sufficient to demonstrate clearly established law.  See <u>Rivas-Villegas v.</u>

24   <u>Cortesluna</u>, __ U.S. __, 142 S. Ct. 4, 7 (2021).  Additionally, the Ninth Circuit recently stated

25   that four district court decisions, even if directly on point, "hardly make a 'consensus of cases

26   of persuasive authority.'" <u>J. K. J.</u>, 17 F.4th at 1260 (internal citations omitted).  Therefore,

27   to demonstrate the right a plaintiff claims was violated was clearly established, the plaintiff

28

must cite on-point Supreme Court precedent, or at a minimum, a "robust consensus" of controlling Circuit precedent, which she cannot do here.

There was not a "robust consensus" of persuasive authority in 2016 holding that a police officer must personally inform the prosecutor of findings of misconduct where the department has assumed that responsibility.  In fact, during Chief Williams' deposition, Plaintiff's counsel questioned her using a Concepts and Issues Paper entitled "Duty to Disclose Exculpatory Evidence" dated May 2020 (which post-dates the events at issue in this case), published by the International Association of Police Chiefs ("IACP").  (SOF ¶ 159). That document shows that even now, let alone in 2016, police officers were not personally required to provide information about findings of misconduct to a prosecuting agency. Instead, the document states that "**law enforcement agencies** are required to inform the prosecution of any evidence know to them that could be exculpatory in nature."  (SOF ¶ 160, emphasis added). It also states:

> One approach requires that any agency employee who is aware of any potential exculpatory material must report it to their supervisor or other appropriate person or unit within the agency.  The policy may then impose upon supervisors the responsibility for forwarding any such information received from employees to the appropriate office or executive.  A unit within the agency may be established, or if one is already in existence, may be charged with the duty of maintaining records of matters that have the potential of falling within the disclosure rules in an easily retrievable format.

(SOF ¶ 161).  In other words, Officer Amour was permitted to rely on the police department to provide potential <u>Brady</u> material related to findings of misconduct that were made against him to prosecuting agencies, which is what PSB did in this case at the conclusion of the disciplinary process.

Likewise, it was not clearly established in 2016 that a police officer or law enforcement agency must inform a criminal defendant or her attorney about potential <u>Brady</u> material.  Federal courts have held that police officers and police departments are not obligated under <u>Brady</u> to disclose exculpatory evidence directly to criminal defendants.  <u>See</u> <u>D'Ambrosio v. Marino</u>, 747 F.3d 378, 389 (6th Cir. 2014) (holding that "the role that a police

20

officer plays in carrying out the prosecution's <u>Brady</u> obligations is distinct from that of a prosecutor . . . <u>Brady</u> obliges a police officer to disclose material exculpatory evidence only to the prosecutor rather than directly to the defense"); <u>Cannon v. Polk Cnty/Polk Cnty Sheriff</u>, 68 F.Supp.3d 1267, 1279 (D. Or. 2014) ("The requirement that police disclose evidence known only to the police merely imposes a duty on prosecutors to learn of exculpatory evidence from the police. It does not require the police officer to disclose any sort of information—even information known only to the officer—directly to the defense.") Indeed, both of Plaintiff's criminal attorneys testified at deposition that law enforcement is to disclose <u>Brady</u> material to the prosecutor, who then must disclose it to the criminal defendant's attorney. (SOF ¶ 162). The IACP Concepts and Issues Paper–again published in 2020—similarly discusses the responsibility of law enforcement to provide exculpatory information to the prosecuting agencies, and not directly to criminal defendants. (SOF ¶ 163).

Similarly, there is not a "robust consensus" of persuasive authority holding that at the time the fact finding part of a police misconduct investigation is complete and concludes that the officer's conduct affects the officer's credibility, but the disciplinary process regarding that investigation is not yet complete, the officer (or the agency for that matter) is constitutionally mandated to disclose the investigation to the prosecutor. Indeed, there is not any authority, let alone a robust consensus of cases, holding that a police officer in the same situation as Officer Armour violated a plaintiff's constitutional rights by not providing information to the prosecutor about sustained findings of misconduct before he testified at a criminal trial where the disciplinary process had not yet been completed. According to the City Defendants' police practices expert Ken Wallentine, who currently serves as Chief of the West Jordan, Utah Police Department:

> Officer Armour was not obligated to affirmatively inform anyone of the pending investigation, the allegations contained in the Notice of Investigation, or the outcome of the investigation. To the contrary, he was under an unambiguous admonishment from the police department and could have been subjected to discipline for violating the order. . . . It was the policy and practice of the Phoenix Police Department for the Department, not individual employees (with limited exceptions), to communicate and transmit potential *Brady*

material related to police officers to the Maricopa County Attorney's Office. This practice is consistent with generally accepted police practices and policies. Thus, there was no obligation for Officer Armour to inform the Maricopa County Attorney's Office about the subject investigation, including the outcome. It would be reasonable for an officer in Officer Armour's situation to conclude that he did not have an obligation to disclose the Professional Standards Bureau investigation to anyone while the investigation process was pending. . . . At the time that Officer Armour testified at Plaintiff's criminal trial he knew that the Disciplinary Review Board process was not final. The Disciplinary Review Board was not convened until September 30, 2016. Officer Armour received the Notice of Discipline on November 30, 2016. Thus, at least until November 30, 2016, Officer Armour was not the subject of sustained disciplinary action related to the Professional Standards Bureau investigation into the events of November 4, 2015. Even if the police department's policy had required Officer Armour to communicate potential *Brady* information to the prosecuting agency, which it did not, a reasonable officer would understand that Officer Armour had no obligation to disclose the fact of the investigation prior to any prosecutions in cases in which he might be testifying.

(SOF ¶ 164). Plaintiff's police practices expert did not rebut this opinion. (SOF ¶ 165). There is no evidence or legal authority to satisfy Plaintiff's burden of showing that Plaintiff's claimed due process right was clearly established. Officer Armour is thus entitled to qualified immunity on this claim.

### D. Plaintiff's Claim in Count Three[12] Against the City of Phoenix, Chief Williams, and Retired Chief Yahner Should Be Dismissed.

In Count Three of her Second Amended Complaint, Plaintiff alleges that Defendants Chief Jeri Williams, retired Chief Joe Yahner, and the City of Phoenix are liable to her for failure to adequately train and supervise under <u>Monell v. v. Dept. of Social Services of City of New York</u>, 436 U.S. 658 (1978). Plaintiff fails to allege in her Second Amended Complaint what specific training should have been provided. For the reasons set forth below, this claim should be dismissed as to all three defendants.

---

[12]Count Two of Plaintiff's First Amended Complaint was dismissed by the Court with leave to amend in the Court's ruling on the City Defendants' Motion to Dismiss and Plaintiff chose not to make any amendments and attempt to re-assert it in her Second Amended Complaint. (SOF ¶ 169).

1. **Chief Williams and Retired Chief Yahner Should Be Dismissed as Redundant Defendants.**

Plaintiff states in Count Three that she is bringing this claim against Chief Jeri Williams and retired Chief Joseph Yahner in their official capacities only.  (SOF ¶ 167). There are no other claims asserted against these two defendants in the Second Amended Complaint.  (SOF ¶ 168).  Therefore, the only claim asserted by Plaintiff against Chief Williams and retired Chief Yahner is in their official capacities in Count Three.  An official capacity suit against a municipal officer is equivalent to a suit against the entity.  Kentucky v. Graham, 473 U.S. 159, 165–66, (1985).  The Ninth Circuit has held that "[w]hen both a municipal officer and a local government entity are named, and the officer is named only in an official capacity, the court may dismiss the officer as a redundant defendant."  Center for Bio-Ethical Reform, Inc. v. Los Angeles County Sheriff Department, 533 F.3d 780, 799 (9th Cir. 2008).  Therefore, because Plaintiff has only brought a claim against Chief Williams and retired Chief Yahner in their official capacities and the City of Phoenix is also a defendant, Chief Williams and Chief Yahner should be dismissed as redundant defendants.

2. **There is No Evidence in the Record to Demonstrate Deliberate Indifference by the City of Phoenix.**

To prove a claim brought pursuant to Monell against a municipality or government official in his or her official capacity for failure to adequately train or supervise its employees regarding their legal duty to avoid violating citizens' rights such that it rises to the level of a "policy or custom" that is actionable under Section 1983, a plaintiff must demonstrate deliberate indifference by the municipality.  Connick v. Thompson, 563 U.S. 51, 61 (2011). To demonstrate deliberate indifference, a plaintiff must show that the municipality had "notice that a course of training is deficient in a particular respect," because without such notice, a municipality "can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."  Id. at 62.  Finally, there must be evidence to demonstrate that the supervision was "sufficiently inadequate" to amount to "deliberate indifference."  Dougherty, 654 F.3d at 900.  It is "ordinarily necessary" to demonstrate a pattern of similar constitutional violations by untrained employees to prove deliberate

23

indifference for purposes of showing a claim for failure to train and supervise.  Connick, 563 U.S. at 62; see also Cannon v. City of Petaluma, 2012 WL 1183732, at *19 (N.D. Cal. 2012) (ruling that the plaintiff's allegations relating "solely to his own, isolated experiences" were insufficient).  Absent proving a pattern of similar conduct, a plaintiff must show that the inadequacy in this area of training was so obvious that the defendant municipality should have known that unlawful conduct by its officers was predictable.  See Connick, 563 at 63–64; Bryan County, 520 U.S. at 409 ("[t]he likelihood that [a] situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that [the failure to train] reflected 'deliberate indifference' to the obvious consequence of the policymakers' choice—namely, a violation of a specific constitutional or statutory right).

There is no evidence of any other instance in which a criminal defendant's rights were violated because potential Brady material was not disclosed to the prosecutor by the Phoenix Police Department in a timely manner.  Plaintiff has not listed any witnesses who will testify that someone else's constitutional rights were found to have been violated by failure to timely disclose a PSB investigation regarding an officer that testified at his or her criminal trial.  (SOF ¶ 170).  While Plaintiff refers to four different cases in her Second Amended Complaint that she claims demonstrate a pattern of constitutional violations regarding Brady material by the Phoenix Police Department, she has not disclosed any documents or witnesses to testify regarding these cases.  (SOF ¶ 171).  Regardless, these four cases can all be distinguished from this case and do not demonstrate a pattern at all.  Two of them do not even involve the Phoenix Police Department, but rather involve allegations against other law enforcement agencies.  (Canion v. Cole ex rel. County of Maricopa, 208 Ariz. 133, 140, ¶ 26, 91 P.3d 355, 362 (App. 2004) (involving Brady material related to a City of Glendale police officer) and State v. Camacho, CR 2018-005994 (Maricopa Cnty. Super Ct. July 31, 2019) (involving Brady material from the Glendale Police Department (SOF ¶ 172)).  The third case is Milke v. Ryan, 711 F.3d 998, 1003 (9th Cir. 2013).  This one decision is insufficient to demonstrate a pattern of constitutional violations by the Phoenix Police Department for several reasons.

First, it relates to an alleged <u>Brady</u> violation that occurred over thirty years ago (the criminal trial was in 1990).  Further, the Ninth Circuit held in that case that the criminal defendant was entitled to habeas relief because "the prosecutor" failed to disclose material, favorable evidence to the criminal defendant before her criminal trial.  <u>Id.</u> at 1012.  The Ninth Circuit did not find a <u>Brady</u> violation by the Phoenix Police Department.[13]  In the fourth case referred to in Plaintiff's Second Amended Complaint (<u>Foor v. Smith</u>, 243 Ariz. 594, 416 P.3d 858 (App. 2018)), there was no finding by the Arizona Court of Appeals that there was a constitutional due process violation for failure to disclose impeachment material about a testifying Phoenix police officer.  Moreover, both the United States Supreme Court and the Ninth Circuit Court of Appeals have held that patterns of conduct "may not be predicated on isolated or sporadic incidents." <u>Trevino v. Gates</u>, 99 F.3d 911, 918 (9th Cir. 1996); <u>see also</u> <u>St. Louis v. Praprotnik</u>, 485 U.S. 112, 127 (1988).  Therefore, Plaintiff's allegations in her Second Amended Complaint, unsupported by any evidence in the record, are still insufficient to demonstrate a pattern of similar constitutional violations to support a claim for failure to train and supervise Phoenix Police Department employees regarding disclosure of <u>Brady</u> material.

Further, in this case, the Phoenix Police Department did disclose the PSB Investigation, including the report sustaining the allegations of misconduct, regarding Officer Armour to MCAO once the disciplinary process for the investigation was complete, in accordance with the procedure the police department had always followed and which many police departments follow, the timing of which had always been acceptable to MCAO.  (SOF ¶¶ 114-122, 125-127).  It was not until 2020 that MCAO instructed the Phoenix Police Department to begin submitting findings of officer misconduct for <u>Brady</u> review upon

---

[13]The criminal defendant in <u>Milke</u> brought a civil case against Maricopa County and the City of Phoenix claiming, among other things, that she was entitled to damages because her due process rights were violated due to a failure to disclose <u>Brady</u> material.  That case was ultimately dismissed as a sanction for Milke's discovery violations, and that dismissal was recently affirmed by the Ninth Circuit.  <u>See</u> <u>Milke v. City of Phoenix</u>, 497 F. Supp. 3d 442 (D. Ariz. 2020); <u>Milke v. City of Phoenix</u>, 2022 WL 259937 (9th Cir. 2022).

finalization of the PSB report, and before the disciplinary process is complete.  (SOF ¶ 123).

The Police Department complied with that request, and since that time has been doing that.

(SOF ¶ 124).  This demonstrates that there was no deliberate indifference on the part of the

Phoenix Police Department.   Then Commander John Collins and Chief Williams both

testified that they look to the prosecuting agency to instruct them on how it wants to be

informed about potential <u>Brady</u> material based on officer misconduct.  (SOF ¶ 173).  This

includes the timing of same.  (SOF ¶ 174).  Indeed, it is the prosecuting agency that ultimately

decides whether an internal investigation such as a PSB investigation or other document is

<u>Brady</u> material that needs to be disclosed to a criminal defendant.   <u>See</u> <u>Pennsylvania v.</u>

<u>Ritchie</u>, 480 U.S. 39, 59 (1987).  There is no authority holding that a delay by a police

department in disclosing to a prosecutor potential <u>Brady</u> material consisting of sustained

findings of misconduct by a police officer until the disciplinary process for an internal

investigation is complete amounts to deliberate indifference.

Finally, according to the City Defendants' police practices expert Ken Wallentine:

> There is no generally accepted standard for timeliness of transmission of
> potential <u>Brady</u> information from a law enforcement agency to the appropriate
> prosecutorial agency that is based upon or determined by the number of days
> between the occurrence of the alleged misconduct or the first report of the
> alleged misconduct and either the first communication to the prosecutorial
> agency or the time of the officer's alleged misconduct to the time the officer is
> added to the *Brady* list by the prosecutorial agency.  As noted above, in this
> case the communication from the police department to the Maricopa County
> Attorney's Office was timely, reasonable, and consistent with generally
> accepted police policies and practices.

(SOF ¶ 175).  Also, according to Mr. Wallentine the timing of the Phoenix Police Department

communicating potential <u>Brady</u> material to MCAO at the conclusion of the disciplinary

process "was reasonable and consistent with generally accepted police policies and

procedures throughout the country."  (SOF ¶ 176).  Plaintiff's police practices expert did not

rebut these opinions.  (SOF ¶ 177).  Because there is no authority holding that the actions by

the City of Phoenix/Phoenix Police Department amount to deliberate indifference and

1  because there is no evidence in the record to support this claim, Count Three should be

2  dismissed.

3  **III.   <u>CONCLUSION.</u>**

4      For the reasons set forth above, the City Defendants are entitled to summary judgment

5  on all of Plaintiff's claims against them.

6      DATED this 4th day of February, 2022.

                                              BERKE LAW FIRM, PLLC

7

8

9                                           By   s/ Jody C. Corbett
                                                Lori V. Berke
10                                              Jody C. Corbett
                                                Attorneys for Defendants City of
11                                                Phoenix, Chief Jeri Williams, retired
                                                  Chief Joseph Yahner, and Officer
12                                                Anthony Armour

13

14                           **CERTIFICATE OF SERVICE**

15  I hereby certify that on February 4, 2022, I electronically transmitted the attached document
    to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of
16  Electronic Filing to the following CM/ECF registrants:

17                              Benjamin L. Rundall
                                  Abbie Godles
18                            HONOR LAW GROUP, PLLC
                              4450 S. Rural Road, Suite C-220
19                               Tempe, Arizona  85252
                               rundall@honorlawgroup.com
20                              godles@honorlawgroup.com

21

22                               Maxine S. Mak
                                  Angela Lane
23                         Maricopa County Attorney's Office
                               Civil Services Division
24                              Security Center Building
                          222 N. Central Avenue, Suite 1100
25                            Phoenix, Arizona  85004
                               makm@mcao.maricopa.gov
26                             lane01@mcao.maricopa.gov

27

28

                                        27

1    I further certify that on February 7, 2022, a copy was hand-delivered to:

2                              Hon. Susan R. Bolton
                            United States District Court
3                Sandra Day O'Connor U.S. Courthouse, Ste. 522
4                          401 W. Washington St., SPC 50
                              Phoenix, AZ 85003-2153
5
6                              Hon. Eileen S. Willett
                                 Magistrate Judge
7                          United States District Court
                           401 W. Washington St., SPC 13
8                              Phoenix, AZ 85003-2153
9
        s/ Jody C. Corbett
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28