**HONOR LAW GROUP, PLLC**
Benjamin L. Rundall, State Bar No. 031661
Abbie Godles, State Bar No. 036003
4450 S. Rural Rd., Suite C-220
Tempe, AZ 85282
(602) 282-0223
Attorney E-mail: rundall@honorlawgroup.com
 godles@honorlawgroup.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Frances Salazar, individually,<br><br>Plaintiff,<br><br>vs.<br><br>Phoenix, City of, et al.,<br><br>Defendants. | Case No. CV-19-01188-PHX-SRB (ESW)<br><br>**PLAINTIFF'S CONTROVERTING AND SEPARATE STATEMENTS OF FACTS IN SUPPORT OF HER RESPONSE TO CITY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

Plaintiff, Frances Salazar ("Ms. Salazar" or "Plaintiff"), submits the following Controverting Statement of Facts ("CSF") and Separate Statement of Facts ("PSOF") in opposition to the City Defendants' Motion for Summary Judgment.

### Plaintiff's Controverting Statement of Facts

Before responding individually, Plaintiff makes a general **objection** to DSOF ¶¶ 1–49 as not relevant pursuant to Rule 401, Fed. R. Evid. Rather than providing admissible information helpful to the issues in this case (which Plaintiff takes no issue with), these paragraphs instead take this Court on a granular expedition of Plaintiff's 2013 arrest and criminal trial in an attempt to distract from the actually dispositive issues which are: (1) whether the *Brady* material at issue in this case was withheld by Defendants; and, (2) whether

1

the failure to turn over the *Brady* material violated Plaintiff's due process right to a fair trial. Plaintiff believes City Defendants continue to over-emphasize her 2013 arrest as a backdoor entry into their previously rejected and untimely defense Plaintiff is "guilty," even though this Court rejected those same arguments in 2021. (Doc. 145).

Plaintiff also **objects and moves to strike** the seven (7) "sham affidavits" supplied by City Defendants (commonly as the sole support for individual SOF paragraphs). In addition to the various reasons described below that this Court should treat these affidavits with caution, City Defendants frequently cite to this sham testimony when better support, such as official records or policy documents, exist. Frustratingly, City Defendants also bury critical documents (such as the Professional Standards Bureau Report central to this case) as exhibits to these affidavits.

1.      **Undisputed, but with Clarification.** Plaintiff does not merely claim she was working as a caregiver for Loretta Jones at the time of her December 31, 2013, arrest; she was working as Ms. Jones' caregiver. *See* **Ex. 22 – Pl. Frances Salazar Dep. at 69:22–70:10.**

2–12.    Undisputed.

13.     **Undisputed, but with Clarification.** Plaintiff generally does not object to City Defendants' statement but cautions the only testimony to support the assertion the stop was non-pretextual hinges upon the credibility of Defendant Armour's trial testimony, which has been challenged by Ms. Salazar in this case.

14.     **Disputed.** *See* Plaintiff's clarification in CSF ¶ 13. Additionally, Ms. Salazar testified she did provide identification to Defendant Armour (which City Defendants concede

in ¶ 15 to their Statement of Facts), making this a disputed point. *See* **City Defs.' Separate Statement of Facts in Supp. of Mot. Summ. J. ("DSOF") ¶ 15; Ex. D to DSOF at 18; A.R.S. § 28-1595.**

15.     Undisputed.

16.     **Objection and Motion to Strike.** Plaintiff objects to City Defendants' reliance on a "sham affidavit" as their sole support for the assertions in this paragraph and moves to strike these statements, particularly given Defendant Armour's credibility as a witness is a central issue at play in Plaintiff's *Brady* case. Besides denying Plaintiff the obvious safeguard of cross-examination involving a witness harboring a history of dishonesty, City Defendants had every opportunity to clarify Defendant Armour's testimony during his lengthy deposition. Their decision to wait post-discovery and on the eve of filing their summary judgment to make additional clarifications is suspect and seriously disadvantages Plaintiff.

Additionally, Plaintiff disputes she informed officers there was no current title or registration for the vehicle. Rather, she noted she did not have insurance on the vehicle because it was not her vehicle, and did not have the title or registration for a vehicle that belonged to someone else. Plaintiff's deposition testimony further clarifies: "…when [Defendant Armour] went to the window and asked for registration and insurance and there was nothing there for Rodney to provide them, I offered [the temporary registration] up as a way to prove that the car was not stolen…." *See* **Ex. 22 at 102:7–107:1; Ex. 28 – Police Report No. 2013-02308942 at COP-SALAZAR0003.**

17.     **Undisputed, but with Clarification.** *See* Plaintiff's clarification in CSF ¶ 13.

18. Undisputed.

19–22. **Undisputed, but with Clarification.** *See* Plaintiff's clarification in CSF ¶ 13.

23. **Objection and Motion to Strike.** *See* Plaintiff's objection/motion to strike in CSF ¶ 16. In addition to being untrustworthy, this point is not relevant because Plaintiff was not charged with anything related to the temporary tags (which only served as the purported pretext for the vehicle stop).

24. **Undisputed, but with Clarification.** *See* Plaintiff's objection/motion to strike in CSF ¶ 16 regarding striking the affidavit. Plaintiff will not dispute her deposition testimony, but would clarify she was never charged for any crime related to the temporary tags (which is an issue zealously pursued by City Defendants).

25. Undisputed.

26. **Undisputed, but with Clarification.** *See* Plaintiff's clarification in CSF ¶ 13.

27. **Objection and Motion to Strike.** *See* Plaintiff's objection/motion to strike in CSF ¶ 16.

28. **Objection and Motion to Strike.** *See* Plaintiff's objection/motion to strike in CSF ¶ 16. Interestingly, instead of relying on Plaintiff's deposition, City Defendants fall back on extrajudicial statements only Defendant Armour claims he heard Plaintiff make. Ironically, these statements were also never included in his police report.

29. **Objection.** As evidenced by City Defendants' own phrasing, Plaintiff lacked knowledge to say whether she had the described exchange with Defendant Armour. Far from

an admission, Plaintiff's statement is inadmissible to support City Defendants' separate statement of fact pursuant to Rule 602, Fed. R. Evid.

30. Undisputed.

31–32. **Objection and Motion to Strike.** *See* Plaintiff's objection/motion to strike in CSF ¶ 16.

33. **Objection and Motion to Strike.** *See* Plaintiff's objection/motion to strike in CSF ¶ 16. Additionally, this point is not relevant given City Defendants' own statement in DSOF ¶ 35 confirming Plaintiff was not charged with anything related to the pipe located in the jacket Plaintiff was wearing.

34. **Objection.** *See* Plaintiff's objection/motion to strike in CSF ¶ 33.

35. Undisputed.

36. **Undisputed, but with Clarification and Objection.** *See* Plaintiff's clarification in CSF ¶ 13 and objection/motion to strike in CSF ¶ 16.

37. Undisputed.

38. **Disputed.** Plaintiff has always maintained she has been drug-free since 2007, which is further confirmed by her consistent testimony throughout her criminal trial and the present matter. *See* **DSOF ¶ 39; Ex. 22 at 109:22–111:3, 118:15–120:6.**

39. Undisputed.

40. **Disputed.** Plaintiff has been clean from all illicit drugs since 2007. *See* **DSOF ¶ 39; Ex. 22 at 109:22–111:3, 118:15–120:6.**

41. **Disputed and Motion to Strike.** Plaintiff could not have refused to tell Defendant Armour where she bought crack because she never spoke to him about buying crack. She only admitted to him that the substance in the pipe appeared to be crack, which she knew because, prior to getting clean in 2007, she used crack cocaine. *See* **DSOF ¶ 42; Ex. 22 at 111:4–112:9.**

42. Undisputed.

43. **Undisputed, but with Clarification.** *See* Plaintiff's clarifications in CSF ¶ 13. Plaintiff never stated the drugs and paraphernalia were hers and, thus, did not recant such a statement. Further, she has consistently maintained that she never told Defendant Armour she would take responsibility for the drugs and paraphernalia that were not hers. *See* **DSOF ¶ 45; Ex. 22 at 112:10–113:2.**

44. **Undisputed, but with Clarification.** *See* Plaintiff's clarifications in CSF ¶ 13. Additionally, similar to CSF ¶ 43, *supra*, Plaintiff has always maintained she never admitted to relapsing or that the drugs and/or paraphernalia were hers. *See* **DSOF ¶ 45; Ex. 22 at 109:22–111:3, 112:23–113:2.**

45. Undisputed.

46. **Undisputed, but with Clarification.** *See* Plaintiff's objection/motion to strike in CSF ¶ 16. *See* **Ex. 1 to Ex. E to DSOF.**

47–49. Undisputed.

50.     **Undisputed, but with Clarification.** Plaintiff would simply note denial of many of these motions went to timeliness (ripeness issues), not the substantive merits of whether Defendant Armour actually lied. Plaintiff also questions the relevance of this fact.

51–53.     Undisputed.

54.     **Disputed.** In the State's Response, it did not argue Defendant Armour's trial testimony was consistent but, rather, explicitly argued, "[o]n cross, the officer's testimony was appropriately impeached by the defense…Moreover, the State never relied on the defendant's confession to place the drugs in her possession—the State's theory of the case was always constructive possession." *See* **Ex. M to DSOF at 4.**

55–58.     **Disputed.** Tellingly, instead of pointing this Court to the PSB Report, Defendant Armour paraphrases (and creates) his own testimony in recounting the incident which led to his placement on MCAO's *Brady* list. Plaintiff believes this Court should ignore such misleading characterizations and instead rely directly on the findings of the PSB Report itself. (Conveniently attached for this Court's Review as Plaintiff's **Exhibit 1**).

59–60.     **Disputed and Objection/Motion to Strike.** *See* Plaintiff's objection/motion to strike in CSF ¶ 16 and dispute in CSF ¶ 55.

61.     Undisputed.

62.     **Disputed and Objection/Motion to Strike.** *See* Plaintiff's objection/motion to strike in CSF ¶ 16 and dispute in CSF ¶ 55.

63–64.     **Undisputed, but Motion to Strike "Sham Affidavit."** Plaintiff moves to strike that portion of the statement relying on Defendant Armour's affidavit.

65. **Disputed and Objection/Motion to Strike.** *See* Plaintiff's objection/motion to strike in CSF ¶ 16 and dispute in CSF ¶ 55. Plaintiff wonders how City Defendants could have determined the female victim hindered prosecution if she was never charged and found guilty of hindering prosecution.

66. **Disputed.** Plaintiff agrees Defendant Armour was told by a supervisor not to book the female victim into jail, but disputes Defendant Armour provided accurate facts to the supervisor of what had taken place. *See* **Ex. 1.**

67–68. **Disputed.** *See* Plaintiff's dispute in CSF ¶ 55.

69. **Disputed and Objection/Motion to Strike.** *See* Plaintiff's objection/motion to strike in CSF ¶ 16 and dispute in CSF ¶ 55.

70. **Undisputed, but with Clarification and Objection/Motion to Strike.** As a preliminary matter, Plaintiff moves to Steve Martos' declaration as a "sham affidavit." Asst. Chief Martos was never deposed and was not the PSB Commander at the time City Defendants failed timely to turn over *Brady* material. His opinions and insight into the operations of the current PSB are therefore not relevant, and highly suspect given City Defendants' interest in avoiding accountability for their failed *Brady* policies. Last, while Plaintiff agrees the PSB is tasked with the majority of responsibilities listed by City Defendants, importantly, the PSB is not responsible for updating policies. *See* **Phx. City Code Sec. 2-119.**

71. **Undisputed, but with Clarification and Objection/Motion to Strike.** *See* Plaintiff's objection/motion to strike in CSF ¶ 70. Plaintiff would note the majority of

1    information cited by City Defendants can be more easily located in a checklist created by City

2    Defendants and as attached as Plaintiff's **Exhibit 42**.

3        72.    **Undisputed, but with Clarification and Objection/Motion to Strike.** *See*

4    Plaintiff's objection/motion to strike in CSF ¶ 70. The admonition was limited in time to the

5    investigative period surrounding the PSB Report, which concluded in April 2016. *See* **Ex. 17**

6    **– PSB Manual.**

7        73–82.    **Undisputed, but with Clarification and Objection/Motion to Strike.** As

8    before, Plaintiff objects to and moves to strike those portions of testimony supported only by

9    "sham affidavit." Plaintiff also finds it intentionally confusing City Defendants would bury

10   key documents related to the PSB Report in these sham affidavits. Accordingly, Plaintiff

11   directs this Court's attention to the PSB Report and PPD's own polices as the best undisputed

12   support for how its *Brady* process works. Further, regardless of Defendant Armour's own

13   denial in DSOF ¶¶ 81–82, the PSB investigation led by a team of superior Phoenix police

14   officers determined in no uncertain terms that Defendant Armour did, in fact, make false

15   statements to his supervisor and in his report, and failed to obey a lawful order. *See* **Ex. 1;**

16   **Ex. 17.**

17       83–85.    Undisputed.

18       86.    **Disputed and Objection/Motion to Strike.** *See* Plaintiff's objection/motion to

19   strike in CSF ¶ 70. City Defendants conveniently ignore telling this Court that Defendant

20   Armour's belief as to this point was only formed "when I went to do my deposition prep with

9

Attorney Berke." *See* **Ex. 23 – Def. Armour Dep. at 119:2–120:17; Ex. 16 – Operations Order 3.19.**

87–93. **Undisputed, but with Clarification.** Plaintiff highlights an officer is still aware of the investigation before the final report is released. Additionally, the facts of an investigation do not change based on the DRB Panel's review. *See* **Ex. 24 at 80:14-81:14.**

94. **Undisputed, but with Clarification.** The DRB hearing took place on September 29, 2016. *See* **Ex. 10 to Ex. O to DSOF.**

95–100. Undisputed.

101–102. **Disputed.** *See* Plaintiff's dispute in CSF ¶ 86.

103–106. Undisputed.

107. **Disputed and Objection/Motion to Strike.** *See* Plaintiff's objection/motion to strike in CSF ¶ 70. Additionally, PPD sets its own internal *Brady* policy, instructs the PSB to conduct a *Brady* review based on this policy, and maintains a legal unit of licensed attorneys who can aid in that review. *See* **Ex. 17; Ex. 14 – Operations Order 2.9; Ex. 15 – Operations Order 3.18; Ex. 16.**

108–119. **Undisputed, but with Clarification and Objection/Motion to Strike.** *See* Plaintiff's objection/motion to strike in CSF ¶ 70 to the extent these paragraphs rely on Asst. Chief Martos' affidavit. Additionally, Plaintiff would note PPD's disciplinary process is distinct from the PSB investigation. Stated differently, the findings of the PSB investigation are final facts irrespective of whether the department imposes discipline on an officer. *See* **Ex. 24 – John Collins Dep. at 80:14-81:14.**

120.   **Undisputed, but with Clarification.** During his deposition, Commander Collins indicated there was no reason an investigation resulting in findings of officer misconduct should not immediately go to prosecuting authorities for review; however, Plaintiff agrees PPD trained officers to engage in a different practice which delayed disclosure of officer misconduct for *Brady* review. *Id.* **at 100:12–101:9.**

121.   **Disputed.** Law enforcement agencies such as the Phoenix Police Department (and its officers) have a duty to comply with the constitutional requirements of *Brady*. More perplexing, however, if PPD does not engage in such determinations, Plaintiff is confused why it has policies and flowcharts which discourage timely dissemination of *Brady* material involving officer misconduct to prosecuting authorities. *See* **Ex. 7 – PPD's *Brady* Review Process Flowchart; Ex. 14–17.**

122.   **Disputed and Objection/Motion to Strike.** *See* Plaintiff's objection/motion to strike in CSF ¶ 70. Plaintiff agrees PPD has engaged in a custom of untimely disclosing *Brady* material for years but disputes MCAO and City of Phoenix Prosecutor's Office can ratify its unconstitutional conduct.

123–124.   **Disputed and Objection/Motion to Strike.** The sole support for these statements comes from Asst. Chief Martos' unreliable affidavit which references an extrajudicial conversation with MCAO constituting hearsay. Moreover, this statement is disputed by letters from MCAO to PPD in 2014 and 2020. Both letters are nearly identical and do not "instruct" PPD, but rather **request** PPD continue to provide *Brady* material

including "Findings of Misconduct involving untruthfulness." *See* **Ex. 41 – Letters from MCAO to PPD, dated June 20, 2014, and Feb. 7, 2020.**

125. **Undisputed, but with Clarification.** Plaintiff only clarifies this paragraph to the extent City Defendants argue Commander Collins' decision was influenced by MCAO.

126. Undisputed.

127. **Undisputed, but with Clarification and Objection/Motion to Strike.** Plaintiff objects and moves to strike that portion of the paragraph dependent on the "sham affidavit" of Krista Campagna. Additionally, Plaintiff does not know which "process" City Defendants are referencing given PPD has made controverting claims about its *Brady* process.

128. Undisputed.

129. **Objection and Motion to Strike.** Plaintiff objects and moves to strike this paragraph which is solely supported by Chief Williams' affidavit.

130–131. **Disputed and Objection/Motion to Strike.** Plaintiff objects to these paragraphs to the extent they rely on "sham affidavits." Moreover, these paragraphs do not offer separate statements of fact but are arguments Plaintiff has appropriately rebutted in her briefing.

132–137. **Undisputed**, **but with Clarification.** Plaintiff takes issue with City Defendants' characterization in these paragraphs and notes she has substantively responded to similar paragraphs in response to Defendant Lake's motion for summary judgment. (Doc. 204).

138–141. Undisputed.

142. **Disputed.** Plaintiff will let the Court read the transcript which does not draw the conclusion cited by City Defendants in this paragraph. Moreover, in the same pages City Defendants point to, Defendant Lake concedes the "*Brady* file and Officer Armour's sort of history since the *Brady* incident was – did not make him very likeable." *See* **Ex. 26 – Def. Lake Dep. at 68:10–14.**

143. **Disputed.** Defendant Lake made no such statement.

144. **Disputed.** Again, Plaintiff urges the Court to review the transcript which does not support City Defendants' statement. Defendant Lake never said she ***would*** move *in limine*, but rather she would make an assessment about whether to do so, "[a]nd if I felt that we could not, then I would have dismissed the case." *See* **Ex. 26 at 65:9–13.**

145. **Disputed and Objection/Motion to Strike.** *See* Plaintiff's objection/motion to strike in CSF ¶ 16. Besides serving as a post-hoc rationalization not relevant to Plaintiff's claim, Plaintiff also does not understand how Defendant Armour could make such statements if he did not fully understand this defense until "I went to do my deposition prep with Attorney Berke." *See* **Ex. 23 at 119:2–120:17.**

146–147. Undisputed.

148. **Disputed.** In the present case, Defendant Lake and MCAO were concerned they could not obtain a conviction "given [Defendant Armour's] credibility problems not known at the time of the first trial." As Defendant Lake stated in her deposition, that information made Defendant Armour "not very likeable." *See* **Ex. 26 at 68:10–14; Ex. 32 – High Profile Mem. from Elizabeth Lake.**

149. **Disputed.** Attorney Doran (Plaintiff's trial counsel) said the responsibility is mandatory "by both…[t]he police department, crime lab, according to case law, are an extension of the prosecutorial office…[s]o it's everyone's job to make sure that information is disclosed." *See* **Ex. 25 – Christopher Doran Dep. at 178:7–17.**

150. **Undisputed, but with Clarification.** Even assuming Plaintiff requested the disciplinary file of Defendant Armour prior to her criminal trial, if the DRB did not discipline Defendant Armour until **after** Plaintiff's conviction, how would she have known about the PSB Report (which presumably would have been excluded until after discipline)?

151. Undisputed.

152. **Undisputed, but with Clarification.** In October 2015, Attorney Doran sent a letter to MCAO requesting Defendant Armour sign a "Brady/Kyles Checklist." However, officers have an affirmative duty to disclose *Brady* material.

153. **Undisputed, but with Clarification.** Defendant Armour was required to disclose information about his misconduct pursuant to constitutional law, but Plaintiff agrees PPD's deficient *Brady* policies provided cover for him to avoid responsibility for his unconstitutional conduct.

154–156. **Objection and Motion to Strike.** *See* Plaintiff's objection/motion to strike in CSF ¶ 70.

157. **Undisputed, but with Clarification.** At trial, one of those witnesses took responsibility for the drugs in the vehicle.

158–161. Undisputed.

162.     **Disputed.** *See* Plaintiff's dispute in CSF ¶ 149.

163.     **Disputed.** The paper encourages broad disclosure and notes "[t]he burden is not on the defense to request such material." *See* **Ex. 19 – IACP – Duty to Disclose Exculpatory Evidence at 8.**

**164.**     **Disputed.** Expert testimony does not create clearly established law and this paragraph is nothing more than argument disputed by Plaintiff and Plaintiff's Expert. *See* **Ex. 6 – Dan Brown's Resp. to DSOF, dated March 30, 2022.**

165.     **Disputed.** *See* **Ex. 6.**

166.     **Undisputed, but with Clarification.** Plaintiff summarized *Brady* and its progeny, which unarguably includes impeachment material.

167–168.     Undisputed.

169.     **Undisputed, but with Clarification.** Based on this Court's order, Plaintiff condensed her claims as recommended.

170–172.     **Undisputed, but with Clarification.** Plaintiff's claim relies on an obvious practice as argued in her briefing. Additionally, Plaintiff has identified other pending cases involving *Brady* violations by PPD.

173.     **Disputed.** City Defendants overstate the deposition testimony of Commander Collins and Chief Williams.

174.     **Disputed and Objection/Motion to Strike.** *See* Plaintiff's objection/motion to strike in CSF ¶ 70. Additionally, Chief Williams' deposition testimony does not describe timeliness as emphasized by City Defendants.

175–177.  **Disputed.** Besides the fact City Defendants' expert's opinion says nothing about what would be timely, Plaintiff does not believe due process is satisfied by waiting **245 days** to disclose *Brady* material regarding officer misconduct to a prosecuting authority. Moreover, Plaintiff's expert does not agree with these opinions.

### Plaintiff's Separate Statement of Disputed Facts Overlooked by City Defendants

1.  The *Brady* material involving officer misconduct at issue in Plaintiff's case is an investigatory report (the "PSB Report") created by PPD's Professional Standards Bureau ("PSB") on April 27, 2016. Therein, Defendant Armour was referred for discipline for five separate violations of PPD's policies including dishonesty and falsifying a police report. *See* **Ex. 1.**

2.  On December 31, 2013, Plaintiff was travelling as a passenger in a vehicle pulled over by Defendant Armour. *See* **Ex. 28.**

3.  Defendant Armour searched the vehicle Plaintiff was travelling in and found a glass pipe with a rock of crack cocaine inside it. *Id.*

4.  Defendant Armour's police report noted Plaintiff "claimed that someone else must have left the pipe and the drugs there, but that she would 'take responsibility for it.'" *Id.*

5.  At trial in 2016, Defendant Armour testified inconsistent with his police report and told the jury that Plaintiff "admitted" the crack and crack pipe were hers. *See* **Ex. 29 – Pet. for PCR.**

6.      Plaintiff was found guilty based largely on Defendant Armour's testimony "whose credibility was critical to the conviction." *See* **Ex. 31 – Minute Entry Granting Pet. for PCR, dated July 10, 2018.**

7.      On December 5, 2016, Plaintiff was sentenced to six (6) years in prison. *See* **Ex. 36 – Sentence of Imprisonment.**

8.      Before her sentencing, Plaintiff's criminal trial lawyer ("Attorney Doran") filed a complaint with PPD regarding Defendant Armour's changed testimony at trial. That complaint was ignored by PPD. *See* **Ex. 3 – Compl. from Att'y Doran to PPD re: Def. Armour, dated Nov. 23, 2016.**

9.      Before her conviction, Plaintiff sent a letter to Defendant Armour pleading with him to recant his trial testimony. *See* **Ex. 35 – Letter from Pl. to Def. Armour (no date).**

10.     The April 27, 2016, draft PSB Report signed by then-Lt. Martos on July 13, 2016, confirming Defendant Armour's misconduct was disclosed to MCAO on December 28, 2016, **23 days** after Plaintiff's conviction, and **245 days** after its creation. *See* **Ex. 10 – PPD's Internal Routings Info. re: PSB15-0126.**

11.     Defendant Armour never disclosed his misconduct verbally or otherwise to Plaintiff or the prosecutor prior to testifying at her criminal trial. *See* **Ex. 23.**

12.     The PSB is responsible for investigating allegations of officer misconduct and reporting that misconduct to prosecuting authorities. *See* **Ex. 16–17.**

13.     The PSB is governed by an internal policy manual which notes its commitment to assist PPD "in maintaining unquestionable integrity, effective and efficient police service,

while assuring fair and equal treatment to both the citizens of the City of Phoenix and the employees of [PPD]." *See* **Ex. 17 at COP-SALAZAR0035.**

14.     The PSB is staffed by police investigators who report to the PSB Commander, who in turn reports directly to the Chief of Police. *See* **Ex. 17 at COP-SALAZAR0036.**

15.     When the PSB receives information related to officer misconduct, it opens an investigation and follows a process tracked in a chart maintained in PPD's policies. *See* **Ex. 16 at 5**.

16.     If a claim of misconduct is supported after the PSB interviews witnesses, the PPD officer will then be notified they are under investigation by way of a "Notice of Investigation" ("NOI") and PSB will schedule a time to interview them. *See* **Ex. 16; Ex. 24 at 33:22–34:24, 34:25–36:9.**

17.     The NOI requires an officer's signature confirming receipt of the notice, and includes a proviso at the bottom of the form ordering them to "not discuss this investigation…with any unauthorized person." *See* **Ex. 8 – Notice of Investigation to Def. Armour.**

18.     After an officer is interviewed by the PSB (and all relevant facts are examined) PSB investigators assigned to the case complete a draft investigation report compiling their final findings of facts. *See* **Ex. 24 at 36:24–37:18.**

19.     The draft report is then presented to the PSB Commander for review. *Id.*

20.     After the PSB Commander has an opportunity to review the draft report, the officer and their union representative are afforded an opportunity to review the draft report as part of the Investigative Review Process (the "IRP"). *Id.*

21.     During the IRP, officers and their representatives have 21 days to review the draft investigation to challenge any final findings of fact within the draft report. *Id.*

22.     If an officer challenges a final finding of fact determined by PSB investigators, they can schedule a meeting with the PSB Commander and PSB investigators to discuss their concerns, but the PSB Commander has final say on whether to accept any changes to the final report (and it is rare for changes to be made). *Id.* **at 80:14-81:7.**

23.     The IRP concludes once the employee either signs an IRC (the Investigative Review Control) form, meets with the PSB Commander about their concerns, or 21 days expire without hearing from the employee. *Id.* **at 37:19–39:7; 41:9–12.**

24.     The draft report then becomes a final report (either sustaining or denying allegations of misconduct as investigated) and the facts reported are the final facts. *Id.* **at 55:17–56:5, 76:22–77:4, 81:8–14, 83:21–24;** *see also* **Ex. 16 at 5.**

25.     During this process, the PSB is responsible for forwarding sustained allegations of officer misconduct to prosecuting authorities for *Brady* review. *See* **Ex. 17 at COP-SALAZAR0068–COP-SALAZAR0070; Ex. 24.**

26.     Following the steps above, on November 23, 2015, PSB was made aware that during an arrest on November 4, 2015, Defendant Armour had: (1) unlawfully entered an apartment without cause or a warrant; (2) falsely arrested a female suspect without cause; (3)

lied to a superior officer regarding his unconstitutional entrance and arrest; (4) disobeyed a supervisor's order to release the female resident, booking her into jail instead; and, (5) falsified information about the arrest in a subsequent police report. *See* **Ex. 1.**

27.     After a preliminary investigation involving interviews of fellow PPD officers present at the time of his misconduct, the PSB sent Defendant Armour an NOI on January 28, 2016, informing him that he was being placed under investigation. *See* **Ex. 8.**

28.     Defendant Armour provided an interview to the PSB investigators acknowledging he violated a direct order of a supervising officer, but otherwise denying the allegations (and contradicting the testimony of other officers interviewed). *See* **Ex. 1.**

29.     On April 27, 2016, PSB investigators sustained all five allegations against Defendant Armour, noting some of the allegations arose to "intentional abuse of police powers, authority, and privileges." *Id.*

30.     Defendant Armour was ultimately cited with violation of five department orders, including making false reports and lying. More specifically, 2.2.2.E(1) (disobeying supervisor); 3.13.5.B(1) (making false reports); 3.13.6.A(2) (lying in criminal investigation); 4.10.3F(4) (warrantless entry without consent); and 4.10.3.F(1) (arrest without warrant or cause). *Id.*

31.     These violations constituted "Class III Violations" which, under PPD's policies, involve "[a]cts so serious and malicious in nature, they may require immediate intervention by the Police Chief…with the immediate removal of all employee responsibilities." *See* **Ex. 1; Ex. 15.**

20

32.     On June 30, 2016, Defendant Armour's union representative signed the IRC form confirming Defendant Armour's acknowledgement of the sustained allegations against him. *See* **Ex. 9 – IRC Form.**

33.     During his deposition in this case, Defendant Armour—for the first time—claimed his union representative wrongfully signed this form on his behalf. Yet, Defendant Armour also admitted this theory was only realized "when I went to do my deposition prep with Attorney Berke." *See* **Ex. 23 at 119:2–120:17.**

34.     On July 6, 2016, Commander Collins approved the draft report resulting in it becoming a final factual determination confirming Defendant Armour's misconduct (i.e., the "PSB Report"). *See* **Ex. 9.**

35.     Even though both Defendant Armour and the PSB are required to turn over *Brady* material to prosecuting authorities, the PSB Report was never disclosed to MCAO, Defendant Lake, or Plaintiff's defense counsel before her criminal trial. *See* **Ex. 10; Ex. 25 at 46:16–23, 54:2–5, 93:1–5; Ex. 26 at 74:2–11.**

36.     PPD's *Brady* policy, which instructs officers on their constitutional disclosure requirements, is not identified as a distinct heading in the department's Operations Orders' Introduction or Table of Contents. *See* **Ex. 13 – PPD's Operations Orders Table of Contents.**

37.     PPD's *Brady* policy is concealed on the last page of Section 2 – Organization, Management, and Administration, Subheading 2.9 – Court Appearances. *Id.*

38.     PPD's *Brady* policy requires disclosure of potentially exculpatory information (including information that concerns the credibility of an employee), but does not identify discrete examples of *Brady* material or define impeachment material (other than to broadly note disclosure material "may deal with issues of honesty, integrity, bias, and/or moral turpitude."). *See* **Ex. 14.**

39.     PPD's disclosure policy is further constrained by Section 8(B), which does not encourage broad disclosure but rather limits *Brady* disclosure requirements to only those "[d]epartment employees who may be potential witnesses…." *Id.*

40.     Bullet points under Section 8(B) of PPD's *Brady* policy narrow the scope of disclosure and are confusing for several reasons. Bullet point one, for example, only requires disclosure if the officer knows they have been placed on a *Brady* list by MCAO. Bullet point three does not require an officer to disclose *Brady* material if they believe PPD is already aware of that *Brady* material. *Id.*

41.     PPD does not make *Brady* determinations (and does not maintain a *Brady* list). *See* **Ex. 12 – City Defs.' Resp. to Pl.'s First Set of Non-Unif. Interrog. Nos. 2 and 3; Ex. 27 – Def. Williams Dep. at 121:18–22, 125:25–126:5.**

42.     Because the PSB investigates allegations of officer misconduct, the PSB is also tasked in an internal manual distinct from PPD's policies to produce such material to prosecuting authorities for *Brady* review. *See* **Ex. 17 at COP-SALAZAR0068–COP-SALAZAR0070.**

43.     According to Commander Collins, there should not be a delay in disclosing final PSB Reports sustaining officer misconduct to prosecuting authorities. *See* **Ex. 24. at 100:12–101:9.**

44.     PPD requires the PSB to engage in a thirteen-step process that asks PSB Lieutenants (and the PSB Commander) to make determinations about whether misconduct constitutes *Brady* material. *See* **Ex. 7; Ex. 24; Ex. 27.**

45.     A statistical analysis of 112 PSB investigations that ultimately led to a PPD officer being placed on a *Brady* list concluded that, on average, **200 days** pass before PPD/PSB disclose instances of officer misconduct confirmed in PSB investigations to a prosecuting authority. *See* **Ex. 4 – Expert Report of Melissa Kovacs, dated Aug. 4, 2021.**

46.     On average, over **476 days** pass from a reported incident of misconduct resulting in a PSB investigation to an officer being added to a *Brady* list by a prosecuting authority. *Id.*

47.     Statistically, at any given time there are at least six (6) PPD officers who should be on MCAO's Rule 15/*Brady* List, but are not on that list because PPD failed to timely disclose their misconduct. Importantly, Chief Williams is not aware of how many of her officers are on a *Brady* list. *Id.*; *see also* **Ex. 27 at 121:18–22, 125:25–126:5.**

48.     Between 2011 and Plaintiff's trial, Defendant Armour had a total of eight (8) complaints lodged against him, including allegations of various levels of sexual misconduct and/or assault, physical force, excessive force, abuse of authority, and unprofessional conduct, among others. *See* **Ex. 2 – Compls. to PPD re: Def. Armour.**

49.     Only weeks after Plaintiff's criminal trial, another complaint alleging sexual misconduct was brought against Defendant Armour for an incident that occurred with an arrestee on September 3, 2016. *Id.*

50.     The woman falsely arrested by Defendant Armour described her experience with him to PSB investigators as "the worst she had ever been treated by a police officer…." *See* **Ex. 1.**

51.     Three years prior to Plaintiff's arrest, a fellow PPD officer, Abby Dennison, claims Defendant Armour sexually assaulted and raped her. Mrs. Dennison was pressured by PPD to make an on-the-spot determination about charges mere hours post-assault and ultimately declined charges, believing PPD was fully investigating the incident for potential misconduct. Even though medical records supported sexual assault (Mrs. Dennison had a tampon dislodged by medical providers), PPD did not open an incident report and summarily dismissed the allegations in a two-page memorandum, attaching four pages of inaccurately scribbled notes from Mrs. Dennison's interview with officers at the hospital. *See* **Ex. 37 – ABC15 Article – A Matter of Consent.**

52.     And a month before the November 4 incident leading to the PSB report, JeAnna Anderson made a complaint against Defendant Armour for groping her during a traffic stop on October 16, 2015. When she learned of complaints against Defendant Armour from other woman, Ms. Anderson said "[h]e has no respect for any woman's life…." *See* **Ex. 2; Ex. 38 – ABC15 Article – Phx. Officer Faces Multiple Sex Assault Claims.**

53.     None of these investigations were disclosed by City Defendants to Plaintiff or MCAO before Plaintiff's criminal trial. *See* **Ex. 25 at 46:16–23.**

54.     On January 30, 2017, MCAO placed Defendant Armour on its Rule 15 list (the "Brady list"). *See* **Ex. 11 – Letter from MCAO to Def. Armour, dated Jan. 26, 2017.**

55.     Ms. Salazar's attorneys were first provided with the PSB Report on December 15, 2017. *See* **Ex. 25 at 138:11–15.**

56.     Upon receiving the information, Ms. Salazar's lawyers immediately worked to secure a new trial/her release from prison. *See* **Ex. 29**.

57.     On March 20, 2018, Ms. Salazar's PCR attorney submitted a sixteen (16) page petition on Plaintiff's behalf for post-conviction relief, arguing the suppressed PSB Report about Defendant Armour's misconduct necessitated a new trial. *Id.*

58.     On June 7, 2018, MCAO filed a one-page response to Ms. Salazar's PCR Petition conceding she was entitled to a new trial. *See* **Ex. 30 – State's Resp. to Pet. for PCR.**

59.     On July 10, 2018, the Maricopa County Superior Court granted Ms. Salazar's petition for a new trial, noting specifically Defendant Armour "whose credibility was critical to the conviction." *See* **Ex. 31.**

60.     On July 23, 2018, MCAO filed a motion to dismiss Ms. Salazar's criminal case "in the interest of justice." *See* **Ex. 33 – Def. Lake's Motion to Dismiss.**

61.     On July 26, 2018, the Maricopa County Superior Court vacated Ms. Salazar's judgment, and ordered her release from the Arizona Department of Corrections. *See* **Ex. 34 – Minute Entry and corresponding Order of Release, dated July 26, 2018.**

62. Nearly two years after the guilty verdict obtained by the State based almost entirely on Defendant Amour's testimony, Ms. Salazar was released from prison in August 2018 as a legally innocent woman. *Id.*

63. Despite City Defendants' attempt to deny that discovery of the PSB Report directly led to Plaintiff's release from prison and exoneration, an internal memo created by MCAO confirms its decision to not re-try Plaintiff based on "credibility problems [concerning Defendant Armour] not known at the time of the first trial." *See* **Ex. 32.**

64. Plaintiff's criminal defense lawyers also said the PSB Report would have changed the outcome of Plaintiff's trial.

65. In a concepts and issues paper on police departments' duty to disclose, the International Association of Chiefs of Police notes the "affirmative duty of law enforcement to notify the prosecutor of any exculpatory material." *See* **Ex. 19 at 3.**

66. The IACP is the "world's largest and most influential professional association for police leaders" and a "recognized leader in global policing…." Chief Williams is a member of the IACP. *See* **Ex. 18 – About IACP (The Int'l Ass'n of Chiefs of Police); Ex. 40 – PPD's Biography for Chief Williams.**

67. In the IACP paper, exculpatory material is defined as "evidence that is favorable to the accused….and/or may impact the credibility of a government witness, including the law enforcement officer or other agency employee." *See* **Ex. 19 at 3.**

68. The IACP paper highlights failure to provide such information constitutes a due process violation and warns law enforcement "[t]he burden is not on the defense to request

such material; it is the responsibility of involved law enforcement agencies to provide such material to the prosecutor…" *Id.* **at 8.**

69.   The IACP paper notes *Brady* "places a heavy burden ***on employees*** and their agencies…" *Id.*

70.   The Department of Justice Manual (which is not binding but instructive) explicitly instructs that "before serving as an affiant or witness in any case or matter, the agency employee shall advise the prosecuting attorney(s) of the existence of any potential impeachment information." *See* **Ex. 20 – DOJ Manual Section 9-5.100 – Policy Regarding the Disclosure to Prosecutors of Potential Impeachment Info. Concerning Law Enforcement Agency Witnesses ("Giglio Policy").**

71.   The DOJ manual also provides "[a]gency witnesses…should make broad disclosures of potential impeachment information to the prosecutor so that the prosecutor can assess the information in light of the role of the agency witness, the facts of the case, and known or anticipated defenses, among other variables." *Id.*

72.   Specifically, the West Jordan Police Department's ("WJPD") *Brady* policy notes "[t]he obligation to provide *Brady* information is ongoing. If any new *Brady* information is identified, the prosecuting attorney should be notified." *See* **Ex. 21 – WJPD Policy Manual.**

73.   WJPD's *Brady* policy is conspicuously listed as "Brady Policy" in its table of contents. *Id.*

74.     Plaintiff's expert also opined on PPD's *Brady* policy agreeing it failed to "clearly define…*Brady* disclosure requirements and the timeline to disclose exculpatory *Brady* material." *See* **Ex. 5 – Expert Report of Dan Brown, dated Dec. 30, 2020.**

75.     In an interview on September 15, 2020, Chief Williams could not identify the requirements of *Brady* in an interview with ABC 15, mistakenly stating *Brady* was related to the "voir dire" process. *See* **Ex. 39 – ABC15 Article – Att'ys: Phx. Police Chief has 'no idea' about Brady list system.**

76.     Despite this alleged blunder, during her deposition nearly a year later, Chief Williams could not identify the constitutional amendment *Brady* relies on in creating a constitutional right to exculpatory information; identify key progeny flowing from that decision (such as *Giglio v. United States*); could not adequately cite the disclosure requirements mandated by *Brady*; and routinely blamed MCAO for any deficient policies on *Brady* (even though the Chief sets policy for PPD). *See* **Ex. 27 – Def. Williams Dep. at 37:20-23, 60:20-61:9, 69:10-22, 74:3-14, 157:19-24**; *See also* **Phx. City Code Sec. 2-119.**

77.     Chief Williams is a 32-year police veteran with a master's degree that serves as the executive officer of the fifth largest police force in the country (and with direct control over its policies and procedures). *See* **Ex. 40.**

        RESPECTFULLY SUBMITTED this 8th day of April, 2022.

*/ / /*

28

**HONOR LAW GROUP, PLLC**

By   _/s/ Benjamin L. Rundall_

                Benjamin L. Rundall, Esq.
                Abbie L. Godles, Esq.
                Honor Law Group, PLLC
                4450 S. Rural Rd., Suite C-220
                Tempe, AZ 85282
                _Attorneys for Plaintiff_

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 8, 2022, I caused the foregoing document to be electronically transmitted to the Clerk's Office using the CM/ECF System for filing and transmittal of a notice of Electronic Filing to the following CM/ECF registrants:

Honorable Susan R. Bolton
United States District Court
Sandra Day O'Connor U.S. Courthouse, Ste. 522
401 W. Washington St., SPC 50
Phoenix, AZ 85003-2153

Honorable Eileen S. Willett
United States District Court
Sandra Day O'Connor U.S. Courthouse, Ste. 325
401 W. Washington St., SPC 13
Phoenix, AZ 85003-2153

Maxine S. Mak, Esq.
Angela Lane, Esq.
Maricopa County Attorney's Office – Civil Division
222 N. Central Ave., Suite 1100
Phoenix, AZ 85004
_Attorneys for Elizabeth Lake_

Lori V. Berke, Esq.
Jody C. Corbett, Esq.
Berke Law Firm, PLLC
1601 N. 7th St., Suite 360
Phoenix, AZ 85006
*Attorneys for City Defendants*

  */s/ ALG*