**HONOR LAW GROUP, PLLC**
Benjamin L. Rundall, State Bar No. 031661
Abbie L. Godles, State Bar No. 036003
4450 S. Rural Rd., Suite C-220
Tempe, AZ 85282
(602) 282-0223
Attorney E-mail: rundall@honorlawgroup.com
godles@honorlawgroup.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Frances Salazar, individually,<br><br>Plaintiff,<br><br>vs.<br><br>Phoenix, City of, et al.,<br><br>Defendants. | Case No. CV-19-01188-PHX-SRB (ESW)<br><br>**PLAINTIFF'S RESPONSE TO CITY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

Instead of accepting accountability for failing to timely provide *Brady* material, as constitutionally required, before Plaintiff Frances Salazar's criminal trial, City Defendants continue to point fingers anywhere but at themselves: they blame Plaintiff (a grandmother they continue to refer to as a felon), the Maricopa County Attorney's Office (a dismissed party who does not control PPD's policies), a "rogue" union representative (who Defendant Armour now claims five years later wrongfully signed off on the PSB Report findings), and even the PPD officials involved in the PSB investigation (who Armour thinks got it wrong). The reality is City Defendants' policies, in addition to known problems with an officer they consistently failed to hold accountable, denied Ms. Salazar her right to a fair trial, and resulted in the

wrongful incarceration of a legally innocent woman for nearly two years. As such, City Defendants' Motion should be denied.

## I. Facts

### A. Plaintiff's arrest, unfair criminal trial, & revelation of City Defendants' systemic failure to timely disclose *Brady* information involving officer misconduct

Plaintiff will avoid belaboring details of her arrest and trial, which are well known to this Court, immaterial to her claim she was denied a fair trial, and over-emphasized by City Defendants. Summarized, on December 31, 2013, Ms. Salazar was travelling as a passenger in a vehicle pulled over by Defendant Armour. (PSOF ¶ 2). Defendant Armour searched the vehicle Ms. Salazar was travelling in and found a glass pipe with a rock of crack cocaine inside it. (PSOF ¶ 3). In his police report, Defendant Armour wrote that Plaintiff "claim[ed] that someone else must have left the pipe and the drugs there, but that she would 'take responsibility for it.'" (PSOF ¶ 4). Plaintiff was charged by the Maricopa County Attorney's Office ("MCAO") on January 3, 2014, with two drug-related counts: (1) Possession or Use of Narcotic Drugs, a Class 4 Felony; and (2) Possession of Drug Paraphernalia, a Class 6 Felony. (CSF ¶ 47).[1]

---

[1] Although Ms. Salazar battled addiction when she was younger (1999–2007), she always took responsibility for her actions (accepted plea deals) and had not been charged with a drug-related offense for six years prior to her 2013 arrest. (CSF ¶ 39). Ms. Salazar's sobriety continues to this day, and she has never been charged with a drug-related offense since her 2013 arrest (9 years ago).

On August 10, 2016, MCAO tried Ms. Salazar in connection with the two criminal counts stemming from her 2013 arrest. (CSF ¶ 48). During examination at trial, Defendant Armour testified inconsistent with his police report and told the jury that Plaintiff "admitted" that the crack and crack pipe were hers. (PSOF ¶ 5). Even though Ms. Salazar's defense counsel confronted Defendant Armour with his police report and produced a separate witness who admitted possession of the drugs, Plaintiff was found guilty based largely on Defendant Armour's testimony "whose credibility was critical to her conviction." (PSOF ¶ 6).

Unbeknownst to Plaintiff at the time of her trial, however, is that Defendant Armour had a long history of dishonesty which undermined his credibility as a witness. (PSOF ¶ 1). Even though this impeachment material (the "PSB Report") was known to Defendant Armour and City Defendants months before the criminal trial, they never disclosed it to Plaintiff, Plaintiff's criminal defense lawyer ("Attorney Doran"), the prosecutor ("Defendant Lake"), or MCAO. (PSOF ¶ 35). In failing to do so, City Defendants unfairly stacked the deck against Plaintiff before her trial even began. On December 5, 2016, as the natural consequence of her unfair trial, Plaintiff was sentenced to six (6) years in prison.[2] (PSOF ¶ 7).

On December 28, 2016, only **23 days** after Plaintiff's conviction, the City of Phoenix Police Department ("PPD") disclosed Defendant Armour's misconduct (via the PSB Report)

---

[2] Before sentencing, Plaintiff's criminal lawyer sent a complaint to PPD about Defendant Armour, noting his belief Defendant Armour changed his testimony at trial from his police report. (PSOF ¶ 8). Additionally, Plaintiff also sent a letter to Defendant Armour pleading with him to recant his false testimony, which Defendant Armour refused to do. (PSOF ¶ 9).

3

to MCAO for "Rule 15" Review (the process by which PPD officers are put on a *Brady* List). (PSOF ¶ 1 & 10). The PSB Report concerned allegations of "serious misconduct" about Defendant Armour during an arrest on November 4, 2015 (**420 days** prior to PPD's disclosure of Defendant Armour's misconduct to MCAO). (PSOF ¶ 1 & 10). And even though a draft PSB Report sustaining this "serious misconduct" by Defendant Armour was confirmed by City Defendants after a lengthy investigation on April 27, 2016 (**104 days** prior to Plaintiff's criminal trial), it took PPD **245 days** from that date to provide this information to MCAO.[3] (PSOF ¶ 1 & 10).

Alarmingly, City Defendants' practice of failing to timely disclose allegations of officer misconduct to a prosecuting authority is not limited to Plaintiff's claim, but instead the result of a systemic training failure caused by PPD's flawed *Brady* policies.

**B.** **The PSB investigation before Plaintiff's criminal trial which revealed Defendant Armor's "intentional abuse of police powers, authority, and privileges" including dishonesty and falsification of information in a police report**

To clarify City Defendants' obfuscation of their internal investigation process, Plaintiff notes the following: PPD maintains a Professional Standards Bureau ("PSB") which is responsible for investigating allegations of officer misconduct and reporting that misconduct to prosecuting authorities. (PSOF ¶ 12). The PSB is governed by an internal policy manual which notes its commitment to assist PPD "in maintaining unquestionable integrity, effective

---

[3] Defendant Armour never disclosed his misconduct verbally or otherwise to Plaintiff or the prosecutor prior to testifying at her criminal trial. (PSOF ¶ 11).

and efficient police service, while assuring fair and equal treatment to both the citizens of the City of Phoenix and the employees of [PPD]." (PSOF ¶ 13). The PSB is staffed by police investigators who report to the PSB Commander, who in turn reports directly to the Chief of Police.[4] (PSOF ¶ 14).

When the PSB receives information related to officer misconduct, they open an investigation and follow a process tracked in a chart maintained in PPD's policies:

5. **STEPS IN CONDUCTING MISCONDUCT INVESTIGATIONS**

| STEP | DESCRIPTION | SECTION FOUND |
|---|---|---|
| 1 | If the misconduct only involves a violation of Operations Order 4.49, Body-Worn Video Technology, section 4.C, initiate a "Draft" Body-Worn Camera Investigation Short Form 80-58.1DA. For all other investigations, initiate a "Draft" Internal Investigation Report Form 80-58DA | 6.A |
| 2 | Interview complainants and witnesses | 6.B |
| 3 | Serve any required NOI/s | 6.C |
| 4 | Interview the involved employee/s (ensure a completed Internal Investigation Material List Form 80-58.1DB is provided to each involved employee prior to the interview) | 6.D |
| 5 | Gather information | 6.E & 6.F |
| 6 | Complete the "Draft" Internal Investigation Report/Body-Worn Camera Investigation Short form | 7 |
| 7 | Investigative Review Process (IRP)* | 8 |
| 8 | Complete the "Final" Internal Investigation Report/Body-Worn Camera Investigation Short form | 7 |
| **\*NOTE**: | An IRP will not be conducted if a Loudermill Hearing is conducted (see Operations Order 3.18, Discipline Policy and Review Boards, for more information). | |

(PSOF ¶ 15). Summarized, if a claim of misconduct is supported after the PSB interviews witnesses, the PPD officer will then be notified they are under investigation by way of a "Notice of Investigation" ("NOI") and the PSB will schedule a time to interview them.[5] (PSOF ¶ 16).

---

[4] At the time relevant to Plaintiff's Complaint, John Collins ("Commander Collins") was PPD's PSB Commander.

[5] The NOI requires an officer's signature confirming receipt of the notice, and includes a

After an officer is interviewed by the PSB (and all relevant facts are examined), PSB investigators assigned to the case complete a draft investigation report compiling their final findings of facts. (PSOF ¶ 18). The draft report is then presented to the PSB Commander for review. (PSOF ¶ 19). After the PSB Commander has an opportunity to review the draft report, the officer and their union representative are afforded an opportunity to review the draft report as part of the Investigative Review Process (the "IRP"). (PSOF ¶ 20). During the IRP, officers and their representatives have 21 days to review the draft investigation to challenge any final findings of fact within the draft report. (PSOF ¶ 21). If an officer challenges a final finding of fact determined by PSB investigators, they can schedule a meeting with the PSB Commander and PSB investigators to discuss their concerns, but the PSB Commander has final say on whether to accept any changes to the final report (and it is rare for changes to be made). (PSOF ¶ 22).

The IRP process concludes once the employee either signs an IRC (the Investigative Review Control) form, meets with the PSB Commander about their concerns, or 21 days expire without hearing from the employee. (PSOF ¶ 23). The draft report then becomes a final report (either sustaining or denying allegations of misconduct as investigated) and the facts reported are the final facts. (PSOF ¶ 24). During this process, the PSB is responsible for forwarding sustained allegations of officer misconduct to prosecuting authorities for *Brady*

---

proviso at the bottom of the form ordering them to "not discuss this investigation…with any unauthorized person." (PSOF ¶ 17).

review. (PSOF ¶ 24).

Following the steps above, on November 23, 2015, the PSB was made aware that during an arrest on November 4, 2015, Defendant Armour had: (1) unlawfully entered an apartment without cause or a warrant; (2) falsely arrested a female suspect without cause; (3) lied to a superior officer regarding his unconstitutional entrance and arrest; (4) disobeyed a supervisor's order to release the female resident, booking her into jail instead; and, (5) falsified information about the arrest in a subsequent police report. (PSOF ¶ 26).

After a preliminary investigation involving interviews of fellow PPD officers present at the time of his misconduct, the PSB sent Defendant Armour an NOI on January 28, 2016, informing him that he was being placed under investigation. (PSOF ¶ 27). Defendant Armour provided an interview to PSB investigators acknowledging he violated a direct order of a supervising officer, but otherwise denying the allegations (and contradicting the testimony of other officers interviewed). (PSOF ¶ 28). Apparently finding Defendant Armour's testimony less than credible, on April 27, 2016, PSB investigators sustained all five allegations against Defendant Armour, noting some of the allegations constituted "intentional abuse of police powers, authority, and privileges." (PSOF ¶ 29).

Defendant Armour was ultimately cited with violation of five department orders, including "knowingly submit[ing] a criminal investigation…report with false information."[6]

---

[6] Specifically, 2.2.2.E(1) (disobeying supervisor); 3.13.5.B(1) (making false reports); 3.13.6.A(2) (lying in criminal investigation); 4.10.3F(4) (warrantless entry without

These violations constituted "Class III Violations" which, under PPD's policies, involve "[a]cts so serious and malicious in nature, they may require immediate intervention by the Police Chief…with the immediate removal of all employee responsibilities." (PSOF ¶ 30). On June 30, 2016, Defendant Armour's union representative signed the IRC form confirming his acknowledgement of the sustained allegations against him.[7] (PSOF ¶ 31). On July 6, 2016, Commander Collins approved the draft report resulting in it becoming a final factual determination confirming Defendant Armour's misconduct (i.e., the "PSB Report"). (PSOF ¶ 34).

Even though both Defendant Armour and the PSB are required to turn over *Brady* material to prosecuting authorities, the PSB Report was never disclosed to MCAO, Defendant Lake, or Plaintiff's defense counsel before her criminal trial. (PSOF ¶ 35). The failures of Defendant Armour, the PSB, and PPD to timely provide the PSB Report stems directly from PPD's dysfunctional *Brady* policies, which inadequately train officers on their disclosure obligations and result in an alarming delay in notifying prosecuting authorities of known impeachment material sustained in PSB investigations.

**C.** **PPD's dysfunctional *Brady* policies which fail to train officers on their disclosure obligations and result in a practice of untimely disclosures to prosecuting authorities about officer misconduct**

---

consent); 4.10.3.F(1) (arrest without warrant or cause). (PSOF ¶ 1).

[7] During his deposition in this case, Defendant Armour—for the first time—claimed his union representative wrongfully signed the IRC form on his behalf. Yet, Defendant Armour also admitted this theory was only realized "when I went to do my deposition prep with Attorney Berke." (PSOF ¶ 33).

PPD's *Brady* policy, which instructs officers on their constitutional disclosure requirements, is not identified as a distinct heading in the department's Operations Orders' Introduction or Table of Contents. (PSOF ¶ 36). Rather, the policy is concealed on the last page of Section 2 – Organization, Management, and Administration, Subheading 2.9 – Court Appearances. (PSOF ¶ 37). Were an officer able to locate PPD's *Brady* policy in the Operations Orders **1,140** pages, they would note the policy requires disclosure of potentially exculpatory information (including information that concerns the credibility of an employee), but does not identify discrete examples of *Brady* material or define impeachment material (other than to broadly note disclosure material "may deal with issues of honesty, integrity, bias, and/or moral turpitude."). (PSOF ¶ 38).

The disclosure policy is further constrained by Section 8(B), which does not encourage broad disclosure, but rather limits *Brady* disclosure requirements to only those "[d]epartment employees who may be potential witnesses…." (PSOF ¶ 39). But even if an officer is serving as a potential witness, bullet points under Section 8(B) further narrow the scope of disclosure as indicated below:

/ / /

B. It is the responsibility of all Department employees who may be potential witnesses to notify the prosecutor immediately of their status, if:

- The Department and/or the Maricopa County Attorney's Office have notified an employee that they have had material from the employee's file sent over for review as to whether their names should be added to the Law Enforcement Integrity Database (LEID).

    * This notification will be made unless the Maricopa County Attorney's Office has notified the employee of the results of their file review and they are not on the LEID.

- The employee is aware of potential exculpatory information that the Department is not.
- This notification will be made upon a request for court appearance, testimony, or interview by a prosecutor's office which includes Federal, State, County and/or Municipal courts.
- Notification made to an employee may include but is not limited to telephone, letter, subpoena, and other written or electronic communication.

(PSOF ¶ 40). Facially, bullet point one is confusing because it only requires disclosure if the officer knows they have been placed on a *Brady* list by PPD or MCAO. *Id.* Yet, in order to be placed on a *Brady* list by MCAO, MCAO would already have to be in possession of impeachment/credibility material from PPD (thus making the instruction redundant). *Id.* Additionally, bullet point three problematically absolves an officer of their disclosure obligations under *Brady* if they know PPD is aware of the same disclosure material. *Id.*

Because the PSB investigates allegations of officer misconduct, the PSB is also tasked in an internal manual distinct from PPD's policies to produce such material to prosecuting authorities for *Brady* review. (PSOF ¶ 42). According to Commander Collins, there should not be a delay in disclosing final PSB reports sustaining officer misconduct to prosecuting authorities. (PSOF ¶ 43). PPD's policies, however, require the PSB to engage in a thirteen-step process that asks PSB Lieutenants (and the PSB Commander) to make determinations about whether misconduct constitutes *Brady* material (even though PPD does not make *Brady*

determinations and does not maintain a *Brady* list).[8] (PSOF ¶ 41 & 44). Summarized, even though PPD does not make determinations about whether an officer's misconduct qualifies as impeachment material that should place them on a *Brady* list[9] (and seemingly does not maintain policies or provide training regarding appropriate *Brady* disclosure), PPD nevertheless instructs the PSB to make such determinations before disclosing misconduct in a PSB Report (or learned during an investigation) to prosecuting authorities.[10]

The result of this flawed process which unnecessarily delays disclosure of officer misconduct is apparent. A statistical analysis of 112 PSB investigations that ultimately led to a PPD officer being placed on a *Brady* list concluded that, on average, **200 days** pass before PPD/PSB disclose instances of officer misconduct confirmed in PSB investigations to a prosecuting authority. (PSOF ¶ 45). And, on average, over **476 days** pass from a reported incident of misconduct resulting in a PSB investigation to an officer being added to a *Brady* list by a prosecuting authority. (PSOF ¶ 46). This analysis also found that at any given time there are at least six (6) PPD officers who should be on MCAO's Rule 15/*Brady* List, but are not on that list because PPD failed to timely disclose their misconduct. (PSOF ¶ 47).

---

[8] The "Brady Process" flowchart provided by City Defendants during discovery is found nowhere in PPD or the PSB's policies directly, but was confirmed as the process by Commander Collins during his deposition.

[9] Indeed, City Defendants admitted they do not even maintain a *Brady* list. (PSOF ¶ 41).

[10] Confusingly, the PSB Manual notes the responsibility for *Brady* material will rest with PPD's legal unit, but the legal unit is not mentioned at all in the "Brady Process" flowchart.

### D. Defendant Armour, a dishonest cop with a history of incidents involving women, insulated from criticism by City Defendants' lack of *Brady* training

Defendant Armour is a police officer with a history of misconduct concealed by PPD. Specifically, between 2011 and Plaintiff's trial, Defendant Armour had a total of eight (8) complaints lodged against him, including allegations of various levels of sexual misconduct and/or assault, physical force, excessive force, abuse of authority, and unprofessional conduct, among others. [11] (PSOF ¶ 48). None of these incidents were revealed to Plaintiff before the criminal trial. (PSOF ¶ 53).

Alarmingly, a number of these complaints against Defendant Armour were made by women, whose stories reveal a troubling pattern. Starting with the woman falsely arrested by Defendant Armour in the November 4 incident leading to the PSB Report, she described her experience with him to PSB investigators as "the worst she had ever been treated by a police officer…." (PSOF ¶ 50). Three years prior to Plaintiff's arrest (in 2010), a fellow PPD officer, Abby Dennison, claims Defendant Armour sexually assaulted and raped her. (PSOF ¶ 51).[12] And a month before the November 4 incident leading to the PSB report at issue in Plaintiff's case, a woman named JeAnna Anderson made a complaint against Defendant Armour for

---

[11] Only weeks after Plaintiff's criminal trial, another complaint alleging sexual misconduct was brought against Defendant Armour for an incident that occurred with an arrestee on September 3, 2016. (PSOF ¶ 49).

[12] Even though medical records supported sexual assault (Mrs. Dennison had a tampon dislodged by medical providers), PPD did not open an incident report and summarily dismissed the allegations in a two-page memorandum, attaching four pages of inaccurately scribbled notes from Mrs. Dennison's interview with officers at the hospital. *Id.*

groping her during a traffic stop on October 16, 2015. (PSOF ¶ 52). When she learned of complaints against Defendant Armour from other woman, Ms. Anderson said "[h]e has no respect for any woman's life…."[13] *Id.*

Again, none of the above incidents were disclosed by the City of Phoenix to Plaintiff or MCAO before Plaintiff's criminal trial. (PSOF ¶ 53). Instead, the City of Phoenix suppressed these investigations from prosecuting authorities (and the Arizona Peace Officer Standards and Training Board), thus insulating Defendant Armour from criticism surrounding allegations of serious misconduct involving women.

### E.    Plaintiff's discovery of the PSB Report directly resulted in her release from prison

On January 30, 2017, MCAO placed Defendant Armour on its Rule 15 list (the "Brady list"). (PSOF ¶ 54). Ms. Salazar's attorneys were first provided with the PSB Report on December 15, 2017. (PSOF ¶ 55). Upon receiving the information, Ms. Salazar's lawyers immediately worked to secure a new trial/her release from prison. (PSOF ¶ 56). On March 20, 2018, Ms. Salazar's post-conviction relief ("PCR") attorney submitted a sixteen (16) page petition on Plaintiff's behalf for post-conviction relief, arguing the suppressed PSB Report about Defendant Armour's misconduct necessitated a new trial. (PSOF ¶ 57). On June 7, 2018, MCAO filed a one-page response to Ms. Salazar's PCR Petition conceding she was

---

[13] Ms. Anderson vigorously pursued a civil rights claim against Defendant Armour which survived summary judgment but did not prevail at jury trial. *Anderson v. Armour*, Case No. CV-16-03563-PHX-JJT.

entitled to a new trial. (PSOF ¶ 58). On July 10, 2018, the Maricopa County Superior Court granted Ms. Salazar's petition for a new trial, noting specifically the role of Defendant Armour at trial **"whose credibility was critical to the conviction."** (PSOF ¶ 59).

On July 23, 2018, MCAO filed a motion to dismiss Ms. Salazar's criminal case "in the interest of justice." (PSOF ¶ 60). On July 26, 2018, the Maricopa County Superior Court vacated Ms. Salazar's judgment, and ordered her release from the Arizona Department of Corrections. (PSOF ¶ 61). Nearly two years after the guilty verdict obtained by the State based almost entirely on Defendant Amour's testimony, Ms. Salazar was released from prison in August 2018 as a legally innocent woman. (PSOF ¶ 62). Despite City Defendants' attempt to deny that discovery of the PSB Report directly led to Plaintiff's release from prison and exoneration [14], an internal memo created by MCAO confirms its decision to not re-try Plaintiff based on "credibility problems [concerning Defendant Armour] not known at the time of the first trial." (PSOF ¶ 63).

## II. Legal Standard

At summary judgment, a court should not weigh the evidence but rather determine whether there is any genuine dispute of material fact that may be reasonably resolved in favor of either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–250 (1986). [15] If the

---

[14] Plaintiff was found to have been exonerated by the National Registry of Exonerations, which is overseen in part by the University of Michigan's Law School and "collects, analyzes and disseminates information about all known exonerations of innocent criminal defendants in the United States, from 1989 to the present…."

[15] Importantly, a party opposing summary judgment can show a material fact is genuinely

moving party meets its initial burden, the "court's ultimate inquiry is to determine whether the 'specific facts' set forth by the nonmoving party, coupled with the undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987) (*citing Anderson*, 477 U.S. at 254). When making such a determination the court must believe the nonmoving party's evidence and draw all inferences in the favor of the nonmoving party. *Id.* at 255. And in the context of immunity issues, ambiguities must be resolved in favor of the plaintiff. *Genzler v. Longanbach*, 410 F.3d 630, 642 (9th Cir. 2005).

## III.    Argument

Defendant Armour should not enjoy qualified immunity because he acted with deliberate indifference in failing to disclose *Brady* material and his violation was clearly established in the Ninth Circuit at the time he failed to do so by a robust consensus of authorities. Similarly, City Defendants are not entitled to judgment on Plaintiff's *Monell* claim because Plaintiff has demonstrated sufficient facts to support the City of Phoenix acted with deliberate indifference in failing to implement policies or training which would prevent officers from violating the due process rights of citizens such as Plaintiff.

---

disputed in a number of ways including: "(i) citing to materials in the records, (ii) showing the moving party's materials are inadequate to establish an absence of genuine dispute, or (iii) showing that the moving party lacks admissible evidence to support its factual position." *Marquez*, 2015 WL 12672743, at *2 (citing Fed. R. Civ. P. 56(c)(1)(A)-(B)).

## A. Qualified Immunity

"Qualified immunity affords limited protection to public officials faced with liability under 42 U.S.C. § 1983, insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Shafer v. Cnty of Santa Barbara*, 868 F.3d 1110, 1115 (9th Cir. 2017), *quoting Pearson v. Callahan*, 555 U.S. 223, 231 (2009). As such, officers like Defendant Armour are not entitled to qualified immunity if "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S.Ct. 577, 580 (2018), *quoting Reichle v. Howards*, 566 U.S. 658, 664 (2012). The Court may address either prong first. *Pearson*, 555 U.S. at 230–32. Importantly, however, where "entitlement to qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the non-moving party, summary judgment is not appropriate." *Wilkins v. City of Oakland*, 350 F. 3d 949, 956 (9th Cir. 2003).

### 1. Defendant Armour should not enjoy qualified immunity for failing to disclose *Brady* material about his own misconduct to prosecutors before testifying as a witness at Plaintiff's criminal trial.

Plaintiff agrees with City Defendants that a police officer does not enjoy qualified immunity when they "acted with deliberate indifference to or reckless disregard for an accused's rights or for the truth in withholding evidence from prosecutors." *Tennison v. City & Cty. of San Francisco*, 570 F.3d 1078, 1089 (9th Cir. 2009). When "actual deliberation is practical," however, a reckless indifference standard is appropriate over deliberate indifference. *Id.*, *citing Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). Unlike

16

deliberate indifference, reckless indifference "entails something more than negligence but is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Gantt v. City of Los Angeles*, 717 F.3d 702, 708 (9th Cir. 2013).[16] In sum, "[w]here state officials have the opportunity to deliberate various alternatives prior to selecting a course of conduct, such action violates due process if it is done recklessly." *Tennison*, 570 F.3d, at 1090, *citing Amrine v. Brooks*, 522 F.3d 823 (8th Cir. 2008).

Where City Defendants stray, however, is their rejection of the materiality of the *Brady* material at issue in this case. Turning first to the authorities cited by City Defendants in support of their position Plaintiff must prove the materiality of the *Brady* evidence as a component of qualified immunity analysis, both cases involved determinations during criminal proceedings[17], not post-release civil actions under § 1983 where the *Brady* determination had already been made and resulted in the accused's release.[18] Yet, to even

---

[16] This is the same standard applied to Defendant Lake's qualified immunity claim.

[17] City Defendants specifically cite to *United States v. Olsen*, 704 F.3d 1172 (9th Cir. 2013) (finding impeachment material regarding forensic expert's laboratory misconduct not material because accused's intent to use ricin as a weapon was supported by other overwhelming evidence including his methodical research into poisons and killing) and *Barker v. Fleming*, 423 F.3d 1085 (9th Cir. 2005) (suppression of impeachment material related to jailhouse informant not material because his testimony was not critical to the accused's case, his credibility had already been destroyed, and the conviction rested centrally on the testimony of an eyewitness.)

[18] Oddly, City Defendants also blame PPD policy and MCAO for Defendant Armour's failure to disclose his own misconduct. While Plaintiff agrees PPD's policies and lack of training contributed to Plaintiff's harm (thus her *Monell* claim), if *Brady* was clearly established for officers at the time of Plaintiff's harm, Defendant Armour's excuses are not relevant to the

seriously dispute the materiality of the *Brady* issue here by contorting Defendant Lake's testimony and denying the objective impact of the PSB Report on Plaintiff's release from prison is flawed at best, and intentionally disingenuous at worst.

Defendant Armour's downplaying of the PSB Report as "material"—and argument his actions were not reckless—is comparable to the officers in *Tennison*, who made similar arguments regarding a taped confession discovered post-conviction in connection to a murder investigation. 570 F.3d 1078.[19] There, plaintiffs Tennison and Goff were convicted of murdering a man named Shannon based on eyewitness testimony procured by officers Hendrix and Sanders. *Id.* at 1081–84. After the plaintiffs' conviction, Hendrix and Sanders learned a previously questioned (but released) suspect had been re-arrested and confessed to Shannon's murder. *Id.* at 1084–85. Although the confession eventually found its way to Tennison and Goffs' counsel, the Ninth Circuit found it was disclosed too late by Hendrix and Sanders to be of any value to the plaintiffs' post-conviction release efforts. *Id.* at 1093.[20] Nevertheless, Hendrix and Sanders also challenged the materiality of the evidence by noting the confession was unreliable and riddled with inconsistencies that made it untrustworthy. *Id.* at 1094. In rejecting these arguments, the Ninth Circuit—quoting a sister circuit— emphasized: "[I]f there were questions about the reliability of the exculpatory information, it

_____

inquiry of whether he acted recklessly in complying with its constitutional requirements to disclose the PSB Report (or his misconduct).

[19] The *Tennison* court also examined a failure to disclose that an eyewitness was offered a reward for her testimony. *Id.* at 1095.

[20] Before their civil claim, Hendrix and Sanders did secure *habeas* relief.

was the prerogative of the defendant and his counsel—and not of the prosecution—to exercise judgment in determining whether the defendant should make use of it," because "[t]o allow otherwise would be to appoint the fox as henhouse guard." *Id.*, *quoting DiSimone v. Phillips*, 461 F.3d 181, 195 (2d Cir. 2006).

Turning to whether Hendrix and Sanders acted recklessly in suppressing the confession, the court noted both had ample time to provide the information to the plaintiffs and the prosecutor, but failed to do so for reasons that substantiated something more than negligence. *Id.* at 1090–91. For example, despite learning of the confession only two days after it was made (and one month after Tennison's incarceration), Hendrix and Sanders discounted the confession because it lacked "specifics" such as the location of the murder weapon or other accomplices. *Id.* at 1085. Indeed, Hendrix and Sanders claimed they did not even listen to the taped confession. *Id.* Hendrix' deposition testimony also revealed he may not have presented the tape to the prosecutor because he and Sanders were upset about not being appropriately included in the confession. *Id.* at 1089–90. These acts and omissions led the Ninth Circuit to conclude both officers "acted with reckless disregard for [the plaintiffs'] rights ***and for the truth*** in failing to disclose the evidence to [the prosecutor.]" *Id.* at 1090.

Like the confession in *Tennison*, the PSB Report here also constituted material *Brady* evidence which conclusively secured Plaintiff's release from prison. (PSOF ¶ 63). And like the Ninth Circuit did when the officers downplayed the importance of the confession in *Tennison*, here too the Court should tepidly approach similar statements by Defendant Armour. Besides being contrary to statements made by Defendant Lake and MCAO, even

Defendant Armour admitted during his deposition Plaintiff should have received the PSB

Report (and information about his misconduct):

> Q: Whether you committed those acts, do you think criminal defendants in cases
> where you are opposite – providing testimony for the State – deserve to know
> about that PSB Report?
> A: Sorry. I can't say deserve, but I see what you're saying. ***They're entitled to
> it at some point***.

*See* Ex. 23 – Def. Armour Dep. at 146:18–25 (emphasis added). Yet, despite recognizing

Plaintiff was entitled to the *Brady* information (at some point), Defendant Armour remained

silent about his own misconduct and failed to notify Defendant Lake, MCAO, Plaintiff, or

Plaintiff's defense counsel about the PSB Report in the 6 months before he testified at her

trial. (PSOF ¶ 11). While Defendant Armour faults everyone but himself for this failure,

Defendant Armour's conduct is similar to the inexplicable actions of the officers in *Tennison*,

who had ample opportunity to disclose the *Brady* material to the prosecutor, but chose not to

do so until after its use was of little value. Additionally, Plaintiff believes the PSB Report

(and other instances of misconduct) support an inference Defendant Armour is lying or that

he intentionally withheld the information to avoid investigation into a similar pattern of

alleged misconduct involving women.

> **2.      The law in the Ninth Circuit at the time Defendant Armour failed to
> disclose material, exculpatory evidence in the form of the PSB
> Report was clearly established; and any reasonable officer would
> have understood that *Brady* required disclosure of the PSB
> Report/misconduct constituting impeachment evidence.**

Defendant Armour (like Defendant Lake) also perplexingly argues his failure to

disclose *Brady* material was not "clearly established." Yet, the Ninth Circuit has consistently

20

affirmed that "requiring police officers as well as prosecutors to disclose material and exculpatory evidence flows logically from *Brady's* rationale." *Carrillo v. Cty. of Los Angeles*, 798 F.3d 1210, 1220 (9th Cir. 2015).[21] Indeed, because "police officers play an essential role in forming a prosecution's case, limiting disclosure obligations to the prosecution would undermine *Brady* by allowing the investigating agency to prevent production by keeping a report out of the prosecutor's hands." *Id.*, *citing United States v. Blanco,* 392 F.3d 382, 388 (9th Cir. 2004). As a result, it is "unmistakably clear that police officers and prosecutors alike share an obligation to 'disclose pertinent material evidence favorable to the defense.'" *Id.*, *quoting United States v. Gerard*, 491 F.2d 1300, 1302 (9th Cir. 1974).[22] Thus, the Ninth Circuit precedent since 1984 has "undisputably [sic] put police officers on notice that their failure to disclose *Brady* information would constitute a violation [of] the defendant's constitutional rights." *Id.*, *citing Owens v. Balt. City State's Attorneys Office,* 767 F.3d 379, 400 (4th Cir. 2014).

By ignoring these well-settled opinions Defendant Armour too narrowly construes the right at issue, claiming it was not clearly established "a police officer…must inform a criminal

---

[21] *See also United States v. Butler*, 567 F.2d 885, 891 (9th Cir. 1978) (finding a *Brady* violation when investigators, and not prosecutors, were responsible for non-disclosure of assurances made to prosecution witnesses); *Jackson v. Brown*, 513 F.3d 1057, 1074 (9th Cir. 2008) (finding prosecutors responsible for non-disclosure of evidence favorable to the accused, even when the evidence is known only to police); *Tennison v. City & Cty. of San Francisco*, 570 F.3d 1078, 1093-1094 (9th Cir. 2009) (finding officers failure to turn over *Brady* material of a reliable taped confession to defense violative of clearly established constitutional rights).

[22] As directly stated, the duty is clearly established for prosecutors as well.

defendant or her attorney about potential *Brady* material." (Doc. 210, at Pg. 20).[23] Yet the Ninth Circuit has found the duty under *Brady* does require disclosure to the defense. *See Tennison*, 570 F.3d at 1094–1095.[24] Moreover, unlike in the Fourth Amendment context where a violation of rights is heavily fact specific, the right to *Brady* information is "significantly more specific than the extremely abstract right of freedom from unreasonable searches and seizures." *Carrillo*, 798 F.3d at 1224, *citing Anderson*, 483 U.S. at 639. Indeed, "*Brady* defines the type of material the government is obligated to disclose concretely and specifically as 'favorable to the accused, either because it is exculpatory, or because it is impeaching.'" *Id.*, *quoting Strickler v. Greene*, 527 U.S. 263, 281–82 (1999); *see also Barker v. Fleming,* 423 F.3d 1085, 1095 (9th Cir. 2005) (noting "it is well settled that evidence impeaching the testimony of a government witness falls within the *Brady* rule…"). So, "[u]nlike the broad touchstone of 'unreasonableness [in search and seizure cases], the contours of a defendant's right to *Brady* material are focused and clear.'" *Id.*

---

[23] In narrowing the right clearly established in this case, City Defendants also ignore "[f]or a legal principle to be clearly established, it is not necessary that 'the very action in question has previously been held unlawful,' but rather that 'in the light of pre-existing law the unlawfulness [is] apparent.'" *Fogel v. Collins*, 531 F.3d 824, 833 (9th Cir. 2008), *quoting Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

[24] City Defendants also claim the Supreme Court has "insinuated" in *Rivas-Villegas v. Cortesluna*, 142 S.Ct, 4, 7 (2021), that only Supreme Court precedent can create clearly established law; however, *Rivas-Villegas* was overturned precisely because the Supreme Court found its facts in a Fourth Amendment seizure case distinguishable from existing Ninth Circuit precedent. Yet, even if Supreme Court precedent were required to clearly establish rights, City Defendants ignore *Kyles v. Whitley*, 514 U.S. 419, 437 (1995), in which the Supreme Court affirmatively "extended" *Brady* to police officers.

In *Carrillo*, the plaintiff was convicted of murder, largely based on eyewitness testimony curated by defendant officers. *Id.* at 1214. After nearly twenty years behind bars, the plaintiff uncovered previously undisclosed handwritten notes taken by the officers during interviews of the eyewitnesses. *Id.* at 1214–1215. These notes were withheld from the "prosecutors and defense" and included discrepancies about who the eyewitnesses had picked as suspects in a photo lineup, important distinctions differentiating the plaintiff's physical characteristics from other witnesses' accounts of the shooter, and information identifying a possible alternative suspect to the crime. *Id.* at 1215–1218. In rejecting the officers' argument it was not "clearly established" they had to turn over such notes, the Court emphasized it would have been clear to a reasonable officer that such material should have been disclosed to the defense. *Id*. at 1224.

Like the notes omitted by officers in *Carillo*, the PSB Report affirming Defendant Armour's misconduct clearly constituted *Brady* material that needed to be turned over to prosecutors and the defense. Defendant Armour was aware of the PSB Report's findings before Plaintiff's criminal trial, and knew they sustained allegations of dishonesty rising to "intentional abuse of police powers, authority, and privileges." (PSOF ¶ 27). Indeed, precisely because the PSB Report confirmed allegations of Defendant Armour's own misconduct, it should have been even more clear to him than the officers in *Carrillo* that the information needed to be disclosed to prosecutors and the defense before he testified as a witness in upcoming criminal proceedings like Plaintiff's trial. Defendant Armour's failure to disclose his misconduct and the PSB Report to Defendant Lake, MCAO, Plaintiff, or Plaintiff's

counsel prior to Plaintiff's trial violated Plaintiff's due process right to a fair trial in contravention of clearly established precedent from the Ninth Circuit and United States Supreme Court.

> ### i. Even though cases from the Ninth Circuit create a "robust consensus" confirming Defendant Armour's duty to disclose *Brady* material, other authorities also put Defendant Armour on notice that his actions would violate Plaintiff's rights.

City Defendants ignore or mischaracterize guidance from other persuasive authorities on the issue of *Brady* disclosure because they know these authorities all encourage robust disclosure by officers, particularly of information regarding an officer's untruthfulness or dishonesty. In a concepts and issues paper on police departments' duty to disclose, the International Association of Chiefs of Police ("IACP")[25] notes the "affirmative duty of law enforcement to notify the prosecutor of any exculpatory material." (PSOF ¶ 65). The paper goes on to define exculpatory material as "evidence that is favorable to the accused…and/or may impact the credibility of a government witness, including the law enforcement officer or other agency employee." (PSOF ¶ 67). The paper highlights that failure to provide such information constitutes a due process violation and warns law enforcement "[t]he burden is not on the defense to request such material; it is the responsibility of involved law enforcement agencies to provide such material to the prosecutor…." (PSOF ¶ 68). And while Defendant

---

[25] The IACP is the "world's largest and most influential professional association for police leaders" and a "recognized leader in global policing…." Chief Williams is a member of the IACP. (PSOF ¶ 66).

Armour tries to argue the duty outlined by the IACP only applies to supervisors, the guidelines note *Brady* "places a heavy burden ***on employees*** and their agencies…." (PSOF ¶ 69).

Another helpful authority given the federal origin of *Brady* (and its progeny) are Department of Justice guidelines for its agency employees. Specifically, the Department of Justice Manual (which is not binding but instructive) explicitly instructs that "before serving as an affiant or witness in any case or matter, the agency employee shall advise the prosecuting attorney(s) of the existence of any potential impeachment information." (PSOF ¶ 70). The manual also provides "[a]gency witnesses…should make broad disclosures of potential impeachment information to the prosecutor so that the prosecutor can assess the information in light of the role of the agency witness, the facts of the case, and known or anticipated defenses, among other variables." (PSOF ¶ 71).

The only support Defendant Amour musters for his argument a "robust consensus" would not have required disclosure of the impeachment *Brady* material comes from his own expert. Besides the fact that an expert's opinion cannot create clearly established law[26], Expert Wallentine's opinion is peculiar given the West Jordan Police Department's ("WJPD") own *Brady* policies would seemingly require disclosure in this case.[27] Specifically, WJPD's policy notes "[t]he obligation to provide *Brady* information is ongoing. If any new *Brady* information

---

[26] *See Daubert v. Merrell Dow Pharm, Inc.,* 509 U.S. 579, 595 (1993) (noting courts should focus on the principles and methodology of experts, and not their conclusions).

[27] As a reminder, Expert Wallentine is the current Chief of Police for the West Jordan Police Department.

is identified, the prosecuting attorney should be notified." (PSOF ¶ 72). Nowhere in this policy does the disclosure to a prosecutor of *Brady* material that includes officer misconduct turn on the conclusion of department discipline (or actively discourage an officer from disclosing *Brady* material like PPD's policies). And to conclude otherwise would counteract the caution advised by the *Tennison* court against "appoint[ing] the fox as henhouse guard." 570 F.3d at 1094.

**B.** **Plaintiffs *Monell* claim against the City of Phoenix has only strengthened since her Complaint.**

The allegations in Plaintiff's Complaint flow directly from *Monell*, revealing policies and customs which so directly point to the need for further training by City Defendants that their deliberate indifference to the due process rights of Phoenix citizens such as Plaintiff is obvious. Accordingly, City Defendants' motion for summary judgment regarding *Monell* should be denied.

**1.** **Plaintiff agrees Chief Williams and retired Chief Yahner should be dismissed.**

Plaintiff does not dispute an official capacity suit against a municipal officer is equivalent to a suit against the entity. *Kentucky v. Graham*, 473 U.S. 159, (1985). As such, '[w]hen both a municipal officer and a local government entity are named, and the officer is named only in an official capacity, the court ***may*** dismiss the officer as a redundant defendant. *See Ctr. for Bio-Ethical Reform, Inc. v. Los Angeles County Sheriff Dept.*, 533 F.3d 780, 799 (9th Cir. 2008), *citing Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991). Because the decision is left to the court, Plaintiff argues Chief Williams and Chief Yahner should be

26

kept in this lawsuit, particularly given the interplay of *Monell* issues involving executive oversight. Additionally, City Defendants could have moved to dismiss Chief Williams and Chief Yahner from Plaintiff's lawsuit when she amended her complaint, but chose not to do so. Accordingly, it is not unfair for them to remain as named parties in the current lawsuit.

> **2.** **City Defendants' policies, custom, and failure to train led to Plaintiff's constitutional deprivation, and abundant evidence in the record demonstrates their deliberate indifference towards the due process rights of Phoenix citizens such as Plaintiff in disclosing *Brady* material from PSB reports.**

As a preliminary matter, Plaintiff notes City Defendants set up a straw man fallacy in telling this Court Plaintiff's *Monell* claim against PPD was based on four cases identified in her second amended complaint. Looking at Paragraph 147 of her amended Complaint, however, the Court will note Plaintiff cited those cases to support a *Monell* claim ***against MCAO***, not City Defendants. (Doc. 37, at Pg. 17). Indeed, this Court confirmed Plaintiff had sufficiently stated a *Monell* claim against City Defendants before her second amended complaint, based on single-theory incident and an obvious failure to train. (Doc. 36 at 25–29). In reaching that conclusion this Court noted "most police officers do not go to law school; thus, absent specific training, there would be no way for police officers to obtain the legal knowledge necessary to apply constitutional law principles and ensure that due process rights of the accused are not violated prior to criminal trials." *Id.*

Turning to the law, in "order to establish municipal liability, a plaintiff must show that a 'policy or custom' led to the plaintiff's injury." *Castro v. Cty. Of Los Angeles*, 833 F.3d 1060, 1073 (9th Cir. 2016), *quoting Monell v. Department of Social Services*, 436 U.S. 658

694 (1978). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S., 51, 61 (2011). Official policy includes an adopted "longstanding practice or custom." *Thomas v. Cty. of Riverside*, 763 F.3d 1167, 1170 (9th Cir. 2014). "Such circumstances may arise when, for instance, the public entity 'fails to prevent constitutional violations' or, sometimes, when it fails to train its employees adequately." *Gordon v. Cty. of Orange*, 6 F.4th 961, 973 (9th Cir. 2021), *quoting Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012). A failure-to-train claim may also arise where "a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick*, 563 U.S. at 60.[28]

Deliberate indifference in the context of a failure-to-train claim under *Monell* "requires proof that the municipality had actual or constructive notice that a particular omission in their training program will cause municipal employees to violate citizens' constitutional rights." *Kirkpatrick v. Cty. of Washoe*, 843 F.3d 784, 793 (9th Cir. 2016), *quoting City of Canton v. Harris*, 489 U.S. 378, 390 (1989). In essence, deliberate indifference focuses on whether "a municipal actor disregarded a known or obvious consequence of his action." *Connick*, 563

---

[28] *See also Merritt v. Cty. of Los Angeles*, 875 F.2d 765, 770 (9th Cir. 1989) (noting summary judgment inappropriate for failure-to-train claim where reasonable jury could find an adequate training program, deliberate indifference, and a deprivation based on the inadequate training).

U.S. at 61. To demonstrate "the municipality was on notice of a constitutionally significant gap in its training [arising to deliberate indifference], it is ordinarily necessary for a plaintiff to demonstrate a pattern of similar constitutional violations by untrained employees." *Kirkpatrick*, 843 F.3d. at 794, *quoting Connick*, 563 U.S. at 62. Deliberate indifference in a failure-to-train claim, however, can also be shown where "a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Long v. Cty. of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006). In such instances, "failing to train could be so patently obvious that [a municipality] could be liable under § 1983 without proof of a pre-existing pattern of violations." *Connick*, 563 F.3d at 63–64. And deliberate indifference can be further substantiated and obvious when multiple employees' actions led to the constitutional deprivation. *Henry v. Cty. of Shasta*, 132 F.3d 512, 521 (9th Cir. 1997).

In analogous case *Wilson v. City of Los Angeles*, 2021 WL 192014, at *33–34 (C.D. Cal. Jan. 8, 2021), appeal dismissed sub nom. *Wilson v. Marks*, 2021 WL 6751443 (9th Cir. Dec. 9, 2021), the plaintiff was released from custody after thirty-two years behind bars following the discovery of *Brady/Manson* information confirming the suppression of material evidence and use of unduly suggestive identification techniques in his conviction. Specifically, the detective defendant named in the plaintiff's complaint failed to turn over a "murder book," an investigative record he created to maintain his documents and notes prepared during the investigation. *Id.* at *5. In addition to being improperly withheld, this book helped confirm the detective repeatedly and improperly influenced eyewitness

identifications. *Id.*

In support of their claim the detective's failures resulted from the municipality's failure to train under *Monell*, the plaintiff in *Wilson* emphasized the police department's deficient policies which directed eyewitness identifications to be free from suggestion but did not separately elaborate on techniques which constitute unconstitutional "suggestive identification." For example, plaintiff's counsel produced officer testimony confirming the department's policies did not prohibit certain suggestive techniques such as pointing out a particular suspect and asking about that person specifically in a photographic lineup. The *Wilson* court noted the deficient policies coupled with this testimony "created a triable issue of fact" that could not be dispelled at summary judgment.

Similar to the municipal defendant in *Wilson*, here City Defendants' failure to train begins at its deficient *Brady* policies, continues with a lack of training that leads to a custom of untimely *Brady* disclosures, and ultimately culminated in Defendant Armour's actions which resulted in a deprivation of Plaintiff's due process rights.

### i. PPD's deficient *Brady* policies

Starting with City Defendants' policies, even if an officer were to successfully locate PPD's *Brady* policy, its advisal is vague, ambiguous, and contradictory.[29] The policy instructs

---

[29] Plaintiff re-emphasizes PPD's *Brady* policy is not identified in the table of contents of its policies, but rather located under the "Court Appearances" section. (PSOF ¶ 36 & 37). Comparatively, turning back to WJPD's policies, it is notable that even a department servicing only 7% of the City of Phoenix' total population (116,000 compared to 1.633 million), has a conspicuous *Brady* policy listed in its table of contents. (PSOF ¶ 72 & 73).

officers they are required to inform a prosecutor "of potentially exculpatory information, including any conduct or information that concerns the credibility of an employee's testimony." But, like *Wilson*, specific examples of impeachment material are not identified in the policy.[30] (PSOF ¶ 38). Were an officer to understand what *Brady* material actually is from PPD's policy, as Plaintiff has previously noted, subsection B wrongfully instructs an officer *Brady* only requires disclosure to a prosecutor when they have (1) already been placed on a *Brady* list by the prosecuting authority; (2) are aware of information that PPD is not already aware of; or (3) when they are notified by a prosecuting authority.[31] (PSOF ¶ 39 & 40). These limitations on disclosure are further compounded by PPD's admonition connected to the NOI, which could lead employees to believe they are not allowed to discuss investigations concerning their misconduct with prosecutors before providing trial testimony (as City Defendants themselves argue). (PSOF ¶ 16 & 17).

And like *Wilson*, Plaintiff's critiques are not limited to facial readings or omissions, but supported by PPD leadership such as Commander Collins who confirmed "conflicts" in PPD's policies which result in confusion:

> Q: I like that word that you just used "conflict." It does seem like a conflict. It seems like the [*Brady* Disclosure] policy doesn't actually best ensure that *Brady*

---

[30] The policy does say "potential" *Brady* disclosure material "may deal with issues of honesty, integrity, bias, and/or moral turpitude," but fails to explain what these criteria mean for the purposes of *Brady* (or why they would be important for the accused to have in order to ensure a fair trial). *Id.*

[31] Plaintiff's expert also opined on PPD's *Brady* policy agreeing it failed to "clearly define…*Brady* disclosure requirements and the timeline to disclose exculpatory *Brady* material." (PSOF ¶ 74).

is followed. Would you agree that there seems to be a conflict here?

A: *I think it needs to be reviewed, and that would be something that we would probably do at our legal advisors from the legal department.* We rewrite and revise operations orders all the time.

Q: Right.

A: So, when we identify issues or things that need to get fixed, there's a process for that. And if this appears to be an issue that needs to be reviewed, there's nothing to prohibit us from making some adjustments.

Q: Is this something you would recommend to the legal unit based on this deposition and what I've told you that might need to be reviewed?

A: *I would bring it up to them and have the discussion.* It would be a discussion. I'm not – it probably would not be the determining factor, but it would be a discussion.

*See* Ex. 24 – John Collins Dep. at 130:15–131:13. When asked to look more closely at subsection B, which provides an employee only has to notify the prosecutor of *Brady* information if "the employee is aware of potential exculpatory information that the Department is not," Commander Collins continued:

Q: ...I want to go the next bullet point, which says "The Employee is aware of potential exculpatory information that the Department is not." We talked about honesty. We talked about integrity. This policy, essentially, I guess as we sort of talked about earlier, well, if you've done something dishonest, but [PPD] knows about it, it doesn't matter, not your responsibility to tell the prosecutor. Is that how you read that policy?

A: *If an employee is aware of potentially exculpatory information that the department is not, meaning the employee would be obligated to tell the prosecutor even if the department is not aware*.

Q: Correct. But doesn't that mean if [PPD] knows about it, then the officer doesn't have any responsibility to tell the prosecutor?

A: *That needs to be cleaned up*.

Q: It needs to be cleaned up because currently it's not in compliance with what Brady requires, correct?

A: There needs to be additional work on that bullet point there. If the employee is aware of potential exculpatory information that the department is not, there needs to be probably some more verbiage or language added to that.

Q: To make sure that it complies with Brady and the requirements of Brady?

A: To make it easier to understand so officers are able to follow it and take the confusion away.

32

Q: So they can comply with Brady and its requirement?
A: *So they can comply with Brady.*

*Id.* at 131:14–133:9. Like *Wilson,* these excerpts from Commander Collins' deposition demonstrate the confusion caused by PPD's current *Brady* disclosure policies, training on which resulted in a highly predictable risk of violating the due process rights of the accused (such as Plaintiff).[32]

### ii. Chief Williams' role in perpetuating a cycle of untimely *Brady* disclosures involving officer misconduct

PPD's failure to adequately arm their officers with the knowledge they need to avoid violating the constitutional rights of citizens such as Plaintiff also stems from an unfamiliarity about *Brady* that trickles from the Chief down the chain of command. Specifically, on September 15, 2020, Chief Williams could not identify the requirements of *Brady* in an interview with ABC15, mistakenly stating *Brady* was related to the "voir dire" process. (PSOF ¶ 75). Despite this alleged blunder, during her deposition nearly a year later, Chief Williams could not identify the constitutional amendment *Brady* relies on in creating a constitutional right to exculpatory information; identify key progeny flowing from that decision (such as *Giglio v. United States*); could not adequately cite the disclosure requirements mandated by *Brady;* and routinely blamed MCAO for any deficient policies on *Brady* (even though the Chief sets PPD's policies). (PSOF ¶ 76). Perhaps most telling of these deficiencies was Chief

---

[32] Commander Collins' reliable testimony also provides further support for Plaintiff's expert opinions which conclude PPD's policies failed to adequately protect the constitutional rights of individuals such as Ms. Salazar resulting in her constitutional deprivation.

Williams' belief officers must first be told they are on a Rule 15/*Brady* list (as referenced in

PPD's policies) before they have to disclose exculpatory information:

> Q: So is it your opinion that an officer only has to disclose potential
> impeachment and exculpatory information if they know they're on a Brady list?
> A: *So how do I know that I'm on a – the employee has to be notified that*
> *they're on that list. And that list is maintained by MCAO and City*
> *Prosecutor's Office.*

*See* Ex. 27 – Def. Williams Dep. at 69:6–12. *Brady* requires officers to turn over impeachment

information irrespective of whether they have already been placed on a Rule 15/*Brady* list,

because, as *Carillo* warned, officers and departments are often the only individuals/entities

with knowledge that potential impeachment material even exists. *Carrillo*, 798 F.3d at 1220.

Chief Williams' misunderstanding as to this point results from a fundamental unfamiliarity

with *Brady* itself:

> Q: Right. But how does the MCAO make Brady determinations?
> A: *You would have to ask MCAO that. So I don't control the Brady list,*
> *MCAO and the prosecutor's office does.*
> Q: Oh, gotcha. Does MCAO have access to the City of Phoenix Police
> Department's PSB investigations?
> A: So it's my understanding that we give the investigations to them. So they
> have access working with my people to get information.
> Q: …So the City of Phoenix Police Department has to give access to a PSB
> report to MCAO before they have access to it?
> A: It's my understanding that PSB works directly with MCAO to provide
> information as opposed to having direct access to a database. *And I would really*
> *have to drill down and ask the PSB commander how that process really works.*
> *I'm talking a 30,000-foot level.*

*See* Ex. 27 – Def. Williams Dep. at 69:13–70:6. And when asked whether she implemented

any specific training requirements on *Brady* material for her officers, Chief Williams

responded "I have not." *Id.* at 116:16–18. Chief Williams is a 32-year police veteran with a

34

master's degree who serves as the executive officer of the fifth largest police force in the country (and with direct control over its policies and procedures). (PSOF ¶ 77). Stated directly, if Chief Williams does not know what *Brady* is, what it requires, or even the number of officers under her command on a Rule 15/*Brady* list, how can Phoenix residents such as Plaintiff have any confidence PPD's officers have been properly trained on what it is either.

### iii. A pattern of untimely disclosures culminating from a lack of training which resulted in Plaintiff's constitutional deprivation

Unlike the plaintiff in *Wilson*, here Plaintiff can further support her *Monell* claim by demonstrating City Defendants engaged in a pattern of failing to timely disclose *Brady* material involving officer misconduct. Specifically, by examining over ten (10) years of PPD officers that ended up on MCAO's Rule15/*Brady* list, it can be shown that, on average, PPD waits **200 days** before turning over information about officer misconduct uncovered in a PSB Report to prosecuting authorities. (PSOF ¶ 45). And, nearly **476 days** pass from the time an incident involving a PPD officer occurs to the time that officer is added to a *Brady* list. (PSOF ¶ 46). In her report, Plaintiff's expert further posits that based on the City Defendants' current practice there are at least "6 Brady List cases in the pipeline not yet disclosed" during any given 200-day period of time. (PSOF ¶ 47).

And like the officers in *Wilson*, the culmination of bad policy, deficient training, and a custom of untimely disclosure is realized, as both Defendant Armour and several PSB Investigators (including Commander Collins) failed to disclose pertinent *Brady* material in a timely manner. Indeed, Defendant Armour is unable to answer basic questions about *Brady*

35

in Plaintiff's case (confused about what it means and what it requires):

> Q: As an officer, you were commonly called as a witness for the State to provide testimony on behalf of the State, correct?
> A: Yes.
> Q: And critical to testimony you provide is information that goes to your dishonesty as an officer, correct?
> A: Possibly, yes.
> Q: And that "possibly, yes," that's because of operations orders that you were told about, that's because of the Constitution, and that's because of a case called *Brady v. Maryland*; correct?
> A: **If you say so**.

*See* Ex. 23 – Def. Armour Dep. at 133:9–134:1. And when asked directly about what his obligations are as an officer to provide impeachment material to a prosecuting authority before providing testimony, Defendant Armour said:

> Q: …What are your obligations as a police officer to make sure that a prosecuting attorney has all impeachment evidence available to them before you testify as a witness?
> A: **I'm not certain**.

*Id.* at 149:2–7. As a result, Plaintiff was not provided with *Brady* information known to City Defendants months before her criminal trial. So, like the plaintiff in *Wilson*, Plaintiff here believes she has successfully raised a triable issue on the City's failure to implement a policy which satisfactorily trains officers on its requirements to disclose *Brady* information.

## IV.    Conclusion

For the foregoing reasons, Plaintiff respectfully requests City Defendants' motion for summary judgment be denied.

RESPECTFULLY SUBMITTED this 8th day of April, 2022.

**HONOR LAW GROUP, PLLC**

By /s/ *Benjamin L. Rundall*
      Benjamin L. Rundall, Esq.
      Abbie L. Godles, Esq.
      Honor Law Group, PLLC
      4450 S. Rural Rd., Suite C-220
      Tempe, AZ 85282
      *Attorneys for Plaintiff*

<u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on April 8, 2022, I caused the foregoing document to be electronically transmitted to the Clerk's Office using the CM/ECF System for filing and transmittal of a notice of Electronic Filing to the following CM/ECF registrants:

Honorable Susan R. Bolton
United States District Court
Sandra Day O'Connor U.S. Courthouse, Ste. 522
401 W. Washington St., SPC 50
Phoenix, AZ 85003-2153

Honorable Eileen S. Willett
United States District Court
Sandra Day O'Connor U.S. Courthouse, Ste. 325
401 W. Washington St., SPC 13
Phoenix, AZ 85003-2153

Maxine S. Mak, Esq.
Angela Lane, Esq.
Maricopa County Attorney's Office – Civil Division
222 N. Central Ave., Suite 1100
Phoenix, AZ 85004
*Attorneys for Elizabeth Lake*

Lori V. Berke, Esq.
Jody C. Corbett, Esq.
Berke Law Firm, PLLC
1601 N. 7th St., Suite 360
Phoenix, AZ 85006
*Attorneys for City Defendants*

/s/ ALG