JDN

NOT FOR PUBLICATION

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Frances Salazar, | No.  CV 19-01188-PHX-SRB (ESW) |
| Plaintiffs, | |
| v. | **ORDER** |
| City of Phoenix, et al., | |
| Defendants. | |

Plaintiff Frances Salazar brought this civil rights action under 42 U.S.C. § 1983, though counsel, against the City of Phoenix, Chief of Police Jeri Williams, former Chief of Police Joe Yahner, and police officer Anthony Armour ("City Defendants"), and against Maricopa County Deputy County Attorney Elizabeth Lake.  (Doc. 37.)  Before the Court are Lake's Motion for Summary Judgment (Doc. 203) and City Defendants' Motion for Summary Judgment (Doc. 210).  The Court will grant Lake's Motion and grant in part and deny in part City Defendants' Motion.

## I.     Background

After Salazar was in prison for almost two years, she was exonerated and released when *Brady* impeachment material untimely disclosed by Defendants cast doubt on statements made by the officer who arrested her, Officer Amour, whose testimony and credibility were critical to Salazar's conviction.  (Doc. 37 ¶ 18.)  Defendants did not disclose the *Brady* material until 190 days after Salazar's conviction.  (*Id.* ¶ 20.)

1    In her Second Amended Complaint, Salazar set forth two counts stemming from the
2    failure to timely disclose *Brady* material: a Fourteenth Amendment due process claim
3    against Deputy County Attorney Lake and Officer Armour (Count One), and a *Monell*
4    failure-to-adequately-train/supervise claim against City Defendants (Count Three).  (*Id.*
5    ¶¶ 128–135, 142–157.)[1]

6    Lake moves for summary judgment on the ground that the claim against her is barred
7    by absolute prosecutorial immunity or, in the alternative, by qualified immunity.  (Doc.
8    203.)

9    City Defendants move for summary judgment on the grounds that (1) Armour did
10   not violate Salazar's Fourteenth Amendment rights, (2) Armour is entitled to qualified
11   immunity, (3) Police Chiefs Williams and Yahner should be dismissed as redundant
12   Defendants, and (4) there is no evidence of deliberate indifference by the City.  (Doc. 210.)

13   **II.    Summary Judgment Standard**

14   A court must grant summary judgment "if the movant shows that there is no genuine
15   dispute as to any material fact and the movant is entitled to judgment as a matter of law."
16   Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  "A fact
17   is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only
18   if a reasonable trier of fact could resolve the issue in the non-movant's favor."  *Fresno*
19   *Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014).  The
20   movant bears the initial responsibility of presenting the basis for its motion and identifying
21   those portions of the record, together with affidavits, if any, that it believes demonstrate
22   the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  "[T]o carry its
23   burden of production, the moving party must either produce evidence negating an essential
24   element of the nonmoving party's claim or defense or show that the nonmoving party does
25   not have enough evidence of an essential element to carry its ultimate burden of persuasion
26   at trial."  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102 (9th

27

28   ___

[1] Plaintiff did not include a Count Two in the Second Amended Complaint.  (*See* Doc. 37.)

Cir. 2000).

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Id.* at 1102–03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden then shifts to the nonmovant to produce evidence to support its claim or defense. *Id.* at 1103. The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In its analysis, the court does not make credibility determinations; it must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255; *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

**III.    Evidentiary Issues**

Salazar objects generally to ¶¶ 1–49 of City Defendants' Statement of Facts on the ground that these asserted facts, which go into the details of Plaintiff's 2013 arrest, are not relevant to the issues in this case. (Doc. 225 at 1.) The Court agrees that many of City Defendants' asserted facts are not relevant or material, and many of their asserted facts are disputed or objected to by Salazar. (*See* Doc. 225 ¶¶ 14, 16, 23, 27–29, 31–34, 38, 41, 43–44.) Where a fact is disputed, the Court must take the nonmovant's properly supported fact as true. Accordingly, the Court summarizes only the relevant facts regarding Salazar's underlying 2013 arrest and construes the disputed facts in Salazar's favor. Salazar's general objection is overruled as unnecessary.

Salazar also objects to what she claims are "sham" affidavits that support City Defendants' asserted facts in ¶¶ 16, 63–64, 73–82, 127, 130–131. (Doc. 225 ¶¶ 16, 63–64,

73–82, 127, 130–131.)  The cited paragraphs are not relevant or material, and the Court has not considered them in the analysis; therefore, Salazar's objections are overruled as unnecessary.

City Defendants argue that most of the facts contained in Salazar's Separate Statement of Facts are not supported by admissible evidence, are based on misrepresented evidence, or are not supported by specific citations.  (Doc. 236 at 7–9.)  Much of City Defendants' argument goes to asserted facts that are not relevant or material and are therefore not considered.  To the extent the parties disagree over interpretation of certain evidence, the Court has relied directly on the cited evidence instead of the parties' interpretations or clarifications set forth in their respective Statements of Facts.  And although the Court need not consider asserted facts that are not properly supported by specific citations to the record, the Court may also consider any material in the record, whether cited to or not. Fed. R. Civ. P. 56(c)(3); *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003) ("[g]eneral references without page or line numbers are not sufficiently specific").

City Defendants argue generally that numerous documents proffered by Salazar, including news stories, website printouts, and policies and procedures, lack authentication or foundation and that many of these documents include hearsay.  (Doc. 236 at 8.)  City Defendants do not cite to any particular document or exhibit to which they object.  (*See id.*)  *See Reinlasoder v. City of Colstrip*, CV-12-107-BLG, 2013 WL 6048913, at *7 (D. Mont. Nov. 14, 2013) (unpublished) ("objections [ ] must be stated with enough particularity to permit the Court to rule").  Nonetheless, the Court will not consider a news article Salazar submitted regarding Phoenix Police Chief Williams, as newspaper articles are generally inadmissible, particularly where, as it appears here, the evidence is submitted for the truth of the matter asserted.  (*See* Doc. 225-5 at 10–13.)  *See Larez v. City of Los Angeles*, 946 F.2d 630, 642-43 (9th Cir. 1991) (newspaper articles, unsupported by corroborating evidence, are generally inadmissible hearsay).

In conjunction with their Reply, City Defendants filed a "Response to Plaintiff's

Separate Statement of Facts in Support of her Response" pursuant to Local Rule of Civil Procedure 7.2(m)(2). (Doc. 234.) In this filing, City Defendants respond to each of Salazar's separate asserted facts and indicate whether they dispute or do not dispute each asserted fact, they present argument as to why some of Salazar's facts are not "completely accurate," and they present some objections. (*Id.*) In support of their filing, City Defendants attach 40 pages of evidence. (*Id.*, Exs. NN–QQ.) This filing goes beyond what is permitted in Rule 7.2(m)(2) and it constitutes a reply statement of facts, which is prohibited by Rule 56.1(b). Therefore, the Court will not consider the filing.

## IV.    Relevant Facts

On the morning of December 31, 2013, Salazar was traveling in the front passenger seat of a car driven by Rodney McCullough. (Doc. 208 ¶ 1 (in part), ¶¶ 2–3; Doc. 225 ¶¶ 1–3.) McCullough had borrowed the car from a man named Antonio Harris. (Doc. 208 ¶ 6; Doc. 225 ¶ 6.) There was an expired license plate on the car, and Phoenix Police Officers initiated a traffic stop of the car. (Doc. 208 ¶¶ 10, 12 (in part); Doc. 225 ¶¶ 10, 12.) Officers ran a records check and learned that McCullough's license was suspended. (Doc. 208 ¶ 18; Doc. 225 ¶ 18.) Officers arrested McCullough for driving with a suspended license and failure to provide identification, and they placed him in the patrol vehicle. (Doc. 208 ¶¶ 21–22; Doc. 225 ¶¶ 21–22.)

Officer Armour asked for Salazar's identification, and Salazar complied. (Doc. 208-1, Evid. Hr'g Tr. 18:4–8.) Armour asked Salazar to step out of the car and to leave everything in the car, so she tossed her wallet on the passenger seat and got out of the car. (*Id.* 18:7–10.) In his police report, Armour wrote that he asked Salazar whether there were drugs inside the car and that Salazar answered, "there shouldn't be," but that several people had been inside the car. (Doc. 208-1 at 82.)[2]

---

[2] In her deposition, Salazar testified that she does not remember if Armour asked her whether there were drugs in the car; she only remembered that there was very little conversation. (Doc. 208-1 at 25, Salazar Dep. 109:2–15.)

Armour searched the car and found a glass pipe with a rock of crack cocaine inside it.  (*Id.* at 83.)  Armour read Salazar her *Miranda* rights and told her he had found drugs and drug paraphernalia in the vehicle, and he questioned her about them.  (Doc. 208 ¶ 37; Doc. 225 ¶ 37.)  Armour wrote in his police report that Salazar told him that "someone else must have left the pipe and drugs" in the car, but that she would "take responsibility for it."  (Doc. 208-1 at 83.)  Salazar denied that she stated she would take responsibility for the drugs.  (Doc. 208 ¶ 45; Doc. 225 ¶ 45.)

Salazar was booked into jail for possession of narcotic drugs and possession of drug paraphernalia.  (Doc. 208 ¶ 46; Doc. 225 ¶ 46.)

On January 3, 2014, the Maricopa County Attorney's Office (MCAO) charged Salazar with two counts: (1) possession or use of narcotic drugs, a Class 4 felony, and (2) possession of drug paraphernalia.  (Doc. 204 ¶ 1; Doc. 213 ¶ 1.)

On May 4, 2016, Lake was assigned as the prosecutor in Salazar's case.  (Doc. 204 ¶ 4: Doc. 213 ¶ 4.)

At Salazar's trial in August 2016, Armour testified inconsistent with his police report, and he told the jury that Salazar "admitted" the crack and crack pipe were hers.  (Doc. 225-3 at 100.)  On August 17, 2016, Plaintiff was convicted of both crimes.  (Doc. 204 ¶ 6; Doc. 213 ¶ 6; Doc. 208 ¶ 48; Doc. 225 ¶ 48.)

On November 23, 2016, before her sentencing, Salazar's criminal trial lawyer, Doran, filed a complaint with Phoenix Police Department (PPD) regarding Armour's changed testimony at trial; however, the complaint was ignored by PPD.  (Doc. 225 ¶ 8.)

On December 5, 2016, Salazar was sentenced to six years in prison.  (Doc. 208 ¶ 49; Doc. 225 ¶ 49.)   On December 12, 2017, the Court of Appeals affirmed Salazar's conviction.  (*See* CR2013-462384-001 DT, July 10, 2018 Minute Entry.[3])

---

[3] *See* http://www.courtminutes.maricopa.gov/viewerME.asp?fn=Criminal/072018/m8365374.pdf (last visited Sept. 1, 2022).

1    In post-trial motions, Salazar argued that Armour testified for the first time at her

2    criminal trial that Salazar admitted that the crack pipe and drugs were hers. (Doc. 208 ¶ 53;

3    Doc. 225 ¶ 53.)

4    Meanwhile, on November 23, 2015, the PPD Professional Standards Bureau, which

5    investigates potential misconduct of department employees, received a complaint about

6    Armour. (Doc. 208 ¶ 70 (in part); Doc. 225 ¶ 70[4]; Doc. 225-5 at 22.) That same day, the

7    Professional Standards Bureau initiated an internal investigation of an incident involving

8    Armour that occurred on November 4, 2015. (Doc. 225-5 at 22.)

9    On January 28, 2016, Armour signed the Notice of Investigation for the Professional

10   Standards Bureau investigation. (Doc. 208 ¶ 72 (in part); Doc. 225 ¶ 72.) When he signed

11   this Notice, Armour was put under the following "admonition":

12   > You are being given a direct order not to discuss this investigation, including
13   > your interview with any unauthorized person. Other than the investigating
14   > supervisor/s, the only persons you may speak to concerning this investigation
15   > are enumerated in Operations Order 3.19 and the MOU for your respective
16   > work unit, as follows: Privileged communications between the employee and
17   > his/her attorney, minister, unit representative, or spouse.

16    (Doc. 208-3 at 21.) Operations Order 3.19 identifies those persons that an officer may

17   speak to about the investigation as the officer's own attorney, the officer's unit

18   representative, a spouse, or a clergy member. (*Id.* at 23.) Operations Order 3.19

19   specifically states that officers under investigation "will not jeopardize or interfere with

20   criminal investigations, administrative investigations, or prosecutions." (*Id.*)

21   On April 27, 2016, approximately four months before Salazar's trial, the PPD

22   Professional Standards Bureau concluded its internal investigation into allegations about

---

[4] Salazar's objection to the declaration of Steve Martos as a sham affidavit is overruled. (Doc. 225 ¶ 70.) City Defendants cite to Martos' declaration in support of its asserted fact at ¶ 70. (*Id.*) The Court relies on ¶ 70 for its description of what the Professional Standards Bureau does and that it received a complaint on November 23, 2015. (*See* Doc. 208 ¶ 70.) Martos avers that he was a Lieutenant in the Professional Standards Bureau in 2015–2016; thus, he has personal knowledge to testify to these facts. (Doc. 208-3 at 2, Martos Decl. ¶ 2.) Salazar does not dispute these facts, and she does not point to any prior sworn testimony by Martos that is inconsistent with these statements. (Doc. 225 ¶ 70.)

Armour's actions that occurred in the unrelated case on November 4, 2015.  (Doc. 204 ¶ 2: Doc. 213 ¶ 2.)  The PPD concluded that Armour unlawfully entered a residence, falsely arrested a female resident inside her home, provided a false report to a supervisor regarding the arrest, provided false information in an incident report regarding the arrest, and disobeyed a lawful order from a supervisor by booking the female subject after being directed to release her from custody.  (Doc. 204 ¶ 3: Doc. 213 ¶ 3; Doc. 225-1 at 4–5, 15.)  The investigation and findings were codified in Professional Standards Bureau Report (PSB) 15-0126 (the "PSB Report").  (Doc. 225-1 at 4.)

On May 5, 2016, a draft PSB Report was provided to Armour for review.  (Doc. 208 ¶ 85; Doc. 225 ¶ 85.)

On June 27, 2016, the PSB Report was "finalized," and, on June 30, 2016, Armour signed the Notice of Findings.  (Doc. 208 ¶ 87; Doc. 225 ¶ 87.)  Upon the June 30, 2016 receipt of the Notice of Findings, the admonition not to discuss the investigation was lifted.  (Doc. 208 ¶ 89; Doc. 208-3 at 23 (Operations Order 3.19 § 3(A)(4)(c)).)

On July 13, 2016, PPD Assistant Chief Steve Martos initialed and approved the PSB Report.  (Doc. 208 ¶ 90; Doc. 225 ¶ 90.)

The PSB Report was not disclosed to the MCAO, Lake, or Salazar's defense counsel before Salazar's August 2016 criminal trial.  (Doc. 204 ¶ 5; Doc. 213 ¶ 5.)

In September 2016, a review board recommended that Armour receive an 80-hour suspension for the violations outlined in the PSB report.  (Doc. 208 ¶ 94; Doc. 225 ¶ 94.)  On November 14, 2016, a Discipline Notice was served on Armour, and he had 14 days to appeal the disciplinary.  (Doc. 208 ¶ 100; Doc. 225 ¶ 100.)

The PPD does not make the determination as to whether an officer is to be placed on the *Brady* list.  (Doc. 208 ¶ 103; Doc. 225 ¶ 103.)  That determination is made by the prosecuting agencies—the MCAO and the City of Phoenix Prosecutor's Office.  (Doc. 204 ¶ 104; Doc. 225 ¶ 104.)  The MCAO instructed the PPD to timely disclose to it any impeachment misconduct by police officers; specifically, any findings of misconduct involving untruthfulness, bias or prejudice; credible allegations that are the subject of an

ongoing investigation; findings of a violation of a defendant's constitutional rights; and any AZ POST hearing findings regarding such matters. (Doc. 208-3 at 14.) The PPD has delegated the responsibility for informing prosecuting agencies about potential *Brady* material stemming from officer misconduct to the Professional Standards Bureau. (Doc. 208 ¶ 106; Doc. 225 ¶ 106.)

Under the PPD practice at the relevant time, the Professional Standards Bureau did not review the PSB report and determine whether to forward it to the MCAO or City of Phoenix Prosecutor's Office for *Brady* consideration until after a disciplinary notice had been served on the offending officer, and after any disciplinary appeal was complete or the time to appeal had run. (Doc. 208 ¶ 120; Doc. 225 ¶ 120.)

As stated, Armour was served the disciplinary notice on November 14, 2016, and he had fourteen days to file an appeal. Armour did not file an appeal. (Doc. 208 ¶ 101 (in part).)[5]

On December 28, 2016, Professional Standards Bureau Commander Collins reviewed the PSB investigation for *Brady* issues and disclosed the PSB Report to the MCAO. (Doc. 208-3 at 88.) On that day, the PPD notified Erlinda Parrish, a Legal Management Assistant at the MCAO, that Professional Standards Bureau reports were available for the Office's review. (Doc. 204 ¶ 8: Doc. 213 ¶ 8.) Ms. Parrish downloaded the reports for several PPD officers, including the PSB Report on Armour, and she routed them to the MCAO's Rule 15 Disclosure Database Committee for review. (Doc. 204 ¶ 9; Doc. 213 ¶ 9.)

On January 30, 2017, the MCAO's Rule 15 Disclosure Database Committee added Armour to the database. (Doc. 213 ¶ 10.) That same day, the MCAO notified all prosecutors that Armour had been added to the database and directed prosecutors to check their cases against the Rule 15 Disclosure Database. (Doc. 204 ¶ 11; Doc. 213 ¶ 11.) The

---

[5] The reason why Armour did not appeal the disciplinary notice is not relevant.

1    MCAO's email notification about Armour listed active cases involving him; however,

2    Salazar's case was not listed.  (Doc. 204 ¶ 13; Doc. 213 ¶ 13.)

3         Meanwhile, on December 22, 2016, Salazar's trial counsel of record, Doran, who

4    was unaware of the PSB Report, filed a Notice of Appeal.  (Doc. 204 ¶ 7: Doc. 213 ¶ 7.)

5    The Notice of Appeal concluded with a notice stating that "the following address may be

6    used for all court notices, unless and until the Court appoints a public defender to represent

7    the indigent Appellant, at which time Appellant's attorney's address may be used," and the

8    address listed was Salazar's mailing address at the Arizona Department of Corrections.

9    (Doc. 213-1 at 42, Lake Dep. 146:21–147:25.)  Lake confirmed that she received Salazar's

10   Notice of Appeal.  (*Id.* 146:21–23.)

11        When Lake received the January 30, 2017 email notification about Armour, she

12   knew that a Notice of Appeal had been filed in Salazar's case because she saw it on the

13   docket in the Superior court.  (Doc. 204 ¶ 12; Doc. 213-1 at 35, Lake Dep. 117:21–25;

14   118:4–9.)  Lake testified that, when she received the PSB Report, she was not certain if

15   Salazar was represented by counsel.  (Doc. 213-1 at 34, Lake Dep. 113:20–114:17, 117:12–

16   120:14.)

17        On January 31, 2017, Lake emailed the Appeals Division Bureau Chief, Diane

18   Meloche, and asked whether the PSB Report needed to be disclosed in Salazar's case and,

19   if so, how the disclosure should be made.  (Doc. 204 ¶¶ 14–15; Doc. 213 ¶¶ 14–15.)

20        On February 2, 2017, Meloche advised Lake to disclose the PBS Report and file a

21   motion entitled "State's Supplemental Motion to Disclose New Evidence Pursuant to Rule

22   15 and/or ER 3.8."  (Doc. 204 ¶ 16; Doc. 213 ¶ 16.)  On February 6, 2017, Meloche directed

23   Lake to also file a motion for protective order pursuant to MCAO procedures to prevent

24   dissemination of the PBS Report outside of Salazar's criminal case.  (Doc. 204 ¶¶ 17–18;

25   Doc. 213 ¶¶ 17–18.)

26        Also on February 6, 2017, Lake directed her paralegal, Michael Torrez, to prepare

27   a Motion for Protective Order and to Bates stamp the PSB Report for disclosure.  (Doc.

28   204 ¶ 19: Doc. 213 ¶ 19.)  The Motion for Protective Order described the contents of the

material to be disclosed as containing "personal and sensitive material relating to Officer Anthony Armour Jr." (Doc. 204-1 at 128–129.) Lake drafted the State's Supplemental Motion to Disclose New Evidence Pursuant to Rule 15 and/or ER 3.8. (Doc. 204 ¶ 20; Doc. 213 ¶ 20.)

On February 21, 2017, Lake directed her assistant, Cheryl Mumford, to file both Motions and to advise her and Torrez when that was complete so that Torrez could disclose the Report. (Doc. 204 ¶ 21; Doc. 213 ¶ 21.) Lake did not email or mail a copy of the Motion for Protective Order to Doran or his staff. (Doc. 213, Separate Statement of Disputed Facts (SSDF) ¶ 18.)

On February 22, 2017, Mumford emailed Lake and Torrez to advise that the filings were completed. (Doc. 204 ¶ 22; Doc. 213 ¶ 22.) That same date, the Motions were filed in the Superior Court criminal case, CR2013-462384-001, with Lake identified as the attorney for the State. (Doc. 204-1 at 10–14.)

The *Brady* material—the PSB Report—was not attached to the Motions that were filed in Superior Court. (Doc. 213-1 at 33, Lake Dep. 110:5–7.) Lake testified that the only way for the *Brady* material to be transmitted would have been by email; the *Brady* material "would have been transmitted via e-mail from Michael [Torrez] to Mr. Doran." (*Id.* 110:8–21.)

Torrez avers that Lake had directed him to disclose the "R.15 packet" (the *Brady* material) in the *Salazar* criminal case. (Doc. 204-1 at 222, Torrez Decl. ¶ 4.) Torrez avers that, when he received the February 22, 2017 email from Mumford confirming that she had filed the Motions, he understood that he was supposed to disclose the "R.15 packet" by sending the documents to Salazar's attorney of record. (*Id.*, Torrez Decl. ¶¶ 5–6.) Lake did not follow-up with Torrez to confirm that the PSB Report was disclosed—that is, whether it was emailed. (Doc. 204 ¶ 26 (in part).) Lake never sent copies of the Motions or PSB Report to Salazar directly. (Doc. 213-1 at 34, Lake Dep. 115:14–16, 120:15–16.)

On March 6, 2017, the Superior Court denied the State's Motion for a Protective Order. (Doc. 204 ¶ 27; Doc. 213 ¶ 27.) On March 8, 2017, a copy of the Order denying

the State's Motion was to be automatically emailed from the court to the MCAO and Salazar's attorney of record, Doran. (Doc. 204 ¶ 28 (in part); Doc. 213-1 at 72, Doran Dep. 190:3–15.) Doran testified that he did not receive the March 8, 2017 Order denying the State's Motion. (*Id.* 190:6–10.) Doran explained that, typically, the court automatically sends such emails in an automated distribution around 1:00 am the morning after the filing date; however, if he was not "endorsed," the email was not sent to him. (*Id.* 199:15–20.)

On March 23, 2017, Doran filed a Motion to Withdraw as Counsel. (Doc. 204 ¶ 29: Doc. 213 ¶ 29.) The Motion stated that Tennie B. Martin, from the Maricopa County Public Defendant's Office, had been appointed as Salazar's appellate counsel, and the Motion provided Martin's mailing address. (Doc. 204-1 at 134–136.) Lake did not send a copy of the *Brady* material to Martin. (Doc. 213-1 at 43, Lake Dep. 149:11–13.)

On June 8, 2017, Joseph T. Maziarz of the Arizona Attorney General's Office sent a letter to Thomas McDermott at the MCAO. (Doc. 204-1 at 239.) Maziarz advised that he was the attorney assigned to handle Salazar's appeal, and he asked MCAO to review the issues raised by Salazar in her opening brief and let the Attorney General's Office know if it had any comments, and he asked that MCAO provide copies of any audio or video cassette tapes admitted in evidence at the trial. (*Id.*)

On November 7, 2017, Doran was ordered to turn over a copy of his entire file to Salazar's appointed appellate counsel. (Doc. 213 ¶ 27.) In preparing a copy of the file, Doran's paralegal pulled the docket history and noticed for the first time the Motion for Protective Order that had been filed by Lake in February 2017. (*Id.* ¶ 28.)

On December 13, 2017, Doran e-mailed Lake and stated that he was ordered to provide all material in Salazar's case to the appellate attorney and, when going through the docket, he noticed the State's Supplemental Motion to Disclose New Evidence Pursuant to Rule 15 and/or ER3.8. (Doc. 213-1 at 62.) Doran wrote that, although the Motion said the State sent him new evidence pertaining to Officer Armour, and it identified additional Bates-numbered pages, he did not have those Bates pages. (*Id.*) Doran wrote that his mailing log showed no receipt of mail at the relevant time, and he did not have an email

1  from Lake or anyone from her Office with a copy of the Motion or the cited Bates pages.

2  (*Id.*)  Doran requested that Lake send the materials to him as soon as possible.  (*Id.*)

3          On the morning of December 14, 2017, Lake responded to Doran's e-mail and stated

4  "I can send it directly to new counsel of record.  Thanks for letting me know."  (*Id.*)

5          On December 14, 2017, Doran emailed Lake and stated "Please send me the

6  discovery immediately, or I will need to file an emergency motion with [the criminal trial

7  judge] about exculpatory *Brady* material being withheld and I will ask for sanctions since

8  you said you already disclosed it to me in February."  (*Id.* at 63.)

9          Upon receipt of Doran's reply, Lake emailed Torrez and asked him if he could find

10 the email sent to the defense in February 2017 with the "original disclosure."  (*Id.* at 155.)

11 Torrez responded to Lake that he could not find the email.  (*Id.*)

12         On December 15, 2017, Torrez sent the following email to Doran:

13     RE:    State v. Francis Salazar, CR2013-462384-001
14     DR 201302308942 – Phoenix Police Department

15     Dear Mr. Doran:

16     As part of its duty of discovery under the Arizona Rules of Criminal
17     Procedure, Rules 15.1 & 15.6, the State has discovery material to supply you.
       Those materials comprise the following:
18

19     Bates #              Description

20     0115-0130            MCAO Rule 15 DD report for Officer Armour

21     The items mentioned above are being disclosed in a digital format and are
22     attached to this email.  You must confirm receipt of those items by
       responding to this email.  If you have any questions regarding this discovery,
23     please contact me at (602)-506-0299 or torrem02@mcao.maricopa.gov.
24     Thank you.

25
       Sincerely,
26     Michael Torrez
27     Paralegal to Elizabeth Lake

28

- 13 -

1   (*Id.* at 161.)[6]

2   On March 30, 2018, Salazar filed a motion for Post-Conviction Relief arguing that

3   the State should have disclosed the PSB Report to her before Armour testified at her trial

4   in August 2016. (Doc. 208 ¶ 138; Doc. 225 ¶ 138.)  On June 7, 2018, the State filed a

5   response and agreed that Salazar was entitled to new trial.  (Doc. 208 ¶ 139; Doc. 225

6   ¶ 139.)

7   On July 10, 2018, the criminal court granted Salazar's petition for Post-Conviction

8   Relief.  (Doc. 208 ¶ 140; Doc. 225 ¶ 140.)  In its Minute Entry, the Superior Court detailed

9   the State's failure to disclose the *Brady* material "with respect [to] Officer Armour of the

10  Phoenix Police Department, whose credibility was critical to the conviction."  (*See*

11  Superior Court No. CR2013-462384-001 DT, July 10, 2018 Minute Entry.[7])

12  On July 23, 2018, Lake filed a motion to dismiss without prejudice and to quash

13  warrant or summons as to Salazar "in the interest of justice."  (Doc. 213-1 at 163–164.)

14  On July 26, 2018, the Maricopa County Superior Court vacated Salazar's judgment

15  and ordered her release from the Arizona Department of Corrections.  (*Id.* at 166–168.)

16  . . . .

17  **V.    Lake's Motion for Summary Judgment**

18  In Count One, Salazar alleges that Lake violated her Fourteenth Amendment due

19  process rights when Lake failed to timely disclose *Brady* evidence.  (Doc.37 ¶¶ 129–135.)

20  Lake asserts absolute prosecutorial immunity or, in the alternative, qualified immunity.

21  (Doc. 203.)

22  **A.    Standard Governing Absolute Immunity**

23  Prosecutors are absolutely immune from liability in § 1983 lawsuits for acts that are

24

25  ───────────────

26  [6] Torrez sent the same email to Stephen M. Johnson, Salazar's appellate attorney. (Doc. 213-1 at 159–160.)  *See* http://www.courtminutes.maricopa.gov/viewerME.asp?fn=Criminal/012018/m8156144.pdf (last visited Sept. 1, 2022).

27

28  [7] *See* http://www.courtminutes.maricopa.gov/viewerME.asp?fn=Criminal/072018/m8365374.pdf (last visited Aug. 30, 2022).

"intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976); *see Lacey v. Maricopa Cnty.*, 693 F.3d 896, 912 (9th Cir. 2012).  Absolute prosecutorial immunity is based on the theory that "it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation." *Van de Kamp v. Goldstein*, 555 U.S. 335, 340–41 (2009) (quotation omitted).  Consequently, prosecutors have absolute prosecutorial immunity for inadvertent or negligent acts as well as for acts that constitute a willful or malicious violation of the constitutional rights of the accused. *See Imbler*, 424 U.S. at 428, 431 n.34.

But a prosecutor's conduct is not covered by absolute immunity merely because it was performed by a prosecutor. *Genzler v. Longanbach*, 410 F.3d 630, 636 (9th Cir. 2005) (citing *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993)).  Prosecutorial immunity "depends on the nature of the function performed, not the identity of the actor who performed it." *Broam v. Bogan*, 320 F.3d 1023, 1029 (9th Cir. 2003) (citing *Kalina v. Fletcher*, 522 U.S. 118, 127 (1997)).  When determining the "nature of the function performed," the essential question is whether the alleged unconstitutional act was "intimately associated with the judicial phase of the criminal process." *Genzler*, 410 F.3d at 637 (citations omitted).  Acts taken in the course of a prosecutor's role as an advocate are entitled to absolute immunity. *Buckley*, 509 U.S. at 273.  For example, acts taken by a prosecutor to determine whether to bring charges and to prepare for the initiation of judicial proceedings or for trial are actions occurring within the role of an advocate and are entitled to absolute immunity. *Faulkner v. Cnty. of Kern*, No. 1:04-CV-05964 OWWTAG, 2006 WL 1795107, at *19 (E.D. Cal. June 28, 2006) (citing *Buckley*, 509 U.S. at 269, and *Demery v. Kupperman*, 735 F.2d 1139, 1144 (9th Cir. 1984)).  However, a prosecutor performing administrative functions or "investigative functions normally performed by a detective or police officer" is only entitled to qualified immunity. *Genzler*, 410 F.3d at 636.  "Absolute immunity only attaches to a prosecutor's post-trial activities that are related to his or her role as an advocate." *Faulkner*, 2006 WL 1795107, at *27.

In evaluating the facts on the question of immunity, courts must resolve any ambiguities in favor of the plaintiff. *Id.* at 642. The defendant prosecutor bears the burden of showing that, based on the nature of the function performed, absolute immunity is justified. *Buckley*, 509 U.S. at 269. "[T]he presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." *Genzler*, 410 F.3d at 636–37 (internal citation omitted).

**B.    Discussion**

Lake previously raised her absolute immunity claim in a Motion to Dismiss, which the Court denied. (*See* Doc. 36.) At that time, the Court was limited to the facts in the First Amended Complaint, and more factual development was needed to determine the nature of the function of Lake's act and whether it was performed in her role as an advocate such that absolute immunity may apply. (*Id.* at 12.) The Court noted that the available facts showed the failure to disclose the PSB Report occurred post-trial after a Notice of Appeal had been filed, and neither Lake nor her office were involved in the appeal. (*Id.* at 10.) The Court discussed cases that suggested absolute immunity may not apply to prosecutors post-trial when they are not personally involved in the appeal. (*Id.* at 10–11, citing cases.)

The expanded record shows that Lake first learned of the PSB Report related to Armour when she received the January 30, 2017 email that was sent to prosecutors in the MCAO. (Doc. 204 ¶¶ 11–12; Doc. 213 ¶ 11; Doc. 204 ¶ 12; Doc. 213-1 at 35, Lake Dep. 117:21–25; 118:4–9.) At that time, Salazar had been sentenced and had filed her Notice of Appeal, and Lake was not personally involved in the appeal. The January 30, 2017 email put the onus on prosecutors in the office to review their own cases against the "Rule 15 Disclosure Database," which now included Armour. (Doc. 204-1 at 171.) Upon receipt of the January 30, 2017 email, Lake determined that the new disclosure may affect Salazar's case, and Lake sought guidance as to how to proceed from her supervisor. (*Id.* at 176–77.) The supervisor informed Lake that she must disclose the PSB Report and

1    advised her of the steps to take for disclosure.  (*Id.*)  Thereafter, Lake failed to disclose the

2    PSB Report.

3         In March 2017, Tennie Martin was appointed as Salazar's appellate counsel.  (Doc.

4    204-1 at 134–136.)

5         In June 2017, Joseph Maziarz filed his Notice of Appearance as the State's attorney

6    of record in Salazar's appeal.  (Doc. 204-1 at 240.)  That same month, Maziarz sent a letter

7    to the MCAO, with a notice that he had been assigned to handle the appeal, and asking that

8    the MCAO review the issues raised in Salazar's opening appeal brief and provide him any

9    comments regarding the issues raised.  (*Id.* at 239.)

10        At some point in late November or early December 2017, Johnson was appointed

11   as Salazar's new appellate counsel.  *See* supra n.5.

12        On December 15, 2017, the PSB Report was disclosed to attorneys Doran and

13   Johnson.  (Doc. 213-1 at 63, 155, 161.)

14        In the summary judgment briefing, Plaintiff argues that Lake and her office's lack

15   of involvement in the appeal after Plaintiff's conviction is dispositive to the inquiry and

16   precludes absolute immunity.  (Doc. 216 at 10–11.)  Plaintiff further argues that it was

17   Lake's supervisor who made the decision to disclose; thus, it was the supervisor—not

18   Lake—who engaged in a prosecutorial function, and Lake was merely a custodian of

19   evidence who was instructed to disclose the PSB Report.  (Doc. 216 at 10–11.)

20        In support, Plaintiff cites to cases indicating that absolute immunity applies to

21   prosecutors post-conviction only where the prosecutor is personally involved in the appeal

22   and continues her role as an advocate, as opposed to merely a custodian of evidence.  (*Id.*

23   at 10–12.)  *Yarris v. City of Delaware*, 330 F.3d 791, 799 (6th Cir. 2003) ("a prosecutor

24   acting merely as a custodian of evidence after conviction serves the same non-adversarial

25   function as police officers, medical examiners, and other clerical state employees and—

26   just as with certain police investigative work—it is neither appropriate nor justifiable that,

27   for the same act, [absolute] immunity should protect the one and not the other[s]");

28   *Spurlock v. Thompson*, 330 F.3d 791, 799 (6th Cir. 2003) ("absolute immunity applies to

- 17 -

the adversarial acts of prosecutors during post-conviction proceedings . . . where the prosecutor is personally involved . . . and continues his role as an advocate," but "where the role as advocate . . . has concluded, absolute immunity does not apply").

Plaintiff also relies on *Faulkner v. County of Kern*, where a prosecutor discovered impeachment material helpful to the defendant post-conviction, but the prosecutor failed to disclose the material directly to the defendant's appellate lawyer. (Doc. 216 at 11–12, citing No. 1:04-CV-05964 OWWTAG, 2006 WL 1795107, at *27 (E.D. Cal. June 28, 2006).) The district court recognized that "[t]he Ninth Circuit has extended the protection of absolute immunity to a prosecutor's acts before, during, and after trial." *Faulkner*, 2006 WL 1795107, at *27 (citing *Demery*, 735 F.2d at 1144–45). But the district court found that the prosecutor's conduct was not protected by absolute immunity because, by the time the prosecutor discovered the impeachment material, the defendant had already filed his notice of appeal, appellate counsel had been appointed, and the prosecutor was no longer prosecuting the case. (*Id.*) The district specifically noted that, conversely, where a prosecutor is still handling post-conviction motions or the direct appeal, absolute immunity would apply. *Id.* (citing *Carter v. Burch*, 34 F.3d 257, 263 (4th Cir. 1994).

Lake cites to *Fields v. Wharrie* to support that a prosecutor's personal involvement in the proceedings is no longer a requirement for absolute immunity to apply. (Doc. 203 at 7, citing 672 F.3d 505, 512–16 (7th Cir. 2012). In *Fields*, the Seventh Circuit noted that previously, it concluded that once a prosecutor was no longer part of the trial team, absolute immunity would not apply; however, "[t]he Supreme Court's reasoning in *Van de Kamp* . . . suggests that a prosecutor's direct participation in an appeal or retrial is no longer dispositive of his right to absolute immunity." 672 F.3d at 512 (citing 555 U.S. at 345.) *Fields* explained that the absolute immunity analysis considers not only whether a prosecutor is participating on a trial team when she suppresses evidence, but also on whether she owes a continuing *Brady* obligation to the defendant in question; if so, she functions as a prosecutor. *Id.* at 514.

- 18 -

Lake contends that her conduct in this instance was a prosecutorial function, not a custodial one, because when she received the information about Armour, she had to review that information and determine whether it implicated *Brady* in the context of Salazar's case and the evidence presented at trial.  (Doc. 220 at 2.)  The evidence shows that Lake was notified by email that Armour had been placed on the "Rule 15 Disclosure Database"; however, Lake, as a prosecutor, was responsible for determining which of her cases were impacted by this information and whether the information had to be disclosed to Salazar or her attorney.  (Doc. 204-1 at 171.)  Making this determination was a prosecutorial function. *See United States v. Lacey*, No. CR-18-00422-001-PHX-SRB, 2020 WL 3488615, at *11 (D. Ariz. June 26, 2020) ("*Brady*'s constitutional mandates are self-executing and fall exclusively within the province of a prosecutor") (citing *Paradis v. Arave*, 240 F.3d 1169, 1176 (9th Cir. 2001)).   That Lake sought guidance from her supervisor to make this determination, and that the supervisor then made the decision, does not turn Lake's role into one of a custodian.  Lake's interaction with the supervisor was as a prosecutor, and their communication related to what action Lake should take as the trial prosecutor in Salazar's case regarding *Brady* material.

Lake further contends that, even though this determination occurred post-trial, it was a prosecutorial function intimately associated with the judicial phase of the criminal process because she had a continuing duty to disclose *Brady* evidence.  (Doc. 220 at 3.)  In *Imbler*, the Supreme Court noted that even after a conviction, a prosecutor is "bound by the ethics of his office to inform the appropriate authority of after-acquired or other [material] information that casts doubt upon the correctness of the conviction."  424 U.S. at 427 n.25.  The Supreme Court and the Ninth Circuit have recognized that where a state has provided an appellate review in a criminal case, "the proceedings in the appellate tribunal are to be regarded as part of the process of law under which he is held in custody by the State, and to be considered in determining any question of alleged deprivation of his life or liberty contrary to the Fourteenth Amendment."  *Marion v. United States*, 164 F.2d 158, 159 (9th Cir. 1947) (quoting *Frank v. Mangum*, 237 U.S. 309, 327 (1915)).  This

1    caselaw supports that the appeal process is an important phase of the criminal process such

2    that a prosecutor's actions during the appeal, particularly those related to *Brady*

3    obligations, are intimately associated with the judicial phase of the criminal process.

4           The Ninth Circuit has explained that a prosecutor's failure to "turn over exculpatory

5    material before trial, during trial, or after conviction is a violation of due process under

6    *Brady*." *Broam*, 320 F.3d at 1030.  In *Fields*, the Seventh Circuit stated that a prosecutor's

7    obligation under *Brady* does not expire even if she is no longer involved directly in the

8    trial; a prosecutor "ha[s] a continuing *Brady* obligation to reveal material evidence to the

9    defense until [the defendant's] conviction bec[o]me[s] final, as the ongoing judicial process

10   continue[s] to evolve."  672 F.3d 505, 516 (7th Cir. 2012).  In Arizona, "[a] conviction

11   becomes final upon the issuance of the mandate affirming the conviction on direct appeal

12   and the expiration of the time for seeking certiorari in the United States Supreme Court."

13   *State v. Sepulveda*, 32 P.3d 1085, 1086 n.2 (Ariz. Ct. App. 2001) (citing *State v. Dalglish*,

14   901 P.2d 1218 (Ariz. Ct. App. 1995)).  The Court of Appeals did not affirm Salazar's

15   conviction until December 12, 2017.  *See* supra n.3.  Because Salazar's conviction had not

16   yet become final when Lake learned of the PSB Report on January 30, 2017, Lake had a

17   continuing *Brady* obligation to reveal impeachment evidence to Salazar.

18          The specific facts in this case further support that Lake had a continuing *Brady*

19   obligation post-trial.  The prosecutor from the Arizona Attorney General's Office who

20   handled the appeal did not file a Notice of Appearance until June 2017.  (Doc. 204-1 at

21   240.)  Until that date, Lake was the only attorney who had appeared in Salazar's case on

22   behalf of the state and the only attorney who had learned of the PSB Report.  *Cf. Faulkner*,

23   2006 WL 1795107, at *5 (the defendant trial prosecutor learned of potential impeachment

24   evidence the same month that an Assistant Attorney General Attorney was assigned to

25   handle the appeal).

26          In addition, the record shows that, in December 2016, when the PPD determined

27   that a PSB Report regarding one of its officers must be disclosed for potential *Brady* issues,

28   it was forwarded to the MCAO and the City Prosecutor's Office—there is no evidence that

PPD disclosed PSB reports to the Arizona Attorney General's Office.   (Doc. 208-3 at 5–6, Martos Decl. ¶ 21.)   Thus, again, Lake was the only attorney in Salazar's case who received the PSB Report at that time and therefore the only attorney obligated under *Brady* to disclose the material.

Lastly, the record shows that, in June 2017, when Joseph Maziarz of the Arizona Attorney General's Office was assigned to handle Salazar's appeal, he sent a copy of Salazar's opening brief to the MCAO and requested that the Office review the issues raised in the brief and provide any comments that may assist in preparation of the State's response. (Doc. 204-1 at 239.)   This evidence supports that Lake and her Office were not completely uninvolved in the appellate proceedings, and, at the time, Lake still had an obligation under *Brady* to disclose impeachment evidence that had not yet been disclosed.

In light of these facts, when Lake learned of the PSB Report in January 2017, Lake had an ongoing *Brady* obligation to disclose the impeachment evidence, and her withholding of the material was a prosecutorial function intimately associated with the judicial process.   It is of no moment whether Lake's failure to disclose the PBS Report until December 2017 was willful or, as she asserts, inadvertent.   Either way, she is entitled to absolute immunity.   *See Imbler*, 424 U.S at 431 n.34.   Lake's Motion for Summary Judgment will be granted on this basis, and the Court need not address the qualified immunity argument.

## VI.   City Defendants' Motion for Summary Judgment

### A.   Fourteenth Amendment Claim Against Armour

#### 1.   Legal Standard

A criminal defendant's Fourteenth Amendment due process rights are violated "if the government fails to disclose evidence that is materially favorable to the accused." *Youngblood v. West Virginia*, 547 U.S. 867, 869 (2006) (citing *Brady v. Maryland*, 373 U.S. 83 (1963)).   The obligation under *Brady* "is the obligation of the government, not merely the obligation of the prosecutor." *United States v. Blanco*, 392 F.3d 382, 393 (9th Cir. 2004).   Police officers violate *Brady* if they "withhold[ ] evidence from prosecutors."

*Tennison v. City and Cnty. of San Francisco*, 570 F.3d 1078, 1088 (2009).  There are three elements for a § 1983 claim premised on a *Brady* violation against a police officer: "(1) the officer suppressed evidence that was favorable to the accused from the prosecutor and the defense, (2) the suppression harmed the accused, and (3) the officer acted with deliberate indifference to or reckless disregard for an accused's rights or for the truth in withholding evidence from prosecutors."  *Mellen v. Winn*, 900 F.3d 1085, 1096 (9th Cir. 2018) (quoting *Tennison*, 570 F.3d at 1087, 1089).

### 2. Discussion

#### a. Was the PSB Report Favorable to Salazar and was it Suppressed?

Whether evidence was favorable turns on whether it was material, and "[s]uppressed evidence is material if 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'"  *Mellen*, 900 F.3d at 1096–97 (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)).  "Impeachment evidence is especially likely to be material when it impugns the testimony of a witness who is critical to the prosecution's case."  *Silva v. Brown*, 416 F.3d 980, 987 (9th Cir. 2005); *see Carriger v. Stewart*, 132 F.3d 463, 480 (9th Cir.1997) (en banc) (holding that impeachment evidence was material where it pertained to "the prosecution's star witness").  "[A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal."  *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).  The touchstone is a "reasonable probability" of a different result, which is shown when the withholding or suppression of evidence "undermines confidence in the outcome of the trial."  *Id.*

City Defendants argue that there is no evidence supporting a reasonable probability that, had the PSB Report been disclosed prior to Salazar's trial, the outcome would have been any different.  (Doc. 210 at 18.)  City Defendants rely on Lake's testimony that, even if the PSB Report had been available before trial, she would have moved in limine to prevent some or all of it from being used to impeach Armour, and she would have

proceeded to trial.  (*Id.*)  As Salazar points out, the Ninth Circuit has explained that "if there were questions about the reliability of the exculpatory information, it was the prerogative of the defendant and [her] counsel—and not of the prosecution—to exercise judgment in determining whether the defendant should make use of it," because "[t]o allow otherwise would be to appoint the fox as henhouse guard."  (Doc. 227 at 18–19, citing *Tennison*, 570 F.3d at 1094 (quotation omitted).)  The fact that Lake would have moved to exclude the PSB Report suggests that it was material and would have put the case in a different light.  Moreover, it is not at all clear that the trial court would have granted a motion in limine to exclude any or all of the Report, leaving a question of fact whether there is a reasonable probability that its disclosure could have changed the outcome of Salazar's trial.

Significantly, Armour's trial testimony was that Salazar confessed to him that the crack cocaine was hers.  "As the Supreme Court has observed: 'A confession is like no other evidence.  Indeed, the [criminal] defendant's own confession is probably the most probative and damaging evidence that can be admitted against h[er].'"  *Silva*, 416 F.3d at 987 (citing *Hayes*, 399 F.3d at 986, and *Ariz. v. Fulminante*, 499 U.S. 279, 296 (1991)).  It follows that Armour's testimony was critical to the prosecution's case, and the PSB Report—which found that Armour falsely arrested an individual, provided a false report to a supervisor, and provided false information in an incident report—undermines Armour's credibility and would have impugned his testimony.  (Doc. 225-1 at 4–5, 15.)  Indeed, in granting post-conviction relief, the Superior Court referred to the government's failure to disclose *Brady* material with respect to Armour, "whose credibility was critical to the conviction."  (*See* supra n.6.)

Lastly, the facts show that, after the PSB Report was disclosed, Salazar's conviction was thrown out and, thereafter, the State chose not to retry her.  The inference can be made that this was because the PSB Report put the whole case in such a different light as to undermine confidence in a second conviction.  At the least, there is a question of fact whether the PSB Report was material.

As to whether the PSB Report was suppressed, the undisputed facts show that Armour was notified of the PSB investigation on January 28, 2016; he was provided a draft of the PSB Report on May 5, 2016; and he signed the Notice of Findings on June 27, 2016. (Doc. 208 ¶¶ 72, 85, 87.) Armour did not disclose the PSB Report to prosecutors prior to Salazar's August 2016 trial, or anytime thereafter.

City Defendants do not directly dispute that the PSB Report was suppressed; rather, they argue that Armour, himself, was not required to disclose the PSB investigation or Report to prosecutors prior to the August 2016 trial because (1) PPD's policy did not require disclosure to the MCAO until disciplinary proceedings were complete and the PPD had conducted its own preliminary *Brady* review; (2) it was the PPD, through its Professional Standards Bureau, that assumed responsibility for disclosure of *Brady* materials to prosecutors; and (3) Armour was under an admonition not to discuss the PBS investigation, including with prosecutors. (Doc. 210 at 17–18; Doc. 236 at 24–25; Doc. 208-3 at 21.)

City Defendants do not present any legal argument or cite any case law to support that a police officer's constitutional obligation under *Brady* to turn over evidence to prosecutors can be superseded by internal office policy. (*See id.*)[8] The duty under *Brady* extends to an individual police officer and requires him to turn over exculpatory or impeaching evidence to the prosecutor. *See Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006) ("a *Brady* suppression occurs when the government fails to turn over even evidence that is known only to police investigators and not to the prosecutor") (citation and

---

[8] Instead, City Defendants submit the declaration and expert report of Ken Wallentine, the Chief of Police in the West Jordan, Utah Police Department, who opines that Armour was not obligated to inform anyone of the investigation or its outcome because he was under a direct order not to, it was reasonable for PPD to have a policy that assigned disclosure duties to an internal agency rather than individual officers, and even if Armour was required to disclose potential *Brady* information, he was not required to do so until the disciplinary proceedings against him were completed after November 30, 2016. (Doc. 208-4 at 199–217.) These opinions simply mirror City Defendants' arguments and do not establish that police officers' obligations under *Brady* are superseded by office policy.

internal quotation omitted).  An individual officer who fails to do so can be individually liable for a *Brady* violation.  *Tennison*, 570 F.3d at 1088.

With respect to the admonition, which was issued upon Armour being notified of the investigation, City Defendants assert, without any legal support, that when the admonition is in effect, there is no obligation under *Brady* to disclose because there has not been a final conclusion regarding the allegations.  (Doc. 236 at 24–25.)  City Defendants explain that once there is a conclusion finding misconduct, the admonition is lifted.  (*Id.* at 25.)  City Defendants' own evidence establishes that the admonition on Armour was lifted as of June 30, 2016, when the PSB Report was "finalized," and Armour signed the Notice of Findings.  (Doc. 208 ¶¶ 87–89.)  This was more than six weeks before Salazar's trial, yet still, Armour did not disclose the Report to the prosecutor, nor did he ever disclose it thereafter.

In sum, when viewing the facts in the light most favorable to Salazar, Armour suppressed evidence favorable to Salazar.

### b.      Did the Suppression Harm Salazar?

Salazar spent 22 months in prison before she was finally released after untimely disclosure of the PSB Report.  The inference can be made that the State did not seek a retrial because the PSB Report impugned the testimony of its critical witness.  It follows that Salazar was deprived of a fair trial, and she may not have been convicted, or even tried, had the impeachment evidence been timely disclosed before the August 2016 trial date. There can be no dispute that the loss of liberty for 22 months constitutes significant harm.

### c.      Did Armour Act with Deliberate indifference or Reckless Disregard to Salazar's Rights?

"Whether a defendant acted with deliberate indifference or reckless disregard 'is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence.'"  *Mellen*, 900 F.3d at 1101 (quoting *Lemire v. Cal. Dep't of Corrs. & Rehab.*, 726 F.3d 1062, 1078 (9th Cir. 2013)).  Armour was the only witness to

testify that Salazar made a confession regarding ownership of the crack cocaine.  Given the substance of Armour's testimony, and his experience as a Phoenix Police Officer since 2006, the inference can be made that Armour knew his testimony was critical to Salazar's prosecution and conviction.  (*See* Doc. 208-1 at 75, Armour Decl. ¶ 1.)  *See Id.* at 1102 (in finding a question of fact as to whether the defendant officer acted with deliberate indifference or reckless disregard by withholding evidence from prosecutors, the court relied in part on the fact that the defendant was an experienced detective who had the training and experience to know the value of the withheld evidence).  Further, in his deposition, Armour admitted that information going to his dishonesty as an officer was critical to testimony he provides as a witness for the State, and he admitted that in criminal cases where he was testifying for the State, criminal defendants were "entitled to [the PSB Report] at some point."  (Doc. 225, Armour Dep. 133:9–134:1, 146:18–25.)  Nonetheless, Armour made a deliberate decision to withhold the PSB Report.  *See Tennison*, 570 F.3d at 1089 (as opposed to situations where an officer must take evasive actions and react quickly, "the decision whether to disclose or withhold exculpatory evidence is a situation in which 'actual deliberation is practical'") (citing and quoting *Osborn*, 546 F.3d at 1137, 1140).

On this record, a reasonable jury could find that Armour acted with deliberate indifference or reckless disregard to Salazar's due process rights when he failed to disclose the PSB Report to prosecutors.

### 3.    Qualified Immunity

#### a.    Legal Standard

Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In deciding if qualified immunity applies, the Court must determine: (1) whether the facts alleged show the defendant's conduct violated a constitutional right; and (2) whether that right was clearly established at the time of the violation.  *Pearson v. Callahan*, 555 U.S. 223, 230–

32, 235–36 (2009) (courts may address either prong first depending on the circumstances in the particular case).  In the qualified immunity analysis, the court must consider all disputed facts in the light most favorable to the nonmovant.  *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 946 (9th Cir. 2017).

For a right to be clearly established there does not have to be a case directly on point; however, "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2017)).  Clearly established law "must be particularized to the facts of the case," and "should not be defined at a high level of generality." *White*, 137 S. Ct. at 552 (quotation and citation omitted).  A right is clearly established when case law has been "earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017) (citing *White*, 137 S. Ct. at 551).

Once the right at issue is defined, the court must then "identify a case where an officer acting under similar circumstances as [the defendant] was held to have violated" that right. *Id.* If there is no such case, then the right was not clearly established. *See id.* at 1117–18.  "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal citations omitted).  "The Supreme Court has made clear that 'officials can still be on notice that their conduct violates established law even in novel factual circumstances.'" *Mattos*, 661 F.3d at 442 (quoting *Hope*, 536 U.S. at 741).

### b.    Discussion

The Court has already determined that there exists a question of fact whether Armour violated Salazar's Fourteenth Amendment rights.  Therefore, the qualified immunity question turns on the second prong—whether the right at issue was clearly established.

1   To support that the right at issue was clearly established, Salazar relies on *Carrillo*

2   *v. City of Los Angeles*, a case in which the plaintiff was convicted of murder, primarily

3   based on eyewitness testimony curated by the defendant officers.  798 F.3d 1210, 1214

4   (9th Cir. 2015.)  During his habeas proceeding, after almost twenty years in prison, the

5   plaintiff uncovered previously undisclosed handwritten notes taken by the defendant

6   officers during eyewitness interviews.  *Id.* at 1214–15.  These notes included discrepancies

7   about who an eyewitness identified as the shooter during a photo lineup, and they revealed

8   a possible alternative suspect to the crime.  *Id.* at 1215.  These handwritten notes were

9   never turned over to the prosecutors or the defense.  *Id.*  In granting the plaintiff's habeas

10  petition, the court concluded that the defendant officers' notes could have impeached the

11  eyewitnesses' credibility.  *Id.*  In the plaintiff's subsequent § 1983 action alleging that the

12  defendant officers withheld material, exculpatory evidence, the court rejected the

13  defendants' qualified immunity argument.  *Id.* 1224–26.  The Court found that "[b]ecause

14  it was clearly established by 1984 that police officers were bound by *Brady*, and that

15  evidence undermining the credibility of government witnesses fell within *Brady*'s ambit,

16  it would have been clear to any reasonable officer that the nondisclosure of this evidence

17  was unlawful."  *Id.* at 1226; *see Atkins v. Cnty. of Riverside*, 151 F. App'x 501, 507 (9th

18  Cir. 2005) ("as for the *Brady* claim, a police officer in 1988 should have been aware of his

19  obligation to not withhold exculpatory evidence").

20  *Carrillo* relied in part on *United States v. Gerard*, a 1974 case stating that "[t]he

21  basic principle is clear enough: the government is obliged to disclose pertinent material

22  evidence favorable to the defense, and this applies not only to matters of substance, but to

23  matters relating to the credibility of government witnesses."  *Carrillo*, 798 F.3d at 1224

24  (quoting 491 F.3d 1300, 1302 (9th Cir. 1974)).  Salazar also cites to *Barker v. Fleming*, a

25  2005 case stating that "it is well settled that evidence impeaching the testimony of a

26  government witness falls within the *Brady* rule."  (Doc. 227 at 22, quoting 423 F.3d 1085,

27  1095 (9th Cir. 2005).)

28

City Defendants attempt to distinguish *Carrillo* on the ground that the handwritten notes at issue there were part of the investigation file at the time of trial, whereas the PSB Report was from an administrative determination of sustained findings and not part of the criminal investigation file. (Doc. 236 at 15.) But the difference as to where the information was kept does not change the *type* of *Brady* evidence at issue; both the handwritten notes in *Carrillo* and the PSB Report in this case constituted "evidence undermining the credibility of government witnesses" and "evidence impeaching the testimony of a government witness." *Carrillo*, 798 F.3d at 1226; *Barker*, 423 F.3d at 1095. Thus, the PSB Report is the type of evidence that has long been held to fall within the *Brady* rule.

City Defendants contend Plaintiff cannot show that the right at issue was clearly established because she failed to cite any cases with the exact same facts as presented here, nor did she cite to cases involving impeachment evidence regarding a police officer. (Doc. 236 at 15.) But *Carrillo* explained that prior cases with identical factual scenarios are not necessary with a *Brady* claim because the right at issue is specific and clear for qualified immunity purposes. *Carrillo* explained that, unlike in the Fourth Amendment context, where a violation of rights is heavily fact specific and is dependent on the "violative nature of particular conduct," the right involved in a *Brady* violation "is, by its terms, significantly more specific than the 'extremely abstract' right of freedom from unreasonable searches and seizures." 798 F.3d at 1224. This is because "*Brady* defines the type of material the government is obligated to disclose concretely and specifically as favorable to the accused, either because it is exculpatory, or because it is impeaching." *Id.* (internal quotation omitted). Thus, "the contours of a [criminal] defendant's right to *Brady* material are focused and clear." *Id.* And it is well-established that the "government" obligated to disclose such material includes police officers. *Id.* at 1221–22; *see Kyles*, 514 U.S. at 438; *Tennison*, 570 F.3d at 1087; *Conley v. City and Cnty. of S.F.*, 2013 WL 5379376, at *32 (N.D. Cal. Sept. 24, 2013) ("it was 'clearly established' in the Ninth Circuit by 1994 that *Brady* imposed a duty to disclose on both law enforcement and prosecutors").

1    As stated, Armour testified that he knew information going to his dishonesty as an

2    officer was critical to his testimony in criminal cases and that criminal defendants were

3    entitled to the PSB Report. (Doc. 225, Armour Dep. 133:9–134:1, 146:18–25.)  This

4    evidence supports that a reasonable officer, in Armour's position, would have known that

5    withholding such evidence violates a criminal defendant's constitutional rights.  In

6    addition, the fact that there exists a specific *Brady* list of police officers who have engaged

7    in or been accused of misconduct or lying supports that impeachment evidence regarding

8    police officers is especially the type of evidence subject to the *Brady* rule. (*See* Doc. 208-

9    3 at 124, Yahner Decl. ¶¶ 3–4 (describing process for police officers to be placed on the

10   *Brady* list).)  As Plaintiff argues, because the PSB Report directly related to Armour's

11   credibility and misconduct, it should have been even more clear to Armour than the officers

12   in *Carrillo* (who withheld handwritten notes about witness interviews) that the evidence

13   needed to be disclosed to prosecutors. (Doc. 227 at 23.)

14   City Defendants argue that, under department policy, Armour was not required

15   himself to disclose *Brady* material and there is no case law establishing that Armour was

16   required to disclose the PSB Report at any particular point in time or in advance of

17   Salazar's trial. (Doc. 236 at 16–17.)  Like previous arguments, this does not go to the

18   specific right at issue, which was Salazar's specific and clear right to *Brady* material.

19   *Carrillo*, 798 F.3d at 1224.  This argument also implicates the first prong of the qualified

20   immunity analysis and whether Armour's failure to disclose the PSB Report violated

21   Salazar's constitutional rights, and there exist questions of fact on the constitutional prong.

22   Regardless, the Supreme Court has explained that the *Brady* requirement to disclose

23   evidence favorable to the accused is intended to ensure that a defendant receives a "fair

24   *trial*." *United States v. Bagley*, 473 U.S. 667, 675 (1985) (quoting *United States v. Agurs*,

25   427 U.S. 97, 108 (1976) (emphasis added).  Ninth Circuit precedent has established that,

26   under *Brady*, disclosure must be made "at a time when disclosure would be of value to the

27   accused," such that the defendant is not prejudiced by the delay. *United States v. Gordon*,

28   844 F.2d 1397, 1403 (9th Cir. 1988) (quoting *United States v. Davenport*, 753 F.2d 1460,

1462 (9th Cir. 1985)).   Here, Armour never made any disclosure, and the delayed disclosure by PPD came after Salazar's trial, conviction, and sentencing; thus, she was deprived of a fair trial and prejudiced by the delay.[9]

In short, the law regarding a police officer's obligation to turn over impeachment evidence to prosecutors was clearly established at the relevant time.   Accordingly, summary judgment based on qualified immunity is not appropriate.

For the above reasons, summary judgment will be denied as to the Fourteenth Amendment claim against Armour in his individual capacity.

### B.   *Monell* Claim Against City Defendants

#### 1.   Redundant Defendants

City Defendants argue, and Salazar does not dispute, that the official capacity claims against Police Chief Williams and retired Chief Yahner are equivalent to a suit against the entity, in this case, the City.   (Doc. 210 at 24; Doc. 227 at 26.)   "When both a municipal officer and a local government entity are named, and the officer is named only in an official capacity, the court may dismiss the officer as a redundant defendant."   *Ctr. for Bio-Ethical Reform, Inc. v. Los Angeles Cnty. Sheriff's Dep't*, 533 F.3d 780, 799 (9th Cir. 2008). Therefore, Williams and Yahner will be dismissed as redundant defendants, and the *Monell* claim against the City will be addressed.

#### 2.   Legal Standard

"[A] local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983."   *Connick*, 563 U.S. at 60.   To support a *Monell* claim for failure to train under § 1983, a plaintiff must allege facts demonstrating that the local government's failure to train amounts to "deliberate indifference to the rights of persons

---

[9] In arguing for qualified immunity, City Defendants assert that Salazar "does not dispute, and therefore concedes," that police officers are not obligated under *Brady* to disclose exculpatory evidence directly to criminal defendants; rather, *Brady* only obliges a police officer to disclose exculpatory evidence to the prosecutor.   (Doc. 236 at 18.)   This does not change the qualified immunity analysis because Salazar alleges, and the record supports, that Armour failed to disclose the PSB Report to the prosecutor.

with whom the [untrained employees] come into contact." *Connick*, 563 U.S. at 61 (citing *Canton*, 489 U.S. at 388).  Similarly, to properly allege a claim for failure to supervise, a plaintiff must allege facts demonstrating that the supervision was "sufficiently inadequate" to amount to "deliberate indifference." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011).

Deliberate indifference may be shown "if the need to train was obvious and the failure to do so made a violation of constitutional rights likely." *Canton*, 489 U.S. at 390. The plaintiff must allege facts to support that "in light of the duties assigned to specific officers or employees, the need for more or different training is obvious, and the inadequacy so likely to result in violations of constitutional rights, that the policy-makers . . . can reasonably be said to have been deliberately indifferent to the need." *Clement v. Gomez*, 298 F.3d 898, 905 (9th Cir. 2002).  It is "ordinarily necessary" to allege facts demonstrating a pattern of similar constitutional violations by untrained employees to demonstrate deliberate indifference for purposes of showing a claim for failure to train and supervise. *Connick*, 563 U.S. at 62.  By showing a pattern of similar violations, a plaintiff can establish that policymakers were on "actual or constructive notice that a particular omission in their training program causes employees to violate citizens' constitutional rights." *Id.*  Thus, a *Monell* claim generally must be based on more than "a single constitutional deprivation, a random act, or an isolated event." *Castro v. Cnty. of Los Angeles*, 797 F.3d 654, 671 (9th Cir. 2015).

A plaintiff may still prove a failure-to-train claim without showing a pattern of constitutional violations where a violation "may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Long v. Cnty. of L.A.*, 442 F.3d 1178, 1186 (9th Cir. 2006) (internal quotation marks and citation omitted).  In such instances, "failing to train could be so patently obvious that [an entity] could be liable under § 1983 without proof of a pre-existing pattern of violations." *Connick*, 563 F.3d at 63–64.  For example, in *City of Canton v. Harris*, the Court hypothesized that if a city knows that its police officers will be required to arrest fleeing

felons, and the city arms its officers with firearms to accomplish this task, "the need to train officers in the constitutional limitations on the use of deadly force can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights."  389 U.S. at 390 n.10.  A plaintiff may establish *Monell* liability under this route because the failure to train is itself the custom or policy giving rise to the constitutional injury.  *Long v. County of Los Angeles*, 442 F.3d 1178, 1186-87 (9th Cir. 2006).

A plaintiff alleging a policy of failure to train officers must show (1) she was deprived of a constitutional right; (2) the local government entity had a training policy that amounts to deliberate indifference to constitutional rights of persons with whom its officers are likely to come into contact; and (3) the plaintiff's constitutional injury would have been avoided had the local government unit properly trained those officers.  *Blankenhorn*, 485 F.3d at 484.

### 3.   Discussion

The Court has already determined that there exists a triable issue of fact whether Salazar was deprived of a constitutional right when *Brady* evidence was withheld by Armour.  Plaintiff also alleged that the City of Phoenix failed to adequately train and supervise employees regarding the production of *Brady* material and this failure resulted in the PSB Report being withheld from Salazar, which in turn resulted in a violation of Salazar's constitutional rights and wrongful imprisonment for 22 months. (Doc. 37 ¶¶ 145, 156.)

City Defendants argue that the PPD's disclosure of the PSB Report to the MCAO on December 28, 2016 satisfied the PPD's constitutional obligation under *Brady*. (Doc. 210 at 26.)  They submit that the timing of the disclosure—after the PSB investigation was finalized, and after the investigation was sent for a disciplinary review board hearing, and after the subsequent disciplinary and appeal process was completed—comported with the procedure PPD had always followed and the procedure acceptable to the MCAO. (*Id.*) City Defendants do not cite to any written procedure or policy that sets out this procedure

calling for disclosure of potential *Brady* material to the MCAO only after all the steps provided for in disciplinary proceedings have been completed. (*See* Doc. 208 ¶¶ 114, 120.) Nor do City Defendants cite to any written communication or memorandum from the MCAO confirming that the Office approved waiting to receive potential *Brady* material only after all disciplinary proceedings stemming from an adverse PSB report were completed. (*See id.*)

Meanwhile, Salazar presents evidence to support that in 2014, PPD was asked by the MCAO to submit reports of PSB investigations upon finalization of the report, not after disciplinary proceedings were completed. Salazar proffers a 2014 letter from the MCAO to the PPD, in which the MCAO requested that PPD "notify us of any adverse investigative findings in personnel investigations when such findings relate to the credibility of officers as witnesses in legal proceedings," and the letter listed examples of categories, such as findings of misconduct involving untruthfulness. (Doc. 225-2 at 20.) The letter encouraged the PPD to "disclose such materials in a timely fashion to ensure that the rights of defendants are protected." (*Id.*) There is no mention of disciplinary proceedings, nor is there any indication that disclosure need not occur until after an officer has appealed any disciplinary related to findings from a personnel investigation. (*See id.*)

City Defendants' own facts confirm that the PSB Report setting forth adverse investigative findings related to untruthfulness against Armour was finalized on June 27, 2016—six weeks before Salazar's trial; however, the PPD did not disclose the Report to the MCAO until December 28, 2016. (Doc. 208 87, 131–132.) A reasonable jury could find that PPD's withholding of this evidence for six months constituted a violation of Salazar's rights under *Brady*.

As to the second *Monell* element, Salazar argues that Fourteenth Amendment and *Brady* violations were a patently obvious consequence of the PPD's failure to provide adequate training and supervision on police officers' obligations under *Brady*. Salazar submits Armour's deposition testimony, in which he acknowledged that, if there was a PSB Report sustaining allegations that he falsified a police report, it would go to his integrity

and impact his reputation; however, when asked if had a duty to disclose that information, he responded "Disclose to whom?"  (Doc. 225-2 at 108, Armour Dep. 131:20–132:21.) When he was asked what his obligations as a police officer were to make sure that a prosecutor has all impeachment evidence available to her before he testified as a witness, Armour responded "I'm not certain."  (*Id.* 149:2–7.)  Armour's testimony supports that, even though he has been with the PPD since 2006, he was unfamiliar with what *Brady* required of police officers and to whom police officers were supposed to disclose *Brady* material.

The evidence suggests that Police Chief Williams herself was unfamiliar with *Brady* requirements.  In her deposition, Chief Williams could not identify the constitutional amendment *Brady* relies on in creating the right to exculpatory information, and she stated that she did not know the case law; she could state only that *Brady* "deals with honesty, integrity, and bias, moral turpitude, and those kinds of things." (Doc. 225-3, Williams Dep. 37:20–38:23.)  Chief Williams testified that, as chief of police, she is "not to be the subject matter expert on *Brady* lists"; that is left to someone in the MCAO.  (*Id.* 157:19–22, 158:7–9.)

More importantly, Chief Williams testified that she was not aware of any mandatory training modules about *Brady* materials that police officers are required to take annually; that she has not implemented any specific training requirements on *Brady* material for police officers; and that she does not know of any specific trainings involving *Brady* material.  (Doc. 225-3 at 32, Williams Dep. 117:4–8; 118:16–18, 119:2–6.)

The record indicates that the only information regarding *Brady* requirements provided to police officers was in the PPD's Operations Order 2.9, in a one-half page subsection titled "*Brady* Disclosure Procedures."  (Doc. 208-3 at 17.)  This section describes *Brady* and its progeny as imposing a requirement on prosecutors to disclose potentially exculpatory information.  (*Id.*)  This section explains that potential *Brady* material "may deal with issues of honesty, integrity, bias, and/or moral turpitude," and it states that it is the responsibility of all employees who may be potential witnesses to notify

the prosecutor immediately of their status if (1) "[t]he Department and/or the Maricopa County Attorney's Office have notified an employee that they have had material from the employee's file sent over for review as to whether their names should be added to the Law Enforcement Integrity Database" (*Brady* list) or (2) "[t]he employee is aware of potential exculpatory information that the Department is not." (*Id.*)

As Salazar points out, the first instruction requires disclosure to a prosecutor only *after* an officer has been notified that potential *Brady* information has been sent to the MCAO—that is, after the material has already been disclosed to the prosecutor's office. The second instruction effectively absolves an officer of his disclosure obligation if it is information the department already has. Indeed, City Defendants insist that Armour was not personally responsible for disclosing the PSB Report to anyone because, under PPD policy, disclosure to the MCAO was done by the Professional Standards Bureau, not individual officers. (Doc. 210 at 21–23.) As discussed, police officers can be personally liable for failing to disclose material, impeachment evidence, and an internal office policy cannot supersede the requirements under *Brady*.

In sum, the evidence shows that there is little, if any, training provided by the PPD regarding *Brady* requirements. Deposition testimony showing that a veteran police officer and the Chief of Police exhibit little understanding of officers' obligations under *Brady* supports that there is a lack of training about *Brady* requirements. Similarly, the fact that PPD withheld Armour's PSB Report for six months after it was finalized, and multiple Professional Standards Bureau staff members were aware of the *Brady* material during this time but did not disclose it, supports that members of PPD were acting pursuant to their training or lack thereof. *See Henry v. Cnty. of Shasta*, 132 F.3d 512, 521 (9th Cir. 1997) (finding a policy more likely where multiple officers were involved in the constitutional violation). The limited information PPD provided to police officers related to *Brady* issues was confusing and instructed them to disclose potential *Brady* information only after it was already disclosed, informed officers that they were not personally responsible for disclosures, or put officers under admonitions not to disclose potential *Brady* information.

1   Finally, Chief Williams testified that she is not aware of any PPD trainings on *Brady*
2   requirements.

3         Failure to properly train reaches a level of "deliberate indifference" where an entity
4   fails to train its employees "to handle recurring situations presenting an obvious potential"
5   for a civil rights violation. *Bd. of the County Comm'rs v. Brown*, 520 U.S. 397, 409 (1997)
6   (citing *City of Canton*, 489 U.S. at 390). The need for training police officers with respect
7   to the handling and disclosure of *Brady* material is evident given the constitutional right at
8   issue—a criminal defendant's due process right to a fair trial. Further, police officer
9   testimony on behalf of the State is a very common situation, making the need to train police
10   officers about *Brady* requirements related to impeachment evidence paramount. Most
11   police officers do not go to law school; thus, absent specific training, there would be no
12   way for police officers to obtain the legal knowledge necessary to apply constitutional law
13   principles, specifically, the principles outlined in *Brady*, and ensure that due process rights
14   of criminal defendants are not violated prior to criminal trials. *See Connick*, 563 U.S. at
15   63–64 (noting that the need for training police officers regarding the constitutional
16   constraints on the use of deadly force is obvious because absent training, there is no way
17   novice officers would obtain the legal knowledge they require).

18         When viewing the record in Salazar's favor, there are questions of fact whether the
19   PPD made a deliberate or conscious choice not to train officers about *Brady* requirements,
20   and whether the unconstitutional consequences of that failure to train are patently obvious.
21   If a jury finds in the affirmative on those two issues, the City may be found liable for
22   deliberate indifference under § 1983.

23         Lastly, it would not be unreasonable for a jury to conclude that Salazar's injury and
24   her 22-month confinement would have been avoided if PPD had implemented proper
25   training and supervision regarding police officers' obligations under *Brady*. *See*
26   *Blankenhorn*, 485 F.3d at 484.

27         Accordingly, summary judgment will be denied as to the *Monell* failure-to-train
28   claim against the City.

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is withdrawn as to Defendant Lake's Motion for Summary Judgment (Doc. 203) and City Defendants' Motion for Summary Judgment (Doc. 210).

(2)     Defendant Lake's Motion for Summary Judgment (Doc. 203) is **granted**.

(3)     City Defendants' Motion for Summary Judgment (Doc. 210) is **granted in part** and **denied in part** as follows:

(a)     the Motion is **granted** as to the official capacity claims against Defendant Williams and Yahner; and

(b)     the Motion is otherwise **denied**.

(4)     Lake, Williams, and Yahner are **dismissed** as Defendants.

(5)     The remaining claims are the Fourteenth Amendment claim against Defendant Armour in his individual capacity in Count One and the *Monell* failure-to-train claim against the City of Phoenix in Count Three.

(6)     Magistrate Judge Deborah M. Fine having been randomly drawn, this action is referred to Magistrate Judge Fine to conduct a settlement conference on Plaintiff's remaining claims.

(7)     Counsel for the parties must arrange to jointly call Magistrate Judge Fine's chambers at (602) 322-7630 within **14 days** of the date of this Order to schedule a date and time for the settlement conference.

Dated this 14th day of September, 2022.

_____
Susan R. Bolton
United States District Judge

Cc:  Magistrate Judge Fine